# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| American Dairy Queen Corporation,<br><br>Plaintiff,<br><br>v.<br><br>W.B. Mason Co., Inc.,<br><br>Defendant. | Case No. 18-cv-693 (SRN/ECW)<br><br>REDACTED for public access  6/10/21<br><br>**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE EXPERT TESTIMONY**<br><br>*Temporarily Filed Under Seal* |

Dean C. Eyler, Ashley M. Bennett Ewald, Molly Littman, Lathrop GPM LLP, 80 S. 8th St., Ste. 500, IDS Center, Minneapolis, MN 55402; Sheldon Howard Klein, Lathrop GPM LLP, 600 New Hampshire Ave., N.W., Ste. 700, Washington, D.C. 20037, for Plaintiff.

Jason C. Kravitz, Juliet DeFrancisco, Deborah Thaxter, Kathleen Ceglarski Burns, Leslie Hartford, Nixon Peabody LLP, Exchange Place, 53 State St., Boston, MA 02109; Thomas R. Johnson, Merchant & Gould, P.C., 150 S. 5th St., Ste. 2200, Minneapolis, MN 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the following summary judgment motions and motions to exclude expert opinions: (1) the Motion for Partial Summary Judgment filed by Plaintiff American Dairy Queen Corporation ("Dairy Queen") [Doc. No. 180]; (2) the Motion for Summary Judgment filed by Defendant W.B. Mason Co. ("W.B. Mason") [Doc. No. 182]; (3) Plaintiff's Motion to Exclude Surveys and Opinions from Defendant's Expert Sarah Butler [Doc. No. 133]; (4) Plaintiff's Motion to Exclude the Opinion, Report, and Testimony of Dr. Wayne D. Hoyer [Doc. No. 141]; (5) Defendant's Motion to Exclude

the Recognition Survey Conducted by E. Deborah Jay and Any Associated Opinions [Doc. No. 155]; and (6) Defendant's Motion to Exclude Expert Testimony of Erich Joachimsthaler [Doc. No. 172].

Based on a review of the files, submissions, and proceedings herein, and for the reasons stated below, the Court: (1) denies Plaintiff's Motion for Partial Summary Judgment; (2) denies Defendant's Motion for Summary Judgment; (3) denies Plaintiff's Motion to Exclude Surveys and Opinions from Defendant's Expert Sarah Butler; (4) denies Plaintiff's Motion to Exclude the Opinion, Report, and Testimony of Dr. Wayne D. Hoyer; (5) denies Defendant's Motion to Exclude the Recognition Survey Conducted by E. Deborah Jay and Any Associated Opinions; and (6) denies Defendant's Motion to Exclude Expert Testimony of Erich Joachimsthaler.

## I.     BACKGROUND

### A.     Dairy Queen's BLIZZARD® Treat

Plaintiff Dairy Queen, based in Edina, Minnesota, and its franchisees operate more than 7,000 quick-service restaurants in the United States, Canada, and other countries. (Kenny Decl. [Doc. No. 186] ¶ 2.)  Dairy Queen's BLIZZARD® treat, which consists of soft serve ice cream blended with fruit, nuts, candy pieces, and other flavorings, (Compl. [Doc. No. 1] ¶ 6), is a required "core menu item" at all Dairy Queen restaurants.  (Kenny Decl. ¶ 5.)

The BLIZZARD® treat is offered with a spoon, and servers often turn it upside down to demonstrate its thickness.  (*Id.*)  Currently, Dairy Queen serves its BLIZZARD® treat in a blue cup, with red, blue, tan, and white colors appearing on the logo:



(Compl. ¶ 7.)

Dairy Queen contends that it has used the BLIZZARD® mark continuously since 1946, when it applied the mark to "heavy bodied milkshakes," (*Id.* ¶ 8), and beginning in 1985, has offered the BLIZZARD® treat nationwide. (Eyler Decl. [Doc. No. 190], Ex. 1 (Pl.'s Supp'l Answers to Def.'s First Set of Interrogs.) at 4.) Dairy Queen holds four trademarks for "BLIZZARD®" and one for "THE ORIGINAL BLIZZARD ONLY AT DQ®," registered with the United States Patent and Trademark Office ("USPTO"). (*Id.* ¶ 70; Compl. ¶ 8.)

███████████████████████████████████████████

████████████████ (Eyler Decl., Ex. 30 (Glosemeyer Dep.) at 55; *id.*, Ex. 31 (BLIZZARD® Brand Strategy) at 5.) A former Dairy Queen executive attributed the product's success to the novel pairing of traditional vanilla soft serve ice cream with a wide variety of flavors and textures. (*Id.*, Ex. 2 (*The Cone with the Curl on Top: The Dairy Queen Story*) at ADQ0000915.) When Dairy Queen introduced the BLIZZARD® to the national market in 1985, Dairy Queen and its franchisees sold over 100 million BLIZZARD® treats. (*Id.*) █████████████████████

████████████████████████████████ (*Id.*, Ex. 31 (BLIZZARD®

Brand Strategy) at 5–7.)  By 2002, the BLIZZARD® was a half-billion dollar brand in

terms of sales, exceeding Stouffer's® Frozen Dinners, Maybelline® Color Cosmetics, and

Scott® Toilet Tissue.  (*Id.* at 9.)



(Eyler

Decl., Ex. 68 (Pl.'s Second Supp'l Answers to Def.'s First Set of Interrogs.) at 6–7.)

. (*Id.*)

(*Id.*)

Dairy Queen advertises the BLIZZARD® treat through the following channels:  (1)

national media; (2) local media; (3) production; and (4) point of purchase.  (Eyler Decl.,

Ex. 3 (Lammers Dep.) at 154; Kenny Decl. ¶¶ 6–9.)

(Eyler Decl.,

Ex. 3 (Lammers Dep.) at 156–57.)

(*Id.*, Ex. 4 (BLIZZARD® 2004–08

Nat'l  Ad.  Spend).)

(*Id.*,  Ex.  5  (BLIZZARD®  2011–20  Nat'l  Ad.

Expenditures).)

Dairy  Queen  participates  in  several  large-scale,  nationwide  BLIZZARD®

promotions, such as "Miracle Treat Day," in support of the Children's Miracle Network,

(Kenny Decl. ¶ 11), and  frequently launches BLIZZARD®-specific treats tied to new

4

movie releases. (Eyler Decl., Ex. 29 (Prod. Positioning Worksheet).)  It also maintains a BLIZZARD® Fan Club with approximately 4.4 million members, (*id.*, Ex. 24 (BLIZZARD® Fan Club Members by State)), and has garnered 12.6 million followers on social media platforms. (*Id.*, Ex. 79 (Social Media Screenshots).)

At a local level, Dairy Queen advertises its BLIZZARD® treat through television, radio, local sponsorship, and field marketing. (*Id.*, Ex. 1 (Pl.'s Supp'l Answers to Def.'s First Set of Interrogs.) at 17.)  For instance, it has promoted its BLIZZARD® treat at major and minor league baseball games, high school sports events, "Monster Jam" television spots, and at circus performances. (*Id.*) ███████████████████████████
███████████████████████████ (Eyler Decl., Exs. 10–11 (2004–09 BLIZZARD® Local Ad. Expenditures; 2009 BLIZZARD® Local Ad. Expenditures).)

███████████████████████████████████████████
███████ (*Id.*, Exs. 12–20, 32 (2010–19 BLIZZARD® Local Ad. Expenditures).)

██████████████████████████████████████████
███████████████████ (*Id.*, Ex. 6 (BLIZZARD® 2013–19 Prod. Costs).) ███████████████████████
███████████████████████████████████████████
████████ (*Id.*, Ex. 7 (Culver Dep. at 68–69).)

## B.   W.B. Mason's BLIZZARD Water

Defendant W.B. Mason, based in Brockton, Massachusetts, is a business-to-business retailer of office supplies, furniture, equipment, and consumables. (Burns Decl. [Doc. No. 194], Ex. 1 (Meehan Dep. at 178–80); Compl. ¶ 2.)  Among its products, W.B.

Mason sells BLIZZARD paper and water products. (*Id.*, Ex. 3 (Def.'s Answers to Pl.'s First Set of Interrogs. at Nos. 3, 6, 7).) Beginning in approximately 2003, W.B. Mason first used the BLIZZARD name, applying it to bright white copy paper that it sells under the W.B. Mason brand. (*Id.*, Ex. 1 (Meehan Dep. at 75–77; 90–96.) The CEO of W.B. Mason, Leo Meehan, testified that prior to this litigation, he had never seen the Dairy Queen BLIZZARD® product. (*Id.* at 48–49.)  Meehan also testified that he selected BLIZZARD as the name for the copy paper because it evoked the sensation of blinding brightness on a sunny day after a blizzard, when the snow is "so bright that it would almost hurt your eyes." (*Id.* at 91–92.) W.B. Mason uses its "standard" colors for BLIZZARD labeling, which are red, yellow, white, and blue. (*Id.*, Ex. 4 (Karb Dep.) at 38–39.) Shortly after its introduction to the market, the company's sales of BLIZZARD paper grew rapidly. (*Id.*, Ex. 1 (Meehan Dep.) at 93, 131–32; *id.*, Ex. 26 (Def.'s Responses to Pl.'s Second Set of Interrogs.) at No. 22.) In 2017, the company registered the trademarks BLIZZARD BLINDING WHITE COPY PAPER and BLINDING WHITE BLIZZARD 78 COPY PAPER with the USPTO.[1] (*Id.*, Ex. 9 (Kenny Dep.) at Exs. 57, 58; Ex. 3 (Def.'s Response to Pl.'s First Set of Interrogs.) at No. 3; Ex. 25 (Def.'s First & Second Supp'l Responses to Pl.'s First Set of Interrogs.) at No. 3.)

---

[1]    Although W.B. Mason's marks are registered trademarks, the Court does not use the registered trademark symbol, ®, here when referring to Defendant's marks. This is simply for the sake of clarity, to distinguish the Court's references to Dairy Queen's BLIZZARD® mark, which is the subject of this litigation.



(*Id.*, Ex. 1 (Meehan Dep.) at 61–67.)

(*Id.* at 65–67; 112–19.)

(*Id.* at 116–17, 120.)

(*Id.* at 118.)

(*Id.*)  In approximately 2010, W.B. Mason launched the WHO BUT W.B. MASON'S BLIZZARD SPRING WATER mark on its private label water products, selling it in five-gallon containers.  (*Id.*, Ex. 5 (Rogers Dep.) at 18; *id.*, Ex. 1 (Meehan Dep.) at 139–40.)  In approximately 2013 to 2014, W.B. Mason introduced its private-label BLIZZARD water in 8-ounce and 16-ounce bottles, sold in packs of 24 or 35.  (*Id.*, Ex. 1 (Meehan Dep.) at 154–61.)  Recently, W. B. Mason began selling boxed spring water and non-potable distilled water.  (*Id.* at 171–72; *id.*, Ex. 8 (Magee Dep.) at 10–11.)

Below are examples of the trade dress for W.B. Mason's BLIZZARD water, a BLIZZARD

water label, and BLIZZARD copy paper:





(Compl. ¶ 34; Def.'s Summ. J. Opp'n [Doc. No. 257] at 5.)

In 2015 and 2016, W.B. Mason filed applications with the USPTO to register two

marks for its private-label water: (1) WHO BUT W.B. MASON'S BLIZZARD SPRING

WATER; and (2) BLIZZARD SPRING WATER.  (Compl. ¶ 36.)   When Dairy Queen

became aware of Defendant's applications in approximately April 2017, it asked W.B.

Mason to withdraw them and to cease all use of the BLIZZARD brand. (*Id.* ¶ 38.) W.B.

Mason refused to do so, prompting Dairy Queen to file its opposition to Defendant's

trademark applications with the USPTO.  (*Id.*)

**C.   Lawsuit and the Instant Motions**

In March 2018, Dairy Queen filed this lawsuit against W.B. Mason.  It asserts the

following causes of action:  (1) federal trademark infringement (*id.*, Count I); (2) federal

unfair competition by false designation of origin (*id.*, Count II); (3) federal trademark

dilution (*id.*, Count III); (4) common law unfair competition under Minnesota law (*id.*,

Count IV); and (5) deceptive trade practices under Minnesota law (*id.*, Count V).

W.B. Mason denies any unlawful or actionable conduct, and asserts several defenses, including that its products present no likelihood of confusion or dilution. (Answer [Doc. No. 50].)

As noted, the parties have filed cross-motions for summary judgment, along with several motions to exclude expert witnesses. Plaintiff seeks partial summary judgment on its trademark dilution claim, asserting that the undisputed facts show that W.B. Mason's BLIZZARD spring water marks are likely to dilute Dairy Queen's BLIZZARD® mark. (Pl.'s Summ. J. Mem. [Doc. No. 183] at 1.)   Defendant moves for summary judgment on all of Plaintiff's claims, arguing that Dairy Queen cannot prove infringement and cannot prove trademark dilution because its mark is not famous and distinctive under the law and there is no likelihood of dilution. (Def.'s Summ. J. Mem. [Doc. No. 188] at 10–27; 27–47.) Further, Defendant argues that it is entitled to a determination that its conduct was not willful, and that Dairy Queen is not entitled to the disgorgement of W.B. Mason's profits. (*Id.* at 48–52.)

The parties have also filed cross-motions to exclude certain expert opinions and testimony. Dairy Queen moves to exclude two surveys and related opinions on the likelihood of confusion and the likelihood of dilution offered by defense expert Ms. Sarah Butler. (Pl.'s Mem. to Exclude Butler [Doc. No. 135] at 3–4.) It also seeks to exclude the testimony and opinions on third-party use of "blizzard" marks offered by defense expert Dr. Wayne Hoyer. (Pl.'s Mem. to Exclude Hoyer [Doc. No. 143] at 1–2.)

W.B. Mason moves to exclude the opinions offered by Plaintiff's expert Dr. Erich Joachimsthaler on the following topics: likelihood of confusion, similarity of the marks,

9

competitive proximity, risk for "misassociation," distinctiveness of Plaintiff's mark, third-party use, and poor quality and low awareness of Defendant's brand. (Def.'s Mem. to Exclude Joachimsthaler [Doc. No. 174] at 1–4.) In addition, W.B. Mason seeks to exclude the Recognition Survey conducted by Plaintiff's expert Dr. E. Deborah Jay. (Def.'s Mem. to Exclude Jay [Doc. No. 157] at 2.)

Because of the form of Plaintiff's requested relief in this lawsuit, and the agreement of the parties, this matter will be tried in a bench trial before the undersigned judge in the upcoming months.

## II.    DISCUSSION

### A.    Summary Judgment Motions

#### 1.    Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it may affect the outcome of the lawsuit." *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). And a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Although the moving party bears the burden of establishing the lack of a genuine

issue of fact, the party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

### 2.   Trademark Dilution

Dairy Queen and W.B. Mason have filed cross-motions for summary judgment on Dairy Queen's trademark dilution claim (Compl., Count III).   Dairy Queen maintains that it is entitled to summary judgment because its registered BLIZZARD® mark has been heavily used and advertised for decades, and is, therefore, famous. (Pl.'s Summ. J. Mem. at 21–30.)  In addition, it argues that W.B. Mason's use of BLIZZARD is likely to dilute Dairy Queen's mark. (*Id.* at 31–38.)  For its part, W.B. Mason argues the opposite—the Court should grant it summary judgment because Dairy Queen's mark is neither famous nor distinctive, and there is no likelihood of dilution. (Def.'s Summ. J. Mem. at 27–47; *see also* Def.'s Summ. J. Opp'n at 19–22.)

Under the Lanham Act, the owner of a famous and distinctive trademark may bring an action against an entity that uses the owner's mark or trade name in commerce, after the mark has become famous, in a way "that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely

confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1). This is a rigorous standard. *Everest Cap. Ltd. v. Everest Funds Mgmt., LLC*, 393 F.3d 755, 763 (8th Cir. 2005). "Dilution is a cause of action invented and reserved for a select class of marks—those marks with such powerful consumer associations that even non-competing uses can impinge their value." *Id.* (citing *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 875 (9th Cir. 1999)). A mark is "famous," for purposes of dilution, if it "is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A).

When determining whether the mark possesses a sufficient degree of recognition among the public, courts "may consider all relevant factors," including: (1) the duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; (2) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (3) the extent of actual recognition of the mark; and (4) whether the mark was registered. *Id.* § 1125(c)(2)(A)(i)-(iv).

In particular, Plaintiff alleges trademark dilution "by blurring," asserting that W.B. Mason's use and attempted registration of BLIZZARD SPRING WATER and WHO BUT W.B. MASON'S BLIZZARD SPRING WATER is likely to cause an association between those marks and Dairy Queen's BLIZZARD® marks that impairs the distinctiveness of the Dairy Queen marks. (Compl. ¶¶ 48, 55.) Dilution by blurring occurs when "consumers associate a famous mark that has traditionally identified the mark holder's goods with a new and different source." *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 832 (8th Cir. 1999) (citing *McCarthy*, § 27.40). Typically, dilution by blurring involves the use of

12

similar marks on dissimilar goods, *id.*, such as "DUPONT shoes, BUICK aspirin, and KODAK pianos." *Mosely v. V Secret Catalogue, Inc.*, 537 U.S. 418, 431 (2003) (citation omitted). To determine whether blurring has occurred, courts may consider "all relevant factors," including:   (1) the degree of similarity between the two marks; (2) the distinctiveness of the famous mark; (3) the exclusivity of the famous mark; (4) how recognizable the famous mark is; (5) the intent of the user of the allegedly diluting mark; and (6) the existence of any actual association between the famous mark and the allegedly diluting mark. 15 U.S.C. § 1125(c)(2)(B). These six factors provide a "starting point" for the Court's analysis, but the Court also considers whether the defendant's mark is likely to impair the distinctiveness of the famous mark. *Prairie Island Indian Cmty. v. Radisson Hotels Int'l, Inc.*, No. 20-cv-1234 (NEB/TNL), 2020 WL 7490034, at *4 (D. Minn. Dec. 21, 2020) (citing *Luigino's*, 170 F.3d at 832).

### a.   Parties' Positions

As to whether the BLIZZARD® mark is famous, Dairy Queen has submitted evidence showing extensive, nationwide advertising of its BLIZZARD® treat as well as a high volume of nationwide sales. (*See, e.g.*, Eyler Decl., Ex. 68 (Pl.'s Second Supp'l Answers to Def.'s First Set of Interrogs.) at 6–7; *id.*, Ex. 30 (Glosemeyer Dep.) at 55; *id.*, Ex. 31 (BLIZZARD® Brand Strategy) at 5.)   Furthermore, Dairy Queen holds five trademark registrations for variations of the BLIZZARD® mark. (*Id.* ¶ 70; Compl. ¶ 8.)

Dairy Queen has further submitted evidence showing that its BLIZZARD® treat is frequently mentioned in the media, noting, for example, 420 mentions in August 2006 for its Miracle Treat Day promotion, (Kenny Decl. ¶ 14; Eyler Decl., Ex. 80 (Aug. 2006

Clipping Report)), and over 217 mentions in March 2011. (Eyler Decl., Ex. 82 (Mar. 2011 Clipping Report).) Moreover, many media outlets have referred to the BLIZZARD® treat as "famous," "iconic," and "wildly popular." (*See, e.g., id.*, Exs. 36–41, 83 (News articles from MinnPost, Mashed.com, QSR Magazine, The Wall Street Journal, ABC.news.com/GMA, The Calhoun (GA) Times.)

Dairy Queen also contends that its brand studies demonstrate "near-universal awareness" of the BLIZZARD® brand, pointing to a 2008 study that it commissioned to better understand the BLIZZARD® treat customer. (*Id.*, Ex. 56 (Russell Research Study).) The study's researchers identified the BLIZZARD® brand as Dairy Queen's "strongest brand with near-universal awareness," and "the most unifying element across the DQ system." (*Id.* at 3.) Dairy Queen also conducted its own focus group study in 2008 to learn more about the potential for the BLIZZARD® brand. (*Id.*, Ex. 57 (2008 DQ Qualitative Study) at 4.) It found that the BLIZZARD® treat was "the leader [among competitors]— best in class quality and the choice for a rich, indulgent treat." (*Id.* at 9.) Also, since approximately 2012, Dairy Queen has measured consumer recall of its advertising campaigns. (Kenny Decl. ¶ 16.) These reports have found that consumers consistently recall ads focused on BLIZZARD® treats. (Eyler Decl., Ex. 60 (Nov. 2012 Consumer Brand Monitor Q3-2012) at 2.)

For this litigation, Dairy Queen also submits the report of its expert, Dr. E. Deborah Jay, who conducted her Recognition Survey in 2019, to determine the percentage of the general U.S. population who recognize the Dairy Queen BLIZZARD® mark. (Jay Decl. [Doc. No. 196], Ex. 1 (Jay BLIZZARD® Recognition Survey Report) at 1; *id.*, Ex. 2 (Jay

Supp'l Report) at 1.) ████████████████████████████████████

████████████████████████████████████████████ (Jay

Decl., Ex. 1 (Jay BLIZZARD® Recognition Survey Report) at 1, 4.)  She opines that this

level of recognition "strongly supports the conclusion that the BLIZZARD® mark is

famous among the general consuming public in the United States." (*Id.* at 4–5.)

W.B. Mason does not dispute that Dairy's Queen's BLIZZARD® is "a well-known

mark within the market for frozen desserts," but argues that such recognition is insufficient

to establish trademark dilution, because there is no "unique and distinctive link" between

BLIZZARD® and Dairy Queen. (Def.'s Summ. J. Mem. at 32; Def.'s Summ. J. Opp'n at

23–24.)  It contends that the word "blizzard" is also associated with the goods and services

of numerous third parties, including entities with federal registrations for their marks such

as BLIZZARD Sport, BLIZZARD Lighting, BLIZZARD Snow Plows, and BLIZZARD

Entertainment. (*Id.*; Burns Decl., Exs. 11–13, 35 (Exs. from Third-Party Rule 30(b)(6)

deps.).)

In addition, W.B. Mason submits the opinion of its expert, Dr. Wayne Hoyer, who

examined third-party use of other blizzard marks.  Dr. Hoyer states that "[d]ue to the

'crowded field' for the brand name 'Blizzard,' it is highly unlikely that any one company

using this brand name has been or is able to develop distinct and strong association in the

minds of consumers and potential customers for its brand name." (Burns Decl., Ex. 42

(Hoyer Report) ¶ 20.)  W.B. Mason also moves to exclude Dr. Jay's survey, arguing that it

was not properly conducted because Dr. Jay informed respondents that the survey asked

about ice cream and frozen treats, rather than asking whether the respondents uniquely

associated the word "blizzard" with Dairy Queen's ice cream or frozen treats. (*See* Def.'s Summ. J. Mem. at 39–40.)  In addition, Defendant asserts that much of Dairy Queen's evidence of BLIZZARD® "recognition" post-dates 2003—the year in which W.B. Mason first began using BLIZZARD with respect to its paper—and therefore renders much of Plaintiff's evidence of fame irrelevant. (Def.'s Summ. J. Opp'n at 33.)  In response to Dr. Jay's Recognition Survey, W.B. Mason submits the opinion of its expert Sarah Butler, who conducted a "blizzard" word association survey, asking respondents a series of four different questions, including "what, if anything, does BLIZZARD call to mind or make you think of?"  (Hartford Decl. [Doc. No. 230], Ex. A (Butler Report) ¶¶ 45–56.)  ▮

�as

▭

(*Id.* ¶ 50.)

Further, W.B. Mason argues that Dairy Queen's dilution claim fails because no reasonable fact finder could conclude that its WHO BUT W.B. MASON BLIZZARD SPRING WATER is likely to impair the distinctiveness of Dairy Queen's mark. (Def.'s Summ. J. Mem. at 40–48.)  Specifically, W.B. Mason asserts that the marks are dissimilar, Dairy Queen's mark is not distinctive because its use is not substantially exclusive, there is no evidence of actual association, W.B. Mason did not intend to create an association with Dairy Queen, and Dairy Queen has only presented evidence of recognition in a niche market. (*Id.*)

b.     **Analysis**

As the parties' competing evidence highlights, disputed issues of material fact preclude summary judgment on Plaintiff's trademark dilution claim.

As to whether the BLIZZARD® treat mark is "famous" within the meaning of the trademark dilution statute, Dairy Queen has demonstrated that it satisfies some of the non-exclusive factors enumerated in the Lanham Act, 15 U.S.C. § 1125(c)(2)(A)(i)–(iv). In particular, it has submitted undisputed evidence of extensive, nationwide advertising of its BLIZZARD® treat and a high volume of nationwide sales, and it holds five trademark registrations for variations of the BLIZZARD® mark.

For its part, W.B. Mason has submitted evidence showing that it did not intend to create an association with Dairy Queen through the use of its BLIZZARD spring water. The evidence in the record shows that W.B. Mason's CEO, Leo Meehan, originally selected the BLIZZARD name in approximately 2003 for use with the company's bright white copy paper. (Burns Decl., Ex. 1 (Meehan Dep.) at 77.) ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Id. at 110–11.)
Furthermore, Meehan testified that he had never heard of Dairy Queen's BLIZZARD® treat before 2017, when Dairy Queen first objected to W.B. Mason's use of the mark, and he had never visited a Dairy Queen restaurant. (Id. at 46–47.) Dairy Queen effectively concedes the lack of evidence of intent, but argues that Defendant "is aware of its harmful diluting activity and has doubled down by expanding its uses, geographic scope, and sales." (Pl.'s Summ. J. Mem. at 38.) However, Dairy Queen submits no authority supporting the

notion that such recent "awareness" demonstrates W.B. Mason's intent to trade on Dairy Queen's reputation.

The Court declines to rule on the issue of intent at this time, but notes that the record evidence of intent is weak, and Dairy Queen will need to present legal authority to rely on any post-notice evidence supporting intent at trial.

Disputed issues of material fact also remain regarding other factors, including the extent of actual recognition of the mark. The Court declines to exclude the opinions related to consumer recognition offered by Plaintiff's expert, Dr. Jay, and Defendant's experts, Dr. Hoyer and Ms. Butler, addressed in greater detail below, who offer competing opinions regarding the extent of actual recognition of the BLIZZARD® mark. The Court also finds that fact questions remain on issues such as the degree of similarity between the parties' marks, the degree of recognition of the famous mark, and the exclusivity of the famous mark, among other things. *See* 15 U.S.C. § 1125(c)(2)(B)(i)–(vi). Accordingly, the Court will resolve Plaintiff's trademark dilution claim at trial.

### 3. Trademark Infringement

As noted, Dairy Queen alleges that W.B. Mason is infringing its registered BLIZZARD® marks in violation of the Lanham Act, 15 U.S.C. §§ 1114(1)(a) & 1125(a), Minnesota common law on unfair competition, and the Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.44. (Compl., Counts I–II, IV–V.) W.B. Mason moves for summary judgment on all of Plaintiff's claims. (See Def.'s Proposed Order [Doc. No. 210] at 1.)

"To prove a trademark infringement claim, a plaintiff must show that it has a valid, protectible mark and that there is a likelihood of confusion between its mark and the defendant's mark." *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 569 F.3d 383, 389 (8th Cir. 2009) (citation omitted). In its summary judgment motion, W.B. Mason does not appear to challenge the first element and instead focuses on the second. It argues that Dairy Queen has not raised a genuine factual dispute regarding the likelihood of confusion between the parties' marks. (Def.'s Summ. J. Mem. at 10–27.)

Courts within the Eighth Circuit consider a number of non-exclusive factors to address the "core inquiry" for the likelihood of confusion, i.e., "whether the relevant average consumers for a product or service are likely to be confused as to the source of a product or service or as to an affiliation between sources based on a defendant's use." *Select Comfort Corp. v. Baxter*, __ F.3d __, , at *4 (8th Cir. May 11, 2021) (citing *Anheuser-Busch, Inc. v. Balducci Publ'ns*, , 774 (8th Cir. 1994)). As initially articulated in *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980), the factors include: "1) the strength of the plaintiff's mark; 2) the similarity between the plaintiff's and defendant's marks; 3) the degree to which the allegedly infringing product competes with the plaintiff's goods; 4) the alleged infringer's intent to confuse the public; 5) the degree of care reasonably expected of potential customers, and 6) evidence of actual confusion." *Davis v. Walt Disney Co.*, 430 F.3d 901, 903 (8th Cir. 2005). No single factor is determinative, and courts must analyze each factor. *Select Comfort*, 2021 WL 1883314, at *4; *Insty*Bit, Inc. v. Poly-Tech Indus., Inc.*, 95 F.3d 663, 670 (8th Cir. 1996). Application of the factors is "a highly fact-intensive inquiry both as to the assessment of the evidence concerning

each factor and as to the overall synthesis of factors and the evidence." *Select Comfort*, 2021 WL 1883314, at *4. And more generally, the assessment of the likelihood of confusion is typically a question of fact. *SquirtCo.*, 628 F.2d at 1091.

As noted earlier, in addition to Plaintiff's federal trademark infringement claims, it also asserts state law infringement-related claims for common law unfair competition (Compl., Count IV), and deceptive trade practices in violation of Minn. Stat. § 325D.44 (*id.*, Count V). Because all of Dairy Queen's infringement claims require the same analysis of the likelihood of confusion, including Counts IV and V, (*see* Compl. ¶¶ 65, 65), the Court's analysis of this element with respect to the federal claims applies equally to the state law claims. *DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 935 (8th Cir. 2003) (finding state and federal trademark infringement claims were "coextensive" and subject to the same analysis, negating need to discuss state law claims independently); *see also Prairie Island*, 2020 WL 7490034, at *3 (finding analysis of Lanham Act dilution claims was identical to analysis of state law dilution claims); *Med. Graphics Corp. v. SensorMedics Corp.*, 872 F. Supp. 643, 649 (D. Minn. 1994) (noting that same analysis of false advertising claim under the Lanham Act applied to false advertising claim under the Minnesota Deceptive Trade Practices Act, as the state law claim mirrored the federal claim).

### 1.    The Strength of Dairy Queen's Mark

The strength of a trademark is measured by both its conceptual strength and its commercial strength in the marketplace. *Lovely Skin, Inc. v. Ishtar Skin Care Prods., LLC*, 745 F.3d 877, 888 (8th Cir. 2014). The conceptual strength of a trademark depends on

whether the mark is (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful. *Cellular Sales, Inc. v. Mackay*, 942 F.2d 483, 485 (8th Cir. 1991) (citation omitted). The degree of protection afforded a trademark varies based on which of these categories apply. "An arbitrary or fanciful trademark is the strongest type of mark and is afforded the highest level of protection," a generic mark "merits no trademark protection," and "[s]uggestive and descriptive marks fall somewhere in between." *Duluth News-Trib., a Div. of Nw. Publ'ns, Inc. v. Mesabi Pub. Co.*, 84 F.3d 1093, 1096 (8th Cir. 1996) (citations omitted).

Dairy Queen contends that its BLIZZARD® mark is "at least suggestive, and therefore inherently distinctive and conceptually strong." (Pl.'s Summ. J. Opp'n [Doc. No. 256] at 41.) W.B. Mason maintains that, at best, Dairy Queen's marks are suggestive and deserving of "some protection." (Def.'s Summ. J. Mem. at 26.)

A term is suggestive if it requires consumers' imagination and reasoning to reach a conclusion as to the nature of the goods. *Roederer v. J. Garcia Carrion, S.A.*, 732 F. Supp. 2d 836, 866 (D. Minn. 2010) (citations omitted). The Court agrees with the parties that Dairy Queen's BLIZZARD® mark is suggestive, and is entitled to a degree of protection, but the degree of protection is indeterminate at this time.

Dairy Queen's BLIZZARD® mark is not an arbitrary mark that consists of words in common usage that do not suggest or describe any quality, ingredient, or characteristic of the goods to which they apply. *Id.* (citing *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 464 (4th Cir. 1996)). Rather, Dairy Queen's BLIZZARD® mark suggests the cold, diffuse characteristics of the product. *See id.* Nor is it merely a descriptive mark that conveys an "immediate idea of the ingredients, qualities or characteristics of the goods,"

21

like the term "Frosty Treats." *Frosty Treats Inc. v. Sony Computer Ent. Am. Inc.*, 426 F.3d 1001, 1005 (8th Cir. 2005). In comparison, the Eighth Circuit has found that the term "Frosty Treats" conveys an "immediate idea of the qualities and characteristics of the goods" in question, i.e., frozen desserts sold out of ice cream trucks. *Id.* But the BLIZZARD® mark requires imagination and reasoning by consumers to make the connection between the cold connotations of the word "blizzard" and Dairy Queen's product. *See also In re Tricots Canada U.S., Inc.*, No. 455, 1998 WL 333386, at *4 (TTAB June 19, 1998) (finding that BLIZZARD has "suggestive significance" in connection with thermal socks).

As noted, a trademark's commercial value, in addition to its conceptual strength, is also relevant to the overall strength of the mark. *Zerorez Franchising Sys., Inc. v. Distinctive Cleaning, Inc.*, 103 F. Supp. 3d 1032, 1042 (D. Minn. 2015). "In the likelihood of confusion context, commercial strength is based on the 'public recognition and renown' of the mark as shown by the amount of advertising, sales volume, features and reviews in publications, and survey evidence." *Id.* (collecting cases). Dairy Queen argues that its mark is commercially strong, as shown by high sales figures, high advertising expenditures, and a high level of public recognition. (Pl.'s Summ. J. Opp'n at 41.) Moreover, Dairy Queen offers the expert opinion of Dr. Joachimsthaler, who analyzed the BLIZZARD® and Dairy Queen brands, concluding that Dairy Queen is a "strong brand," and the brand's "essence of joy, wholesomeness and authenticity is embodied by its unique product, the BLIZZARD® treat." (Joachimsthaler Report [Doc. No. 191] ¶ 12(c).)

However, W.B. Mason points to several third-party blizzard trademarks that could weaken the strength of Plaintiff's mark. (Def.'s Summ. J. Mem. at 25–27) (citing Burns Decl., Exs. 11–13, 35 (exhibits from depositions of third-party Rule 30(b)(6) witnesses).) "[E]vidence of third party usage of similar marks on similar goods is admissible and relevant to show that the mark is relatively weak and entitled to a narrower scope of protection." *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626–27 (8th Cir. 1987). As noted earlier, W.B. Mason identifies several other federally registered blizzard marks, including BLIZZARD Sport, BLIZZARD Lighting, BLIZZARD Snow Plows, and BLIZZARD Entertainment. (Def.'s Summ. J. Mem. at 25–26.) But Dairy Queen argues that these marks are irrelevant because they "are entirely unrelated to Dairy Queen's sale of food and beverages, restaurant services, and the like." (Pl.'s Summ. J. Opp'n at 42.) Indeed, some courts have given little weight to third-party marks unrelated to the specific product in question. *See Advantus Capital Mgmt., Inc. v. Aetna, Inc.*, No. 06-cv-2855 (JMR/FLN), 2006 WL 2916840, at *2 (D. Minn. Oct. 11, 2006) ("Third-party marks which are used to promote 'entirely unrelated products' are of minimal relevance); *J&B Wholesale Distrib., Inc. v. Redux Beverages, LLC*, 621 F. Supp. 2d 678, 685 (D. Minn. 2007) (giving little weight to third-party uses of mark on unrelated products).

W.B. Mason maintains, however, that a "crowded field" of "blizzard" products, which includes BLIZZARD Wines, BLIZZARD Peanut Butter, and BLIZZARD Beer Systems, (Burns Decl., Ex. 42 (Hoyer Report) ¶ 19; *id.*, Ex. 30 (BLIZZARD Wines R. 30(b)(6) Dep.) at 9; *id.*, Ex. 31 (Saratoga Peanut Butter R. 30(b)(6) Dep.) at 7–10), weakens the strength of Dairy Queen's mark. (Def.'s Summ. J. Mem. at 26–27.)

The Court finds that while Dairy Queen's trademark is suggestive, the disputed issues of material fact surrounding the strength of the mark—particularly regarding the impact of its commercial strength—preclude summary judgment.

### 2. The Similarity Between the Parties' Marks

The similarity between the parties' marks is another factor that courts consider when evaluating the likelihood of confusion. *Davis*, <u>430 F.3d at 903</u>. However, "[t]he use of identical, even dominant, words in common does not automatically mean that two marks are similar." *Sensient Tech. Corp. v. SensoryEffects Flavor Co.*, <u>613 F.3d 754, 764</u> (8th Cir. 2010) (citing *Gen. Mills*, <u>824 F.2d at 627</u>). Courts "must look to the overall impression created by the marks, not merely compare individual features," and "may consider the marks' visual, aural, and definitional attributes and compare the trade dress of the products in determining whether the total effect conveyed by the two marks is confusingly similar." *Luigino's*, <u>170 F.3d at 830</u> (citation omitted). In addition, courts may take into account the "nature of the purchasing process." *Sensient*, <u>613 F.3d at 765</u>.

W.B. Mason argues that the parties' marks convey fundamentally different overall impressions, as evidenced by the products' packaging. (Def.'s Summ. J. Mem. at 13.) It notes that both parties' house marks are prominently featured on their respective labels, which, it contends, clearly identify the different sources of the products. (*Id.*) Moreover, W.B. Mason asserts that its BLIZZARD mark is always secondary to the W.B. Mason house mark, WHO BUT W.B. MASON'S BLIZZARD SPRING WATER. (Burns Decl., Ex. 1 (Meehan Dep.) at 17–22).) Further, W.B. Mason distinguishes the nature of the

purchasing process between the parties' products, stating that its BLIZZARD water can only be purchased directly from W.B. Mason. (*Id.* at 107.)

In response, Dairy Queen contends that the parties' marks are similar, in that BLIZZARD is the dominant word, the packaging and logos involve the same red, white, and blue color scheme, including snow elements, and the BLIZZARD mark is prominently displayed across the parties' respective labels in large, sharp, all-caps lettering. (Pl.'s Summ. J. Opp'n at 44–45.) Dairy Queen's branding expert, Dr. Joachimsthaler, opines that W.B. Mason uses a "similar color palette and style" of branding, making it "likely that in passing moments of interaction with [Defendant's] product, consumers mistake[] it to bear the same symbol as Dairy Queen's BLIZZARD® treat, or otherwise wrongly associate it with Dairy Queen." (Joachimsthaler Report ¶ 68.)   In addition, Dairy Queen argues that the use of a house mark does not necessarily eliminate the likelihood of consumer confusion, particularly because "W.B. Mason's use of the BLIZZARD  mark completely drowns out [the] W.B. Mason house mark." (Pl.'s Summ. J. Opp'n at 45.)

The Court finds that disputed issues of material fact preclude a finding on summary judgment with respect to the similarity of the marks.  It is true that both products use the BLIZZARD mark and a somewhat similar color scheme and style in their packaging.






(Compl. ¶ 34.)  However, as Defendant notes, the parties also display their respective house marks on their packaging.  The use of house marks in a sufficiently prominent manner may allow consumers to distinguish between two products, *Gen. Mills*, 824 F.2d at 627, and house marks are one factor to consider in the analysis of a likelihood of confusion.  *See Woodroast Sys., Inc. v. Restaurants Unlimited, Inc.*, 793 F. Supp. 906, 914 n.14 (D. Minn. 1992).

As the parties' competing arguments and evidence demonstrates, resolution of the similarity-of-the-marks factor involves many disputed issues of material fact.  In its role as the fact finder at trial, the Court will consider all of the parties' evidence and evaluate the overall similarities of the impression created by the marks.

### 3.      Competition Between the Plaintiffs' Products

As to the third factor, the Court analyzes the degree of competition between the products.  *Davis*, 430 F.3d at 903.  "If the two companies' products are closely related, confusion among customers is more likely." *Id.* at 904.  Where the two products are wholly unrelated, this factor weighs against finding a likelihood of confusion.  *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1056 (8th Cir. 2005).  However, "[a] showing of direct competition . . . is not required because this factor requires a broader examination of the products' relationship in the market." *Eniva Corp. v. Global Water Sols., Inc.*, 440 F. Supp. 2d 1042, 1050 (D. Minn. 2006).

W.B. Mason argues that the products in question are unrelated, (Def.'s Summ. J. Mem. at 16; Def.'s Reply [Doc. No. 268] at 10), and points to the testimony of Dairy Queen's Rule 30(b)(6) witness, Kelly Kenny, who stated that W.B. Mason is not Dairy

Queen's direct competitor. (Burns Decl., Ex. 9 (Kenny Dep.) at 473.)  Also, W.B. Mason asserts that the parties' products are marketed, distributed, and sold through "fundamentally different channels," with Dairy Queen's BLIZZARD® sold only at Dairy Queen restaurants, and W.B. Mason's BLIZZARD spring water sold and distributed by its employees to corporate accounts or through the company's website and catalog. (*Id.*, Ex. 1 (Meehan Dep.) at 107, 179–80; *id.*, Ex. 8 (Magee Dep.) at 107–09; *id.*, Ex. 9 (Kenny Dep.) at 141–44.)  In addition, Defendant contends that the products are marketed and sold for different purposes, with Dairy Queen's BLIZZARD® sold as an indulgent treat, and W.B. Mason's water sold in bulk to businesses as part of its break room line. (*Id.*, Ex. 1 (Meehan Dep.) at 63, 179; *id.*, Ex. 3 (Def.'s Responses to Pl.'s First Set of Interrogs.) at Nos. 7, 13; *id.*, Ex. 8 (Magee Dep.) at 107.)

However, Dairy Queen maintains that the products are related such that consumers will likely draw a connection between the two sources, leading to a likelihood of confusion, and offers Dr. Joachimsthaler's opinion in this regard. (Pl.'s Summ. J. Opp'n at 46–47) (citing Joachimsthaler Report ¶¶ 79, 110).  Confusion is likely, Dairy Queen contends, because Dairy Queen provides water to customers in BLIZZARD® branded cups, and offers bottled water as a core menu item at all of its restaurants in the United States. (*Id.* at 47.)  Also, Dairy Queen asserts that W.B. Mason sells BLIZZARD water to restaurants and ice cream shops, which then re-sell it to their customers. (*Id.*)  It further notes that W.B. Mason has distributed at least one flyer that advertised and offered BLIZZARD water for sale, targeting products that W.B. Mason believes ice cream shops might need. (Eyler Decl., Ex. 74 (W.B. Mason Ice Cream Flyer).)

These disputed issues of material fact, and others, preclude a ruling on the question of competitive proximity at this time. As noted, Dairy Queen points to evidence in the record that may show relatedness between the products, while W.B. Mason highlights the fact that the products do not directly compete, and notes that the parties utilize different distribution methods. Because of these factual issues and others, the Court will weigh the evidence at trial to determine whether the factor of competitive proximity favors Plaintiff or Defendant.

### 4.     Intent to Confuse the Public

The fourth factor in assessing the likelihood of confusion is whether the alleged infringer intended to pass off its goods as the trademark owner's goods. *Davis*, 430 F.3d at 903. Although intent is not a prima facie element of a trademark infringement claim, intent "is relevant because it demonstrates the junior user's true opinion as to the dispositive issue of whether confusion is likely." *Roederer*, 732 F. Supp. 3d at 871 (citing *Kemp*, 398 F.3d at 1057); *see also Davis*, 430 F.3d at 904 (stating that while "proof of bad intent is not required for success" in a trademark infringement claim, "the absence of such intent is a factor to be considered.").

W.B. Mason argues that no record evidence suggests that it intended to confuse customers with its use of the BLIZZARD mark. (Def.'s Summ. J. Mem. at 22.) In response, Dairy Queen states that a lack of intent does not negate a finding of infringement, and that W.B. Mason acted carelessly when it failed to determine whether the BLIZZARD mark was available. (Pl.'s Summ. J. Opp'n at 49.) In addition, it argues that W.B. Mason

28

has "scrubbed" references to the BLIZZARD brand from its ice cream flyers and website, suggesting that W.B. Mason knows that its product is likely to cause confusion. (*Id.*)

As with Plaintiff's dilution by blurring claim, discussed earlier, the record evidence of intent is weak, but the Court declines to rule on this factor at this time. It will consider the parties' arguments regarding any intent-related evidence in motions in limine or at trial.

### 5.   Consumers' Degree of Care

In the likelihood-of-confusion analysis, the fifth factor that the Court considers is the degree of care reasonably expected of potential customers. *Davis*, 430 F.3d at 903. This factor is analyzed from the perspective of "the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Gen. Mills*, 824 F.2d at 627. As a general matter, "the greater the cost of the product or service, the more time and effort consumers are expected to expend when making decisions, and therefore the likelihood of confusion decreases." *Mars Musical Adventures, Inc. v. Mars, Inc.*, 159 F. Supp. 2d 1146, 1153 (D. Minn. 2001); *see also Kibler v. Hall*, , 1080 (2016) (observing that when consumers exercise caution in purchasing items, they are less likely to confuse their origins, such as "when consumers have expertise in the items and when the items are particularly expensive."). However, other factors, such as the defendant's distribution methods, may affect the consumers' degree of care, even when the individual product is not expensive. *See, e.g., ZW USA, Inc. v. PWD Sys., LLC*, 889 F.3d 441, 447–48 (8th Cir. 2018) (finding fact that parties sold their respective low-cost products on different websites under different trade names strongly cut against a likelihood of confusion); *Duluth News-Tribune*, 84 F.3d

at 1099 (rejecting argument that consumers exercised minimal care when purchasing newspapers, because it "ignore[d] the reality of defendant's distribution methods," in which 92% of the alleging infringing products were sold via subscriptions, which implicated a greater degree of consumer knowledge).

W.B. Mason contends that ordinary purchasers of its products are "sophisticated buyers of office supplies likely to exercise a high degree of care." (Def.'s Summ. J. Mem. at 24.) It contends that the Butler Association Survey (*see* Burns Decl., Ex. 27 (Butler Report) ¶¶ 39–56) confirms its position that professional office buyers, who place orders through the W.B. Mason website or catalog, or with W.B. Mason's salespeople, are extremely unlikely to confuse W.B. Mason's BLIZZARD water products with BLIZZARD® desserts sold at Dairy Queen restaurants, "particularly given the prominence of W.B. Mason's house mark in all of these distribution channels." (*Id.*) As to this last point, W.B. Mason notes that Dairy Queen's own rebuttal marketing expert, David Stewart, observed that W.B. Mason's website contains numerous "cues" that "signal, like a flashing neon sign, the source of the product." (Burns Decl., Ex. 28 (Stewart Rebuttal Report) ¶ 47.)

In opposition, Dairy Queen first asserts that multiple types of confusion are likely—sponsorship/affiliation confusion, post-sale confusion, and initial interest confusion—and W.B. Mason fails to address these different forms. (Pl's Summ. J. Opp'n at 37-40.) Dairy Queen argues that ordinary consumers of W.B. Mason's products are likely to be confused by Defendant's mark, noting that it is a low-priced item to which W.B. Mason's customers attach no brand loyalty. (*Id.* at 53–54) (citing Eyler Opp'n Decl. [Doc. No. 259], Ex. 28

30

(Rogers Dep.) at 104–08) (stating that if W.B. Mason is unable to fulfill a BLIZZARD water order, it replaces the water with another brand, without informing the customer, and no customer has complained about receiving the replacement brand). Moreover, Dairy Queen asserts that W.B. Mason's emphasis on its business purchasers ignores the fact that consumers of BLIZZARD water may be less sophisticated than purchasers. (*Id.* at 54–55). Because W.B. Mason's consumers are, at most, a mixed group of consumers, Dairy Queen argues, they are likely to be more confused about the BLIZZARD mark, particularly given their likely familiarity with Dairy Queen's BLIZZARD® mark. (*Id.* at 56.) Likewise, Dairy Queen contends that sponsorship or approval confusion is likely among the employees of the businesses purchasing BLIZZARD water, as well as among consumers who purchase the water at a restaurant or ice cream shop. (*Id.*) Dairy Queen also asserts that initial interest confusion and post-sale confusion as are also likely among W.B. Mason's consumers. (*Id.* at 56–57.) In particular, it notes that downstream consumers of BLIZZARD water, purchased at restaurants or ice cream shops, are likely to be confused as to the source of the water because they are not business customers who are exposed to W.B. Mason's catalog or website. (*Id.* at 57.)

Given the parties' competing evidence, the Court finds that disputed issues of material fact exist regarding whether ordinary consumers of W.B. Mason's products are likely to be confused.

### 6.   Evidence of Actual Confusion

Finally, W.B. Mason argues that Dairy Queen presents no evidence of actual confusion, "despite ten years of coexistence in the marketplace and over ███████ in

31

BLIZZARD water sales (and ███████ in BLIZZARD paper sales)." (Def.'s Summ. J.

Mem. at 19.)



(Burns Decl., Ex. 27 (Butler

Report) ¶¶ 104, 106, table 10.)  Plaintiff, however, moves to exclude Defendant's survey,

arguing that it is flawed and unreliable.  (*See* Pl.'s Mem. to Exclude Butler at 15–16.)  In

addition, Dairy Queen states that it is not required to demonstrate actual confusion to prove

its claim, and there are many reasons why it chose not to conduct a survey, including the

considerable expense.  (Pl.'s Summ. J. Opp'n at 52.)

It is true that evidence of actual confusion is not required in order to establish a

likelihood of confusion, but "it is perhaps the most effective way" to do so.  *Hubbard*

*Feeds, Inc. v. Animal Feed Supp'l, Inc.*, 182 F.3d 598, 602 (8th Cir. 1999).  However,

Defendant argues that little or no evidence of actual confusion, despite periods of

concurrent sales, may indicate no likelihood of confusion.  (Def.'s Summ. J. Mem. at 19–

22).  In *Hubbard*, the Eighth Circuit affirmed the district court's finding that the likelihood

of confusion did not support a preliminary injunction, noting that the plaintiff presented no

evidence of actual confusion.  182 F.3d at 602–03.  While the court acknowledged that no

such evidence was expressly required, it stated, "Considering that AFS has persisted in

using the half-barrel container for over two decades, and has done so with Hubbard's

knowledge since 1988, Hubbard's failure to present evidence of consumer confusion owing

to AFS's allegedly infringing conduct is telling." *Id.* at 603.  While *Hubbard* does not

stand for the proposition that the lack of evidence of actual confusion creates a presumption of no confusion, it does recognize that such absence is simply a factor in the court's analysis.

The Court notes that in connection with the instant motions, Dairy Queen sought to offer a declaration regarding actual confusion, which W.B. Mason successfully moved to exclude on hearsay grounds and because there had been no opportunity for cross-examination of the out-of-court declarant. (*See* Def.'s Mot. to Exclude Hokanson Decl. [Doc. No. 192]; Mar. 29, 2021 Hr'g Tr. [Doc. No. 285] at 87–88.) While the Court refused to consider the declaration for purposes of the instant motions, it ruled that if Dairy Queen wished to present this evidence at trial, it would be required to give notice to W.B. Mason immediately, identifying the person who expressed confusion, and giving W.B. Mason the opportunity to depose the witness before trial. (Mar. 29, 2021 Hr'g Tr. at 88.)

Accordingly, the Court declines to rule on this factor at this time, but simply notes that at this stage of the litigation, Dairy Queen has not presented admissible evidence of actual confusion. Again, this is merely one factor in the analysis of the likelihood of confusion and is not dispositive.

### 7.   Conclusion

In sum, the Court finds that disputed issues of material fact preclude summary judgment on the question of the likelihood of confusion. The parties have submitted conflicting evidence on several of the factors that courts consider when evaluating the issue, including the strength of Dairy Queen's marks, the similarity between the marks, competition between the parties' products, and consumers' degree of care when buying the

products. There is no admissible evidence in the current record, however, that W.B. Mason intended to trade on the goodwill of Dairy Queen's trademark, nor has Dairy Queen submitted evidence of actual confusion for purposes of the instant motions. Due to the presence of disputed issues of material fact on the likelihood of confusion, Defendant's Motion for Summary Judgment is denied.

As noted earlier, Plaintiff's state law claims for common law unfair competition and deceptive trade practices both allege the likelihood of consumer confusion. (Compl. ¶¶ 65, 68.) Because the Court finds that genuine issues of material fact remain in dispute on this issue, the denial of summary judgment on Plaintiff's federal trademark infringement claims in Counts I and II extends to Plaintiff's state law claims.

### 8.    Willfulness and Disgorgement

Among the remedies that Dairy Queen requests in its Prayer for Relief is "W.B. Mason's profits generated in connection with its use of the infringing marks." (Compl. at 23.)

On summary judgment, W.B. Mason seeks a ruling that Dairy Queen is not entitled to the disgorgement of profits under 15 U.S.C. § 1117, and moves for summary judgment on the related issue of willfulness. It argues that Dairy Queen identifies no evidence suggesting that W.B. Mason deliberately acted unlawfully, and further argues that injunctive relief is the exclusive remedy for a dilution claim. (Def.'s Summ. J. Mem. at 49.)

Typically, injunctive relief is the preferred remedy in the resolution of trademark disputes, however, the Lanham Act also contemplates the disgorgement or accounting of

profits to remedy unfair infringement. *Masters v. UHS of Del., Inc.*, 631 F.3d 464, 471 (8th Cir. 2011). The relevant portion of the Lanham Act states:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.

15 U.S.C. § 1117(a).

Disgorgement of profits may be based on unjust enrichment, as a measure of plaintiff's damages, or as deterrence for willful behavior. *Masters*, 631 F.3d at 474. A showing of willfulness is not a precondition for the disgorgement of profits based on a trademark infringement claim. *See Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1494 (2020). However, a showing of willfulness is a precondition for a profits award based on a trademark dilution claim. *Id.* (citing 15 U.S.C. § 1117(a)).

At the hearing on the instant motions, Dairy Queen explained that it does not seek disgorgement of profits based on willfulness. (Mar. 29, 2021 Hr'g Tr. at 69–70.) Rather, with respect to its trademark dilution claim, it seeks only injunctive relief. (*Id.* at 70; Pl.'s Summ. J. Opp'n at 59–62.) And with respect to its trademark infringement claim, Dairy Queen seeks disgorgement of profits based on Defendant's alleged bad faith and deliberate disregard. (Mar. 29, 2021 Hr'g Tr. at 70.)

The Court reserves for trial any disgorgement determinations related to Plaintiff's trademark infringement claim. The resolution of these issues will be best informed by a fully developed trial record on the claim. *See Safeway Transit, LLC v. Party Bus*, No. 15-

cv-3701 (JRT/HB), (D. Minn. July 31, 2017) [Doc. No. 93 at 46] ("There is a genuine dispute of material fact regarding whether Defendants willfully infringed Plaintiffs' asserted marks, so whether willfulness is required or merely a relevant factor, the Court cannot resolve the issue of disgorgement without a more robust record permitting findings of fact on willfulness and other relevant factors[.]"), *report & recommendation adopted* (D. Minn. Sept. 28, 2017) [Doc. No. 97 at 6] ("[C]redibility determinations as to Defendants' evidence of prior use and intent are required to decide whether the alleged infringing use of the marks was deliberate copying or merely a resumption of prior use."). Just as disputed issues of material fact preclude summary judgment on Plaintiff's trademark infringement claim, such fact disputes likewise preclude summary judgment on any entitlement to disgorgement of Defendant's profits. Furthermore, given that the Lanham Act is "grounded in equity and bars punitive remedies," the Court finds it particularly appropriate to consider remedies, if any, with the benefit of a full record. *Zerorez Franchising*, 103 F. Supp. 3d at 1048 (citing *Minn. Pet Breeders, Inc. v. Schell & Kampeter, Inc.*, 41 F.3d 1242, 1247 (8th Cir. 1994)). Accordingly, Defendant's summary judgment motion is denied with respect to disgorgement.

### B.   Motions to Exclude Expert Opinions

#### 1.   Standard of Review

Federal Rule of Evidence 702 governs the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

      (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

      (b) the testimony is based on sufficient facts or data;

      (c) the testimony is the product of reliable principles and methods; and

      (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under Rule 702, proposed expert testimony must satisfy three prerequisites to be admitted. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). "First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact." *Id.* (citation omitted). "Second, the proposed witness must be qualified to assist the finder of fact." *Id.* (citation omitted). "Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." *Id.* (citation omitted) (internal quotation marks omitted).

These requirements reflect the Supreme Court's analysis in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, in which the Court emphasized the district court's gatekeeping obligation to make certain that all testimony admitted under Rule 702 "is not only relevant, but reliable." 509 U.S. 579, 589 (1993); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) (extending *Daubert* to technical and other specialized expert testimony). Under *Daubert*, the cornerstone for admissibility is assistance to the trier of fact. *See Larson v. Kempker*, 414 F.3d 936, 940–41 (8th Cir. 2005). When this Court sits as the finder of fact, as will be the case here, there is "less need for the gatekeeper to keep the gate[.]" *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012)

(citation omitted) (internal quotation marks omitted), *cert. denied*, <u>568 U.S. 888</u> (2012). Nonetheless, the Court still must assess whether expert testimony satisfies Daubert, although under a more "relax[ed] application for bench trials." *Id.* (citation omitted).

Under this standard, proponents must demonstrate by a preponderance of evidence that the expert's opinion is reliable. Courts generally support "an attempt to liberalize the rules governing the admission of expert testimony," and favor admissibility over exclusion. *See Lauzon*, <u>270 F.3d at 686</u> (citation omitted) (internal quotation marks omitted); *Daubert*, <u>509 U.S. at 596</u> ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Doubts regarding the usefulness of an expert's testimony should be resolved in favor of admissibility, *United States v. Finch*, <u>630 F.3d 1057, 1062</u> (8th Cir. 2011), and gaps in an expert witness's qualifications or knowledge generally go to the weight of the testimony and not its admissibility, *Robinson v. GEICO Gen. Ins. Co.*, <u>447 F.3d 1096, 1100</u> (8th Cir. 2006) (citing 29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure: Evidence* § 6265 (1997)).

### 2.   Plaintiff's Motions

Dairy Queen moves to exclude two surveys conducted by defense expert Sarah Butler, along with her associated opinions. In addition, it seeks to exclude the opinion of Dr. Wayne Hoyer in its entirety.

### a.   Ms. Sarah Butler

W.B. Mason retained Sarah Butler, a market researcher, to rebut the opinions offered by Dairy Queen's experts Drs. Jay and Joachimsthaler. (Hartford Decl., Ex. A

(Butler Report) ¶ 8.) Ms. Butler is a managing director at NERA Economic Consulting, in San Francisco, California, where she is the chair of the firm's Survey and Sampling Practice. (*Id.* ¶ 1.) In that capacity, she conducts survey research and market research on a variety of topics including "consumer perception, consumer decision making, and choice and preference behavior." (*Id.* ¶ 2.) She has also been professionally involved in litigation concerning trademark and trade dress confusion, secondary meaning, and false advertising. (*Id.*) In such litigation, she has submitted expert reports and declarations, been deposed, and has testified at trial within the last five years. (*Id.* ¶ 5.) In addition, Ms. Butler has worked as a market researcher conducting focus groups, interviews, and surveys, and has taught courses concerning research methodologies in the United States and Europe. (*Id.* ¶ 3.)

In this litigation, Defendant asked Ms. Butler to rebut Dr. Jay's opinion that the Dairy Queen BLIZZARD® mark is famous, and Dr. Joachimsthaler's opinion regarding consumer confusion. (*Id.* ¶ 8.) To develop her opinions, Ms. Butler conducted three surveys: (1) a word test survey; (2) a survey on the likelihood of dilution; and (3) a survey on the likelihood of confusion. (*Id.* ¶¶ 9–17.) Dairy Queen moves to exclude the latter two surveys. (Pl.'s Mem. to Exclude Butler at 2–6.)

### (i)      Likelihood-of-Dilution Survey

In her survey on the likelihood of dilution, Ms. Butler sought to "evaluate whether exposure to W.B. Mason BLIZZARD spring water logo would substantially alter or affect consumers' recognition of the Dairy Queen BLIZZARD logo." (Hartford Decl., Ex. A (Butler Report) ¶ 14.) Ms. Butler first showed respondents the Dairy Queen BLIZZARD®

logo and asked them to identify whether it was from one company or more than one company. (*Id.*) Then, she showed respondents a series of other logos, including logos for W.B. Mason's BLIZZARD spring water, the Sun, Dasani, Frigidaire, Dreyers, and Vortex. (*Id.*) After showing the series of logos twice, in random order, she then showed respondents the Dairy Queen BLIZZARD® logo again, and asked if they associated it with one company, more than one company, no company, or did not know. (*Id.*) Ms. Butler included four control groups, in which three of the groups were shown a different company logo that used "blizzard," other than W.B. Mason. (*Id.*) These groups were shown the logos of BLIZZARD Entertainment, BLIZZARD Skis, BLIZZARD Bounty, and the last group included the McDonald's McFlurry logo. (*Id.*) Based on her survey, Ms. Butler concluded the following: (1) the rate of exposure to W.B. Mason's use of BLIZZARD had no impact on the overall rate of respondents mentioning Dairy Queen; (2) there was some change in respondents identifying the Dairy Queen BLIZZARD® logo with one company before and after seeing the W.B. Mason BLIZZARD spring water label; (3) the change in identification with one company before and after exposure to the W.B. Mason BLIZZARD label was not statistically significant; and (4) as a result, exposure to the W.B. Mason BLIZZARD spring water label is not likely to dilute consumers' associations with the Dairy Queen BLIZZARD® treat. (*Id.* ¶¶ 15, 87.)

Dairy Queen argues that Ms. Butler's likelihood-of-dilution survey should be excluded as unreliable and irrelevant because it relies on an untested methodology that has neither been subjected to peer review nor approved by any court. (Pl.'s Mem. to Exclude Butler at 8–11; Pl.'s Butler Reply [Doc. No. 276] at 2–5.) In addition, Plaintiff argues that

Ms. Butler conducted the survey in a contrived environment that does not reflect actual marketplace conditions.  (Pl.'s Mem. to Exclude Butler at 11–12; Pl.'s Butler Reply at 6–7.)  Finally, Dairy Queen contends that the survey is irrelevant because it fails to measure the impact of associations over time as to the parties' respective marks.  (Pl.'s Mem. to Exclude Butler at 12–15; Pl.'s Butler Reply at 5.)

In response, W.B. Mason asserts that the likelihood-of-dilution survey utilizes standard, commonly accepted trademark survey questions and applies a methodology consistent with the relevant published and peer-reviewed literature.  (Def.'s Butler Opp'n [Doc. No. 228] at 16.)  Moreover, W.B. Mason disputes that Butler's survey was performed in a contrived environment, but, in any event, states that it is not required to perfectly replicate market conditions in order to rebut Plaintiff's dilution claim.  (*Id*. at 23–25.)  Finally, Defendant maintains that Butler's likelihood-of-dilution survey is highly relevant to the claims and defenses in this action, and should not be excluded.  (*Id*. at 26–28.)

Expert testimony must be based on reliable methods to be admissible.  Fed. R. Evid. 702.  "'As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility.'"  *Bonner v. ISP Techs., Inc*., 259 F.3d 924, 929–30 (8th Cir. 2001) (quoting *Hose v. Chi. Nw. Transp. Co*., , 974 (8th Cir. 1995)).  "To assess the admissibility of survey evidence, the court should consider . . . whether [ ] the proper universe was examined and the representative sample was drawn from that universe[.]"  *Malletier v. Dooney & Bourke, Inc*., 525 F. Supp. 2d 558, 580 (S.D.N.Y. 2007) (citation omitted).  However, simply because a survey does not "perfectly represent" the examined population "does not make it irrelevant or unhelpful" since sample surveys "by their very

nature, are sketches, not exact replicas, of the examined population." *Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1082–83 (D. Minn. 2015) (citation omitted) (internal quotation marks omitted).

The Court declines to exclude Ms. Butler's likelihood-of-dilution survey and associated opinions. She possesses the requisite expertise, and despite the fact that her survey format has not been published or subject to peer review, Defendant has explained that her methodology uses standard, commonly-accepted questions in trademark surveys and is consistent with other published and peer-reviewed work. (Def.'s Butler Opp'n at 15–23.) The Court finds that her likelihood-of-dilution survey is relevant and may be helpful to the trier of fact. As noted above, surveys are not meant to be exact replications of real-life scenarios, and Dairy Queen's criticisms of the likelihood-of-dilution survey and related opinion go more to the weight than to the admissibility of the evidence. If Dairy Queen believes that the survey and related testimony violate other rules of evidence, it may address such arguments in a motion in limine. Moreover, it will be free to offer counter evidence and to cross-examine Ms. Butler at trial. For all of these reasons, the Court denies this aspect of Plaintiff's motion.

### (ii)    Likelihood-of-Confusion Survey

Ms. Butler also devised a likelihood-of-confusion survey aimed at consumers "who are the likely purchasers of W.B. Mason's bottled water products (e.g., office managers)" to see if they "would confuse W.B. Mason's BLIZZARD spring water and believe it was made or put out by, associated with, or received permission from Dairy Queen." (Hartford Decl., Ex. A (Butler Report) ¶ 17.)

█████████████████████████████████████████████

██████████████████████████████████ (*Id.*) Ms. Butler therefore concluded that confusion is highly unlikely. (*Id.*)

Dairy Queen moves to exclude Ms. Butler's likelihood-of-confusion survey and related opinion, asserting that the survey is biased and irrelevant because it fails to address the most likely scenarios for confusion. (Pl.'s Mem. to Exclude Butler at 15.) Specifically, Dairy Queen contends that the survey used a host of visual cues that biased the results. (*Id.*) Dairy Queen also argues that the survey only measures point-of-sale confusion through direct online ordering from W.B. Mason, but fails to address possible confusion in resale environments like restaurants or ice cream parlors. (*Id.*)

In opposition to Plaintiff's motion, Defendant contends that the survey properly approximates real-world conditions, noting that Ms. Butler replicated the most common scenario by which Defendant's customers purchase water—through W.B. Mason's website. (Def.'s Butler Opp'n at 29.) As to the injection of purported bias into the survey based on visual cues, Defendant notes that the visual "cues" are found on Defendant's actual web page, depicting the product images that a W.B. Mason customer would encounter when making an online purchase. (*Id.* at 29–30.) Finally, Defendant argues that Ms. Butler's likelihood-of-dilution survey is highly relevant, and is not rendered irrelevant simply because Plaintiff believes that some purchasing scenarios are more likely to result in confusion than others. (*Id.* at 30–32.)

The Court denies Plaintiff's motion to exclude Ms. Butler's likelihood-of-confusion survey and her related opinions. Again, based on her experience and education, she is

qualified to offer her opinion based on the survey. Dairy Queen will have ample opportunity on cross-examination and through its own evidence to challenge any bias or limitations presented by the likelihood-of-confusion survey. Accordingly, the Court denies this aspect of Plaintiff's motion as well.

### b.   Dr. Wayne Hoyer

W.B. Mason offers the opinion of Dr. Wayne Hoyer on the strength of Dairy Queen's BLIZZARD® mark, particularly as it relates to the number of third parties using the word "blizzard" in connection with a variety of goods and services. (Littman Decl. [Doc. No. 144], Ex. A (Hoyer Report [Doc. No. 145]) ¶ 1.) Dr. Hoyer is a professor in the Department of Marketing at the McCombs School of Business at the University of Texas at Austin. (*Id.* ¶ 2.) Dr. Hoyer, who has a Ph.D. in Social-Consumer Psychology from Purdue University, has won several teaching awards and taught a variety of classes during his 40-year career at the University of Texas, including courses on integrated marketing communications, customer strategy, and consumer behavior. (*Id.* ¶¶ 2, 4.) He is particularly interested in research regarding "consumer information processing and decision making, branding (including brand personality and brand sabotage), cause-related marketing, and advertising information processing (including miscomprehension and humor)." (*Id.* ¶ 2.) Dr. Hoyer has published over 100 articles in academic marketing journals and has co-authored a textbook on consumer behavior that is in its seventh edition. (*Id.* ¶ 3.) He has served on seven editorial review boards, has reviewed hundreds of research articles for marketing journals, and serves as the associate editor for three

marketing journals. (*Id.*) In the past four years, Dr. Hoyer has served as an expert witness and testified by deposition or trial in three cases. (*Id.* ¶ 5.)

As to the strength of the BLIZZARD® mark, Dr. Hoyer opines that Dairy Queen's branding is severely weakened by a crowded field of "blizzard" products, making consumer confusion unlikely. (*Id.* ¶¶ 20–22.) In addition, he states that this "crowded field" of "blizzard" goods and services lessens the capacity of Dairy Queen to identify or distinguish its BLIZZARD® mark from numerous other uses in the market. (*Id.* ¶¶ 23–25.)

Dairy Queen moves to exclude Dr. Hoyer's testimony in its entirety. (Pl.'s Mem. to Exclude Hoyer at 1.) First, it argues that Dr. Hoyer's opinion is irrelevant because he failed to perform the work that W.B. Mason asked him to do—"to assess the strength of the brand 'Blizzard.'" (*Id.* at 3–5; 25–28.) Dairy Queen contends that Dr. Hoyer not only failed to analyze the strength of the Dairy Queen BLIZZARD® mark, he did not review any case-specific evidence about the strength of the mark. (*Id.*) In addition, Dairy Queen asserts that Dr. Hoyer's "crowded field" analysis is irrelevant and insufficient because he improperly relied on the mere existence of third parties to support his analysis, rather than reviewing and analyzing the extent to which each third party uses the blizzard mark. (*Id.* at 5–7; 17–21.) Dairy Queen further contends that an underlying report concerning the extent and use of the word "blizzard," compiled by the Orange Research Group, is incomplete and inaccurate, rendering Dr. Hoyer's "crowded field" analysis unreliable. (*Id.* at 7–12; 22–23.) In addition, Dairy Queen asserts that Dr. Hoyer's opinion on the crowded field is based on the wrong legal standard, in that he opines that Dairy Queen's

BLIZZARD® mark is not "distinct," and he fails to analyze the strength of the BLIZZARD® mark. (*Id.* at 12–13; 28–31; Pl.'s Hoyer Reply [Doc. No. 274] at 2–8.) Finally, Dairy Queen contends that Dr. Hoyer's opinions, including his criticism of Dr. Joachimsthaler's opinions, should be excluded because they are "generic," do not require any expertise, and consist of "nothing more than attorney argument." (Pl.'s Mem. to Exclude Hoyer at 31–33; Pl.'s Hoyer Reply at 8.)

In response, W.B. Mason asserts that Dr. Hoyer's opinions on third-party use are reliable and highly relevant, and the weight to be afforded his opinions is an issue for the fact finder. (Def.'s Hoyer Opp'n [Doc. No. 236] at 13–28.) It contends that relevant third-party uses of "blizzard" are not limited to "consumables." (*Id.* at 30) (citing *Luigino's*, 170 F.3d at 833 (stating that the dilution doctrine typically applies in cases involving similar marks on dissimilar goods). In addition, W.B. Mason contends that Dr. Hoyer's opinions as an expert in branding, marketing, and consumer behavior are not "generic," but are based on his expertise, and will be helpful to the finder of fact. (*Id.* at 30–31; 38–41.) As to the reliability of Dr. Hoyer's opinions, W.B. Mason states that he did not simply rely on information provided by counsel, but also recommended that the Orange Research Group be engaged, instructed them on the scope of the research project, and verified many of their findings. (*Id.* at 33.) Further, Defendant contends that the Orange Report is not fundamentally unreliable, and to the extent that Dr. Hoyer's report contains discrepancies based on underlying data, Dairy Queen will have a full opportunity to cross-examine him at trial. (*Id.* at 34–35.) Defendant also contends that Dr. Hoyer did not apply the incorrect legal standard for dilution claims, and properly opines that where there is widespread use

of the term "blizzard," it is highly unlikely that consumers will have a unique association with Dairy Queen's BLIZZARD® mark, and it is difficult for any single use of "blizzard" to dilute the strength of another use. (*Id.* at 37–38.)

The Court will not exclude Dr. Hoyer's opinions under Rule 702. In general, he is qualified to offer his opinions and has sufficiently explained the bases for his opinions, (*see* Littman Decl., Ex. A (Hoyer Report) ¶¶ 12–46), based on his background in marketing, branding, and consumer decision making. *See Roederer*, 2010 WL 489529, at *4 (finding, on motion in limine, expert's opinion admissible where it was based on basic principles of marketing and consumer behavior, applied to the facts of the case). Dr. Hoyer has also described his methodology, which included the review of websites, trademark databases, and online marketplaces for third-party usage of "blizzard." *See CareFirst of Md., Inc. v. First Care, P.C.*, , 270 (4th Cir. 2006) (accepting plaintiff's evidence of third-party use, which included web page print-outs from healthcare-related businesses); *Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 94 (4th Cir. 1997) (finding substantial evidence of third-party registrations and uses). As third-party use forms a large part of W.B. Mason's defense, Dr. Hoyer's opinions are certainly relevant. Regarding whether he applied the correct legal standard, W.B. Mason notes that to be eligible for protection, a trademark must be both famous and distinctive, (Def.'s Hoyer Opp'n at 37) (citing 15 U.S.C. § 1125(c)(1)), and asserts that Dr. Hoyer analyzed the strength of the brand "blizzard" in light of the third-party use of that term. (*Id.* at 20.)

As to Dr. Hoyer's reliance on the work of the Orange Research Group, it appears that Dr. Hoyer did not "blindly accept" their findings, as Dairy Queen contends, but was

involved in their work, and reviewed many of their findings.  *See Garnac Grain Co., Inc. v. Blackley*, 932 F.2d 1563, 1567 (8th Cir. 1991) (finding expert's opinion was admissible although it was based on an outside report, where the expert later reviewed the work papers and reaffirmed his previous opinion).  Dairy Queen is free to vigorously cross-examine Dr. Hoyer, pointing out any discrepancies in his report or in the work of the Orange Research Group, and to challenge his criticisms of Dr. Joachimsthaler's opinions.

In sum, the Court finds Dr. Hoyer's testimony will assist the Court in its role as fact finder.  Plaintiff's motion to exclude his testimony is therefore denied.

### 3.   Defendant's Motions

W.B. Mason moves to exclude the opinions and testimony of Dr. Erich Joachimsthaler, including opinions concerning the likelihood of confusion, similarity of the parties' marks, competitive proximity, risk of misassociation, distinctiveness, and the quality of the products.  In addition, W.B. Mason moves to exclude the Recognition Survey conducted by Dr. E. Deborah Jay and any associated opinions.

#### a.   Dr. Erich Joachimsthaler

Dr. Erich Joachimsthaler is a branding and marketing expert, retained by Dairy Queen to consider the impact of W.B. Mason's activities on Plaintiff's trademarks and brands, including any resulting damage or harm.   (Joachimsthaler Report ¶ 1.)   Dr. Joachimsthaler is the founder and CEO of Vivaldi Group, "a strategic consulting firm with a focus on branding, marketing and innovation," that is headquartered in New York City. (*Id.* ¶ 3.)   During his 25-year career in the marketing field, Dr. Joachimsthaler has helped build marketing strategies for numerous well-known international companies, and has

published many articles, blogs, and books on business strategy, marketing strategy and building strong brands. (*Id.* ¶¶ 4–5.) Dr. Joachimsthaler has a Ph.D. in business administration, with an emphasis on mathematical statistics and marketing, from the University of Kansas, and completed a post-doctoral fellowship at the Harvard Business School. (*Id.* ¶ 7.) He has held faculty positions at a variety of academic institutions, and has been a member of the American Marketing Association for the last 25 years. (*Id.* ¶ 6.)

Dairy Queen asked Dr. Joachimsthaler to opine on the following issues: (1) the value of the BLIZZARD® brand, rooted in the strength of the Dairy Queen brand; (2) the role of a brand in influencing consumers' memories and decisions, specifically in the context of food and beverages; (3) the means by which a brand can be susceptible to harm; and (4) whether and how W.B. Mason's use of the BLIZZARD brand name, in connection with a beverage, harms the Dairy Queen and BLIZZARD® brands. (*Id.* ¶ 8.)

To formulate his opinions, Dr. Joachimsthaler "applied the standard methods of scientific inquiry in [his] field" by using "well-known frameworks, models, methods and methodologies" and "multiple approaches based on proven conceptual models of branding and brand equity, used in both academia and in business." (*Id.* ¶ 11.) He states that using various approaches is consistent with the standards of scientific inquiry applicable to the social and behavioral sciences. (*Id.*) Dr. Joachimsthaler's process involves "triangulating data from various sources in order to confirm or disconfirm working generalizations or hypotheses." (*Id.*) When assessing damage to the Dairy Queen and BLIZZARD® brands, Dr. Joachimsthaler incorporated the following three approaches: (1) industry or category analyses; (2) brand analyses; and (3) consumer behavior analyses. (*Id.*) He states that he

49

relied on the following materials and methods to formulate his opinion here:  (1) a review of materials, including market research reports and industry publications such as branding studies, surveys, and competitive analyses, as well as journal articles, books and academic literature regarding brands and branding; (2) documents provided by counsel, including Dairy Queen's brand strategy documents, research and survey reports, and marketing and advertising materials; (3) interviews that Dr. Joachimsthaler and his team conducted with Dairy Queen executives Kelly Kenny, Vice President of Brand Marketing, and Whitney McChane, Vice President of Marketing Communications; and (4) litigation-related documents such as filings or pleadings.  (*Id.* ¶ 10.)

Dr. Joachimsthaler notes that Dairy Queen participates in the quick-service restaurant ("QSR") market, which accounts for a large share of the restaurant industry in the United States.  (*Id.* ¶ 12(a).)  He states that the high levels of competition and market saturation in the QSR industry require QSRs to maintain strong brands in order to set them apart from others.  (*Id.*)  With respect to Dairy Queen in particular, Dr. Joachimsthaler asserts that its BLIZZARD® is critical to the company's financial success.  (*Id.* ¶ 12(b).)  Further, he opines that Dairy Queen is a strong brand that is built on a powerful set of organizational values and beliefs, including joy, wholesomeness, and authenticity, which, he states, are embodied by the BLIZZARD® treat.  (*Id.*)  However, Dr. Joachimsthaler states, because W.B. Mason uses the same product name and similar looking symbol on its bottled water, "there is a high risk for consumer confusion and association by mistake." (*Id.* ¶ 12(c).)

Dr. Joachimsthaler further contends that because Dairy Queen's BLIZZARD® and W.B. Mason's BLIZZARD water contain similar verbal and visual cues, "it is likely that consumers falsely recognize" the bottled water to be part of Dairy Queen's brand. (*Id.* ¶ 12(f).) He states that W.B. Mason's use of the BLIZZARD product name harms both the Dairy Queen BLIZZARD® brand in particular, and the Dairy Queen brand overall, by creating a likelihood of consumer confusion, generating perception of poor quality and consistency, and weakening the [Dairy Queen] brands' strengths and favorability." (*Id.* ¶ 12(g).)

W.B. Mason moves to exclude all of Dr. Joachimsthaler's opinions pursuant to Federal Rules of Evidence 403 and 702, arguing that they are based only on abstract principles, untethered to the facts of this case. (Def.'s Mem. to Exclude Joachimsthaler at 2.)

First, regarding Dr. Joachimsthaler's confusion-related opinion, W.B. Mason argues that it should be excluded because his opinion does not rely on any original empirical evidence or reliable methodology, fails to approximate market conditions, and ignores key factors like the multi-factor test governing the likelihood of confusion in trademark infringement cases, as well as the products' coexistence in the marketplace, the lack of actual confusion between the marks, and the extent of third-party use of "blizzard." (*Id.* at 7–18.) In addition, W.B. Mason asserts that Dr. Joachimsthaler's opinion improperly invades the province of the fact finder. (Def.'s Joachimsthaler Reply [Doc. No. 270] at 2–3.)

But Dairy Queen argues that Dr. Joachimsthaler formed his opinion through the use of well-known branding methodologies, frameworks, and accepted literature. (Pl.'s Joachimsthaler Opp'n [Doc. No. 263] at 16–17.) Moreover, it asserts that he was not required to use a survey to support his opinion on the likelihood of confusion, and his opinions are based on real-world conditions. (*Id.* at 19–25.) Further, Dairy Queen maintains that Dr. Joachimsthaler's opinion does not impermissibly invade the fact finder's role in determining the likelihood of confusion, but provides expertise concerning numerous subsidiary factors relevant to the issue. (Mar. 29, 2021 Hr'g Tr. at 104–05.)

The Court will not exclude Dr. Joachimsthaler's opinion related to consumer confusion. Dr. Joachimsthaler has sufficiently explained his methodology, and the Court finds that his opinions related to subsidiary elements of confusion will be helpful to the fact finder, similar to Ms. Butler's opinions offered by Defendant. Defendant will be free to cross-examine him about his methodology, market conditions, the products' coexistence, the lack of actual confusion, and the extent of third-party use. These issues all go to the weight to be assigned to his testimony, as opposed to its admissibility.

Regarding the similarity of the marks, W.B. Mason argues that Dr. Joachimsthaler's opinion usurps the role of the fact finder and is unsupported by any reliable methodology. (Def.'s Mem. to Exclude Joachimsthaler at 19–23; Def.'s Joachimsthaler Reply at 4–5.) However, Dairy Queen maintains that his opinion will not usurp the fact finder's role, but can help inform the fact finder's analysis of the marks' similarities. (Pl.'s Joachimsthaler Opp'n at 31.) Moreover, Plaintiff contends that Dr. Joachimsthaler's opinion on similarity is informed by several factors—font, style, typography, color, representation, and graphic

design. (*Id.* at 30.) Also, Dairy Queen states that Dr. Joachimsthaler properly explains how similarities in the parties' marks contribute to consumers "mistakenly activating their memory to associate or confuse the marks, relying on specific design factors." (*Id.*) In addition, Dairy Queen notes that W.B. Mason's expert, Dr. Hoyer, who stated that analysis of similarity is an empirical question, was also willing to opine, based on his own observation, that the parties' symbols "are clearly visually distinct." (*Id.*) The Court declines to exclude this aspect of Dr. Joachimsthaler's opinion. This opinion may be helpful to the finder of fact and is sufficiently reliable to overcome Defendant's *Daubert* motion.

With respect to competitive proximity, Defendant also seeks to exclude Dr. Joachimsthaler's opinion that the parties' products are in "adjacent categories," or part of the same category of consumable goods, on the grounds that this opinion is unsupported by proper analysis, process, or methodology. (Def.'s Mem. to Exclude Joachimsthaler at 23–24.) In response, Dairy Queen contends that this factor does not rely simply on whether the parties' products compete, but requires a broader examination of the products' relationship in the market. (Pl.'s Joachimsthaler Opp'n at 31–32.) Dr. Joachimsthaler opines that the parties' products are both consumables, occupying adjacent categories, with similar goals of being refreshing, cold, and portable. (*Id.* at 32) (citing Joachimsthaler Rebuttal Report [Doc. No. 191-1] ¶¶ 72–77.) The Court will not exclude this aspect of Dr. Joachimsthaler's opinion. As noted earlier, where products are "wholly unrelated," confusion is less likely, while confusion is more likely where the products are related. *Kemp*, 398 F.3d at 1056. The question of whether the products are related remains in

dispute. The Court finds that Dr. Joachimsthaler's opinion is sufficiently reliable to survive a *Daubert* challenge, and expert opinions on competitive proximity will assist the finder of fact.

Regarding Dr. Joachimsthaler's opinion on the risk of misassociation, W.B. Mason moves to exclude it as unreliable and unhelpful, arguing that it is based on a subjective diagram of an "associative memory network" that Joachimsthaler himself created. (Def.'s Mem. to Exclude Joachimsthaler at 25–26.)  Dairy Queen counters that Dr. Joachimsthaler's opinion that consumers will mistakenly associate W.B. Mason's mark with Dairy Queen's mark is reliable and should not be excluded. (Pl.'s Joachimsthaler Opp'n at 33–34.)  It states that Dr. Joachimsthaler "analyzed myriad documents" that included information about consumer association with the BLIZZARD® brand, then "created an illustrative associative memory network to describe the cognitive science about the ways in which people store memories and access information from their memory when they see similar or related marks." (*Id*. at 33.)  The Court denies Defendant's *Daubert* motion as to this opinion. The testimony is relevant to the issues in this case, and Defendant is free to fully cross-examine Dr. Joachimsthaler in this regard, and offer its own evidence.

As relevant to Plaintiff's trademark dilution claim, W.B. Mason argues that Dr. Joachimsthaler's opinion on the distinctiveness of Dairy Queen's BLIZZARD® mark is unreliable and must be excluded, as it not based on a survey or the collection of any empirical evidence. (Def.'s Mem. to Exclude Joachimsthaler at 27–28.) Moreover, W.B. Mason contends that Dr. Joachimsthaler's opinion fails to account for the applicable standard for dilution under the Lanham Act, nor does he address any factors that undermine

his opinion. (*Id.*)  In response, Dairy Queen asserts that Dr. Joachimsthaler's opinion is based on empirical research regarding trademark dilution, including scientific marketing literature. (Pl.'s Joachimsthaler Opp'n at 34.)  To show the weakening of an association between a brand and its definitional aspects to consumers, Dairy Queen states that Dr. Joachimsthaler examined the product category and meaning of Dairy Queen's BLIZZARD® brand "across five dimensions of brand equity:  awareness, brand associations, perceived quality, loyalty/affinity, and retail relationships." (*Id.*)  Dairy Queen contends that in forming his opinion on distinctiveness, Dr. Joachimsthaler applied guidance from multiple scientific studies, including a study showing that "where brand associations in consumer memories are dissimilar . . . , the senior brand will be harmed through blurring." (*Id.* at 35.)  Further, Dairy Queen states that Dr. Joachimsthaler is not required to use a likelihood-of-dilution survey, as the dilution statute includes a list of non-exclusive factors. (*Id.*)

The Court declines to preclude Dr. Joachimsthaler from testifying on the issue of distinctiveness.  He sufficiently explains his methodology to survive a *Daubert* challenge, and is not required to submit a survey on the likelihood of dilution, nor must he address all of the statutory factors for dilution.  W.B. Mason will have the opportunity to challenge his testimony on cross-examination and through its own evidence.

W.B. Mason also argues that Dr. Joachimsthaler's opinion on third-party use should be excluded because it is based on a misunderstanding of the law. (Def.'s Mem. to Exclude Joachimsthaler at 30–31.)  Specifically, Defendant points to Dr. Joachimsthaler's opinion that the use of "blizzard" for products outside the realm of food and beverage would not

harm Dairy Queen's brand, arguing that it "conflicts with the fundamental premise of federal anti-dilution law" to protect against harm caused by non-competing uses like KODAK pianos. (*Id.* at 30.) However, Dairy Queen argues that Dr. Joachimsthaler's opinion is grounded in cognitive psychology and a review of the evidence in this case. (Pl.'s Joachimsthaler Opp'n at 36–37.) Further, it contends that W.B. Mason's contention about the proper legal standard is based on the legislative history and does not preclude Dr. Joachimsthaler's opinion on third-party use. (*Id.* at 37.) Dairy Queen states that while it may be easier to prove dilution in cases involving fanciful or coined words, like "KODAK pianos," the Court should not preclude Dairy Queen from offering Dr. Joachimsthaler's opinion. The Court agrees with Dairy Queen. As noted, while dilution by blurring typically involves unrelated products, neither case law nor the Lanham Act require that the products or services be dissimilar. *Prairie Island*, 2020 WL 7490034, at *3–4 (citing *Luiginos*, 170 F.3d at 833; 15 U.S.C. § 1125(c)(1)). Again, W.B. Mason will have a full opportunity to cross-examine Dr. Joachimsthaler regarding third-party use, and to present the evidence offered by its own experts.

Finally, W.B. Mason moves to exclude Dr. Joachimsthaler's opinions on the allegedly poor quality and low awareness of W.B. Mason's water. (Def.'s Mem. to Exclude Joachimsthaler at 31.) Defendant contends that to support Dr. Joachimsthaler's opinion that Defendant's "use of Blizzard can weaken Dairy Queen's perceived quality," he relies on a single negative comment that he found on an online Twitter poll. (*Id.*) Dairy Queen counters that W.B. Mason misconstrues Dr. Joachimsthaler's opinion, stating that he did not opine that W.B. Mason's water is inferior. (Pl.'s Joachimsthaler Opp'n at 37.)

Rather, Dairy Queen contends, Dr. Joachimsthaler "explained that once a business like Dairy Queen loses control of its brand, one of the ways it can be harmed is when customers have negative experiences that may be associated with the senior user." (*Id.* at 37–38.) The Court declines to exclude this aspect of Dr. Joachimsthaler's opinion. It is relevant to his overall opinion on harm, and appears to address harmful or negative associations with bottled water and W.B. Mason's reputation. Defendant will be free to challenge the weight of his opinion through cross-examination and its own evidence.

For all of the foregoing reasons, W.B. Mason's Motion to Exclude the Expert Testimony of Erich Joachimsthaler is denied.

### b.     Dr. E. Deborah Jay

Dairy Queen retained Dr. E. Deborah Jay to conduct a nationwide survey regarding the extent to which Dairy Queen's BLIZZARD® brand is recognized by the general consuming public in the United States. (Burns Decl., Ex. A (Jay Report [Doc. No. 160]) at 5.) Dr. Jay is the principal and founder of Jay Survey Strategies LLC, a research firm that provides survey design, sampling, data collection, and statistical analysis. (*Id.* at 1.) She holds a doctorate in political science from the University of California at Berkeley, is the past chair of the Council of American Survey Research Organizations, and has chaired the Standards Committee for the American Association of Public Opinion Research. (*Id.* at 5–6.) In addition, Dr. Jay has served on the editorial boards of several journals, has published articles in trademark and research-related journals, and previously served as a program director at SRI International (formerly Stanford Research Institute), a manager at

KPMG Peat Marwick in San Francisco, and as a research associate at the Survey Research Center at the University of California at Berkeley. (*Id.* at 6.)

To conduct the Recognition Survey, Dr. Jay administered a questionnaire to 449 survey respondents across the United States. (*Id.* at 1.) ████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████ (*Id.* at 1–2.) ████████████
████████████████████████████████████████████████████████████
██████████████████████████ (*Id.*) ███████████████████████████████
████████████████████████████████████████████████████████████
██████████████ (*Id.* at 2–3.) ████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████████ (*Id.*) After accounting for "noise," Dr. Jay found that ████ of survey respondents had seen or heard of the BLIZZARD® brand. (*Id.* at 4.)

The Recognition Survey also asked respondents ████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████ (*Id.* at 11–12.) ████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████ (*Id.* & table 6.) Dr. Jay opines that the results of the Recognition Survey strongly support the conclusion that "the BLIZZARD mark is famous among the general consuming public in the United States." (*Id.* at 5, 13.)

W.B. Mason argues that the Recognition Survey should be excluded under Federal Rule of Evidence 702 because Dr. Jay applied the wrong legal standard, and failed to test for "distinctiveness," as required by the Trademark Dilution Revision Act. (Def.'s Mem. to Exclude Jay at 2, 9–14; Def.'s Jay Reply [Doc. No. 272] at 1–6.)   Additionally, Defendant argues that the survey should be excluded because Dr. Jay ████████████ ██████████████████████████████████████ (Def.'s Mem. to Exclude Jay at 2, 14–15; Def.'s Jay Reply at 6–8.)   Defendant also argues that the survey should be excluded because Dr. Jay "cheated" by using inappropriate cues, such that Dairy Queen can only show "niche fame" within a particular market segment, at best. (Def.'s Mem. to Exclude Jay at 15–18; Def.'s Jay Reply at 9–10.)   In rebuttal to Dr. Jay's Recognition Survey and opinions, W.B. Mason offers the opinions of Ms. Butler and Dr. Joel Steckel, who critique Dr. Jay for using the contextual cues of "ice cream and frozen treats" when asking about the brands, and for not assessing recognition among the general consuming public.   (Hartford Decl., Ex. A (Butler Report) ¶ 29; Eyler Opp'n Decl., Ex. 25 (Steckel Report) ¶¶ 21; 43–45.)   And, as discussed earlier, Ms. Butler devised and performed her own surveys.   Because of the flaws in the Recognition Survey, W.B. Mason argues, it will not assist the finder of fact. (Def.'s Mem. to Exclude Jay at 2, 18–20.)   Instead, W.B. Mason contends that it will inject confusion and prejudice into the case, and should be excluded. (*Id.*)

The Court declines to exclude Dr. Jay's Recognition Survey and her opinions regarding the survey.   In her expert report, Dr. Jay explained her methodology, attesting that she adhered to accepted survey standards and the survey conformed with the *Federal*

*Manual for Complex Litigation* and the *Reference Guide on Survey Research, Federal Reference Manual on Scientific Evidence.* (Burns Decl., Ex. A (Jay Report) at 4 & n.9.) In response to Defendant's criticisms, Dr. Jay states in her Supplemental Report that she likewise adhered to accepted standards in the use of contextual cues, based on the guidance set forth in the leading treatise on trademark surveys. (Jay Supp'l Report [Doc. No. 198-1] at 6.) Regarding the criticism about surveying only a "niche market," Dr. Jay asserts that she conducted the Recognition Survey with a nationwide representative sample of respondents who were not required to be either past or prospective buyers of ice cream. (*Id.* at 8.) Moreover, Dairy Queen's expert Dr. Stewart also reviewed the Jay Recognition Survey, and opines that it was conducted according to established theory and practice for marketing and survey research. (Stewart Decl. [Doc. No. 193], Ex. 1 (Stewart Rebuttal Report) ¶ 14(a)–(c).)

As exemplified by the parties' competing evidence, the Court finds that W.B. Mason's concerns about the Jay Recognition Survey and associated testimony go to the weight of Dr. Jay's opinion, and not its admissibility. The Court, in its role as fact finder at trial, will decide what weight to assign to the Recognition Survey after considering Defendant's arguments about the inadequacy of the survey and Defendant's rebuttal evidence. Accordingly, Defendant's Motion to Exclude the Recognition Survey Conducted by E. Deborah Jay and Any Associated Opinions is denied.

### 4.    Conclusion Regarding Expert Testimony

As noted, the Court denies the parties' cross-motions to exclude expert witnesses. Because trial in this matter will conducted as a bench trial, many of the concerns about

testimony that might be confusing to the jury, or prejudicial, are not implicated here. Accordingly, the Court has examined whether the parties' expert witnesses have met the *Daubert* standards under the more "relax[ed] application for bench trials." *David E. Watson, P.C.*, 668 F.3d at 1015. In many instances, the Court will need to assess how the proposed expert testimony will be offered in context. The testimony of the parties' expert witnesses will be presumptively admissible assuming proper foundation is laid, subject to any pretrial evidentiary rulings and objections at trial.

Accordingly, the admissibility of specific tests, surveys, and related expert opinions may be resolved either through motions in limine or in the context of foundation laid at trial. Generally, experts may not testify so as to invade the province of the court, testify to legal matters, or offer legal opinions couched as expert testimony. *See, e.g., S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) (noting that expert testimony on legal matters is not admissible, and matters of law are for the trial judge).

III.   **CONCLUSION**

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that

1. Plaintiff's Motion for Partial Summary Judgment [Doc. No. 180] is **DENIED**;

2. Defendant's Motion for Summary Judgment [Doc. No. 182] is **DENIED**;

3. Plaintiff's Motion to Exclude Surveys and Opinions from Defendant's Expert Sarah Butler [Doc. No. 133] is **DENIED**;

4. Plaintiff's Motion to Exclude the Opinion, Report, and Testimony of Dr. Wayne D. Hoyer [Doc. No. 141] is **DENIED**;

5. Defendant's Motion to Exclude the Recognition Survey Conducted by E. Deborah Jay and Any Associated Opinions [Doc. No. 155] is **DENIED**;

6. Defendant's Motion to Exclude Expert Testimony of Erich Joachimsthaler [Doc. No. 172] is **DENIED**;

7. This Order is temporarily filed under seal.  Within seven (7) days of the date of this Order, the parties are **ORDERED** to show cause as to why the Order should remain under seal, and if so, which portions of the Order should remain sealed and for how long.  To that end, the parties must file (under seal) a joint brief, no longer than five (5) pages, and/or a proposed Redacted Order, if they would like portions to remain under seal; and

8. The bench trial in this matter will commence on **August 16, 2021**, in the United States Courthouse, 316 N. Robert St., Courtroom 7B, in St. Paul, Minnesota.  A trial scheduling notice will follow.


Dated: June 1, 2021

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge