**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| AMERICAN DAIRY QUEEN CORPORATION,<br>Plaintiff,<br><br>v.<br><br>W.B. MASON CO., INC.,<br><br>Defendant. | Case No. 18-CV-693 (SRN/ECW)<br><br>**AMENDED[1]**<br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
|---|---|

Dean Eyler and Ashley Bennett Ewald, Lathrop GPM LLP, 80 S. 8th St., Ste. 500, IDS Center, Minneapolis, MN 55402, and Sheldon Howard Klein, Lathrop GPM LLP, 600 New Hampshire Ave., N.W., Ste. 700, Washington, DC 20037, for Plaintiff.

Jason Kravitz, Gina McCreadie, Deborah Thaxter, Leslie Hartford, Melanie Dempster, Nixon Peabody LLP, Exchange Pl., 53 State St., Boston MA 02119; and Thomas Johnson, Merchant & Gould, P.C., 150 S. 5th St., Ste. 2200, Minneapolis, MN 55402, for Defendant.

---

[1] The Court's July 10, 2022 Findings of Fact and Conclusions of Law [Doc. No. 454] are amended in response to W.B. Mason's Unopposed Motion to Amend Findings Under Rule 52(b) to Correct Scriver's Error [Doc. No. 467]. The scrivener's error concerns the status of W.B. Mason's two pending trademark applications filed with the U.S. Patent and Trademark Office for BLIZZARD SPRING WATER and WHO BUT W.B. MASON'S BLIZZARD SPRING WATER. The corrections are found in: (1) the first sentence of the second paragraph of the introduction; (2) the second sentence in paragraph 584; and (3) any use of the ® trademark symbol in connection with W.B. Mason's Blizzard marks for spring water. Also, while the July 10, 2022 ruling was initially filed under seal and contained language on the final page directing the parties to provide any proposed redactions to the Court, because the parties had no redactions, the Amended Findings of Fact and Conclusions of Law contain no such language and are not sealed. In all other respects, the Amended Findings of Fact and Conclusions of Law are identical to the original July 10, 2022 Findings of Fact and Conclusions of Law and contain no substantive changes. Accordingly, the amendments have no effect on the Court's judgment of no infringement, no dilution, and no violation of any state law.

# CONTENTS

I. INTRODUCTION .......... 4

FINDINGS OF FACT .......... 7

II. FACT WITNESSES AND EVIDENCE .......... 7

A. The Parties .......... 7

B. Dairy Queen's BLIZZARD® Frozen Treat .......... 9

C. W.B. Mason's Business and Products .......... 25

D. Dairy Queen's Trademark Enforcement Strategy .......... 40

E. Dairy Queen's Refreshed Logo, July 2018 .......... 44

F. W.B. Mason's Sales and Advertising of Third-Party Brands .......... 47

G. Sales of Ice Cream and Blizzard Water In Ice Cream Shops .......... 49

H. Third-Party Use of BLIZZARD .......... 56

III. EXPERT OPINIONS .......... 76

A. Recognition of Dairy Queen's BLIZZARD® Mark .......... 76

B. Strength of the Mark .......... 89

C. Similarity .......... 102

D. Association, Impairment of Distinctiveness, and Harm .......... 106

E. Consumer Confusion .......... 123

F. Dilution .......... 129

CONCLUSIONS OF LAW .......... 134

I. JURISDICTION ........ 134

II. TRADEMARK INFRINGEMENT/FALSE DESIGNATION OF ORIGIN .... 134

A. Strength of the Mark ........ 137

B. Similarity ........ 148

C. Degree of Competitive Proximity ........ 158

D. Intent ........ 169

E. Degree of Care of Potential Customers ........ 174

F. Evidence of Actual Confusion ........ 179

G. Balancing the *SquirtoCo* Factors ........ 182

III. DILUTION ........ 186

A. Fame ........ 188

B. Degree of Similarity ........ 193

C. Distinctiveness of the Famous Mark and Substantially Exclusive Use 195

D. Degree of Recognition ........ 202

E. Intent to Create an Association with Senior Mark ........ 204

F. Evidence of Actual Association Between the Marks ........ 204

G. Likelihood of Impairment of Famous Mark's Distinctiveness ........ 208

H. Balancing the Factors ........ 212

IV. STATE LAW CLAIMS ........ 217

V. INJUNCTIVE RELIEF ........ 218

ORDER ........ 219

SUSAN RICHARD NELSON, United States District Judge

## I. INTRODUCTION

Plaintiff Dairy Queen Corporation, ("Plaintiff" or "Dairy Queen"), a quick-service restaurant franchisor based in Minnesota, holds registered trademarks for its BLIZZARD® frozen treat. It sells BLIZZARD® frozen treats directly to consumers from its nationwide network of franchisee-operated, quick-service restaurants. Dairy Queen's general trademark enforcement strategy for its BLIZZARD® marks is to stop others from using "blizzard" in connection with "consumables," because Dairy Queen restaurants carry a broad variety of consumable food and beverages.

Defendant W.B. Mason Co., Inc., ("Defendant" or "W.B. Mason"), an office-supply company based in Massachusetts, holds a registered trademark for its Blizzard® copy paper. In 2016, the U.S. Patent and Trademark Office approved its Blizzard spring water marks for publication, which Dairy Queen has opposed.[2] W.B. Mason sells copy paper and spring water, along with other office supplies, to businesses for use in office breakrooms. It does not sell goods directly to consumers. Dairy Queen and W.B. Mason are not business competitors.

At issue here is W.B. Mason's use of its Blizzard marks on bottled spring water. W.B. Mason began selling its Blizzard branded spring water in 2010. Since that time,

---

[2] The Court uses capital letters for "BLIZZARD®" to refer to Dairy Queen's frozen treat, "Blizzard®" to refer to W.B. Mason's copy paper, and "Blizzard" to refer to W.B. Mason's spring water.

Dairy Queen's BLIZZARD® treat and W.B. Mason's Blizzard spring water have coexisted in the marketplace for over eleven years. During this period of coexistence, there have been no reports of actual consumer confusion between Dairy Queen's BLIZZARD® treat mark and W.B. Mason's Blizzard bottled water mark.

In March 2018, Dairy Queen filed this lawsuit, asserting federal and state law claims against W. B. Mason for trademark infringement, trademark dilution, unfair competition, and deceptive trade practices, for which it seeks damages, injunctive relief, and an award of attorneys' fees and costs.

First, Dairy Queen contends that W.B. Mason's Blizzard marks on spring water are likely to cause confusion with Dairy Queen's marks for its BLIZZARD® treat. Thus, Dairy Queen asserts two Lanham Act claims—one for trademark infringement under 15 U.S.C. § 1114(1)(a) (Count 1), and one for unfair competition by false designation of origin under 15 U.S.C. § 1125(a) (Count 2). To succeed on such claims, a plaintiff must establish by a preponderance of the evidence that it has a valid, protectible mark and that there is a likelihood of confusion between its mark and the defendant's mark. *Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1009 (8th Cir. 2011).

In a third Lanham Act claim, Dairy Queen alleges that W.B. Mason's use of its Blizzard marks on spring water are likely to cause dilution by the blurring of Dairy Queen's BLIZZARD® marks. Under this theory, it asserts one count of trademark dilution in violation of 15 U.S.C. § 1125(c) (Count 3). To succeed on a federal claim of dilution by blurring, a plaintiff must establish by a preponderance of the evidence that it is the owner

of a famous and distinctive mark, and after its mark became famous, the defendant began using a mark in commerce that is likely to impair the distinctiveness of the famous mark. 15 U.S.C. § 1125(c)(2)(A)-(B).

Under Minnesota common law, Dairy Queen also asserts a claim for unfair competition, arguing that W.B. Mason's infringing use of its Blizzard marks on spring water causes a likelihood of confusion as to the origin of W.B. Mason's goods (Count 4). Finally, Dairy Queen asserts a state-law claim under the Minnesota Trade Practices Act, Minn. Stat. §§ 325D.44, based on W.B. Mason's allegedly willful deceptive trade practices by using Blizzard on its spring water (Count 5). These state-law claims are subject to the same requirements as the Lanham Act claims for trademark infringement and false designation of origin, which require a plaintiff to prove, by a preponderance of the evidence, the likelihood of confusion among consumers between the plaintiff's mark and the defendant's mark. *DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 935 (8th Cir. 2003) (finding state and federal trademark infringement claims were 'coextensive' and subject to the same analysis).

This matter was tried by way of a bench trial before the undersigned judge over twelve days on September 27–30, October 12–14, October 18–21, and November 8, 2021. At trial, the parties introduced over 500 exhibits and testimony from 30 witnesses. Plaintiff introduced the testimony of 17 witnesses, 13 of whom appeared live and four by deposition designation.[3] Defendant introduced the testimony of 13 witnesses, four of whom appeared

[3] Plaintiff introduced the live testimony of the following witnesses at trial: Kelly Kenny, Lance Glosemeyer, Lisa Jesser, Mary Joyce, Susan Culver, Deborah Jay, Jon

live and nine by deposition designation.[4] Based on the evidence presented at trial, and all of the files, records, and proceedings in this matter, the Court makes the following Findings of Fact and Conclusions of Law.[5]

## FINDINGS OF FACT

## II. FACT WITNESSES AND EVIDENCE

### A. The Parties

1. Plaintiff is the franchisor of the DAIRY QUEEN® system of quick-serve restaurants, with its headquarters located in Bloomington, Minnesota. (Tr. at 81:12-17.)

2. Dairy Queen was founded in 1940 in Joliet, Illinois. (Tr. at 80:9-12.)

3. A pioneer in the franchising business, Dairy Queen expanded quickly across the United States. (Tr. at 80:12-81:11.)

4. Currently, Dairy Queen has over 7,000 DAIRY QUEEN® restaurants around the world, 4,600 of which are located in 49 states throughout the United States. (Tr. at 80:22-82:4, 82:22-24.)

---

Gallant (via video link), Kane Winn (via video link), Robert Simmons (via video link), Elisa Edlund (via video link), Erich Joachimsthaler, Rae Wang, and David Stewart. Also, Plaintiff designated, and the Court admitted, portions of the video testimony of Jennell Lammers, Matthew Rogers, Richard Magee, and Despina Tolides.

[4] Defendant introduced the live testimony of the following witnesses at trial: Leo Meehan, Wayne Hoyer, Sarah Butler, and Richard Magee. Defendant designated, and the Court admitted, portions of the video testimony of William Komassa, Gerald Depries, Pamela Kitter, Jessica Arceri, Christopher Canavati, Dana Blizzard, Katherine Treankler, Terrence Kiel, and Jennifer Lewin.

[5] To the extent that any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and vice versa.

5. These 4,600 franchises are operated by Dairy Queen's over 3,000 franchisees—small business owners who independently own their restaurants and are authorized to use Dairy Queen's various trademarks, recipes, menus, products, and system procedures. (Tr. at 80:21-81:11.) Unlike Dairy Queen's franchise competitors who tend to have more multi-unit franchisees, the majority of Dairy Queen's franchisees are single-unit operators owning just one single DAIRY QUEEN® location. (Tr. at 82:5-21.)

6. Currently, approximately 125,000 people work at DAIRY QUEEN® restaurants throughout the country. (Tr. at 83:2-8.)

7. Defendant W.B. Mason Co., Inc. ("Defendant" or "W.B. Mason") is a Massachusetts corporation, having a principal place of business at 59 Centre Street, Brockton, Massachusetts. The Court has found that because W.B. Mason maintains a registered office and a registered agent in Minnesota, it has consented to the jurisdiction of this Court. (Jan. 8, 2019 Order [Doc. No. 29] at 12–13.)

8. W.B. Mason was founded in 1898 by William Betts Mason. (Tr. at 817:21-25.) At the time of its founding, W.B. Mason sold engraving materials, rubber stamps, printing materials, and office supplies. (Tr. at 821:23-25.) Today, W.B. Mason sells hundreds of thousands of products in fourteen major office supply categories including toner, janitorial products, copy paper, office supplies, coffee; "just about anything you could use in an office." (Tr. at 819:15-19, 822:4-5.) With a fleet of about 750 trucks, W.B. Mason offers next-day delivery and delivers products directly to the customer's copy center, supply room, or wherever the customer needs them to go. (Tr. at 822:8-25.)

9. W.B. Mason is a business-to-business retailer of office supplies. (Tr. at 823:1-18.) It sells its products directly to businesses of all types and sizes for use in office and breakrooms, primarily to businesses located in "Masonville," a nickname for the region W.B. Mason serves, which includes all of New England, New York, Pennsylvania, New Jersey, Delaware, Maryland, Washington, Richmond, Virginia, Florida, and eastern Ohio. (Tr. at 823:1-8, 824:20-825:5, 1916:5-7.)

10. W.B. Mason does not have any retail locations and it does not sell its products directly to consumers. (Tr. at 823:1-18.) Customers can purchase products from W.B. Mason's online website, over the phone, by fax, or through a sales representative. (Tr. at 825:20-826:14.)

11. W.B. Mason competes with large office supply companies such as Staples and Office Depot, and it also competes with Amazon. (Tr. at 823:19-21.) W.B. Mason also competes on a smaller scale with a few thousand small independent dealers throughout the United States. (Tr. at 823:19-824:2.)

12. Ms. Kenny, Dairy Queen's Vice President of Brand & Product Marketing, and Mr. Meehan, W.B. Mason's CEO, agreed that W.B. Mason does not compete with Dairy Queen. (Tr. at 343:7-8, 913:13-15.)

**B. Dairy Queen's BLIZZARD® Frozen Treat**

13. The following fact witnesses—all current or former Dairy Queen employees—testified live or via deposition about the history of the Dairy Queen's BLIZZARD® frozen treat, as well as the product's sales, publicity, and advertising expenditures: (1) Vice President of Brand & Product Marketing, Kelly Kenny; (2) Director

of Financial Planning & Analysis, Lance Glosemeyer; (3) Senior Campaign Manager, Lisa Jesser; (4) Director of Transformative Product Innovation, Mary Joyce; (5) Former Vice President of Retail Merchandising, Susan Culver; (6) Senior Media Manager Jennell Lammers; and (7) Senior Product and Brand Manager for BLIZZARD®, Rae Wang. The Court found their testimony to be credible.

**1. History**

14. Ms. Kenny testified that shortly after Dairy Queen itself was founded in 1940, Dairy Queen introduced the first iteration of the BLIZZARD® treat, "a thicker shake-type product," in 1946. (Tr. at 86:13-17; Ex. P-118A.)

15. She noted that in 1985, Dairy Queen introduced the current version of the BLIZZARD® treat, which featured pieces of candy, fruit, and other toppings blended into Dairy Queen's soft serve frozen treat. (Tr. at 85:9-24, 86:22-23, 87:11-23.)

16. Dairy Queen requires all of its quick-service restaurants to sell the BLIZZARD® treat, which is exclusively available at Dairy Queen restaurants. (Tr. at 84:13-85:8, 339:5-8.) Dairy Queen customers can walk up to the register to place their order and dine at the restaurant or order take-out, or they can use the drive-thru to place their order. (Tr. at 249:3-18.) Ms. Wang, the Senior Product and Brand Manager for BLIZZARD®, testified that the BLIZZARD® treat currently sells for between $3 and $5 in the United States, depending on the size. (Tr. at 1439:22-25.)

17. Dairy Queen also requires its franchisees to sell bottled water and, consistent with its beverage contracts with Coca-Cola or Pepsi, encourages its franchisees to offer bottled water from Coca-Cola (Dasani) or Pepsi (Aquafina). (Tr. at 242:24-245:6, 322:2-

327:2.) Ms. Kenny, Dairy Queen's Vice President of Brand & Product Marketing, testified that Dairy Queen has never considered selling BLIZZARD®-branded water. (Tr. at 323:11-324:3.)

18. Ms. Kenny testified that Dairy Queen's BLIZZARD® treat is sold in a cup which contains a logo. (Tr. at 337:9-15.) At some point between 1995 and 1998, Dairy Queen adopted a BLIZZARD® logo that includes the phrase "THE ORIGINAL BLIZZARD® ONLY AT DQ." (Tr. at 337:19-22.) The inclusion of this logo on every Dairy Queen BLIZZARD® confirms that Dairy Queen is the only source of its BLIZZARD® frozen treat. (Tr. at 336:13-339:15) Below is an image of the Dairy Queen cup used until 2018:




(Exs. P-56, P-57, D-437 at ¶ 7.)

19. Mary Joyce, Dairy Queen's Director of Transformative Product Innovation, testified that Dairy Queen added the phrase "The Original BLIZZARD® Only at DQ" on all BLIZZARD® cups after McDonalds introduced its McFlurry product because Dairy

Queen wanted to position itself "as the only and the original at that time." (Tr. at 501:19-25.)

20. Ms. Joyce further noted that after introducing the BLIZZARD® treat nationwide, Dairy Queen expanded its BLIZZARD® brand to include BLIZZARD® bars, BLIZZARD® pies, BLIZZARD® cakes, and frozen treats with a center liquid or solid core, dubbed ROYAL BLIZZARD® treats. (Tr. at 503:18-23.) Currently, Ms. Kenny testified that Dairy Queen continues to sell its BLIZZARD® treats, BLIZZARD® cakes and ROYAL BLIZZARD® treats today and continuously researches BLIZZARD® innovations, such as offering a "mini" sized BLIZZARD® treat, and adding coffee, slush, and soda into the middle of a BLIZZARD® treat. (Tr. at 129:4-25, 251:9-13, 271:24-272:20.)

**2. Trade Registrations**

21. Dairy Queen owns a valid and subsisting registration for the mark depicted below, used in connection with "Heavy bodied milkshakes."




(Registration No. 559,844, Ex. P-118A.) This registration issued on June 10, 1952.

22. Dairy Queen owns a valid and subsisting registration for the mark BLIZZARD, for use in connection with "Milk shakes and semi-frozen ice milk and ice cream confections." (Registration No. 895,139, Ex. P-119A.) This registration issued on July 21, 1970.

23. Dairy Queen owns a valid and subsisting registration for the mark BLIZZARD, for use in connection with "Flavor blender machine for frozen treats." (Registration No. 1,458,987, Ex. P-120A.) This registration issued on September 29, 1987.

24. Dairy Queen owns a valid and subsisting registration for the mark BLIZZARD, for use in connection with "Restaurant services." (Registration No. 1,503,396, Ex. P-121A.) This registration issued on September 6, 1988.

25. Dairy Queen owns a valid and subsisting registration for the mark depicted below, used in connection with "Frozen reduced-fat ice cream soft-serve for consumption on and off the premises consisting primarily of frozen reduced-fat ice cream with one or more of the following toppings, namely, candy, cookies, syrup, nut or fruit toppings."




(Registration No. 2,693,918, Ex. P-389A.) This registration issued on March 4, 2003.

**3. Sales**

26. When Dairy Queen began selling the current form of its BLIZZARD® treat in 1985, it sold over 75 million BLIZZARD® treats in that year alone. (Ex. P-22 at 1.)

27. In 2001, the earliest year for which Dairy Queen has maintained sales records, Dairy Queen sold nearly $365 million in BLIZZARD® treats in the United States. (Ex. P-226.)

28. From 2001 to 2020, Dairy Queen sold over $13.3 billion in BLIZZARD® treats in the U.S., hitting $1.1 billion in sales in 2020 alone. (Ex. P-226.) Sales of BLIZZARD® treats have increased every year in the United States and Canada. (*Id.*)

29. Ms. Kenny testified that BLIZZARD® is the top selling product for the entire DAIRY QUEEN® system, making up approximately 25% of its system sales. (Tr. at 84:13-20.)

30. Because the BLIZZARD® makes up a quarter of Dairy Queen's system sales, Ms. Kenny stated that the BLIZZARD® brand is important to Dairy Queen and to each of its franchisees. (Tr. at 273:12-274:2.)

**4. Publicity**

31. In 1985, the year Dairy Queen introduced the BLIZZARD® treat nationally, Dairy Queen sold over 75 million BLIZZARD® treats in 20 different flavors. (Ex. P-22.)

32. Just one year later, on September 1, 1986, the New York Times published an article about the success of the BLIZZARD® treat, titled *Dairy Queen's BLIZZARD is Hot*. (Ex. P-40.) In 1999, the BLIZZARD® treat received more publicity in the New York Times for being featured in Todd Wilbur's 1993 book *Top Secret Recipes: Creating Kitchen Clones of America's Favorite Brand-Name Foods*, with a recipe for making the BLIZZARD® treat at home. (Ex. P-30; Tr. at 1431:2-9.) In 2006, the BLIZZARD® treat was again featured in a New York Times' "10 Favorites" column. (Tr. at 1432:18-22; Ex. P-41.)

33. Ms. Kenny testified that in 2004, Dairy Queen held its first Miracle Treat Day, an event in which many Dairy Queen franchisees donate a portion of the proceeds from every BLIZZARD® treat sold to Children's Miracle Network Hospitals. (Tr. at 114:19-115:2.) Between 2008 and 2019, Dairy Queen and its franchisees donated more

than $20 million dollars to Children's Miracle Network Hospitals from the sales of BLIZZARD® treats on Miracle Treat Day. (Ex. P-231.)

34. Ms. Kenny also testified that in 2005, Dairy Queen launched the BLIZZARD® Fan Club, an e-mail fan club through which Dairy Queen connects with its fans to give them information about its BLIZZARD® treats, including sneak peaks at upcoming flavors and promotions. (Tr. at 115:21-116:10.) By 2010, the BLIZZARD® Fan Club had grown to 2.2 million members. Today, the BLIZZARD® Fan Club has approximately 4.4 million members. (Tr. at 126:19-24.)

35. In 2005, the BLIZZARD® treat was the focus of an episode of *The Apprentice* on NBC, one of the top-rated network shows at the time. (Ex. P-47 at 1–3.) In conjunction with the episode, Dairy Queen also ran its own BLIZZARD® *Apprentice* contest, a Buy One Get One BLIZZARD® treat promotion, and created special point-of-purchase ("POP") kits for its franchisees. (*Id.* at 2–3.) In September 2005 alone, the BLIZZARD® *Apprentice* cross-over publicity was mentioned in print publications across the United States, including in West Virginia, New Jersey, Kentucky, Ohio, Minnesota, Nevada, California, Indiana, and Pennsylvania, on TV, online, on the radio, and in magazines such as Forbes. (Ex. P-38.)

36. Dairy Queen also works with other brands to introduce BLIZZARD®-related products. For example, Ms. Kenny noted that in 2008, Dairy Queen partnered with the Girl Scouts of America for the Thin Mint Cookie BLIZZARD®, which sold more than 10 million BLIZZARD® treats in just one month. (Tr. at 115:10-16; Ex. P-22.) In 2010, Dairy Queen worked with Kraft Foods to offer limited edition BLIZZARD® flavored Oreo

cookies, in which the cream inside the Oreo cookie was BLIZZARD® flavored cream. (Tr. at 107:2-10; Ex. P-148 at 8.) Lisa Jesser, Dairy Queen's Senior Campaign Manager, testified that the BLIZZARD® flavored Oreo cookie was sold in major retailers nationwide from April to December 2010. (Tr. at 453:25-454:5, 454:10-15.)

37. In 2010, Dairy Queen celebrated the 25th anniversary of the BLIZZARD® treat. Ms. Kenny testified that in conjunction with the celebration, Dairy Queen created the BLIZZARD®-mobile, which traveled to 25 different cities, distributing 75,000 free Mini BLIZZARD® treats to BLIZZARD® fans. (Tr. at 128:23-129:3; Ex. P-25.)

38. She also noted that in addition to the BLIZZARD®-mobile, Dairy Queen celebrated the BLIZZARD® treat's 25th anniversary with a series of "webisodes" starring the BLIZZARD®'s first family, the Blizzmans—"a very passionate BLIZZARD family" that followed the BLIZZARD®-mobile through the 25-city tour. (Ex. P-25; Tr. at 131:16-23.) Television commercials promoting the BLIZZARD® 25-city birthday tour and the Blizzman webisodes were aired during popular television shows including *American Idol*, *Glee*, *30 Rock*, *Today*, and *Good Morning America*. (Tr. at 133:7-11; Ex. P-25.)

39. From March 15 to April 15, 2010, the BLIZZARD® treat was featured in the media over 650 times, including in media with large audiences as of 2010, such as *USA Today* (circ. 2.2 million), *Minneapolis Star Tribune* (circ. 345,252, and online circ. 1.8 million) *Houston Chronicle* (circ. 2 million), NCDC IND of Washington, DC (viewership 2.3 million), NCCT Independent of New York, NY (viewership 7.4 million), WBAL NBC of Baltimore, MD (viewership 1 million), WUSA CBS of Washington, DC (viewership 2.3 million), WXYZ ABC of Detroit, MI (viewership 1.8 million), KCNC CBS of Denver

(viewership 1.5 million), WCAU NBC of Philadelphia, PA (viewership 2.9 million), WBFF FOX of Baltimore, MD (viewership 1 million), KGO ABC of San Jose, CA (viewership 2.5 million), FNC FOX of New York, NY (viewership 1.1 million), and CBS of New York, NY (viewership 3.2 million). (Ex. P-31 at 1–4.)

40. Ms. Jesser testified about Dairy Queen's licensing of BLIZZARD® toys. She noted that in 2010, Dairy Queen released the BLIZZARD® Maker toy—a toy for children to make their own BLIZZARD® treat at home—and offered it for sale between 2010 and 2014 in major retailers like Walmart and Target. (Tr. at 440:2-9, 441:13-17; Exs. P-141, P-158.) From June through December 2011, Dairy Queen ran a promotion with Build-a-Bear Workshop promoting BLIZZARD®-branded Build-a-Bear toys designed after a particular BLIZZARD® flavor. (Tr. at 441:18-442:18; Ex. P-152.) Each BLIZZARD® Build-a-Bear toy featured the BLIZZARD® mark. (Tr. at 443:14-18, Ex. P-145.) In 2016, Dairy Queen partnered with Jakks Pacific to release its own "MiWorld" toys—a line of toys for well-known brands—including a BLIZZARD® treat toy. (Tr. at 446:19-448:12; Ex. P-156.)

41. Ms. Wang testified regarding Dairy Queen's history of launching BLIZZARD®-specific treats tied to new movie releases. She noted that in June 2015, Dairy Queen released the "Jurassic Smash BLIZZARD®" in partnership with the film *Jurassic World*. This BLIZZARD® flavor made up 22.1% of overall BLIZZARD® sales, totaling about $6 million for the DQ® system that month. (Tr. at 1418:14-1419:15; Ex. P-29.) In 2017, Dairy Queen created the "Guardians Awesome Mix BLIZZARD®" in partnership with the movie *Guardians of the Galaxy Vol. 2*. (Tr. at 1419:16-1420:1; Ex.

P-29.) In May 2017, this BLIZZARD® flavor made up 21% of total BLIZZARD® sales, totaling just under $4 million in sales that month. (Tr. at 1419:19-1420:1, Ex. P-29.) Similarly, in 2018, Dairy Queen launched the Jurassic Chomp BLIZZARD® treat in partnership with the second *Jurassic World* film, *Jurassic World: Fallen Kingdom*. (Ex. P-26.) During the month of June 2018, the Jurassic Chomp BLIZZARD® treat received 3.7 million+ "total and broadcast online impressions," 34 million+ "PR-driven social media impressions," and over 30 placements in the media, for an ad value of over $750,000. (Ex. P-62.) In 2020, Dairy Queen partnered with the release of the film, *Wonder Woman 1985*, to create a similar limited-time BLIZZARD® treat. (Tr. at 1423:17-21.)

42. In the realm of professional sports, Dairy Queen launched the Triple Play BLIZZARD® commemorating Major League Baseball's opening day in 2018. (Ex. P-117.) The Triple Play BLIZZARD® treat received 8.8+ million "total broadcast and online impressions," 51.3+ million "PR-driven social media impressions," and had placements in 530+ media outlets, for an ad value of approximately $1.2 million. (Tr. at 257:22-258:8; Ex. P-117.)

43. In 2015, the *MinnPost* characterized the BLIZZARD® treat as "wildly popular" and "famous," in an article titled *Dairy Queen is out to become the world's best-performing fast-food chain*. (Ex. P-32.) Over time, the BLIZZARD® treat has been regarded as "famous," "beloved," "iconic," and an "American classic." (Tr. at 1429:4-8, Exs. P-30, P-32, P-33, P-35, P-36, P-41, P-42, P-50, P-130.)

**5. Advertising Expenditures**

44. Ms. Kenny, along with Dairy Queen's Senior Media Manager, Jennell Lammers, and former Vice President of Retail Merchandising, now retired, Susan Culver, testified regarding Dairy Queen's advertising efforts and expenditures. Ms. Kenny noted that Dairy Queen's advertising expenditures arise in four categories: (1) national media; (2) local media; (3) production costs for producing national and local media; and (4) point-of-purchase advertising. (Tr. at 148:13-149:2, 217:4-8.)

45. Dairy Queen advertises its BLIZZARD® treat in many different ways such as national and local television, including on cable television (e.g., Discovery, Nickelodeon, TLC, ESPN), on network primetime television (e.g., NBC, ABC, CBS), and on late night television (e.g., Jimmy Kimmel), online video services (e.g., Hulu), social media, radio, printed materials (including point of purchase materials and other in-store promotions), on billboards, and in sports arenas and stadiums. (Tr. at 166:13-167:4, 624:23-625:23.)

46. Ms. Lammers, Dairy Queen's Senior Media Manager, testified via video deposition about Dairy Queen's presence in national media and social media, as well as its advertising expenditures. (Tr. at 590:3-645:12.) Ms. Lammers testified that among its expenditures, Dairy Queen engages in search engine marketing, but does not purchase search terms for "strong" branded words such as "Dairy Queen." (Tr. at 607:23-608:7.) For example, by entering "Dairy Queen" into the Google search engine, Dairy Queen appears as the top "hit" because the brand is organically strong. (Tr. at 606:14-607:12.) She acknowledged that when the term "Blizzard" is searched on Google, however, the

first hit is Blizzard Entertainment Group. (Tr. at 607:12-14, 608:1-7, 610:11-17.) Ms. Lammers stated that this is also because Dairy Queen's website is not built to optimize "Blizzard" on search engines, as compared to "Dairy Queen," which produces strong, organic results when searched. (Tr. at 608:1-7.)

47. Between 2004 and 2021,[6] Dairy Queen spent over $500 million on BLIZZARD®-specific advertising. (Tr. at 156:17-157:9.) Dairy Queen advertises the BLIZZARD® treat in television advertising between three and six months of the year. (Ex. P-2, Exs. P-221-P-222, Exs. P-363-P-378.)

48. In the last ten years, Dairy Queen has spent more than $362 million on national BLIZZARD® advertising, using types of advertising such as television, radio, cable, digital, and outdoor advertising. (Tr. at 157:10-16; Exs. P-10-P-17, Ex. P-28, Ex. P-229.)

49. Ms. Culver testified that in addition to its national advertising, Dairy Queen also creates BLIZZARD®-specific point of purchase ("POP") advertising for each of its locations throughout the United States. (Tr. at 522:19-24.) These POP materials include displays within the store, as well as window clings, lawn signs, outdoor banners, and other "exterior merchandising" that the public may see if they are driving to or near a DAIRY QUEEN® restaurant. (Tr. at 546:15-25.) Each quarter, Dairy Queen's franchisees receive

[6] This does not include advertising dollars spent prior to 2004 or for 2009 and 2010 because Dairy Queen does not have documentation from those years reflecting its total advertising spend, although it did conduct advertising of its BLIZZARD® products during those time periods. (Tr. at 156:24-157:5.)

a POP kit, which has approximately 100 to 200 pieces of advertising. (Tr. at 521:4-18.) Between 2004 and 2019, Dairy Queen spent over $11 million on printing costs for BLIZZARD® POP advertising. (Tr. at 531:18-21; Exs. P-5, P-6.)

50. Ms. Kenny testified that in addition to national television and POP advertising, Dairy Queen engages in local advertising for its BLIZZARD® treat. (Tr. at 217:4-19.) She noted that from 2004 through 2009, Dairy Queen spent $29,511,359 on local advertising for BLIZZARD®. (Tr. at 226:3-7; Ex. P-7.) From 2010 through 2020, Dairy Queen spent $47,335,607 on local advertising for BLIZZARD®. (Tr. at 222:17-224:21; Exs. P-9-P-14, Ex. P-15A, Ex. P-16A, Ex. P-17, Ex. P-28, Ex. P-229.) Ms. Kenny further stated that in addition to Dairy's Queen's own advertising expenditures, individual franchisees also conduct their own advertising "all the time." (Tr. at 221:4-16.)

51. Dairy Queen has also routinely introduced and sold BLIZZARD® memorabilia to its BLIZZARD® fans, including items like BLIZZARD® bumper stickers, BLIZZARD® sportswear, BLIZZARD® antenna toppers, BLIZZARD® survival kits, BLIZZARD® birthday cups, BLIZZARD®-mobile keychains, etc. (Ex. P-148.)

**6. Consumer Research**

52. Ms. Kenny testified that Dairy Queen routinely conducts consumer research into its BLIZZARD® brand. (Tr. at 259:11-18.) Dairy Queen's marketing group employs a team of eight people who work with companies like Russell Research and other vendors to conduct consumer research. (Tr. at 285:7-12.) Ms. Kenny noted that they travel to Atlanta, Minneapolis, and Toronto to conduct consumer research and run about ten to fifteen BLIZZARD marketing tests every year. (Tr. at 285:13-286:2.) She explained that

in those marketing tests, the team talks to and interacts with real consumers about the BLIZZARD frozen treat. (Tr. at 286:2-12.)

53. Ms. Kenny testified about a 2008 brand equity study from Russell Research, in which Dairy Queen learned that "a majority of DQ customers buy BLIZZARDs," and that "BLIZZARD® is a very strong brand, outperforming its competitors both in overall opinion and in important measures." (Tr. at 267:13-268:1; Ex. P-52.) Consumers strongly associated BLIZZARD® frozen treat with characteristics such as "totally indulgent," "a lot of different mix-ins," and "customize it however I want." (Tr. at 356:22-358:18; Ex. P-52 at 20.)

54. In a separate 2008 study, Dairy Queen learned that "BLIZZARD® is the leader-best in class quality," and that "BLIZZARD® brand equity is indivisible from total Dairy Queen brand equity." (Ex. P-53.)

55. Ms. Kenny testified that in March 2012, Dairy Queen created the "DQ Treats Growth Strategy" presentation (the "DQ Treats Presentation"), using data from Russell Research, to summarize its strategy for increasing its treats business, which includes the BLIZZARD® frozen treat. (Tr. at 361:7-362:21; Ex. P-44.)

56. The DQ Treats Presentation indicated BLIZZARD® was best in class for quality and the choice for a rich, indulgent treat. (Tr. at 363:8-21; Ex. P-44 at 29.) The data cited in the DQ Treats Presentation further indicated that characteristics consumers associate with Dairy Queen's BLIZZARD® include "rich indulgent treat," "one-of-a-kind ice cream thickness branded toppings," "wide array of flavors and textures," and "made at the counter reinforces quality special 'made for me' feeling." (Tr. at 364:9-365:15; Ex. P-

44 at 27.) Ms. Kenny agreed that there is no mention of the word "portable" in the key findings from the DQ Treats Presentation. (Tr. at 365:12-366:7; Ex. P-44.)

57. The DQ Treats Presentation also includes a "correspondence map" from Russell Research (depicted below) that illustrates the strengths of Dairy Queen's BLIZZARD® frozen treat. (Ex. P-44 at 25.) The closer the attribute is to BLIZZARD® on the map, the more consumers associate that attribute with a BLIZZARD® frozen treat. According to the map, the attributes with the closest correspondence to Dairy Queen's BLIZZARD® frozen treat include "something I crave," "totally indulgent," "something I will go out of my way for," "something I like to share with friends or family," and "brings a smile to my face." (*Id.*) The correspondence map contains no reference to the word "portable." (*Id.*; Tr. at 366:8-370:13.)




(Ex. P-44 at 25.)

58. The DQ Treats Presentation also reports that a barrier to people buying more BLIZZARD® frozen treats is that the product is too high in calories. (Tr. at 370:17-371:20; Ex. P-44 at 32.) Ms. Kenny acknowledged that indeed, some people associate Dairy Queen's BLIZZARD® frozen treat with being unhealthy, or requiring them to go to the gym the next day to burn off the calories. (Tr. at 344:11-17.)

59. In part of the DQ Treats Presentation, Dairy Queen identified "key trends" within the quick-service restaurant category, including "indulgence," "discovery," "comfort & nostalgia," "healthier trends," "getting thrifty," and "on-the-go." (Ex. P-44 at 49–54.) On the page of the presentation listing the "on-the-go" trend, it states, "Portability continues to move at a fast pace," and is illustrated with photographs of other quick-service restaurants' branded products such as "cake pops," tacos, snack wraps, bottled root beer floats, and a sandwich chain's "grab and go" drinks cooler. (Ex. P-44 at 54.)

60. Ms. Wang, Senior Product and Brand Manager for BLIZZARD®, testified that Dairy Queen spends "over half a million dollars every year on BLIZZARD®" in terms of consumer research and testing, substantially more than the approximately $200,000 it spends per year researching its other products. (Tr. at 1404:3-13.) Dairy Queen spends approximately two times as much on BLIZZARD® research than on its other products because the BLIZZARD® is Dairy Queen's "flagship product," and its "key product for growth." (Tr. at 1404:14-23.)

### C. W.B. Mason's Business and Products

#### 1. Leadership and Growth of Company

61. Leo J. Meehan is the President and CEO of W.B. Mason. (Tr. at 815:8-13.) Mr. Meehan testified at trial about the history of the W.B. Mason company, the history of its selection and use of Blizzard marks for paper and water products, the advertising and promotion of such products, sales related to its Blizzard spring water, and the company's general business operations. The Court found Mr. Meehan's testimony to be credible.

62. When Mr. Meehan began working for W.B. Mason, it was a small office supply company with approximately $900,000 in annual sales and fourteen employees. (Tr. at 815:21-23.) In 1979, Mr. Meehan assumed responsibility for W.B. Mason's marketing and advertising functions, and was later promoted to Vice President of Marketing. (Tr. at 816:1-14, 816:19-20.) In 1983, he became an owner of the company, (Tr. at 816:20-23), and in 1994, he became the President and CEO. (Tr. at 816:14-20.) Mr. Meehan testified that as CEO, his primary job is to plan the future of the company, oversee company operations, and support the company's future mission. (Tr. at 828:12-25.)

63. In 1986, W.B. Mason decided to expand. (Tr. at 816:24-25.) It considered changing the company's name and hired an advertising agency to explore different options. (Tr. at 816:24-817:6.) With input from Mr. Meehan, the company created its "Who But W.B. Mason Company" slogan and marketing campaign. (Tr. at 817:6-13.) Mr. Meehan credited this tag line, used in the company's advertising and marketing materials, with helping to expand the company's annual revenue. (Tr. at 817:10-20.) He testified that

during the approximately 20-plus years of his leadership, the company increased its annual revenue from $20 million to $2 billion. (Tr. at 817:14-20.)

64. W.B. Mason prides itself on being a "throwback" company that provides customers with quality service, old-time values, reliability, and fast delivery. (Tr. at 820:5-821:2, 827:14-22.) Mr. Meehan testified that W.B. Mason rarely loses a customer. (Tr. at 827:23-828:9.)

65. W.B. Mason currently has 2,200 employees and over 300,000 customers. (Tr. at 825:6-9.) Before the COVID-19 pandemic, the company had over 4,000 employees. (Tr. at 825:10-19.)

**2. Marketing, Advertising Style, and Use of the W.B. Mason Character and W.B. Mason House Mark**

66. W.B. Mason's marketing materials utilize a bright and playful tone that Mr. Meehan likened to the circus coming to town, using "very colorful, bright, primary colors, and a good feeling and a lot of fun surrounding it." (Tr. at 842:7-19; Exs. P-168, P-169, D-298, D-300.) Mr. Meehan testified that customers often comment on the company's attention-grabbing red and yellow delivery trucks, which are an effective marketing tool and often appear in W.B. Mason's sales materials. (Tr. at 829:14-24, 841:12-842:19; Ex. P-172; *see also* Ex. D-298.)

67. W.B. Mason's advertising also features the stylized image of its namesake: a chiseled, dark-haired man, with a prominent mustache, modeled after the company's founder, William Betts (W.B.) Mason. (Tr. at 817:24-818:9, 821:3-9; Ex. D-66.) He is the "spokesman" for the company's marketing. (Tr. at 820:2-10.) W.B. Mason began

using the W.B. Mason character in 1986 as a central theme of its marketing to represent the timeless, throwback essence of a hard-working company that has been in business since the nineteenth century. (Tr. at 820:11-821:20.) The W.B. Mason character is integrated into everything the company does and is typically featured in its marketing and advertising. (Tr. at 821:3-20.)

68. The company also prominently uses the tagline "Who But W.B. Mason," in its marketing, to allow any hypothetical question related to a customer's business needs to be answered with, "Who But W.B. Mason." (Tr. at 821:10-20.)

69. Another important component of W.B. Mason's marketing is its association with Major League Baseball ("MLB"). W.B. Mason has advertised with the MLB for the past eighteen years, beginning with the Boston Red Sox in 2003. (Tr. at 833:17-834:25; Ex. D-477.) In 2004, it expanded its MLB advertising to the Philadelphia Phillies, then to the New York Yankees in 2006, and later to the Washington Nationals, the Baltimore Orioles, the Pittsburgh Pirates, the Cleveland Indians, the Miami Marlins, and the Tampa Bay Rays. (Tr. at 836:8-13; Exs. D-478, D-479.)

70. Specifically, in 2002, after losing its office supply team sponsor, the Boston Red Sox contacted W.B. Mason to negotiate a deal that would allow W.B. Mason to become a prominent sponsor of the Red Sox. (Tr. at 831:4-832:16.) In five days, Mr. Meehan negotiated a sponsorship that gave W.B. Mason, among other things, the first sign in fifty years on the "Green Monster," the renowned green left-field wall in Fenway Park, and a brand new sponsored post-game show. (Tr. at 831:4-833:11.)

71. Mr. Meehan felt that baseball's storied history blended perfectly with W.B. Mason's brand image. (Tr. at 835:22-836:2.) He testified that the sponsorship has been a great success, and customers frequently mention the company's signage on the Green Monster. (Tr. at 836:5-7.) After nearly two decades of prominent advertising with the Red Sox, Mr. Meehan believes that W.B. Mason has become synonymous with the team. (Tr. at -836:5-7.) Prior to the pandemic, W.B. Mason spent over $20 million annually on MLB advertising, which included television advertising during games and sponsorship of a pre- or post-game show. (Tr. at 830:4-19, 839:21-24.)

72. W.B. Mason also advertises on television. Its commercials prominently feature W.B. Mason's house mark and tagline "WHO BUT W.B. MASON," and contain no reference to Dairy Queen or its BLIZZARD® frozen treat. (Tr. at 858:23-862:8, 875:2-878:18; Exs. D-98, D-99, D-286, D-287.)

73. In addition to its partnership with MLB, W.B. Mason also advertises using sell sheets, flyers, catalogs, television commercials, and through its website. (Tr. at 862:9-16; Exs. D-66, D-98, D-99, D-127, D-286, D-287, D-298, D-300.)

### 3. Initial Adoption of W.B. Mason's Blizzard® Mark and Design on Copy Paper

74. As noted, Defendant W.B. Mason sells office-related products, including copy paper. (Tr. at 819:15-19, 822:4-5.) In the early 2000's, the brightest copy paper available for routine use was known as '84 bright. (Tr. at 845:1-2.) Today, there are two basic brightness copy papers—'92 bright, standard copy paper, and '96 bright, which is noticeably brighter. (Tr. at 844:16-23.)

75. In 2002, Mr. Meehan met with a South American paper mill that offered a pulp capable of making paper brighter than any copy paper sold at the time. (Tr. at 845:3-14.) The paper mill suggested that Mr. Meehan make the copy paper a private label brand for W.B. Mason. (Tr. at 845:3-14.) Mr. Meehan agreed. (Tr. at 845:3-14.)

76. In 2003, W.B. Mason first began using its Blizzard® mark for its private label brand of copy paper products. (Tr. at 852:16-18.)

77. Mr. Meehan selected and adopted the Blizzard® mark to convey to consumers that its copy paper was brighter (‘96 bright versus ‘84 bright) than standard copy paper. (Tr. at 845:15-846:15.) At trial, Mr. Meehan explained how he selected the name for the mark:

> So I was thinking how would I get that [W.B. Mason's copy paper was brighter] across to people, when it came to me that when I was young and I was at home and after a blizzard, if you ever went outside into the yard, as soon as you would go out into the yard and the sky was clear blue and the sun was shining off the snow, it would create a glare that would make you turn your face away and block your eyes until your eyes adjusted. And that feeling was the feeling I thought if we described that to the customers and said, that's the feeling you're going to have when you see this copy paper, it could be a breakthrough for us to be able to get them to really look at it. So what would the name of the paper be? We said, [w]hy don't we call it Blizzard. I mean, that's when this would happen. And we really liked the way Blizzard sounded. It had a whiteness, a pureness to it, all the things that sort of related well to the way that we were going to describe the paper.

(Tr. at 845:23-846:15.)

78. Shortly thereafter, W.B. Mason developed a Blizzard® logo and design for its paper with a blue sky, a tree filled with bright white snow (as it would appear after a blizzard), and the descriptor "Blinding White" (as depicted below). (Tr. at 846:23-847:16, 852:10-15; Exs. D-279, D-279A.)




(Exs. D-279, D-279A.)

79. Mr. Meehan testified that when creating W.B. Mason's Blizzard® copy paper logo and design, he did not instruct the graphic artist to copy Dairy Queen's BLIZZARD® logo or design. (Tr. at 851:15-852:4.)

80. In 2012, W.B. Mason expanded its Blizzard® copy paper line to include Blizzard of 78 copy paper and Blizzard envelopes, which used the same Blizzard logo and design. (Tr. at 852:21-855:13; Exs. D-280, D-281.)

81. Since 2003, W.B. Mason has sold more than $400 million of Blizzard® paper products. (Tr. at 856:10-20, 1908:19-24.)

82. W.B. Mason owns two trademarks registered with the U.S. Patent and Trademark Office ("USPTO") for its Blizzard® copy paper: BLIZZARD BLINDING WHITE COPY PAPER and BLINDING WHITE BLIZZARD 78 COPY PAPER. (Tr. at 944:21-945:5, 1669:14-16.)

83. Mr. Meehan testified that W.B. Mason's selection of its Blizzard® mark and design for copy paper had nothing to do with Dairy Queen, and W.B. Mason was not trying

to obtain an unfair advantage by attempting to create an association between W.B. Mason and Dairy Queen or its frozen dessert. (Tr. at 857:15-22.)

84. In fact, Mr. Meehan testified that he had no knowledge of Dairy Queen's BLIZZARD® frozen treat prior to adopting the W.B. Mason BLIZZARD mark for its copy paper. (Tr. at 857:23-858:8.) Consequently, he did not think about Dairy Queen's BLIZZARD® treat at any point during selection of the Blizzard® name for W.B. Mason's line of copy paper. (Tr. at 858:18-22.)

85. Indeed, Mr. Meehan was unaware that Dairy Queen offered a BLIZZARD® frozen treat until Dairy Queen sent W.B. Mason a letter challenging its use and registration of W.B. Mason's Blizzard mark on spring water in 2017. (Tr. at 858:9-15.) Mr. Meehan has never been to a Dairy Queen restaurant, nor could he recall seeing or noticing any Dairy Queen BLIZZARD® television advertisements prior to the commencement of this dispute. (Tr. at 858:16-17, 952:25-953:9.)

86. W.B. Mason produced two television commercials in the 2005-2007 timeframe to promote its Blizzard® copy paper. (Tr. at 858:23-861:24; Exs. D-99, D-286.) These commercials ran approximately 120 times in the New York, Boston, and Philadelphia television markets. (Tr. at 861:25-862:5.)

87. During 2005-2007, W.B. Mason also marketed and promoted its Blizzard® copy paper through sell sheets, flyers, and catalogs, and through the company's website. (Tr. at 862:9-16.)

88. W.B. Mason includes the W.B. MASON name and logo on its Blizzard® copy paper products so that consumers know the copy paper is coming from W.B. Mason. (Tr. at 851:1-14, 1021:20-25; Exs. D-279, D-279A, D-280, D-281.)

**4. W.B. Mason's Use Of Blizzard Mark On Spring Water**

**a. Background and Labeling**

89. In 2010, W.B. Mason launched its own private label spring water business under the name Blizzard. (Tr. at 870:1-4.) Initially, W.B. Mason sold five-gallon bottles of Blizzard spring water (as depicted below). (Tr. at 870:5-13.)




(Ex. D-276.)

90. W.B. Mason entered the water business to protect its office breakroom coffee business. (Tr. at 865:7-866:1.) Specifically, Mr. Meehan testified that unless W.B. Mason began offering its own water products, a water supplier would be positioned to steal W.B. Mason's coffee business because it could offer both water and coffee to customers. (Tr. at 865:12-18.) This would put at risk W.B. Mason's entire breakroom coffee business, which also included sugar, stir sticks, creamers, and cups. (Tr. at 865:12-18.) Prior to launching

its own branded spring water, W.B. Mason primarily sold Poland Spring water. (Tr. at 864:9-10.)

91. However, to compete for its breakroom coffee business using Poland Spring water, Mr. Meehan testified that W.B. Mason would need to undersell Poland Spring, which would likely result in thin profit margins for W.B. Mason and would lead to friction with Poland Spring. (Tr. at 864:9-20.) As a result, W.B. Mason decided that it needed a private label spring water to compete on price and to maintain customers. (Tr. at 864:23-865:6.)

92. After securing a source of spring water for its new business, W.B. Mason needed to select a name for its spring water product. (Tr. at 866:4-7.) While discussing possible names with his designer, Mr. Meehan saw a box of W.B. Mason's Blizzard® copy paper sitting under a desk and decided that "blizzard" would work as a name for spring water for several reasons: (1) it evokes the feeling of going outside as a child after a blizzard and eating freshly-fallen snow on the ground; (2) "blizzard" and water would work together in advertising; (3) W.B. Mason already had the artwork for the Blizzard® copy paper brand; and (4) W.B. Mason could leverage its existing "blizzard" brand that was "already quite powerful in the company." (Tr. at 866:8-867:14.)

93. W.B. Mason's then-existing registered marks for its copy paper were BLIZZARD BLINDING WHITE COPY PAPER and BLINDING WHITE BLIZZARD 78 COPY PAPER. (Tr. at 944:21-945:5.)

94. W.B. Mason used the Blizzard® copy paper logo and packaging design to create the five-gallon Blizzard spring water label, incorporating the snow-covered tree, the

blue sky, the Blizzard mark, the WHO BUT W.B. MASON mark, and the W.B. Mason character wearing sunglasses with the crossed flags as a "punctuation point" at the end. (Tr. at 869:8-25.) W.B. Mason replaced "blinding white" with "spring water" on the label (as depicted below). (Tr. at 869:15-20.)







(Exs. D-279, D-324.)

95. Mr. Meehan testified that W.B. Mason expanded its use of its Blizzard® copy paper mark and design to spring water because Blizzard was already a very strong brand associated with W.B. Mason, and the company wanted to "squeeze[] out" as much of the brand as possible for its new spring water, building on customers' trust in W.B. Mason's Blizzard brand. (Tr. at 870:14-871:9.)

96. When W.B. Mason adopted the Blizzard mark for its new water product, it did not conduct a trademark search. (Tr. at 955:4-13.) Although Mr. Meehan was personally involved in the development of the water and personally selected the name, he did not request that a trademark search be done, nor did he subsequently make such a request when W.B. Mason expanded its spring water line. (Tr. 955:11-13, 956:4-958:15.)

97. Mr. Meehan disavowed that W.B. Mason wanted the colors of its logo to be similar to Dairy Queen's BLIZZARD® logo, noting, again, that he had never seen a Dairy Queen BLIZZARD® treat. (Tr. at 871: 10-15.) Rather, W.B. Mason wanted its spring water packaging to be the same as its copy paper packaging. (Tr. at 871:14-15.) Likewise, Mr. Meehan testified that W.B. Mason did not choose Blizzard as the name for its spring water in the hope that customers would associate it with Dairy Queen or its frozen treat, or that any association would give W.B. Mason a competitive advantage. (Tr. at 872:6-9, 872:18-23, 873:2-9.)

98. In 2013, W.B. Mason began selling individual-sized bottles of Blizzard spring water to continue to expand its water business. (Tr. at 872:18-23, 873:2-9.) The labels on the smaller bottles use the same Blizzard logo and design scheme as the larger bottles. (*Compare* Exs. D-277 and D-448, *with* Exs. D-276 and D-324.) The packaging (depicted below) has remained the same from 2013 to the present. (Tr. at 874:4-6.)




(Exs. D-277, D-448.)

**b. Advertising, Marketing, and Sales of Spring Water**

99. In 2015-2016, W.B. Mason aired two television commercials to promote its Blizzard spring water, which commercials ran approximately 120 times per year in each of W.B. Mason's MLB markets. (Tr. at 875:5-16, 876:18-20, 878:1-10.) These television commercials contained no reference to Dairy Queen, its BLIZZARD® frozen treats, or Dairy Queen's "happy tastes good" tagline. (Tr. at 876:11-18; Exs. D-98, D-287.)

100. W.B. Mason also used "read-outs" (advertisements read during major league baseball broadcasts) to promote its Blizzard spring water, including "Real spring water tastes better! Try BLIZZARD WATER exclusively from WB Mason!" or "Don't settle for Purified Water! Try W.B. Mason's BLIZZARD SPRING WATER Today!" (Tr. at 878:19-880:8, Ex. P-166.) W.B. Mason also advertised its Blizzard spring water on printed flyers and sell sheets. (Tr. at 881:1-884:17; Exs. D-300, D-298.) It generated and distributed approximately 30,000 of each flyer and spreadsheet. (Tr. at 882:11-13.) None of the advertisements contains any reference to Dairy Queen or its BLIZZARD® frozen treat. (Tr. at 881:1-884:17.)

101. Mr. Meehan testified that through W. B. Mason's marketing, it has never attempted to create any kind of association between its Blizzard spring water and Dairy Queen or its BLIZZARD® frozen treat. (Tr. at 884:4-13.) He explained that he saw no possible reason why such an association would benefit W.B. Mason. (Tr. at 884:1-17.)

102. On the W.B. Mason website, its Blizzard spring water is promoted as "W.B. Mason's Very Own Spring Water" (depicted below) to make clear to its customers that Blizzard is a W.B. Mason brand and belongs to W.B. Mason. (Tr. at 884:18-885:20.) W.B.

Mason's website makes no reference to its spring water being connected to Dairy Queen or its BLIZZARD® frozen dessert. (Tr. at 885:20-24; Ex. D-437 at 15.)




(Ex. D-437 at 15.)

103. Mr. Meehan testified that W.B. Mason's Blizzard spring water is a "lead" product for the company, in that customers are familiar with it and its pricing, and it attracts new customers to the company's coffee breakroom business. (Tr. at 886:20-887:4, 887:25-888:5.) W.B. Mason's sales representatives lead with a sale of Blizzard spring water to encourage customers to buy other breakroom items and other office items. (Tr. at 887:25-888:5.)

104. W.B. Mason customers primarily buy Blizzard spring water through the W.B. Mason website. (Tr. at 1933:9-20.) Approximately 74% of W.B. Mason's water customers order and purchase their water through the company's website at wbmason.com. (Tr. at 1933:17-20; Ex. D-312.)

105. W.B. Mason has never trained its sales people to represent that its Blizzard spring water is associated with Dairy Queen. (Tr. at 888:9-17.) W.B. Mason is also not

aware of a single customer asking W.B. Mason whether its Blizzard spring water is connected with Dairy Queen. (Tr. at 888:18-21.)

106. In 2010, W.B. Mason's sales of Blizzard spring water totaled $91,000. (Tr. at 897:18-22.) Since that time, W.B. Mason has grown the business considerably, with total sales of more than $130 million. (Tr. at 898:2-5.)

107. W.B. Mason does not compete with Dairy Queen for the sale of desserts. (Tr. at 913:13-15.) W.B. Mason's customers are not able to order single-serving milkshakes or frozen treats from the company, and W.B. Mason does not intend to go into the ice cream business. (Tr. at 913:16-18, 914:4-12.) Indeed, as a business-to-business supplier of office supplies, Mr. Meehan testified that W.B. Mason has no interest in entering the retail ice cream business. (Tr. at 914:4-12.)

108. Mr. Meehan testified that in the 11 years W.B. Mason has been selling its Blizzard spring water, no one has suggested or expressed a belief that there was any connection between W.B. Mason's Blizzard spring water and Dairy Queen or its frozen desserts. (Tr. at 919:18-920:7.)

109. Mr. Meehan also testified that W.B. Mason would not derive a business advantage if consumers mistakenly believed its Blizzard spring water was connected to Dairy Queen because there is no commonality between the two products. (Tr. at 920:8-11.) In fact, any such association might hurt W.B. Mason, he stated, because its spring water is a healthy, no-calorie refreshment whereas Dairy Queen's BLIZZARD® is a high-calorie dessert. (Tr. at 920:12-921:2.)

**c. Trademark Registrations for Defendant's Spring Water**

110. When W.B. Mason launched its Blizzard spring water in 2010, Mr. Meehan turned the trademark application process over to his attorney, but his attorney did not file a trademark application at that time. (Tr. at 921:9-22.) Mr. Meehan testified that he was unaware why these applications were not filed then. (Tr. at 921:9-13.)

111. In 2016, W.B. Mason learned that no trademark application had been filed for its Blizzard spring water when an outside banker noticed that the company's Blizzard mark (for spring water) was not registered. (Tr. at 921:23-922:7.) Mr. Meehan contacted W.B. Mason's trademark attorney, Tom Behenna, who then filed two applications for Blizzard spring water. (Tr. at 921:23-922:7, 923:4-9; *see also* Exs. D-340, D-342.)

112. Mr. Meehan is unaware whether Mr. Behenna conducted a formal trademark search before filing the Blizzard spring water applications in 2016. (Tr. at 923:10-13, 955:4-957:8.)

113. In any event, the USPTO approved for registration both of W.B. Mason's Blizzard spring water applications without citing any of Dairy Queen's BLIZZARD® registrations as a basis to refuse registration. (Tr. at 923:14-16; *see also* Exs. D-340, D-342.)

114. W.B. Mason always includes the W.B. MASON name and logo on its Blizzard spring water products so that consumers know the water comes from W.B. Mason. (Tr. at 928:2-929:13, 1021:20-25; Exs. D-276, D-277.)

**D. Dairy Queen's Trademark Enforcement Strategy**

115. Elisa Edlund is the primary in-house attorney at Dairy Queen in charge of Dairy Queen's trademark portfolio. (Tr. at 1607:7-10.) She works closely on trademark matters with Dairy Queen's trademark paralegal, Sara Broze. (Tr. at 1608:2-8.) Ms. Edlund has worked at Dairy Queen for over fourteen years, (Tr. at 1608:9-11), and Ms. Broze has worked there for over twenty years. (Tr. at 1608:5-14.) Ms. Edlund and Ms. Broze both work with outside counsel to prepare new trademark applications. (Tr. at 1608:18-1609:8.)

116. During Ms. Edlund's deposition in this case, she testified that Dairy Queen's primary concern is with third-party use of the BLIZZARD® mark in the "consumable" category. (Tr. at 1604:18-21.) She said nothing about "restaurant services" at her deposition. (Tr. at 1604:22-1605:3.)

117. Ms. Edlund also testified at trial via video link, where she explained that Dairy Queen's general BLIZZARD® trademark enforcement strategy is to stop others from using "blizzard" in connection with food or beverages because Dairy Queen® stores carry a broad variety of consumable food and beverage products. (Tr. 1049:12-1050:1.) However, at trial, Ms. Edlund also testified that "restaurant services" (in addition to "consumables") is a category of use with which Dairy Queen is concerned. (Tr. at 1595:5-9, 1596:10-1596:6, 1604:18-1605:11.)

118. Dairy Queen takes a variety of actions to protect its BLIZZARD® mark, including sending cease and desist letters (Dairy Queen's primary enforcement tactic), trademark oppositions, take-down requests, and litigation. (Tr. at 1051:15-1052:12.)

119. Dairy Queen has enforced its BLIZZARD® marks at least 109 times against infringers using marks confusingly similar to BLIZZARD. (Ex. P-199c.) Of those 109 matters, 105 were resolved to Dairy Queen's satisfaction. (Tr. at 1578:8-22.)

120. Currently, through a third-party trademark watch service called Clarivate Analytics, Dairy Queen is alerted to trademark application filings and published trademark applications that use the word "blizzard." (Tr. at 1595:17-22, 1609:25-1610:9.) Ms. Broze receives the watch notices by e-mail directly from Clarivate Analytics. (Tr. at 1595: 21-22, 1615:1-15.)

121. Since December 2006, Dairy Queen has placed a continuous watch on published marks containing the word "blizzard," and since 2014, it has placed a watch for pending third-party applications involving the word "blizzard." (Tr. at 1611:10-21, 1613:1-4; Ex. D-481 at ¶ 2.)

122. Dairy Queen does not monitor trademark applications in all classes. (Tr. at 1614:5-7.) Rather, Dairy Queen only monitors applications in certain trademark classes. (Tr. at 1613:24-1614:1.)

123. Ms. Edlund testified that when evaluating trademark watch notices, Dairy Queen will generally object to any use on a product that it deems a "consumable" and any use that is arguably related to a consumable, like an ice cream machine. (Tr. at 1617:7-24.) Ms. Edlund acknowledged that the USPTO trademark registry contains 75 Blizzard-related registrations or pending applications that Dairy Queen did not oppose (and does not plan to oppose) because they are not within the categories of goods or services about which

Dairy Queen is concerned. (Tr. at 1675:2-1678:23; Exs. D-351–D-353, D-355–D-425, D-480; *see also* Stip. of Facts [Doc. No. 419] at 1.)

124. When Ms. Broze receives the watch notices, she initially assesses them to determine whether the mark in question is a concern for Dairy Queen "based on the criteria [and] the boundaries that [Dairy Queen] established as far as what is likely to be confusing." (Tr. at 1595:25-1596:14, 1616:7-25.) If Ms. Broze determines that the mark is not likely to be confused with Dairy Queen's BLIZZARD® mark, she does not forward it to Ms. Edlund for further review. (Tr. at 1616:20-25.)

125. Ms. Broze received publication watch notices when each of W.B. Mason's two applications to register Blizzard in connection with spring water were cleared by the USPTO and approved for publication on or about April 25, 2017. (Tr. at 1629:17-21; Ex. D-241.)

126. Although W.B. Mason's Blizzard spring water trademark applications were filed on October 20, 2016, they were apparently not brought to Dairy Queen's attention for six months. (Tr. at 1633:4-1634:23.)

127. When it became apparent in April 2017 that Dairy Queen had no copies of an application watch notice from the time when W.B. Mason had originally filed its Blizzard spring water applications in October 2016, Ms. Edlund did not investigate whether the watch notice had not been received, or whether it had been lost or deleted. (Tr. at 1633:4-1634:19.) Rather, Ms. Edlund was focused on "looking forward" and did not consider following up with the vendor or Ms. Broze as to why she did not receive the original notice. (Tr. at 1633:4-1635:19.)

128. In some instances, Dairy Queen has not identified or investigated the use of "blizzard" in connection with a consumable product, such as Disney's BLIZZARD BEACH, BLIZZARD WINES, Saratoga Peanut Butter's BLIZZARD BUTTER, Whole Foods' BLIZZARD BOUNTY, and Warwick Ice Cream Company's BLIZZARD OF '78 ice cream. (Tr. at 1618:19-1619:8, 1619:20-1620:11.) Indeed, Dairy Queen was unaware of these consumable uses of "blizzard" and had not objected to them prior to W.B. Mason identifying them during this case. (Tr. at 1620:12-1620:15.) While Ms. Edlund assumed that consumable products, such as food, beverages, and ice cream, are sold at Disney's Blizzard Beach park, she has never investigated it. (Tr. at 1618:19-1619:8, 1661:20-1662:17.)

129. With respect to BLIZZARD WINES, Saratoga Peanut Butter's BLIZZARD BUTTER, Whole Foods' BLIZZARD BOUNTY, and Warwick Ice Cream Company's BLIZZARD OF '78 ice cream, after the close of fact discovery in this matter, Dairy Queen sent each of these third parties a cease-and-desist letter, demanding that they cease using "blizzard" on their products. (Tr. at 1620:16-24.)

130. After learning of Warwick Ice Cream's use of BLIZZARD of '78 ice cream, Dairy Queen gave it six months to phase out its use. (Tr. at 1623:8-20; Ex. P-294.)

131. After Dairy Queen learned of W.B. Mason's use of Blizzard spring water, it sent a cease and desist letter, (Tr. at 1642:14-22), and ultimately, in March 2018, filed this trademark infringement and dilution lawsuit.

### E. Dairy Queen's Refreshed Logo, July 2018

132. Ms. Kenny, Dairy Queen's Vice President of Brand & Product Marketing, testified that from the early 2000s to July of 2018, Dairy Queen used a different version of its BLIZZARD® logo, which displayed staggered blue letters for BLIZZARD® against a gold background with the phrase "THE ORIGINAL BLIZZARD ONLY AT DQ."[7] (Tr. at 301:12-302:20.) This phrase was written in yellow or gold lettering against a red background, as depicted below:




(Tr. at 301:12-302:1; Ex. D-238.) Dairy Queen commenced the instant action against W.B. Mason on March 12, 2018. (Ex. D-437.) Ms. Kenny acknowledged that four months after Dairy Queen filed the instant action accusing W.B. Mason of infringing and diluting its existing (gold) BLIZZARD® mark, Dairy Queen changed the look and feel of its BLIZZARD® logo. (Tr. at 308:3-7, 308:25-309:25.)

[7] Ms. Culver, Dairy Queen's former Vice President of Retail Merchandising, clarified that prior to using the blue lettering on the logo, the BLIZZARD type was depicted in purple from approximately 2000 until 2004, but the other features of the logo were the same. (Tr. at 538:18-19; 551:8-22.)

133. In the summer of 2018, after this lawsuit was commenced, Dairy Queen began using its new logo. (Tr. at 302:21-23, 304:6-8.) The new logo no longer has gold in the center, and the word "blizzard" now appears in white letters (instead of blue letters) against a blue background. (Tr. at 304:9-305:8.) In addition, the "blizzard" lettering and typeface is now straight instead of being staggered, as it was in the prior gold logo. (Tr. at 305:8-15, 306:17-21.) Dairy Queen's new BLIZZARD® logo is depicted below:




(Ex. D-332.)

134. In addition to being responsible for trademark matters at Dairy Queen, Ms. Edlund is also the primary contact for the marketing department at Dairy Queen and works closely with the marketing team to review marketing and packaging materials before they are released. (Tr. at 1609:9-16.) Ms. Edlund testified that Dairy Queen makes "every effort to not roll out a new mark without having it approved by legal." (Tr. at 1609:17-20.)

135. Susan Culver, Dairy Queen's former Vice President of Retail Merchandising, now retired, testified at trial that based on marketing presentation materials from 2018, Dairy Queen had finalized its decision on the new BLIZZARD® logo between March 20, 2018, and July 2018. (Tr. at 571:16-572:9.) Around March 20, 2018, Ms. Culver prepared

a PowerPoint presentation for the internal marketing team to present the logo updates, including the intended use of the logo on a new cup design. (Tr. at 557:21-559:13; D-333.)

136. After the numerous options for the new logo were whittled down to a few, the legal team, including Ms. Edlund, became involved in the review and approval of the new logo design. (Tr. at 1650:22-1651:13.) At the time the legal team reviewed and considered the new logo options, Ms. Edlund was aware of the look of W.B. Mason's Blizzard spring water packaging. (Tr. at 1650:22-1651:13.) Ms. Edlund acknowledged that the process for selection the new BLIZZARD® logo took several months, and occurred during the same time that the parties in this action were seeking to resolve the dispute amicably. (Tr. at 1650:10-17.)

137. Ms. Culver testified that Dairy Queen's CEO, Troy Bader, had ultimate approval authority, and the design for the refreshed log would not have been approved had he not agreed to it. (Tr. at 565:20-566:8.)

138. Ms. Edlund acknowledged that the Mr. Bader was aware of the dispute between W.B. Mason and Dairy Queen before the lawsuit was filed and before he ultimately approved the new logo design. (Tr. at 1651:21-1652:6.)

139. To obtain the USPTO's approval for Dairy Queen's refreshed logo, which was approved, Dairy Queen amended the existing logo, which did not claim color or offer protection for particular colors. (Tr. at 1648:13-1649:11.) Ms. Edlund testified that trademark owners are allowed to modernize a logo under an existing trademark registration if the new logo does not materially alter the character of the mark or create a new impression. (Tr. at 1041:3-18.)

140. At trial, in ruling that Dairy Queen was not entitled to the equitable remedy of the disgorgement of profits, the Court pointed to the evidence, set forth above, that Dairy Queen had refreshed its logo after accusing W.B. Mason of trademark infringement and trademark dilution. (Tr. at 1901:15-17.) The Court noted that at that time, "key players at Dairy Queen and its counsel were very familiar with W.B. Mason's mark," yet the record made clear that the refreshed logo was "more similar to W.B. Mason's mark than the original logo in place at the time the controversy arose in this case." (Tr. at 1901: 17-22.) While the Court made clear that its denial of the remedy disgorgement of profits was not a ruling on the ultimate issue of trademark infringement, Dairy Queen's conduct weighed against a finding that Dairy Queen was concerned that W.B. Mason's Blizzard spring water would confuse customers in a way that would harm Dairy Queen's brand. (Tr. at 1901:23-1902:1.)

**F. W.B. Mason's Sales and Advertising of Third-Party Brands**

141. W.B. Mason's CEO, Mr. Meehan, testified that W.B. Mason sells its Blizzard water and other items to ice cream shops, restaurants, and similar establishments. (Tr. at 976:19-24; Ex. P-59.)

142. W.B. Mason's Vice President of Marketing, Matthew Rogers, testified via video deposition that in approximately 2015-2016, W.B. Mason's fastest growing sales category was food service products—those targeted at restaurants. (Tr. at 1025:25-19.)

143. Despina Tolides, a senior category analyst for W.B. Mason's break room products, testified via video deposition that in approximately 2017, W.B. Mason added ice cream cones to its line of break room products. (Tr. at 1379:12-24.) It decided to offer ice

cream cones based on requests from the field and to capitalize on "opportunities in mom and pop shops that [W.B. Mason's sales] guys wanted to go after." (Tr. at 1380:2-9.) W.B. Mason also added toppings and sprinkles to its repertoire of products. (Tr. at 1379:12-1380:6.) It has also created its own ice-cream sales flyers:




(Tr. at 977:11-13; Ex. P-59.) W.B. Mason's Blizzard spring water is advertised on the third page depicted above. (Ex. P-59.) The company's tag line, "WHO BUT W.B. MASON," is found only on the first page. (*Id.*)

144. In these ice cream flyers, W.B. Mason sells Blizzard water alongside well-known third-party brands like HERSHEYS®, REESE'S®, SNICKERS®, M&M®, OREO®, DIXIE®, SOLO®, JOY®, NESQUIK®, and SMUCKERS®. (Ex. P-59.)

145. Mr. Meehan testified that W.B. Mason uses the tagline "One Source Wonderful" to enforce the idea that "[i]t's wonderful for the customer to be able to get all these things in one place delivered." (Tr. at 819:10-25; Ex. D-66.)

146. W.B. Mason's Vice President of Marketing, Mr. Rogers, testified in his deposition that W.B. Mason co-brands and advertises on its trucks—one of its most important forms of advertising—with other well-known brands because it wants its customers to know that "[w]e sell [other companies'] products" and to know there's an association between W.B. Mason and the other companies. (Tr. at 1030:8-1031:18.) W.B. Mason co-brands with third parties such as HP, KEURIG, GREEN MOUNTAIN, and DUNKIN' DONUTS. (Tr. at 1030:5-21.)

147. W.B. Mason advertises its Blizzard spring water alongside other well-known brands:




(Exs. D-298C, D-299.)

**G. Sales of Ice Cream and Blizzard Water In Ice Cream Shops**

148. Ms. Kenny, Dairy Queen's Vice President of Brand & Product Marketing, testified that all Dairy Queen restaurants are required to sell bottled water. (Tr. at 245:5-

6.) Ms. Wang, Senior Product and Brand Manager for BLIZZARD®, noted that Dairy Queen restaurants also offer water to customers in BLIZZARD® branded paper cups. (Tr. at 1438:23-7; Ex. P-394.) Thus, customers can purchase BLIZZARD® frozen treats and water at DAIRY QUEEN® restaurants, and W.B. Mason's President and CEO admitted that it would be "very normal for you to sell water that way in a Dairy Queen." (Tr. at 937:14-18.)

149. In light of W.B. Mason's business-to-business sales model, Mr. Meehan testified that it does not sell to resellers. (Tr. at 907:19-908:16, 908:24-909:13, Ex. D-274.) If it learns that a customer is reselling products purchased from W.B. Mason, including Blizzard spring water, it will contact the customer and remind it of W.B. Mason's "no resale" policy. (Tr. at 903:6-904:14, 908:24-909:9, see, e.g., Exs. D-446–D-447.)

150. Mr. Meehan testified that W.B. Mason's "no resale" policy has been included in its customer materials, including catalogs and flyers, since the early 2000s. (Tr. at 903:6-12, 906:25-907:16.) For example, in its ice cream themed flyers, "Here's The Scoop!" (Ex. P-168), "Sprinkling Savings" (Ex. P-169), and "A Sweet End of Season Deal" (Ex. P-170), the bottom page of each flyer contains states, "W.B. Mason reserves the right to limit quantities on its products and we prohibit sales to resellers." (Tr. at 903:6-12, 906:25-907:16, 1921:9-1924:5; Exs. D-108, P-168, P-169, P-170.) W.B. Mason's Vice President of Marketing, Matthew Rogers, testified that the resale prohibition does not appear on every flyer, including every ice cream flyer. (Tr. at 1028:22-1029:16.)

151. W.B. Mason's water bottles do not contain a "not for resale" prohibition on the labeling, (Exs. D-276–D-277), and Mr. Meehan acknowledged that the company's sales

representatives and delivery drivers have not been instructed to reprimand customers or tell them directly that they cannot resell Blizzard water. (Tr. at 1946:3-11.)

152. Richard Magee, W.B. Mason's Vice President, testified that he was not aware at the time of his deposition in February 2020 of any policy that would stop a customer from reselling Blizzard spring water. (Tr. at 1942:8-1943:15.) Similarly, Mr. Meehan testified at his deposition that he was unaware of any written policy that restricted W.B. Mason customers from reselling Blizzard water. (Tr. at 905:19-906:11.) At trial, Mr. Meehan stated that during his deposition, he had forgotten about the statement in the company's catalogue. (Tr. at 906:16-24.) He further testified that the no-resale policy had been in place for as long as he could remember, before the company included it in its catalog. (Tr. at 905:25-907:16.)

153. At trial, Mr. Meehan testified that W.B. Mason's no-resale policy and lack of interest to enter the retail sales market is based on two factors. (Tr. at 909:23-910:9.) First, some of W.B. Mason's important manufacturer/suppliers, like Coca-Cola, control the distribution of their products, which includes Coca-Cola's brand of bottled water, Dasani. (*See* Tr. at 910:13-911:7.) If one of W.B. Mason's customers could not obtain a resale distribution line directly from the manufacturer, W.B. Mason would not want the customer to resell Blizzard water in order to avoid any perception from a manufacturer/supplier like Coca-Cola that W.B. Mason is competing with it. (Tr. at 907:17-908:16, 910:25-911:7.) Second, Mr. Meehan testified that there is no incentive for its business customers to resell Blizzard water because it is not competitively priced for a retail sales channel. Tr. at 910:3-9.)

154. He acknowledged, however, one agreed-upon minor exception to the no-resale policy: W.B. Mason had allowed Blizzard water to be sold at a minor league baseball stadium for one year. (Tr. at 984:20-23.) The owner of a fledgling minor league baseball team, the Pawtucket Red Sox, who was also Mr. Meehan's personal friend, had asked W.B. Mason to serve as a team sponsor. (Tr. at 984:20-986:6.) Mr. Meehan initially declined the sponsorship request, finding it too expensive, but subsequently agreed when his friend suggested that W.B. Mason's Blizzard water be sold at the stadium for one year in order to defray some of the sponsorship cost. (Tr. at 985:3-12.) After W.B. Mason's water was sold at the stadium for the single season, the team's owner entered into a contract with Coca-Cola to sell Dasani water. (Tr. at 985:12-16.) Mr. Meehan testified that he was aware of the potential risks of the transaction, but because his friend had "been very good to [W.B. Mason] [in his friend's prior role] with the [Boston] Red Sox," Mr. Meehan felt that he owed him a favor. (Tr. at 985:17-20.) Mr. Meehan further testified that the "only rule against not selling to resellers was something [he] set up to keep the company clear and keep [W.B. Mason] in [its] channels." (Tr. at 985:21-23.) Dairy Queen did not elicit testimony or introduce evidence to quantify the amount of Blizzard water sales for the one-year period at the minor league baseball stadium.

155. At trial, Dairy Queen presented evidence from an investigation, conducted for this litigation, to determine whether certain restaurant customers of W.B. Mason were reselling Blizzard spring water to customers. One of Dairy Queen's private investigators, Jon Gallant, testified via video link about the investigation, which found that three ice cream shops (Penguin's Ice Cream Igloo, Mark and Julie's Homemade Ice Cream, and

Gofer Ice Cream) were reselling W.B. Mason's Blizzard spring water. (Tr. at 800:16-803:16, 774:11-777:22, 789:14-793:16; Exs. P-355-P-357.) Dairy Queen's investigators also found that two other W.B. Mason customers (Telly's Restaurant and Vazzey's Italian Restaurant) were reselling Blizzard spring water. (Tr. at 1925:3-9; Exs. D-347–D-348.) Mr. Magee, W.B. Mason's Vice President, testified that the total amount of Blizzard spring water sales to these five W.B. Mason customers was approximately $5,200, over a five-year time period. (Tr. at 1929:18-1930:11.) Finally, as presented in Dairy Queen's rebuttal evidence, its investigators visited three additional restaurant locations operated by two of W.B. Mason's customers (Clovis Point Vineyard & Winery and two locations of King's Road Brewing Co.). (Stip. of Rebuttal Facts [Doc. No. 430].) They determined that these two customers were also reselling Blizzard spring water to the public. (Ex. P-396, Ex. P-398, Ex. P-400.) W.B. Mason has sold a total of approximately $618 of Blizzard spring water to these two establishments, and does not know the portion of those sales that were resold to customers. (Stip. of Rebuttal Facts [Doc. No. 430] at 2.) In sum, the highest possible total of Blizzard spring water resales from these seven customers would amount to $5,818.

156. Mr. Magee testified that prior to this litigation, W.B. Mason was unaware that any of these establishments were reselling Blizzard spring water. (Tr. at 1925:10-1926:9; Stip. of Rebuttal Facts at 2.) Mr. Magee testified that as soon as W.B. Mason learned of the resales, it sent letters to each of these customers reminding them that the resale of W.B. Mason's products, including W.B. Mason's Blizzard spring water, violates the company's terms and conditions, and requested that they stop reselling the water. (Tr.

at 1927:9-1929:13; Exs. D-173, D-347–348, D-446–447, D-489, D-490; Stip. of Rebuttal Facts at 2.) In addition, after sending the letters to the five customers identified in Dairy Queen's case in chief, Mr. Magee stated that W.B. Mason directed its local salespersons to visit the establishments in question to ensure that they were no longer selling Blizzard water, and it reviewed a Blizzard water sales report, showing that these customers stopped purchasing the product after receiving the no-resale letters. (Tr. at 1929:6-13.) Mr. Magee acknowledged that W.B. Mason did not direct notices or reminders about the resale prohibition to all of its customers generally, however. (Tr. at 1945:2-6.)

157. The exact amount of Blizzard spring water the seven W.B. Mason customers resold is unknown. (Tr. at 1929:14-17.) However, the Court finds that even the total Blizzard water sales of $5,818 to these seven customers is *de minimis* in light of W.B. Mason's more than $130 million in sales of Blizzard water from 2010 to the present. (Tr. at 898:2-5, 902:14-25, 1929:18-1930:12; D-488.)

158. Moreover, W.B. Mason's Blizzard spring water was not advertised or promoted in any of the locations. Dairy Queen's private investigators, Jon Gallant, Kane Winn, and Robert Simmons, all testified via video link that none of the locations displayed any signage or advertising mentioning W.B. Mason, its Blizzard spring water, or Dairy Queen or its BLIZZARD® frozen treat. (Tr. at 780:1-17, 795:20-796:21, 808:13-809:9; Stip. of Rebuttal Facts at 2.)

159. Dairy Queen's investigators did not ask customers, store owners, or employees at any of the locations any questions about possible confusion between W.B.

Mason's Blizzard spring water and Dairy Queen's BLIZZARD® frozen treat. (Tr. at 780:21-781:22, 797:7-16, 809:10-810:1; Stip. of Rebuttal Facts at 2.)

160. Dairy Queen's investigators testified that Dairy Queen did not ask them to uncover evidence of whether anyone believed that Blizzard Spring Water was connected to Dairy Queen or its BLIZZARD® frozen treat or whether anyone had formed any association between Blizzard Spring Water and Dairy Queen or its BLIZZARD® frozen treat, and they did not do so. (Tr. at 781:9-22, 797:7-16, 809:10-810:1; Stip. of Rebuttal Facts at 2.)

161. W.B. Mason's Vice President, Mr. Magee, testified that W.B. Mason has never received any indication from customers of these shops that its Blizzard spring water was somehow connected to Dairy Queen. (Tr. at 1930:13-1931:5, 1937:17-1938:10.)

162. W.B. Mason's President and CEO, Mr. Meehan, testified that the company has a "no-resale" policy because it operates a business-to-business sales model. (Tr. at 908:24-909:13.) It is not in the resale business and has a number of important vendors, such as Poland Spring and Coca-Cola, that sell their products to W.B. Mason because W.B. Mason limits its operations to business-to-business sales. (Tr. at 907:17-908:9.) Mr. Meehan stated that W.B. Mason does not want to damage its relationship with these vendors. (Tr. at 907:17-908:9.) Rather, W.B. Mason desires to "stay in its lane" of business-to-business sales and does not plan to enter the business-to-consumer market. (Tr. at 909:3-21.) Mr. Magee testified that W.B. Mason does not plan to sell its spring water in the retail market, and has taken no steps to do so. (Tr. at 1937:7-16.) Moreover, as Mr.

Meehan explained, W.B. Mason's water prices are generally too high to compete in the business-to-consumer market. (Tr. at 907:17-910:9, 1924:6-20.)

163. Indeed, Mr. Meehan was surprised to learn that a small number of W.B. Mason customers have resold its Blizzard spring water, because it is not priced to compete in the business-to-business market. (Tr. at 902:19-903:5.) There are less expensive options for reselling bottled water. (*Id.*)

**H. Third-Party Use of BLIZZARD**

164. At trial, W.B. Mason offered recorded deposition testimony from the following third parties using the blizzard mark: Blizzard Entertainment (video games), Blizzard Lighting, Douglas Dynamics (Blizzard snowplows), Blizzard Wines, Blizzard Ski and Snowboard School, St. Cloud Blizzard (a semi-professional ice hockey team), Saratoga Peanut Butter (Blizzard Butter peanut butter), Green Bay Blizzard (a semi-professional football team), and Blizzard Sport. The Court summarizes this testimony below.

**1. Blizzard Entertainment**

165. Terrence Kiel, a senior trademark administrator at Activision Publishing, a subdivision of Activision Blizzard, testified via video deposition on behalf of Blizzard Entertainment. (Tr. at 2122:25-2123:11.)

166. Blizzard Entertainment is a subsidiary of Activision Blizzard. (Tr. at 2124:6-7.)

167. Blizzard Entertainment is a multibillion-dollar company that develops and sells video games, books, E-Sport games, and related merchandise. (Tr. at 2124:15-18,

2124:24-2125:5, 2128:9-25, 2130:12-19.) Blizzard Entertainment has over 30 million monthly active users and owns the URL blizzard.com. (Tr. at 2124:9-14, 2129:5-19.)

168. Blizzard Entertainment produces the following video game franchises: World of Warcraft, Diablo, StarCraft, Hearthstone, Overwatch, and Heroes of the Storm. (Tr. at 2129:20-2130:11; Exs. D-89, D-148.)

169. The primary source of accessing a video game from Blizzard Entertainment is through its websites, blizzard.com and battle.net, where games are played using the company's servers. (Tr. at 2139:7-18.)

170. In November 2004, Blizzard Entertainment released World of Warcraft, a massive multi-player online role-playing game based on the original Warcraft game released in 1994. (Tr. at 2131:11-2132:1.) The Warcraft franchise was so popular that Blizzard Entertainment decided to make a live-action movie out of it. (Tr. at 2132:2-12.)

171. In 2018, Blizzard Entertainment generated $7.5 billion in revenue. (Tr. at 2128:20-22.) In 2019, Blizzard Entertainment generated about $6.5 billion in revenue. (Tr. at 2128:23-25; Ex. D-147.)

172. In April 1994, Blizzard Entertainment first began using the BLIZZARD name in connection with video games. (Tr. at 2125:11-2123.)

173. Blizzard Entertainment owns thirteen U.S. trademark registrations, including registrations for BLIZZARD and BLIZZARD ENTERTAINMENT. (Tr. at 2133:1-22; Exs. D-9, D-397, D-398, D-407, D-408, D-412–D-418, D-421.)

174. Dairy Queen did not oppose or seek to cancel the application or registration of any of Blizzard Entertainment's marks. (Exs. D-419, D-9, D-397, D-398, D-407, D-408, D-412–D-418, D-421; Stip. of Facts [Doc. No. 419] at 1.)

175. The BLIZZARD ENTERTAINMENT logo is comprised of two stylized words; BLIZZARD and ENTERTAINMENT. (Tr. at 2134:1-7; Ex. D-106.) In size and prominence, the word BLIZZARD dominates the mark and is much larger than the word ENTERTAINMENT (as depicted below):




(Tr. at 2133:23-2134:12; Ex. D-106.)

176. The BLIZZARD ENTERTAINMENT logo "appears on the packaging, labeling, advertisement and promotion of its video games, and also on its websites where games can be accessed, downloadable versions, and battle.net site where games are played using BLIZZARD servers." (Tr. at 2134:18-2135:1.)

177. Blizzard Entertainment holds an annual convention, known as "BlizzCon," a large event with thousands of attendees who dress up in costumes and who are "immersed in all things BLIZZARD, all of the different games, all of the new announcements for new games." (Tr. at 2140:7-25.) Food and drink is served at the event. (Tr. at 2141:1-6.)

178. Blizzard Entertainment merchandise includes a variety of printed matter, clothing, action figures, cups, glasses, computer gaming accessories. (Tr. at 2141:25-

2143:21.) The merchandise is available for purchase on gear.blizzard.com. (Tr. at 2143:22-25; Exs. D-152, D-154, D-450, D-451.)

179. Blizzard Entertainment promotes its games and merchandise through its website, and also on twitch.com. (Tr. at 2139:25-2140:6.)

180. Blizzard Entertainment has collaborated with Uniqlo, the Japanese clothing store, to sell clothing associated with Blizzard Entertainment video games or characters. (Tr. at 2148:3-2150:18.) Those items all display the BLIZZARD ENTERTAINMENT mark and logo. (Tr. at 2148:3-2150:18; Ex. D-154.)

181. Blizzard Entertainment products display the BLIZZARD ENTERTAINMENT mark and logo. (Tr. at 2137:15-17, 2137:25-2138:5, 2146:4-2147:8.)

182. In 2009, Blizzard Entertainment and Dairy Queen worked together to oppose an application for a BLIZZARD mark filed by WTM Establishment Corporation in connection with wine and spirits. (Tr. at 2160:1-2161:11.) Blizzard Entertainment's counsel and Dairy Queen's counsel coordinated for purposes of this dispute, and Dairy Queen offered to take the lead on the opposition proceeding. (Tr. at 2160:24-2161:7.) The dispute was resolved through a settlement agreement. (Tr. at 2161:25-2164:3; Exs. D-471, P-343.)

183. In 2018, Blizzard Entertainment's counsel contacted Blizzard Lighting to raise concerns about potential confusion between the two marks. (Tr. at 2164:18-2167:3; Ex. D-248.)

184. Blizzard Entertainment also objected to a mark used by a company called EBlizz in connection with a social media business. (Tr. at 2167:4-15.)

185. Blizzard Entertainment is not aware of anyone confusing its products with those of Dairy Queen's. (Tr. at 2154:15-21.)

186. Dairy Queen's Kelly Kenny first learned of the BLIZZARD ENTERTAINMENT mark when she saw it in a store and it made her think of Dairy Queen's BLIZZARD mark. (Tr. at 328:7-24.) Ms. Kenny discussed it with colleagues and the Dairy Queen legal department and determined that "there was knowledge of this logo and that was all that [she] really needed to know." (Tr. at 329:4-330:1.)

187. Ms. Kenny testified that Dairy Queen and Blizzard Entertainment have a "shared interest" in the BLIZZARD mark, and a similar interest in defending the BLIZZARD mark. (Tr. at 334:9-336:9.)

188. According to Ms. Kenny, Dairy Queen uses BLIZZARD in its "sandbox" and is not concerned about other companies using BLIZZARD in a different "sandbox" that is unrelated to food and beverage products. (Tr. at 340:10-341:18.)

**2. Blizzard Lighting, LLC**

189. William Komassa, President and CEO of Blizzard Lighting, LLC, testified via video deposition on behalf of Blizzard Lighting, LLC. (Tr. at 1781:14-23.)

190. Blizzard Lighting LLC, based in Waukesha, Wisconsin, is a manufacturer and importer of professional entertainment lighting equipment and accessories and professional LED video wall products for use at theaters and performance and entertainment venues. (Tr. at 1782:20-1783:12; Ex. D-384.)

191. Blizzard Lighting began using its BLIZZARD mark in 2010 and owns a U.S. Trademark Registration for BLIZZARD LIGHTING. (Tr. at 1792:19-23; Ex. D-384.)

192. Dairy Queen did not oppose or seek to cancel the application or registration of the Blizzard Lighting mark. (*See* Ex. D-384; Stip. of Facts at 1.)

193. The Blizzard Lighting mark is comprised of the word BLIZZARD, stylized in white or sometimes gray font next to a snowflake (as depicted below). (Exs. D-110, D-247.) The logo appears on all packaging and products sold by BLIZZARD Lighting:







(Tr. at 1783:13-17; Ex. D-247.)

194. The majority of Blizzard Lighting's products are sold through resellers on e-commerce platforms. (Tr. at 1786:5-19.) Blizzard Lighting's primary customers are businesses and entertainment production companies who purchase lighting equipment for big shows, although it does have some direct consumer customers that purchase products through its website. (Tr. at 1785:4-1786:21; Ex. D-111.)

195. Blizzard Lighting products are advertised online and at trade shows and range in price from $100 to $10,000. (Tr. at 1784:20-1785:3, 1791:5-18; Ex. D-110.)

196. Blizzard Lighting spent approximately $525,000 on advertising in 2019, $505,000 on advertising in 2018, and $360,000 in 2017. (Tr. at 1800:13-20.)

197. Blizzard Lighting sales were approximately $12 million in 2019, $10.8 million in 2018, and $9.6 million in 2017. (Tr. at 1800:21-25.)

198. To Mr. Komassa's knowledge, no one, including Dairy Queen, has ever objected to Blizzard Lighting's use of its BLIZZARD LIGHTING mark except for

Blizzard Entertainment. (Tr. at 1811:5-11.) Blizzard Lighting and Blizzard Entertainment entered into a coexistence agreement in 2019. (Tr. at 1807:19-1809:11.) As a result of that agreement, Blizzard Lighting was required to add a disclaimer to its website that states, "Blizzard Lighting LLC is in no way affiliated with or sponsored by Blizzard Entertainment, Incorporated." (Tr. at 1807:19-1808:25.) To be "snarky," Blizzard Lighting also added to its disclaimer: "but we might as well take this opportunity to mention that we are not affiliated with or sponsored by Dairy Queen either, although DQ BLIZZARD frozen treats are très delish, and we wholeheartedly endorse them when consumed in moderation." (Tr. at 1808:23-1809:4, 1810:4-8; Ex. D-117 at 3.)

199. Also to Mr. Komassa's knowledge, no one has never confused Blizzard Lighting's products with Dairy Queen's BLIZZARD products, nor has anyone mistakenly believed that Blizzard Lighting was in some way affiliated with Dairy Queen. (Tr. at 1810:11-25.)

**3. Douglas Dynamics (BLIZZARD Snow Plow)**

200. Gerald Depies, Engineering Compliance Manager at Douglas Dynamics, testified via video deposition on behalf of Douglas Dynamics. (Tr. at 1817:11-17.)

201. Douglas Dynamics is a manufacturer of snowplows and salt spreaders and related accessories, based in Milwaukee, Wisconsin. (Tr. at 1818:14-24.) It sells its products under the brand name BLIZZARD. (Tr. at 1818:18-24; Ex. D-120.)

202. In 2005, Douglas Dynamics acquired The Blizzard Corporation, which began using the BLIZZARD mark in the late 1990s or early 2000s. (Tr. at 1819:21-1820:1.)

203. Dairy Queen did not oppose or seek to cancel the application or registration of the Douglas Dynamics' marks. (*See* Exs. D-402, D-410, D-411; Stip. of Facts at 1.)

204. Douglas Dynamics' BLIZZARD logo features the word BLIZZARD stylized in white font, next to a red graphic.




(Ex. D-133.)

205. Douglas Dynamics' BLIZZARD products are sold throughout the northern half of the United States (wherever it snows), and Canada. (Tr. at 1821:16-22.) Douglas Dynamics sells its BLIZZARD products to independent authorized dealers who then sell the products to consumers. (Tr. at 1821:22-1822:2.) Its BLIZZARD products range in price from $5,000-$9,000. (Tr. at 1822:19-24.)

206. Douglas Dynamics primarily markets its snow plows to commercial businesses such as landscapers and contractors. (Tr. at 1823:16-19.)

207. Douglas Dynamics advertises its BLIZZARD products through its website and industry trade shows. (Tr. at 1823:20-1824:7.) Authorized retailers of the BLIZZARD products may also advertise on their independent websites. (Tr. at 1825:2-20.)

208. Douglas Dynamics sells about 2,500-3,000 BLIZZARD snowplows annually. (Tr. at 1825:21-1826:9.)

209. Douglas Dynamics has no knowledge of anyone, including Dairy Queen, ever objecting to Douglas Dynamics' use of its BLIZZARD mark. (Tr. at 1830:7-14.)

210. Douglas Dynamics has no knowledge of anyone confusing its BLIZZARD products with Dairy Queen's BLIZZARD products. (Tr. at 1830:15-17.)

211. Douglas Dynamics has no knowledge of anyone mistakenly believing that Douglas Dynamics has received Dairy Queen's permission to use the BLIZZARD mark. (Tr. at 1830:18-1831:4.)

212. Also, Douglas Dynamics has no knowledge of anyone mistakenly believing that Douglas Dynamics' BLIZZARD products are somehow affiliated with or sponsored by Dairy Queen. (Tr. at 1831:5-8.)

213. Douglas Dynamics' BLIZZARD mark is well known in the snow plow industry. (Tr. at 1831:17-19.)

214. Douglas Dynamics' advertising expenses were approximately $5.2 million in 2018, $4.5 million in 2017, and $5.2 million in 2016. (Tr. at 1832:11-1833:6.)

**4. Blizzard Sport U.S.A.**

215. Pamela Kitter testified via video deposition on behalf of Blizzard Sport U.S.A., for which she serves as CEO. (Tr. at 1838:15-1839:4.)

216. Tecnica Group U.S.A. has been the parent company of Blizzard Sport U.S.A. ("Blizzard Sport") and a distributor of BLIZZARD skis since 2006. (Tr. at 1842:23-25, 1875:19-1876:13.)

217. Blizzard Sport is a wholesale distributer of alpine ski equipment and accessories located in West Lebanon, New Hampshire. (Tr. at 1839:7-21.) It sells its

products through both business-to-business and business-to-consumer sales channels. (Tr. at 1861:13-19.) Blizzard Sport's products are available for purchase worldwide through its website. (Tr. at 1843:18-1845:17.)

218. Blizzard Sport owns two U.S. trademark registrations for BLIZZARD for skis and ski accessories. (Tr. at 1840:9-13.) U.S. Trademark Reg. No. 973,899 for BLIZZARD was registered on November 27, 1973. (Ex. D-424.)

219. Dairy Queen did not oppose or seek to cancel the application or registration of this BLIZZARD mark. (*See* Ex. D-424; Stip. of Facts at 1.)

220. Blizzard Sport's mark contains the stylized word BLIZZARD with a graphic, which it uses on its products, including skis and accessories, as well as in advertising and on certain corporate documents. (Tr. at 1842:3-16; Exs. D-176, D-177, D-178, D-429.)

221. Blizzard Sport's annual sales in 2019 for products sold under the BLIZZARD mark in the United States was nearly $17.3 million. (Tr. at 1861:20-1862:1.) Its revenues from BLIZZARD sales consistently increase. (Tr. at 1862:2-8.)

222. Blizzard Sport estimates that it has sold over 10,000 pairs of skis since 2006. (Tr. at 1842:20-1843:4.)

223. Blizzard Sport advertises through its website, purchasing catalogs, magazine ads, social media, its retailers and distributors, promotional items, and point of purchase advertising. (Tr. at 1843:18-1845:17; Exs. D-166–D-172, D-175–D-178, D-445.)

224. Blizzard Sport spent approximately $561,000 on advertising its BLIZZARD-branded products in 2019. (Tr. at 1863:14-19.)

225. Beginning in 2006, Blizzard Sport began sponsoring professional athletes, who compete throughout the world and promote the BLIZZARD brand during competitions, travel, media appearances, and on social media. (Tr. at 1858:16-1860:9.)

226. Blizzard Sport is unaware of any confusion or mistaken belief that an association exists between Blizzard Sport's products and Dairy Queen's BLIZZARD frozen treat. (Tr. at 1880:6-25.)

227. Dairy Queen has never contacted Blizzard Sport regarding its use of the BLIZZARD mark. (Tr. at 1879:22-1880:1.)

228. Blizzard Sport is unaware of anyone ever objecting to its use of the BLIZZARD mark. (Tr. at 1880:2-5.)

**5. Saratoga Peanut Butter (BLIZZARD BUTTER)**

229. Jessica Arceri, founder and owner of Saratoga Peanut Butter Company, testified via video deposition on behalf of her company. (Tr. at 1950:24-1951:23.)

230. Saratoga Peanut Butter is a manufacturer of nut butters based in Victory Mills, New York. (Tr. at 1951:24-1952:4.) It has been in business for over fifteen years. (Tr. at 1952:5-7).

231. Saratoga Peanut Butter uses the word BLIZZARD in connection with a product called BLIZZARD BUTTER—a white chocolate blended peanut butter. (Tr. at 1952:15-1953:22; Exs. D-314, D-316.)

232. The BLIZZARD BUTTER logo is comprised of two stylized words: BLIZZARD and BUTTER. (Ex. D-318.) In size and prominence, the word BLIZZARD is the larger, dominant portion of the logo (as depicted below):




(*Id.*)

233. Ms. Arceri explained that BLIZZARD BUTTER's name arose from the fact that she created it on a snowy February day in upstate New York, and because the white chocolate chips reminded her of snow. (Tr. at 1953:10-15.)

234. Saratoga Peanut Butter advertises BLIZZARD BUTTER on its website and at local farmer's markets. (Tr. at 1953:20-23; Exs. D-315–D-317.)

235. Saratoga Peanut Butter sells its BLIZZARD BUTTER locally at farmer's markets, in stores around New York and the Northeast (primarily "mom and pop shops"), and through its website. (Tr. at 1954:2-21; Ex. D-319.)

236. Ms. Arceri testified that prior to this litigation, no one had ever contacted Saratoga Peanut Butter to object to its use of its BLIZZARD mark. (Tr. at 1962:4-10; *see also id.* at 1620:12-15.)

237. As noted earlier, after learning of Saratoga Peanut Butter's BLIZZARD BUTTER during discovery in this litigation, Dairy Queen sent Saratoga Peanut Butter a demand letter in 2020, asking that it cease using "blizzard" on its products. (Tr. at 1620:16-24; Ex. P-199C.)

238. Ms. Arceri testified that to her knowledge, no one has ever confused Saratoga Peanut Butter's BLIZZARD BUTTER product with Dairy Queen's BLIZZARD®. (Tr. at 1962:11-1963:8.)

**6. Blizzard Hockey Teams**

239. Christopher Canavati, who owns and operates three junior hockey teams, including the St. Cloud Blizzard and Alexandria Blizzard teams, testified via video deposition regarding the teams' use of the word "blizzard." (Tr. at 1969:10-25.)

240. The St. Cloud Blizzard and Alexandria Blizzard play in separate leagues. (Tr. at 1972:8-12.) The Alexandria Blizzard team is a lower-level team for developing players who hope to move up to the St. Cloud Blizzard team. (Tr. at 1972:14-16.)

241. The St. Cloud Blizzard team was previously called the Minnesota Blizzard and the Brookings Blizzard. (Tr. at 1971:2-12.) Blizzard LLC purchased St. Cloud Blizzard in 2005. (Tr. at 1970:25-1971:8.)

242. The St. Cloud Blizzard plays approximately 60 games each season throughout Minnesota, North Dakota, South Dakota, and Wisconsin. (Tr. at 1972:23-1973:16.)

243. The St. Cloud Blizzard mark and logo (depicted below) is comprised of two stylized words: ST. CLOUD and BLIZZARD, and a graphic of a yeti's head:




(*See* Ex. D-223.)

244. The ALEXANDRIA BLIZZARD mark and logo (depicted below) also uses the word BLIZZARD in its logo:




(Ex. D-220.)

245. The ST. CLOUD BLIZZARD mark and logo is used on the players' uniforms and apparel, on the team's and league's websites, on the apparel the team sells, on all of the advertising and signage in the arena in which the team plays, and on any printed material or business cards or letterhead and anything they promote. (Tr. at 1975:24-1976:7, 1978:7-16).

246. St. Cloud Blizzard merchandise, including hats, sweatshirts, T-shirts, shorts, and blankets are sold online and in their store at the arena. (Tr. at 1990:7-20; Exs. D-219–D-221.) The price of merchandise ranges from $5 to $75. (Tr. at 1999:19-2000:1.)

247. St. Cloud Blizzard players make promotional appearances in the St. Cloud community. (Tr. at 1979:3-1980:3.) The team wears apparel featuring the ST. CLOUD BLIZZARD logo during these community appearances. (Tr. at 1980:4-12.)

248. The Alexandria BLIZZARD and the local Dairy Queen franchise have a promotional partnership based on their shared use of the BLIZZARD mark. (Tr. at 2005:17-2006:15, 2014:19-2016:10.) At the end of each home game, Alexandria Blizzard players toss Dairy Queen BLIZZARD® frozen treats into the crowd as a way of thanking their fans. (Tr. at 2016:13-2017:1.)

249. The local Dairy Queen franchisee sponsored and paid for a player tunnel (depicted below) that features both the Dairy Queen logo and the Alexandria BLIZZARD logo. (Tr. at 2018:4-2022:13; Ex. D-224.)




(Ex. D-224.)

250. To Mr. Canavati's knowledge, no one has ever confused the St. Cloud Blizzard or the Alexandria Blizzard hockey teams with Dairy Queen. (Tr. at 2022:18-21.)

251. He testified that although the local Dairy Queen franchisee formed an association between the Alexandria Blizzard and Dairy Queen's BLIZZARD® frozen

treat, (*see* D-224 (shown above)), no one has ever mistakenly believed that the Alexandria Blizzard is somehow affiliated with Dairy Queen. (Tr. at 2023:1-12.)

**7. Blizzard Wines**

252. Dana Blizzard, owner of Blizzard Wines, testified via video deposition regarding her company's use of BLIZZARD. (Tr. at 2025:12-18.)

253. Together with her husband Nicholas Blizzard, Ms. Blizzard established Blizzard Wines in 2011. (Tr. at 2025:11-2026:7; Exs. D-188–D-189.) Blizzard Wines is located in Hillsboro, Oregon. (Tr. at 2026:12-18; Ex. D-197.)

254. The Blizzard Wines logo is comprised of two stylized words: BLIZZARD and WINES. In size and prominence, the word BLIZZARD dominates the mark and is much larger than the word "Wines":




(Ex. D-190.)

255. Blizzard Wines uses its label on all of its products including nearly fifteen varieties of bottled wine, wines by the glass, corkscrews, glassware, cheese plates, and wooden boxes. (Tr. at 2026:23-2027:11; Exs. D-180, D-181, D-188, D-190, D-196, D-198, D-199, D-202, D-237, D-239, D-240, D-331.) Their business and accounting documents also display the Blizzard Wines logo. (Tr. at 2026:23-2027:11, 2033:18-24.)

256. BLIZZARD wine is primarily sold directly to consumers at the Blizzard Wines location or through its website (blizzardwines.com), but is also sold to local restaurants for resale to consumers. (Tr. at 2027:12-23, 2029:12-2030:1, 2031:3-7; Exs. D-199–D-201.)

257. In 2019, Blizzard Wines' annual sales were approximately $700,000 and have been increasing over time as the company grows. (Tr. at 2031:23-2032:8.)

258. Blizzard Wines offers a wine-of-the-month club that ships wine within Oregon, and to California, New Jersey, Texas, Illinois, and possibly also Minnesota. (Tr. at 2030:2-2031:2; Ex. D-199.)

259. Blizzard Wines advertises its products through its website, which was started in 2010 or 2011, through Facebook and Instagram, and the winery was featured in an Alaska Airlines travel magazine. (Tr. at 2031:3-16, 2033:7-17, 2036:3-2037:20; Exs. D-185–D-186, D-207.)

260. After W.B. Mason deposed Blizzard Wines in this matter, Dairy Queen contacted Blizzard Wines' counsel to discuss Dairy Queen's concerns about its use of the BLIZZARD mark. (Tr. at 1594:8-15.)

261. Ms. Blizzard testified that prior to that, no one had objected to Blizzard Wines' use of BLIZZARD. (Tr. at 1620:12-15, 2034:10-19.)

262. On January 14, 2021, Dairy Queen sent a "reservation of rights" letter to Blizzard Wines' counsel, explaining that Dairy Queen was currently involved in litigation with W.B. Mason and explaining that it had no obligation to sue more than one company simultaneously. (Tr. at 1594:8-19.)

263. Ms. Blizzard testified that to her knowledge, no one has ever confused or associated Blizzard Wines with Dairy Queen or its BLIZZARD frozen treat. (Tr. at 2034:20-2035:4.)

**8. Blizzard Ski and Snowboard School**

264. Jennifer Lewin, the owner and director of Blizzard Ski and Snowboard School ("Blizzard Ski School"), a subsidiary of Snow Ventures, Inc., located in Plymouth, Minnesota, testified via video deposition regarding her company's use of BLIZZARD.

265. Blizzard Ski School is a traveling school that provides ski and snowboard instruction to youth in kindergarten through twelfth grade at several locations around the Twin Cities. (Tr. at 2053:15-22; 2054:18-2055:25.)

266. Blizzard Ski School started in 1958, with locations in Los Angeles, Boston, Chicago, Detroit, and Milwaukee. (Tr. at 2056:1-2057:18.) The Blizzard Ski School name has been in use since 1958. (Tr. at 2057:19-24; Ex. D-8.)

267. Blizzard Ski School owns the domain name blizzardmn.com. (Tr. at 2065:2-7.) The website has existed for approximately 12 years. (Tr. at 2065:8-15.)

268. The Blizzard Ski School logo is depicted below. In size and prominence, the word BLIZZARD dominates the mark and is much larger than the other text:




(Ex. D-209.)

269. Blizzard Ski School uses its BLIZZARD mark on its website, brochures, registration materials, instructor uniforms, merchandise and apparel, and promotional and advertising materials. (Tr. at 2058:19-2060:8; Exs. D-100, D-209, D-210, D-211, D-215, D-440, D-441.)

270. Blizzard Ski School partners with local ski and snowboard shops to promote the school. (Tr. at 2060:12-2061:10.) Local ski and snowboard shops display BLIZZARD Ski and Snowboard brochures, signs, posters and banners to promote the school throughout the season. (Tr. at 2060:12-2061:10.)

271. Blizzard Ski and Snowboard school advertises through local publications, print, online, and on radio and television. (Tr. at 2065:16-2066:6, 2072:5-2073:9.)

272. To Ms. Lewin's knowledge, no one, including Dairy Queen, has ever objected to Blizzard Ski School's use of its BLIZZARD mark. (Tr. at 2086:5-11.)

273. To her knowledge, no one has ever confused Blizzard Ski and Snowboard School with Dairy Queen's BLIZZARD frozen treat. (Tr. at 2084:25-2085:7.)

274. Also to her knowledge, no one has ever believed that Blizzard Ski School's products are somehow affiliated with Dairy Queen's BLIZZARD® products. (Tr. at 2085:12-15.)

275. However, ski school customers have suggested that the school should collaborate with Dairy Queen and have a "Blizzard Day." (Tr. at 2086:14-20, 2088:5-22.)

**9. CGT Football—Green Bay Blizzard**

276. Katherine Treankler testified via video deposition on behalf of CGT Football, LLC ("CGT"), which owns the Green Bay Blizzard Football team. CGT Football

purchased the team in 2013, but the team has been in existence since 2010. (Tr. at 2096:9-22). Ms. Treankler is the owner of CGT. (*Id.*)

277. CGT owns registered U.S. trademarks for GREEN BAY BLIZZARD and GREEN BAY BLIZZARD FOOTBALL. (Exs. D-366, D-367.)

278. Dairy Queen did not oppose or seek to cancel either of CGT's BLIZZARD marks. (Exs. D-366, D-367; Stip. of Facts at 1.)

279. CGT Football uses the word BLIZZARD in connection with its logo and mascot. The logo (depicted below) consists of a yeti carrying a football in its left hand and an outstretched right arm. In size and prominence, the word BLIZZARD dominates the mark:




(Ex. D-136.)

280. CGT Football's BLIZZARD logo appears in the end zone of the team's home football field, on the players' uniforms, helmets and apparel, on signage, merchandise, and apparel. (Tr. at 2098:21-2099:19; Exs. D-136–D-137, D-142, D-230–D-232.) Merchandise is available for purchase during games and online during the season. (Tr. at 2100:12-2101:4.) Green Bay Blizzard Football merchandise ranges in price from $15-$80.

(Tr. at 2101:6-16.) The merchandise consists of a variety of clothing and accessories including hats, t-shirts, sweatshirts, and jerseys. (Tr. 2099:8-2100:8.)

281. CGT Football sells approximately 3,500 tickets to each game. (Tr. at 2103:5-12.) Ticket prices range from $8-$45. (Tr. at 2103:13-16.)

282. CGT Football primarily advertises on Facebook and Instagram and has advertised on television, billboards, radio, and in print. (Tr. at 2104:4-2105:11; Exs. D-136–D-137, D-143–D-145.) It also markets football game tickets in schools or restaurants, targeting primarily children and families. (Tr. at 2106:16-2107:24.)

283. To Ms. Treankler's knowledge, no one has ever objected to CGT Football's use of its BLIZZARD mark. (Tr. at 2119:13-15.)

284. To her knowledge, no one has ever confused the GREEN BAY BLIZZARD FOOTBALL mark with Dairy Queen's BLIZZARD mark. (Tr. at 2119:16-19.)

285. Also to Ms. Treankler's knowledge, no one has ever mistakenly believed CGT Football's BLIZZARD products are somehow affiliated with or sponsored by Dairy Queen. (Tr. at 2119:24-2120:6.)

## III. EXPERT OPINIONS

### A. Recognition of Dairy Queen's BLIZZARD® Mark

286. As the Court will address in greater detail in its Conclusions of Law, a plaintiff asserting a trademark dilution claim must establish that the mark in question is famous, i.e., "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). "The extent of actual recognition of the mark" is among the non-exclusive

factors that courts consider when determining whether a mark possesses a sufficient degree of recognition among the public. 15 U.S.C. § 1125(c)(2)(A)(iii). The Federal Circuit has observed that direct evidence of consumer recognition of products and trademarks, such as surveys, "is preferable to indirect evidence of consumer recognition, from which inferences necessarily have to be drawn." *Bose Corp. v. QSC Audio Prods., Inc.*, 293 F.3d 1367, 1374 (Fed. Cir. 2002).

**1. Plaintiff's Expert, Dr. E. Deborah Jay**

287. Dairy Queen retained Dr. E. Deborah Jay to conduct a survey regarding the extent to which Dairy Queen's BLIZZARD® brand is recognized by the general consuming public in the United States. (Tr. at 660:1-5.)

288. The Court finds that Dr. Jay was well-qualified to conduct this survey. She is the principal and founder of the research firm Jay Survey Strategies, LLC, which provides survey design, sampling, data collection, and statistical analysis. (Tr. at 653:25-654:3.) She holds master's and doctorate degrees in political science, with an emphasis on political psychology and survey research. (Tr. at 654:11-13.) Dr. Jay has conducted, directed, and designed over 800 surveys in the last 40 years, including at least 400 surveys in the context of litigation. (Tr. at 655:15-18.) She has conducted approximately six recognition surveys. (Tr. at 698:6-8.) Her recognition survey in this case is the first that she has disclosed as an expert, and on which she has offered expert testimony. (*Id.*) Federal courts have found her qualified as an expert in survey design and methodology, and she has testified 32 times, about surveys that she has conducted, primarily involving trademarks (Tr. at 655:19-656:4.) In addition, Dr. Jay has published articles on survey

research methods and trademark surveys, including in trademark-related journals, and has edited a chapter in the newest edition of the treatise *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Shari Diamond and Jerre Swann. (Tr. at 656:8-18.) Dr. Jay has also taught or guest-lectured courses at the University of California, Davis and Berkeley, and at continuing legal education seminars for bar associations in New York, California, and Florida. (Tr. at 656:25-657:3-5.) She has further presented at seminars for the International Trademark Association, the American Intellectual Property Law Association, and other professional organizations. (Tr. at 657:5-8.)

289. In this case, Dr. Jay conducted a recognition survey of the Dairy Queen BLIZZARD® mark in June and July 2019. (Tr. at 654:3-6, 741:8-10.) She testified that a recognition survey "measures awareness of a mark, whether people have seen or heard of a mark in a context among the general consuming public." (Tr. at 660:1-5.) Dr. Jay explained that Dairy Queen hired her to conduct the survey because "recognition" is one of the factors used to determine the fame of a mark under the law. (Tr. at 659:23-25.)

290. For her recognition survey, Dr. Jay surveyed "a nationwide representative sample of 449 persons in the U.S. age 16 and older" with a questionnaire. (Tr. at 660:18-23.) She found the survey respondents through an internet panel, i.e., "a group of people who are recruited in multiple ways to ensure that they are a representative of people in a particular population, in this case the United States." (Tr. at 663:12-25.) Comparing the respondents' information to U.S. census data showed that they were statistically similar to the general population of the consuming public with respect to gender, age, ethnicity, regional distribution, and education. (Tr. at 662:19-663:10; Ex. P-77 at 9.)

291. Dr. Jay did not exclude people who do not buy ice cream or frozen treats (in other words, did not limit the survey to people who purchase ice cream or frozen treats). (Tr. at 661:8-10, 676:12-23.) The survey was conducted "double blind," in that Dr. Jay did not tell the respondents the name of the client or that the survey was being conducted in connection with litigation. (Tr. at 665:4-9.)

292. The survey questionnaire informed respondents that they would be asked questions "about some names that may or may not be a brand name for an ice cream or other frozen treat sold at a restaurant or store." (Ex. P-76 at 7.) As to why Dr. Jay asked whether the respondents were familiar with the brand names in the context of ice cream or frozen treats, as opposed to their general familiarity, she testified that "this is the way recognition surveys are routinely conducted both in the context of litigation and for branding surveys." (Tr. at 670:11-21.) She stated that recognition surveys normally provide a context so that the questions are not vague. (Tr. at 671:7-672:2.)

293. In a series of individual questions, the survey asked the respondents to identify whether they had seen or heard of each of eight brands of ice cream or frozen treat: BLIZZARD, McFLURRY, POLAR SWIRLS, F'REAL, SLURPEE, CONCRETE MIXER, FROSTY, and CRYMO. (Ex. P-76 at 8-14.) The survey included only the word names of the brands, without logos or visual images. (Tr. at 696:3-6, 696:16-20.)

294. Dr. Jay explained that seven of the brands were real, but one of them, CRYMO, was fictitious, in order to identify "noise," or guessing, among respondents. (Tr. at 666:16-22, 669:18-25.) After accounting for "noise," Dr. Jay found that 84% of survey

respondents had seen or heard of the BLIZZARD® brand, in connection with ice cream or frozen treats:

**Table 2**
**Percentage of Survey Respondents Who Said They Had Seen or Heard of Various Ice Cream/Frozen Treat Brands, After Accounting for Guessing and Other Sources of "Noise"***

| | Recognition Minus "Noise" |
|---|---|
| | *(n = 449)* |
| SLURPEE | 86% |
| BLIZZARD | 84 |
| MCFLURRY | 75 |
| FROSTY | 73 |
| CONCRETE MIXER | 16 |
| POLAR SWIRLS | 10 |
| F'REAL | 8 |

* *Based on Questions A1-A8.*

(Ex. P-77 at 3.)

295. As to that finding, the Court finds Dr. Jay's testimony to be credible.

**2. Defendant's Expert, Ms. Sarah Butler**

296. W.B. Mason hired an expert in consumer survey research and consumer perception, Sarah Butler, to review and respond to the opinions offered by Plaintiff's experts, Dr. Jay and Dr. Erich Joachimsthaler. (Tr. at 1717:1-2.) As part of Ms. Butler's work, she conducted three surveys: (1) a word association survey; (2) a likelihood of dilution survey; and (3) a likelihood of confusion survey. (Tr. at 1721:18-1722:4, 1723:9-12.)

297. The Court finds Ms. Butler qualified to offer her opinions. She is a survey expert who conducts consumer research by designing, implementing, and analyzing survey

data. (Tr. at 1716:11-12.) Ms. Butler serves as the managing director at NERA Economic Consulting ("NERA"), a consulting firm that offers financial, statistical, survey-related advice and consulting. (Tr. at 1716:2-9.) Ms. Butler has worked there for over twenty years, and currently chairs NERA's survey and statistical sampling practice and manages her own research group. (Tr. at 1716:5-9, 1717:15-16; Ex. D-302.) She holds a master's degree in philosophy from Trinity College in Dublin, and a master's degree in Applied Sociology from Temple University. (Tr. at 1717:1214; Ex. D-302.) Also, Ms. Butler is a member of the American Association for Public Opinion Research, the International Trademark Association ("INTA"), and the American Statistical Society, and she is a non-lawyer member of the ABA's International Trademark Association. (Tr. at 1717:19-24; Ex. D-302.) She has conducted over 300 surveys over the course of her career in many types of cases, and has testified in court in bench and jury trials as an expert in survey research, as well as before the International Trade Commission and the U.S. Copyright Board. (Tr. at 1718:10-1719:1; Ex. D-302.)

298. The Court addresses Ms. Butler's work in greater detail below in its discussion of other issues in this case. For example, some of the findings from her likelihood of dilution survey and word association survey bear upon the recognition of the Dairy Queen BLIZZARD® mark among the general public.

**a. Likelihood of Dilution Survey**

299. In the first part of Ms. Butler's dilution survey, she sought to determine the percentage of respondents who identified Dairy Queen as the source of the Dairy Queen BLIZZARD® logo. (Tr. at 11-19.) Ms. Butler showed respondents the new version of

the Dairy Queen logo, and asked "do you associate this NAME with:" (1) one company or brand; (2) more than one company or brand; (3) no company or brand; or (4) don't know/no opinion. (Ex. D-309 at 18-19.)

300. In response, 83% of respondents identified the logo with a single company, and 78.2% of those respondents identified the company as Dairy Queen. (Tr. at 1759:14-1760:13.)

**b. Word Association Survey**

301. In Ms. Butler's word association survey, sometimes referred to as her "word test survey," she surveyed members of the general public, initially asking the open-ended question, without any visual logo, "What, if anything, does 'BLIZZARD' call to mind or make you think of?" (Tr. at 1748:25-1749:3; Ex. D-305 at 3.) The survey instructed respondents to type in their response. (Ex. D-305 at 3.)

302. In response to that question, 82% of respondents answered "snow, a storm, windy or cold weather," and 39% said "Dairy Queen" or "ice cream/frozen treats" (25% specified "Dairy Queen," while 14% said "ice cream or frozen treats"). (Ex. P-78, Table 3; Tr. at 684:2-9, 687, 1749:20-1750:1.) Dairy Queen received the highest percentage of associations with a single business, at 25%, while the only other company identified in response to the question, Activision, received a 2% response. (Ex. P-78, Table 3; Tr. at 1750:2-10.)

303. In response to the survey's subsequent questions about whether "BLIZZARD" called to mind "any specific brands, products, or companies," 54% of respondents said Dairy Queen, ice cream, or frozen treats. (Ex. P-78, Table 4; Tr. at 1753:7-

10.) Of this 54% response, 45% associated the word "BLIZZARD" with Dairy Queen specifically, while 9% associated it with ice cream or frozen treats in general. (Ex. P-78, Table 4.)

304. When asked why the respondents associated the logo with Dairy Queen, several of respondents' answers called Dairy Queen's BLIZZARD® "famous," "iconic," and "synonymous" with Dairy Queen. (*See e.g.*, Ex. D-310 at 19, 103, 104 ("iconic"); at 28, 148, 154 (because Dairy Queen is "famous" for their Blizzard frozen dessert); at 153, 154 (finding that Blizzard is synonymous with Dairy Queen or DQ); at 63, 64 ("very popular"); at 73 ("they are famous!"); at 108 ("DQ Blizzard is a famous brand"); at 193, 194 ("Blizzard is specific to Dairy Queen; Blizzards have been around for a while and are famously known to belong to Dairy Queen"); at 213, 214 ("world renowned" or "world known" snack"); at 218 ("It is one of the famous Dairy Queen brands for a while now").)

**3. Plaintiff's Rebuttal Expert, Dr. David Stewart**

305. In its rebuttal case, Dairy Queen presented testimony from Dr. David Stewart, an expert in marketing, consumer behavior, and survey research. Plaintiff asked him to review several expert reports in this case, including the reports of Dr. Jay and Ms. Butler. (Tr. at 2199:15-22.)

306. The Court finds Dr. Stewart well qualified to offer his opinions. He holds a Ph.D. in psychology from Baylor University and has written extensively about market analysis, consumer behavior, branding, and how consumers and managers search for and use information in decision-making, as well as methods for the study of consumers and their behavior, and the effective and efficient design of marketing programs. (Ex. P-111;

Tr. at 2196:12-2197:1.) He is an Emeritus Professor of Marketing and Business Law at Loyola Marymount University, with over 40 years of experience teaching about survey research. (Tr. at 2196:12-14, 2197:11-13.) Dr. Stewart is also an experienced consultant regarding consumer behavior and marketing research for major brands, non-profits, and government agencies. (Ex. P-111 at 52-53.) In addition, Dr. Stewart has been qualified by a federal court as an expert in survey design and methodology. (Tr. at 2197:7-9.)

307. Dr. Stewart reviewed the Jay survey and testified that Dr. Jay used a "common methodology" for measuring recognition of a trademark. (Tr. at 2200:5-9.) He explained that because words have different meanings for different consumers, the context of ice cream and frozen treats within Dr. Jay's survey "provides a really important set of parameters as to the meaning of a word." (Tr. at 2201:18-19.) Further, Dr. Jay opined that the methodology in the Jay survey is "based on an established body of referee-published research" and the inclusion of context was proper. (Tr. 2201:1- 2202:4, 2202:17-2203:11.) He concluded the survey by Dr. Jay is "a well-constructed survey of fame, of product recognition," that is supported by the "literature and practice in the field." (Tr. at 2216-2217.)

308. In addition, Dr. Stewart testified that Dr. Jay's results are representative of consumers in the general market as a whole, and that she did not analyze only a niche market, such as consumers of frozen treats or customers of Dairy Queen. (Tr. at 2200:10-22, 2201:17-2201:2.)

309. As to Ms. Butler's word association survey, conducted on behalf of Defendant, Dr. Stewart testified that it did not test or rebut the results of the Jay recognition

survey, as it lacked the same context and did not attempt to replicate it. (Tr. at 2204:20-23.) In fact, he stated that some of the data in Ms. Butler's word association survey "is somewhat supportive of Dr. Jay's survey." (Tr. at 2204:20-21.)

310. With respect to Ms. Butler's dilution survey, Dr. Stewart testified that this survey result supports Dairy Queen, because the high level of respondents who associate the BLIZZARD® logo with Dairy Queen is "a very powerful result." (Tr. 2216:10-13.)

**4. Analysis**

311. The Court finds that Dr. Jay's survey provides some empirical support for the public recognition of Plaintiff's BLIZZARD® mark, which is relevant to establishing the fame of the mark.

312. Defendant questions the temporal relevance of Dr. Jay's survey, conducted in 2019, arguing the relevant period for recognition of the mark is 2003 or 2010. ([Doc. No. 449] ¶¶ 152-56.) This argument would have more merit if Dr. Jay's survey were the only measure of recognition of the BLIZZARD® mark. It is not, as Dairy Queen has also submitted other evidence of recognition, including: (1) the duration, extent, and geographic reach of advertising and publicity of the mark; (2) the amount, volume, and geographic extent of sales of goods offered under the mark; and (3) whether the mark is registered. *See* 15 U.S.C. § 1125(c)(2)(A). Because the time period addressed by the Jay survey does not perfectly align with the relevant period here, however, the Court will assign it slightly less weight, but still finds Dr. Jay's survey and opinion helpful.

313. Moreover, the Court observes that some of the respondents to the dilution survey conducted by Defendant's expert, Ms. Butler, explained that they associated the

new BLIZZARD® logo with Dairy Queen, recognizing it from years past, stating, "Dairy [Q]ueen created the Blizzard and it's been a staple of their company for decades," "I've had their Blizzards once a year for the last decade or so," "I've been going there since I was a child [and] everyone knows Dairy Queen is the home of the Blizzard," "it is one of the famous Dairy Queen brands for a while now" or "for many years now," "I have eaten them for over 30 years," "they've served it for years," "they have advertised this for years and I have had many of them," "[i]t is the only frozen beverage that has that name and has been around many years," Dairy Queen "is where I have gotten them for 20 years or so," and "I grew up on Dairy Queen." (Ex. D-310 at 29, 33, 43, 53, 63, 64, 69, 73, 74, 84, 143, 218.) This evidence provides some support for a finding of consumer recognition of the Dairy Queen BLIZZARD® mark for many years—even decades—and supports an inference of recognition dating to 2003 and 2010.

314. As to W.B. Mason's critique that the Jay survey improperly measures recognition within a limited context, i.e., ice cream and frozen treats, and should be rejected or accorded little weight on this basis, ([Doc. No. 449] ¶¶ 157-70), both Dr. Jay and Dr. Stewart explained that this methodology of incorporating context when measuring recognition is common, and indeed, other courts have considered survey evidence of recognition or fame that provided a similar context. *See, e.g.*, *Visa Int'l Serv. Ass'n v. JSL Corp.*, 610 F.3d 1088, 1090–91 (9th Cir. 2010) ("Visa also introduced uncontroverted evidence that Visa is the world's top brand in financial services and is used for online purchases almost as often as all other credit cards combined."). Ms. Butler testified that narrowing the context of consumers' familiarity with "Blizzard" to ice cream or frozen

treats limits the usefulness of Dr. Jay's data, (Tr. at 1729:1-8), but Dr. Jay explained that providing context is a common survey methodology for measuring recognition because questions without context can be confusingly vague. (Tr. at 160:14-672:2.)

315. The Court will consider the results of Dr. Jay's survey, as well as Ms. Butler's word association and dilution surveys. Notably, the objectives of these surveys were somewhat different. For example, through Ms. Butler's word association survey, she sought to measure consumer associations with the word "blizzard" alone, which bears on the exclusivity of the Dairy Queen BLIZZARD® mark. Exclusivity is one of the non-exclusive factors used to determine dilution by blurring. 15 U.S.C. § 1125(c)(2)(B). Dr. Jay's survey sought to measure public recognition of the Blizzard brand, albeit in the context of ice cream and frozen treats, as a measure of fame. A prerequisite for a trademark dilution claim, whether by blurring or tarnishment, is that the mark must be "famous." 15 U.S.C. § 1125(c)(1). The Court agrees, however, that Dr. Jay's survey fails to measure public recognition of the Blizzard brand in the general consuming public, but rather does so explicitly in the context of ice cream and frozen treats. Nonetheless, Ms. Butler's survey does lend some support to the recognition of the Blizzard brand in the general consuming public.

316. Finally, W.B. Mason is also critical of the Jay survey because it fails to specifically link "blizzard," even in the ice cream and frozen treat context, with Dairy Queen. ([Doc. No. 449] ¶¶ 171-84.) In particular, Defendant invokes Warwick Ice Cream Company's Blizzard of '78 ice cream, which, Defendant argues, the Jay survey respondents could have called to mind when expressing familiarity with "blizzard" in the ice cream or

frozen treat context. (*Id.*) The Court declines to disregard the Jay survey on this basis for several reasons.

317. First, the Jay survey only asked respondents about familiarity with "brands" of ice cream or frozen treats, not "flavors." (Ex. P-76 at 7-15.) Warwick Ice Cream Company's Blizzard of '78 ice cream is a flavor, made under the Warwick brand. (Ex. P-294 at 1 (noting that Warwick Ice Cream Company has used the BLIZZARD mark "in connection with an ice cream *flavor* that it makes, promotes, and sells under the name 'Blizzard of '78'") (emphasis added); Tr. at 726:19-727:1 (Dr. Jay testifying, "Well, you showed me Blizzard of '78, which is not used as a brand name. That looks like the flavor. It was used in a descriptive way to refer to [a] blizzard in Rhode Island. . . . [T]he name Warwick was the brand, then it says Blizzard of '78, just like Ben and Jerry's would say Cherry Garcia, so it's the flavor [of] ice cream.").

318. Second, after Dr. Jay learned of the Warwick ice cream flavor at her deposition, and before trial, she reanalyzed her survey data to exclude respondents who lived in the Northeast (specifically, a total of 70 respondents from Rhode Island, Massachusetts, and Connecticut), where consumers might have encountered Warwick's Blizzard of '78 flavor. (Tr. at 727:2-16, 727:2-3.) When she excluded responses from survey participants living in those northeastern states, she found that recognition of Blizzard as a brand of ice cream or frozen treat was actually slightly higher. (Tr. at 727:11-16.) While W.B. Mason contends that in this reanalysis, Dr. Jay failed to account for consumers who do not *reside* in the Northeast, but who may have encountered the Warwick product while vacationing or attending college in the Northeast, (*see* Tr. at 728:14-16,

729:7-9), Dr. Jay found those variables would not apply to a significant portion of respondents, and, in any case, she found little demographic variation in her survey. (Tr. at 728:17-25.) Rather, she found the data internally consistent, and that it demonstrated "very high recognition" of Dairy Queen's BLIZZARD® brand across demographics and regions. (Tr. at 728: 20-25.)

319. Third, Dr. Jay reviewed all of the verbatim responses that Ms. Butler received from her different surveys, many of which asked open-ended questions, to see if any respondents mentioned either the Warwick Ice Cream Company or Blizzard of '78 ice cream. (Tr. at 728:4-8.) She found no such references, whereas she found many references to Dairy Queen.

320. For all of these reasons, the Court will consider the Jay survey and Dr. Jay's opinion as evidence of consumer recognition of the Dairy Queen BLIZZARD® mark. The Court will address the weight it assigns to Dr. Jay's opinion in its Conclusions of Law.

**B. Strength of the Mark**

321. One of the factors used to evaluate the likelihood of confusion—an element of a trademark infringement claim—is the strength of the plaintiff's mark. *Davis v. Walt Disney Co.*, 430 F.3d 901, 903 (8th Cir. 2005). Also, as relevant here, "evidence of third party usage of similar marks on similar goods is admissible and relevant to show that the [the plaintiff's] mark is relatively weak and entitled to a narrower scope of protection." *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626-27 (8th Cir. 1987).

**1. Parties' Experts**

322. Dairy Queen presented expert opinion on the strength of its BLIZZARD® mark from a marketing and consumer perspective, from Dr. Erich Joachimsthaler, who specializes in the subjects of product branding and consumer behavior. Specifically, Dr. Joachimsthaler stated that Dairy Queen retained him "to evaluate the Dairy Queen BLIZZARD brand, also W.B. Mason, the value of that brand to Dairy Queen, the value—how brands—how consumers respond to brands in this case, and the scientific evidence that exists underlying that consumer response or reactions, and how brands are harmed." (Tr. at 1074:11-16.)

323. The Court finds that Dr. Joachimsthaler is qualified as an expert on brands and marketing. He has worked as a branding and marketing consultant since the early 1990s, and for the past 21 years has owned and operated Vivaldi Group, a marketing consulting company. (Tr. at 1067:17-1068:8.) He holds a Ph.D. from the University of Kansas in business administration, with a specialization in marketing and qualitative methods. (Ex. P-107 at 1.) Dr. Joachimsthaler has published a number of branding-related articles in academic journals and has authored several books and book chapters on the subject of building brands. (*Id*. at 3-7.) In addition, he has taught courses in business administration and marketing at several universities. (*Id*. at 2.)

324. W. B. Mason offered testimony from Professor Wayne Hoyer to rebut the opinions of Plaintiff's expert, Dr. Joachimsthaler. (Tr. at 1478:1-6.) Professor Hoyer opined on the strength of the Dairy Queen BLIZZARD® mark from a marketing and

consumer behavior perspective, particularly in the context of third-party uses of "blizzard" in the marketplace. (Tr. at 1478:1-15.)

325. In addition, Professor Hoyer's opinions on third-party uses of "blizzard" in the marketplace pertain to Plaintiff's trademark dilution claim. Among the factors used to evaluate dilution by blurring is the exclusivity of the famous mark and whether any actual association exists between the famous mark and the allegedly diluting mark. 15 U.S.C. § 1125(c)(2)(B). The Court summarizes the majority of Professor Hoyer's opinions on third-party uses of "blizzard" in its discussion of expert evidence on the strength of Plaintiff's mark.

326. The Court finds Professor Hoyer qualified to offer his expert opinions. He is a tenured professor at the University of Texas at Austin, McCombs School of Business, where he teaches consumer behavior, customer strategy, and integrated marking communications. (Tr. at 1471:1-21, 1472:24-1473:1; *see also* Ex. D-112.) Throughout his career, Professor Hoyer has also conducted academic research, concentrated primarily in consumer information processing and decision-making, as well as research in advertising as it relates to miscomprehension and humor, branding and brand sabotage, brand personality, brand defense, and cause-related marketing and customer relationship management. (Tr. at 1473:2-12.) He has published over 100 scholarly papers and is the author of several books, including two books on the miscomprehension of advertising, and a major textbook entitled *Consumer Behavior* that is in its 7th edition with an 8th edition forthcoming. (Tr. at 1473:13-1474:1.) Dairy Queen's expert, Dr. Joachimsthaler, cited Professor Hoyer's textbook *Consumer Behavior* several times in support of his opinions.

(Tr. at 1474:2-7.) Professor Hoyer is also an associate editor for three marketing journals, and serves on the editorial board of four other journals. (Tr. at 1471:10-18.) He holds a Ph.D. in consumer social psychology from Purdue University, and has taught at a number of universities. (Tr. at 1476:8-24.)

**2. Plaintiff's Expert, Dr. Joachimsthaler**

327. Dr. Joachimsthaler testified that he reached his opinions regarding the strength of Dairy Queen's BLIZARD® by applying established principles of branding and consumer psychology—principles that he described as "unwavering" and "law-like." (Tr. at 1098: 3-19, 1138:2-5,1139:21-1140:10, 1297:9-19.) He testified that a strong brand contains tangible and intangible components. (Tr. at 1080:5-7.) Tangible elements include the brand's name, symbol, packaging, spokesperson, and even a gesture, such as the ability to turn a Dairy Queen BLIZZARD® upside down. (Tr. at 1080:7-20.) Intangible elements that contribute to a strong brand include emotions, attributes, feelings, and perceptions, all of which reside in the mind of the consumer. (Tr. at 1080:21-25.)

328. Dr. Joachimsthaler stated that brands are particularly important in the context of quick-service restaurants because the industry is intensely competitive and branding allows a quick-service restaurant to stand out from its competitors. (Tr. at 1083:13-1084:2.) In addition, he testified that brands are helpful to consumers because they serve as an informational shortcut. (Tr. at 1081:19-25.)

329. Dr. Joachimsthaler opined that from a marketing perspective, "Dairy Queen, and BLIZZARD® as part of Dairy Queen is a very, very strong brand." (Tr. at 1084:9-11.) In formulating his opinion about brand strength, he analyzed consumer surveys, sales

data, the number of stores, advertising, and the brand's online presence. (Tr. at 1084:17-24.)

330. In addition, Dr. Joachimsthaler applied a methodology called the brand identity system, or "BIS," that he and his colleagues developed in the early 1990s. (Tr. at 1078:18-1079:6; 1084:25-1085:10; 1086:2-4.) This system involves analyzing a brand in "four buckets": (1) as a product; (2) as an organization; (3) as a person; and (4) as a symbol. (Tr. at 1086:2-1094:9.)

331. Dr. Joachimsthaler testified that in the first category, BLIZZARD® is Dairy Queen's flagship product that "delivers happiness" and is viewed by consumers as an "accessible indulgence." (Tr. at 1097:3-10.)

332. When analyzing Dairy Queen's BLIZZARD® as an organization, he testified that Dairy Queen's mission is to induce a sense of joy, nostalgia, and whimsy in families and the larger community. (Tr. at 1090:2-17.) These corporate values, he stated, are likewise very closely related to the values associated with Dairy Queen's BLIZZARD®. (Tr. at 1090:25-1091:4.)

333. In terms of analyzing the brand as a person, Dr. Joachimsthaler testified that BLIZZARD®, like Dairy Queen, has a happy personality that involves "wholehearted fun" and is "pro dad, pro mom, [and] totally pro grandma." (1092:3-16.)

334. Finally, with respect to brand as a symbol, Dr. Joachimsthaler testified that Dairy Queen evokes nostalgia. (Tr. at 1093:6-22.) In addition, he stated that the BLIZZARD® serves as the singular driver of Dairy Queen's business, noting,

"BLIZZARD is this one thing that you actually go to the store to actually get. Most of the people go for the BLIZZARD." (Tr. at 1093:6-22.)

335. After reviewing these four elements, Dr. Joachimsthaler concluded that BLIZZARD® is "a strong brand with depth and texture. That's the foundation of real value to consumers and also to a company like Dairy Queen." (Tr. at 1095:5-8.)

### 3. Defendant's Expert, Professor Hoyer

336. Professor Hoyer testified that the concept of "brand equity" refers to the value of a brand in the marketplace. (Tr. at 1478:19-23.) Specifically, a brand's financial value is largely attributable to two factors: (1) the ability to differentiate the brand in the marketplace from other brands; and (2) mental associations that consumers form with the brand. (Tr. at 1478:23-1479:5.) Professor Hoyer opined that because brand equity resides in the mind of a consumer, even if a brand is discontinued, consumers can still remember that brand and continue to carry brand associations in their minds. (Tr. at 1486:10-19.)

337. From a marketing perspective, Professor Hoyer opined that it is desirable for companies to differentiate their brands from those of their competitors. (Tr. at 1479:6-9.) First, he explained that brands provide recognition in the marketplace, allowing consumers to identify brands and their meanings. (Tr. at 1479:10-18.) Given the complexity of the consumer marketplace, which is filled with many different brands, "knowing what a brand is all about" allows consumers to recognize a brand and simplifies consumer decision-making. (Tr. at 1479:13-17.) Second, brand differentiation increases the value of brands because consumers desire well-known brands and, as a result, the brand owner can

command a premium price. (Tr. at 1479:19-22.) Consumers are willing to pay more for brands that have higher brand equity. (Tr. at 1479:21-22.)

338. Professor Hoyer also opined that companies use a variety of marketing techniques to differentiate their products from others, including the brand name itself, the development of a distinctive logo, digital or traditional media advertising, sales promotions, public relations, and innovative new features. (Tr. at 1479:23-1480:7.)

339. In addition, Professor Hoyer opined that logos are important to a company's efforts to differentiate a brand because they help a brand stand out from the competition. (Tr. at 1480:8-11.) As examples of distinctive brand logos, he identified Apple's use of an apple with a bite missing, the Nike swoosh, and the Amazon smile. (Tr. at 1480:12-16.)

340. Likewise, Professor Hoyer testified that distinctive brand names aid consumer recognition and help a brand stand out in the marketplace. (Tr. at 1480:17-1481:3.) He noted that brand names such as GOOGLE, VERIZON, and MICROSOFT are distinctive, in part, because "they are not common real words." (Tr. at 1481:4-9.)

341. By contrast, Professor Hoyer stated that from a consumer perspective, a brand that uses common words as a trademark is placed at a disadvantage. (Tr. at 1481:10-15.) He explained that common words have different meanings and associations that are not necessarily associated with a particular brand. (Tr. at 1481:10-22.) Consequently, he testified, when a brand uses a common word, "consumers have to work harder to differentiate it from the common uses or other brands in the market." (Tr. at 1481:17-22.) Similarly, companies using a common-word brand must employ greater marketing efforts to differentiate their brand. (Tr. at 1481:19-1482:5.)

342. In forming his opinions, Professor Hoyer relied on research conducted by Orange Research Group for purposes of this litigation, along with Professor Hoyer's own verification of that research, that identified dozens of third parties using the name BLIZZARD in the marketplace. (Tr. at 1482:6-15.) Professor Hoyer instructed Orange Research Group to identify these companies by using corporate databases, trademark bases, and internet searches, and to then contact them to verify the third-party uses of BLIZZARD, or otherwise verify on Amazon or other websites that such BLIZZARD products or services are actually offered in the consumer marketplace. (Tr. at 1482:18-1483:5.) Orange Research Group assembled their research results in a report spanning about a thousand pages. (Tr. at 1483:6-10.) Professor Hoyer testified that he found it appropriate to rely on Orange Research Group's research because it conducted a time-consuming, primarily clerical task, and it is customary for academics to rely on such third-party research. (Tr. at 1484:17-25.)

343. In addition, Professor Hoyer reviewed nine corporate depositions of companies using the BLIZZARD mark, as well as the exhibits introduced at those depositions. (Tr. at 1483:11-22; *see also* Exs. D-8-9, D-56, D-88-89, D-100, D-109-111, D-116-117, D-119-122, D-133-134, D-136-138, D-142-148, D-152, D-154-156, D-161-163, D-165-172, D-175-183, D-185-191, D-196-204, D-207-211, D-215-224, D-230-232, D-237, D-240, D-247-248, D-259, D-293, D-314-319, D-331, D-427, D-440-441, D-450-451.) He also reviewed materials that Blizzard Beer Systems produced in response to a subpoena. (Tr. at 1483:16-18, 1483:24-1484:1; D-258.)

344. Professor Hoyer did not investigate the extent of each third-party's use of the BLIZZARD mark, because he found it was not relevant to his opinion regarding widespread use of BLIZZARD in the marketplace. (Tr. at 1485:10-17.) Nonetheless, he noted that some third-party users of BLIZZARD are very large entities, like Blizzard Entertainment, with over thirty million monthly subscribers, or Blizzard Beach at Disney World, with over two million visitors per year, or W.B. Mason's Blizzard® copy paper, with over $400 million in sales since 2003, whereas other third-party BLIZZARD users are much smaller entities. (Tr. at 1485:17-23.) Professor Hoyer explained that he sought to demonstrate widespread use, rather than the extent of individual use, to support his opinion that Blizzard is an attractive name that many companies want to use, have used, or may use in the future. (Tr. at 1485:17-1486:14, 1506:10-17.)

345. Professor Hoyer reviewed, independently verified, and relied on each of the following third-party uses of BLIZZARD to form his opinion in this case: Blizzard Motors car dealership in Portland, Oregon; Blizzard Stick used to measure snowfall; Blizzard Media, a digital media marketing company; Blizzard Lighting, a lighting and cable company; Blizzard skis and gear; Blizzard Bashers Hot Wheels truck; Little Blizzard Snow Machine (and the liquids for the snow machine); Ski-Doo MXZ Blizzard snowmobile; Green Bay Blizzard semi-pro football team; Blizzard CX1 vacuum cleaner from Miele; Blizzard OM Performance (offering Blizzard EMS trauma blanket, Blizzard trauma blanket, Blizzard rescue jacket, and Blizzard Transport); Blizzard men's gloves; Blizzard Entertainment; Blizzard snowplow; Exocarb Aero Blizzard tool bit; Blizzard mountain bike; Blizzard Beer Systems; Blizzard Bay sweaters; Blizzard Wizard snow and ice melt

from Morton Salt; Black Blizzard watch; Buffalo Blizzard pool cover; Buffalo Snow Blizzard blanket; Beer Blizzard, a beer can ice cube introduced on *Shark Tank*; Blizzard Beach at Walt Disney World (including the food menu at the Blizzard Beach Water Park, offering a Blizzard Burger and Blue Blizzard Margarita); Dragons of Blizzard Island comic; Buffalo Blizzard soccer team; Blizzard Winery with Blizzard Wines; Blizzard Ski and Snowboard School; Blizzard by FLIP Fabrique entertainment/circus show; Blizzard Industrial Supply Company; Blizzard paintball gun; Blizzard Bounty Snack Mix from Whole Foods; Elk Lake Blizzard Breakers Snowmobile Club; Blizzard Buddy hunting gear; Blizzard Butter from Saratoga Peanut Butter Company; Blizzard Fences; Blizzard Fire Protection; Blizzard freezer from NuAire; Ozzy Osbourne's *The Blizzard of Oz* record album; Blizzard Plus yachting rope; Burst Blizzard Vape Juice; Dometic Blizzard rooftop RV air conditioner; Blizzard Property Management; Blizzard Snow Cone Machine; Blizzard hunting bows; Blizzard Bash demolition derby annual event; *Blizzard*, a book by John Rocco; Blizzard River, a ride at Six Flags Great Escape in Upstate New York; St. Cloud, Minnesota's Blizzard hockey team; *Blizzard* movie; Blizzard Bold Blend coffee; Blackberry Blizzard tea; Blizzard shaving soap; Blizzard Buster snow shovel; Blizzard Brite shower and glass cleaner; Blizzard bubble blower; Blizzard Mountain bumper flap; Blizzard darts; Blizzard Champion Katana TeeDevil golf disk; Blizzard tennis strings; Blizzard sprinkles; Utah County Blizzard hockey, a semi-pro hockey team; Blizzard fan from Holmes; Blizzard's Custom Cycle Supply Company; The Blizzard Box cooler; the Minnesota Blizzard Hockey Club; and W.B. Mason's Blizzard copy paper. (Tr. at 1487-

1505:25); *see also* Exs. D-56, D-106, D-148, D-209, D-220, D-223–224, D-230, D-232, D-258, D-440–441, D-450.)

346. Professor Hoyer opined that these third-party uses of BLIZZARD demonstrate widespread use of BLIZZARD in the marketplace, and reveal a crowded field of BLIZZARD uses. (Tr. at 1506:10-17.) He stated that Blizzard is a very popular name, with many positive features and associations. (Tr. at 1506:18-1507:5.)

347. Given such widespread use of BLIZZARD, Professor Hoyer opined that when consumers are confronted with many BLIZZARD brand names, they learn that there are differences among the brands and associate the different uses with the different brands. (Tr. at 1507:6-20.)

348. Professor Hoyer opined that although consumer confusion can arise even when there is extensive third-party use of a mark, it typically arises when the marks are intentionally very similar, such as with counterfeit goods. (Tr. at 1507:21-1508:7.) However, he testified that is not the case with Dairy Queen and W.B. Mason. (*Id.*; 1521:14-25.)

349. Professor Hoyer testified that the third-party uses of BLIZZARD he reviewed and verified have not weakened the association between Dairy Queen and its frozen treat because consumers learn to distinguish between different brands, and different brands have different associations. (Tr. at 1508:20-1509:2.) As a result, he opined, consumers have been able to distinguish among the different BLIZZARD brands. (Tr. at 1509:1-2.)

350. Further, Professor Hoyer stated that Dairy Queen's BLIZZARD® has "strong brand equity" and because Dairy Queen has "engaged in a lot of solid marketing activities over the years through good product differentiation, through advertising, [and] through strong promotion," it has "been very successful in differentiating" the BLIZZARD® brand. (Tr. at 1509:3-13.)

351. He noted that Dairy Queen distinguishes its brand by stating on the Dairy Queen BLIZZARD logo, "THE ORIGINAL ONLY AT DQ." (Tr. at 1509:3-1510:6.) By doing so, Professor Hoyer explained that Dairy Queen differentiates its BLIZZARD brand by noting its singular availability at Dairy Queen. (Tr. at 1510:3-6; Ex. D-238.)

352. Based on Professor Hoyer's experience and education in the fields of consumer behavior, consumer psychology, and marketing, he opined that W.B. Mason's use of "Blizzard" on spring water will not lessen the capacity of Dairy Queen's BLIZZARD® mark to identify and distinguish Dairy Queen's frozen treat product. (Tr. at 1529:7-14.)

353. From a consumer perspective (not a legal one), Professor Hoyer agrees with the statement that "a mark that is merely one of several identical or very similar marks is already diluted" because it illustrates much of what is in his opinion. (Tr. at 1530:21—1531:10.) Specifically, when similar marks already exist, he testified that people understand that there are similar marks and learn to distinguish between them. (Tr. at 1531:8-10.)

**4. Dr. Joachimsthaler's Rebuttal Opinion on Third-Party Use**

354. Dr. Joachimsthaler testified at trial that despite the presence of third-party uses of "blizzard," W.B. Mason's specific use of the brand on its spring water is likely to cause harm to Dairy Queen, whereas third-party uses of BLIZZARD on different products would not harm Dairy Queen. (Tr. at 1122:5-1125:21.)

355. He testified that unlike other third-party uses that Professor Hoyer identified, Dairy Queen's BLIZZARD® treat and W.B. Mason's Blizzard spring water are in the same or related product category of "consumables." (Tr. at 1134:7-14; Tr. at 1136:19-20.)

356. Dr. Joachimsthaler opined that third-party uses on unrelated products like snow plows would not lead to activation spreading because snow plows are far removed from frozen treats, and he acknowledged that Dairy Queen has generally not enforced brand protection, through legal action, against companies operating in categories far removed from food and beverages, where the risk of activation spreading is low. (Tr. at 1279:7-1283:16.) In his expert report, he acknowledged a low risk of activation spreading for products bearing the Blizzard name in categories such as clothing, machinery, or tools, but could not recall the analysis he undertook to form his opinion (Tr. at 1284:1-1285:18.)

357. On cross-examination, however, Dr. Joachimsthaler testified that activation spreading also occurs in far-removed product categories such as car wax, for example, and acknowledged a 2017 research study that supported such a finding, as it involved far-removed product categories and other factors. (Tr. at 1279:7-1283:16.)

358. Dr. Joachimsthaler explained that he had not carefully studied whether activation spreading occurs in far-removed categories because "that's not relevant in this

case." (Tr. at 1281:10-15.) When reminded that he had previously opined that far-removed uses of BLIZZARD were unlikely to cause activation spreading, he stated, "I misspoke. It is relevant. Yes, it is relevant, yes." (Tr. at 1282:7-15.)

**5. Analysis**

359. Both Dr. Joachimsthaler and Professor Hoyer possess expertise in evaluating the strength of a brand from a marketing perspective. The Court finds their testimony credible that Dairy Queen's BLIZZARD® enjoys strong brand equity. As to third-party use, the Court will address the overall weight assigned to the experts' testimony on this issue in its Conclusions of Law.

**C. Similarity**

360. Another factor relevant to determining the likelihood of confusion in a trademark infringement action is the similarity between the plaintiff's and defendant's marks. *Davis*, 430 F.3d at 903.

**1. Overall Impression**

**a. Dr. Joachimsthaler's Opinion**

361. At trial, Dr. Joachimsthaler testified that the parties' marks use an identical name, and W.B. Mason's Blizzard spring water label design is "similar in terms of visual identity" to both the former gold Dairy Queen BLIZZARD® logo and the new "refreshed" Dairy Queen BLIZZARD logo. (Tr. at 1104:23-24.) In forming this opinion, Dr. Joachimsthaler focused on the similarity of individual features of the designs. (Tr. at 1104:7-17.)

362. On cross-examination, when asked whether his opening expert report lacked any analysis of similarity between the marks, Dr. Joachimsthaler stated, "I don't remember. If you say so, I believe so." (Tr. at 1228:1-3.) And he was uncertain about whether, prior to testifying at trial, he had compared W.B. Mason's Blizzard mark to Dairy Queen's former BLIZZARD® logo (which included a gold or orange color) or to its new logo, (Tr. at 1228:1-9), stating, "I don't know what I compared. I know that in 2018, Dairy Queen reupdated, made it more modern. There's very close similarities between the—it was just an update. It wasn't a rebrand, just a slight update on the visual identity of the bottle to make it more modern[.]" (Tr. at 1228:17-23.) When asked on cross-examination to confirm that his supplemental expert report addressed similarity only with respect to the new BLIZZARD® logo because it contained no reference to gold or orange coloring, Dr. Joachimsthaler stated, "I don't know what—whether this is the reference to the old logo or new logo. As I said, if I—as far as I remember, I was well familiar with a rebrand—or an update, not a rebrand, an update to make the older logo to the newer logo. When we discussed the logos, then we took into consideration that there was this update." (Tr. at 1230:11-17.)

363. Dr. Joachimsthaler acknowledged that the question of whether consumers believe the W.B. Mason Blizzard spring water mark is similar to the Dairy Queen BLIZZARD® mark is a question that could be tested through empirical research, but he conducted no such research. (Tr. at 1234:25-1235:2, 1238:15-21, 1241:5-14.)

**b. Professor Hoyer's Opinion**

364. After comparing the overall impressions of the former gold Dairy Queen BLIZZARD® logo versus the W.B. Mason Blizzard spring water logo, Professor Hoyer opined that they are "very different." (Tr. at 1514:24-1515:15.) Specifically, he noted the different color scheme between the former Dairy Queen BLIZZARD® logo and W.B. Mason's Blizzard water logo, stating, "The orange [or gold] is very bright on the [old] DQ logo, and it's much more blue." (Tr. at 1515:10-15.) Professor Hoyer further noted that the lettering is different and both marks clearly indicate their respective sources: "Only at DQ" versus "Who But W.B. Mason." (*Id.*)

365. Professor Hoyer also opined that consumer perception of the similarity between two marks or two logos is frequently the subject of empirical testing and is not difficult to do, but Dr. Joachimsthaler did not empirically test the similarity of the Dairy Queen BLIZZARD® logo and the W.B. Mason Blizzard spring water logo. (Tr. at 1515:16-24.)

366. Professor Hoyer testified that such empirical testing is beneficial because it provides a representative view of how consumers perceive the marks. (Tr. at 1515:25-1516:5.)

**c. Analysis**

367. The Court assigns little weight to Dr. Joachimsthaler's opinion that the marks are similar based on "visual identity." The credibility of his opinion on visual similarity is undermined by his equivocal testimony concerning whether, in formulating that opinion, he compared Defendant's mark to Dairy Queen's former BLIZZARD® logo or to its new

logo. Moreover, Dr. Joachimsthaler's opinion is not supported by empirical evidence. He could have conducted a survey of consumers to measure their views on the similarity of the marks, but he chose not to do so.

**2. Consumer Involvement in Purchase Decision-making**

368. One subject on which the experts agree is characterizing consumers' purchases of the products at issue here as "low-involvement." While the Court addresses this in the context of "similarities" between the products, their opinions are also relevant to the degree of care reasonably expected of potential consumers, which is a factor used to determine the likelihood of confusion for a trademark infringement claim. *Davis*, 430 F.3d at 903.

369. Dr. Joachimsthaler testified that with respect to consumer decision-making about product purchases, certain products are considered "high-involvement," whereas others are "low-involvement." (Tr. at 1099:1-7.)

370. Professor Hoyer explained that very few products involve high-involvement decision-making, which is reserved for products that are important, interesting, and "very personally relevant." (Tr. at 1522:5-12.) Consumers expend more time and decision-making effort on high-involvement products, such as a car or home than they do low-involvement products, such as breakfast cereal, toothpaste, or shampoo. (Tr. at 1522:9-12.) Professor Hoyer testified that approximately 90%-95% of the products in the marketplace are low-involvement purchases. (Tr. at 1522:13-18.) While consumers need these products, they are not so critical or important that consumers spend much time thinking about them. (Tr. at 1522:16-18.) Consequently, Professor Hoyer explained,

consumers make very simple decisions about low-involvement products and do not spend much time processing information about them. (Tr. at 1522:16-21.)

371. Professor Hoyer and Dr. Joachimsthaler classified consumers' purchases of Dairy Queen's BLIZZARD® and W.B. Mason's Blizzard spring water as low-involvement. (Tr. at 1523:8-11; Tr. at 1099:13-17.)

**D. Association, Impairment of Distinctiveness, and Harm**

372. One factor relevant to a claim for dilution by blurring is the existence of any actual association between the two products in question. 15 U.S.C. § 1125(c)(2)(B). In addition, a plaintiff must establish that the defendant's mark is likely to impair the distinctiveness of the famous mark. *Prairie Island Indian Cmty. v. Radisson Hotels Int'l, Inc*., No. 20-cv-1234 (NEB/TNL), 2020 WL 7490034, at *4 (D. Minn. Dec. 21, 2020) (citing *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 832 (8th Cir. 1999)). Dr. Joachimsthaler opined on topics relevant to these issues, discussing the associative memory network and brand extension, to which Professor Hoyer offered rebuttal opinions.

**1. Associative Memory Network**

**a. Dr. Joachimsthaler's Opinion**

373. Based on his knowledge of the field of consumer psychology, Dr. Joachimsthaler testified that consumers form associations with brands and store these associations in their memories in the form of an "associative memory network." (Tr. at 1098:12-14.) According to Dr. Joachimsthaler, "the memory of a consumer is organized as a network with [nodes] and linkages between [nodes]." (Tr. at 1100:12-21.) He stated that the associative memory network explains how consumers learn and store information,

and also how they retrieve information from memory. (Tr. at 1103:6-1104:1.) The associative memory network for a brand can be diagrammed or illustrated. (Tr. at 1141:8-10.)

374. Dr. Joachimsthaler opined that "when two brands are very similar, . . . thoughts can spread called activation spreading. . . . And it can spread into your memory and can create weakening associations and can create confusion." (Tr. at 1101:11-14.)

375. Specifically, he testified that when consumers see similarities in W.B. Mason's Blizzard spring water and Dairy Queen's BLIZZARD® mark, they are likely to access stored memories about Dairy Queen's BLIZZARD®, and falsely associate the spring water with the frozen treat. (Tr. at 1104:1-1105:1.)

376. For example, he stated that "if people see a Blizzard water, let's say, and whatever they experience with it, they like it, they don't like it, they like the taste, they don't like the taste, they are in an office setting, they might see it at a water cooler. What it means is that whatever they experience at the moment, either objectively or incidentally, spreads into the network of Dairy Queen. And it's almost like a virus that goes into sort of like an information or misinformation that then spreads. Because everything connects in consumers' mind[s] with Dairy Queen. It can affect the entire brand." (Tr. at 1105:6-16.)

377. Dr. Joachimsthaler testified that among the factors relevant to activation spreading are whether the products are in the same or related product categories, whether they are visually similar, whether their names are similar, and whether they share product attributes. (Tr. at 1143:5-1144:7.) As to the first three factors, he stated that Dairy Queen's

BLIZZARD® and W.B. Mason's Blizzard spring water are in adjacent product categories, share similar colors, and share an identical name. (*Id.*; Tr. at 1219:1-8.)

378. In formulating his opinion on the relatedness of the two product categories at issue, Dr. Joachimsthaler relied on a three-factor test set forth in marketing literature to determine the degree of relatedness between two product categories. (Tr. at 1122:12-1124:4; *see also* Tr. at 2189:23-2190:3.) However, he failed to discuss or reference this test in his expert reports. (Tr. at 2191:1-2192:3.) Accordingly, at trial, the Court granted W.B. Mason's motion to strike the portions of Dr. Joachimsthaler's testimony related to this methodology. (*Id.*) However, the Court permitted him to offer the opinion that the products at issue are in the same or adjacent product categories, and that "there is low risk of activation spreading for companies using the word 'blizzard' in categories far removed from food and beverage," because he had previously disclosed those opinions. (Tr. at 2191:11-16.)

379. As to product attributes, Dr. Joachimsthaler believes that attribute similarity helps activation spreading occur. (Tr. at 1168:13-22.) He testified that an associative memory network diagram for a brand is "intended to highlight the most important associations that consumers connect to that brand and how those associations are interconnected." (Tr. at 1145:12-17.) Dr. Joachimsthaler prepared an associative memory diagram for this case, which purports to show the attributes consumers most closely associate with Dairy Queen's BLIZZARD® treat. (Tr. at 1143:11-21.)

380. Dr. Joachimsthaler testified that the three basic attributes of both W.B. Mason's spring water and Dairy Queen's BLIZZARD® are "cold," "refreshing," and

"portable." (Tr. at 1117:4-10, 1135:5-12, 1136:1-13.) Although he did not diagram an associative memory network for bottled water, he concluded that the same key attributes applied to both products. (Tr. at 1166:15-21.)

381. Because of similarities in marks and product names, Dr. Joachimsthaler opined that consumers are likely to become confused when they see W.B. Mason's spring water, activating the wrong memory network, resulting in false recognition and the dilution of Dairy Queen's memory network. (Tr. at 1108:16-1109:9, 1234:13-24.)

382. Dr. Joachimsthaler explained that in creating his associative memory network for this case, he attempted to "illustrate from what you see in the survey, in survey research, what kind of comes up more prominently with a name." (Tr. at 1102:7-9.) Dr. Joachimsthaler did not rely on a BLIZZARD®-specific consumer survey to create his associative memory network, nor did he interview or confer with consumers, but subjectively determined the attributes to include on his associative memory network and where to place them in his diagram. (Tr. at 1101:19-1102:12, 1158:22-1159:10, 1166:22-25.)

383. Dr. Joachimsthaler testified that often, consumers "cannot really tell what they know and oftentimes cannot express their feelings accurately," and are not faithful reporters of the information stored in their memories. (Tr. at 1170:17-1171:3.)

384. Although Dairy Queen has conducted extensive consumer research over the years, including the DQ Treats Presentation specifically, that discussed and analyzed attributes that consumers associate with Dairy Queen's BLIZZARD® treat, Dairy Queen

did not provide the DQ Treats Presentation to Dr. Joachimsthaler. (Tr. at 373:1-375:7, 1172:19-24; Ex. P-44.)

385. Accordingly, Dr. Joachimsthaler did not incorporate into his associative memory network diagram the BLIZZARD®-specific consumer research from the DQ Treats Presentation. Specifically, Dr. Joachimsthaler's associative memory network diagram does not include attributes like "rich" or "indulgent" that are reflected in the consumer research Dairy Queen's vendor conducted and which Dairy Queen's Kelly Kenny agreed were characteristics that consumers associate with the Dairy Queen BLIZZARD®. (Tr. at 364:15-365:3, 1173:12-20; Ex. P-44 at 25, 27.) Ms. Kenney could not recall being shown Dr. Joachimsthaler's associative memory diagram or discussing it with him. (Tr. at 349:24-350:12.) Nor did Dr. Joachimsthaler take into account the Dairy Queen's correspondence map reflecting strengths associated with Dairy Queen's BLIZZARD® based on discussions with actual consumers, including "something I crave" and "totally indulgent," among others. (Tr. at 1174:8-1175:20; Ex. P-44 at 25.)

**b. Professor Hoyer's Opinion**

386. Professor Hoyer disagreed with Dr. Joachimsthaler's opinion that W.B. Mason's Blizzard spring water will cause false activation of consumers' associations with Dairy Queen or its BLIZZARD® frozen treat. (Tr. at 1511:14-20.)

387. He explained that the associative memory network tries to understand how consumers organize knowledge in memory. (Tr. at 1510:18-20.) An important principle in an associative memory network is that associations with certain concepts—in this case, brands and brand names—vary in strength. (Tr. at 1511:4-5.) Some associations are very

strong and others are very weak. (Tr. at 1511:6.) The concepts, or brands, are the "nodes" in the associative memory network. (Tr. at 1511:6-7.) When a node is activated, the strongest associations are more likely to be activated first. (Tr. at 1511:4-10.)

388. Professor Hoyer opined that the variables relevant to the associative memory network here include any similarity of the marks, the categories in which consumers classify the products, consumers' strongest associations with these brands, and the role of the products' house marks. (Tr. at 1512:25-1513:9.)

389. He also testified that the level of consumer involvement for the products here impacts the activation-spreading analysis. (Tr. at 1522:22-1523:1.) With respect to low-involvement products, he stated that consumers do not activate an extensive memory network because they do not think about many product attributes. (Tr. at 1522:22-1523:1.) Typically, a consumer thinks of one or two key associations, which are most commonly prior consumption experiences, such as whether it is a good product, whether the consumer likes or loves it, and perhaps one other attribute. (Tr. at 1523:2-6.) As noted earlier, Professor Hoyer classified both frozen treats and spring water as low-involvement products. (Tr. at 1523:8-11.) Thus, he opined that consumers will not have an extensive activation process with such low-involvement products. (Tr. at 1523:6-7.)

390. With respect to product attributes, Professor Hoyer disagreed with Dr. Joachimsthaler's opinion that consumers closely associate Dairy Queen's BLIZZARD® frozen treat with the specific product attributes of cold, refreshing, and portable. (Tr. at 1519:6-11.)

391. In Professor Hoyer's opinion, strong associations with the Dairy Queen BLIZZARD® frozen treat would instead be "frozen, anti-gravity, which they stress very heavily in its marketing, delicious, probably high-calorie, a reward." (Tr. at 1519:13-16.) Professor Hoyer described Dairy Queen's BLIZZARD® frozen treat as a "very hedonic product," in contrast to water, which is necessary for daily life, and is "functional," and "thirst-quenching." (Tr. at 1519:17-18.) These are the key attributes for these products, in his view. (Tr. at 1519:18-20.)

392. Professor Hoyer also explained that "portable" is a very broad generic term, and consumers are unlikely to think in these terms. (Tr. at 1519:20-22.) Because almost all food is portable in some sense, he stated, it is not a key defining attribute. (Tr. at 1519:22-23.) "Refreshing" is an attribute that Professor Hoyer associates more with beverages than a frozen dessert. (Tr. at 1519:23-25.) Further, he stated that while water can be cold, it is not necessarily always cold, but Dairy Queen's BLIZZARD® frozen treat is frozen—a step beyond cold. (Tr. at 1519:25-1520:2.) Accordingly, Professor Hoyer would not identify cold, portable, and refreshing as the key defining attributes of Dairy Queen's BLIZZARD® treat and W.B. Mason's Blizzard spring water. (Tr. at 1519:18-1520:4.)

393. Further, Professor Hoyer explained that Dr. Joachimsthaler could have gathered empirical evidence on the attributes that consumers most closely associate with Dairy Queen's BLIZZARD® frozen treat, but Dr. Joachimsthaler did not do so. (Tr. at 1520:5-10.)

394. Professor Hoyer also opined on another important type of association that consumers form with products—the purchase context. (Tr. at 1520:11-16.) He stated that if consumers tend to purchase a product in the same context all the time, that context becomes part of the brand's associative memory network. (Tr. at 1520:16-18.) For example, he noted that because the Dairy Queen BLIZZARD® treat can only be purchased at a Dairy Queen location, consumers associate that purchase context with the product. (Tr. at 1520:18-21.) By contrast, W.B. Mason's Blizzard spring water is purchased primarily online for office settings and is consumed in offices, which is very different than the Dairy Queen setting. (Tr. at 1520:21-23.) Professor Hoyer testified that these different purchasing contexts form part of consumers' associations with the respective brands. (Tr. at 1520:11-25.)

395. Similar to the purchase context, Professor Hoyer also testified about consumption experiences, in which consumers typically consume a branded product in a particular context, such that the consumption experience becomes strongly associated with the brand. (Tr. at 1525:9-16.) For example, he noted that the consumption experience associated with Snickers candy bars involves consumers feeling hungry and out of sorts, and eating a Snickers bar to feel better. (Tr. at 1525:16-17.) Professor Hoyer opined that here, the consumption experiences are very different between Dairy Queen's BLIZZARD® frozen treat (consumed in a restaurant or immediately upon leaving the restaurant) and W.B. Mason's Blizzard spring water (consumed in offices). (Tr. at 1525:20-1526:5.) These different consumption associations, he stated, further differentiate the two brands. (Tr. at 1526:5-7.)

396. In sum, with respect to the product attributes, Professor Hoyer explained that Dr. Joachimsthaler could have conducted consumer research to understand consumers' general associations. (Tr. at 1521:1-13.) Such research would have been beneficial as empirical evidence of "how the consumer sees [the product]," providing insight into the associations in the consumer's mind. (Tr. at 1521:1-13.)

397. Professor Hoyer also testified that he disagrees with Dr. Joachimsthaler's opinion that Dairy Queen's frozen treat and W.B. Mason's spring water are in the same or adjacent product categories of "consumables." (Tr. at 1516:7-25.) He stated that in formulating his opinion, he considered categorization theory, in which consumers deal with marketplace complexities by organizing products into meaningful categories based on similarities. (Tr. at 1516:14-19.) By putting items into categories, consumers can determine the relationship between different items. (Tr. at 1516:20-22.) Importantly, categorization theory operates at different levels, from the very abstract to the most basic. (Tr. at 1516:22-25.)

398. Professor Hoyer explained that the category of "consumables" is a good example of an "abstract level" of categorization theory, because it includes anything that a consumer could put in their mouth, such as food and drink. (Tr. at 1517:1-5.) As such, although it is a very high-level category, it is not useful in grouping products together. (Tr. at 1517:5-7.) Rather, consumers most often operate at lower levels of categorization such as the "basic level" or "subordinate level." (Tr. at 1517:8-10.) As applied here, basic categories could be "beverages" or "frozen desserts," which are two different categories. (Tr. at 1517:10-12.) Below that are subordinate categories, which would consist of

examples in those basic categories. (Tr. at 1517:12-14.) Professor Hoyer testified that frozen dairy desserts do not fit into the beverage category, but would instead occupy a more removed, non-adjacent category. (Tr. at 1518:18-21.)

399. Here, Professor Hoyer opined that Dr. Joachimsthaler's opinion operates at a very high abstract level, and that consumers do not meaningfully group beverages and frozen dairy desserts as adjacent product categories. (Tr. at 1517:14-18.)

400. Professor Joachimsthaler testified that Dr. Joachimsthaler could have empirically tested whether consumers categorize frozen desserts or bottled spring water in the same or adjacent product categories, but he did not do so. (Tr. at 1517:19-24.)

401. In particular, he noted that a survey would be beneficial to determine if consumers actually perceive two marks to be within the same or adjacent product categories. (Tr. at 1518:22-1519:1.) Since consumers determine categorization, he stated that it is important to know what is in consumers' minds, and empirical evidence can verify that information. (Tr. at 1518:25-1519:5.) Indeed, Dr. Joachimsthaler acknowledged on cross examination that the consumer's perspective on category similarity is most important and a consumer survey could be conducted, "but I don't know why you would have to do that," he stated. (Tr. at 1219:4-25.)

402. Professor Hoyer testified that activation spreading can be tested empirically through a free association survey given to a group of consumers, in which consumers are asked to identify the first words that come to mind when hearing brand name BLIZZARD. (Tr. at 1513:10-18, 1523:12-17.) The responses will be evidence of the strongest associations, he explained. (Tr. at 1513:14-19.) Professor Hoyer further opined that the

use of free association is very important because in memory work, free association or open-ended questions are most important in eliciting the main associations made by consumers, which are top of mind. (Tr. at 1513:22-1514:4.) If closed-ended questions are used, respondents tend to "check a lot," producing less accurate results in terms of identifying the strongest associations in consumers' minds. (Tr. at 1513:4-1514:7.)

403. Professor Hoyer opined that Dr. Joachimsthaler could have collected empirical data on consumers' free associations with BLIZZARD brand names in order to enhance the reliability of his opinions. (Tr. at 1514:19-23.)

404. Professor Hoyer noted that Dr. Joachimsthaler did not interview any consumers to create his associative memory diagram for this case and that Dr. Joachimsthaler believes that consumers are not trustworthy sources of information about what resides in their memories. (Tr. at 1523:18-1524:7.) Professor Hoyer disagreed with Dr. Joachimsthaler's opinion, explaining, "[I]t's all about consumers and what's in their minds. And consumers can remember things. If they couldn't, then brands wouldn't have any meaning whatsoever. And so that's not a very legitimate opinion." (Tr. at 1523:25-1524:7.) While Professor Hoyer acknowledged that fallacies in memory have been studied, he testified that "consumers can remember things. And it's what they remember that's relevant in terms of how they differentiate brands." (Tr. at 1524:4-7.)

405. Professor Hoyer also testified that there is a risk of bias when a branding expert determines the attributes that a consumer associates with a brand, as Dr. Joachimsthaler did in this case. (Tr. at 1524:8-10.) Professor Hoyer explained that everyone, including Dr. Joachimsthaler, has biases, and those biases could affect opinions.

(Tr. at 1524:8-13.) Thus, he stated, in order to "average out" individual consumers' biases, it is necessary to gather information from a sample of consumers. (Tr. at 1524:13-16.) Professor Hoyer stated that a consumer sample provides an overall consumer perception of a brand, not just the perspective of one person. (Tr. at 1524:15-16.)

406. Professor Hoyer opined that because Dr. Joachimsthaler did not attempt to test his activation spreading theory in this case with his own empirical study, Dr. Joachimsthaler's activation spreading opinions are not reliable. (Tr. at 1514:8-13.) Rather, they are based on Dr. Joachimsthaler's own opinion as a branding expert, based on a "sample" of one person, who is not representative of the entire consumer population. (Tr. at 1514:11-18.) Professor Hoyer testified that Dr. Joachimsthaler's opinion is therefore not representative of the top associations in consumers' minds. (Tr. at 1514:11-18.)

**c. Dr. Joachimsthaler's Response**

407. In response to Professor Hoyer's criticism about the lack of empirical evidence in support of Dr. Joachimsthaler's opinions, he sought out and purchased information from a consumer data company called Brand Keys, which routinely collects consumer data on numerous companies, including Dairy Queen and many other QSRs. (Tr. at 1256:10-23.) However, Dr. Joachimsthaler conceded that he only intended to purchase the information if it validated his findings. (Tr. at 1258:15-1259:6, 1262:10-16, *see also* Ex. D-456.)

408. Dr. Joachimsthaler admitted that the list of attributes Brand Keys used to generate data about Dairy Queen is the same list it uses for all QSRs. (Tr. at 1261:13-19.)

409. Dr. Joachimsthaler testified that the Brand Keys data "shows 90 percent of consumers who think of BLIZZARD also think of Dairy Queen." (Tr. at 1255:3-5, 1270:19-24.)

410. However, Dr. Joachimsthaler admitted he did not know the question that Brand Keys had asked the survey respondents about BLIZZARD, and further admitted that "[t]here are different ways of asking those questions." (Tr. at 1270:25-1272:21, 1276:6-9, 1276:16-1277:4.) Thus, any interpretation of that data by him is necessarily based on speculation.

411. Dr. Joachimsthaler also testified that—while he was unable at trial or at his deposition to recite the question used by Brand Keys—he was still comfortable relying on the Brand Keys data for the opinions he was offering in the case. (Tr. at 1272:22-1273:2.) But he also agreed that he would never simply rely on data compiled by another person or source without performing a quality check, although he could not remember whether he received such information from Brand Keys. (Tr. at 1266:7-13.)

412. Dr. Joachimsthaler admitted that the Brand Keys data relates to consumer perceptions of Dairy Queen rather than BLIZZARD. (Tr. at 1275:13-18.)

413. Dr. Joachimsthaler could not definitively state whether he purchased the raw data from Brand Keys or simply purchased the results. (Tr. at 1267:6-11) ("Q: Dr. Joachimsthaler, you didn't buy that data, did you? A: I don't know. I think I bought the data. That's what we did. Q: You bought the results. You didn't buy the raw data, Dr. Joachimsthaler, did you?" A: I think we did.").

414. The Court finds that, given the lack of a record concerning the context in which the Brand Keys data was developed, it is not helpful to the Court and does not support Dr. Joachimsthaler's opinions.

**2. Brand Extension**

**a. Dr. Joachimsthaler's Opinion**

415. Also relevant to consumer associations, Dr. Joachimsthaler testified to his awareness that other restaurants have extended or expanded their well-known brands to related product categories sold in their restaurants, such as bottled water. (Tr. at 1125:22-25.) He provided the example of the hamburger chain Shake Shack extending its "master brand" to bottled water sold in its restaurants, labeled as "$Shack_2O$." (Tr. at 1126:3-8.) Dr. Joachimsthaler opined, "[W]hen you take that consumer perspective, what consumers ordinarily see, they would expect a water to come from Dairy Queen, basically, because that's what goes along in other restaurants as well." (Tr. at 1126:9-16.) Kelly Kenny, Dairy Queen's Vice President of Brand & Product Marketing, also testified to her familiarity with other companies selling private label water bottles, which increases her concerns about consumers associating Blizzard spring water with Dairy Queen. (Tr. at 282:24-283:18.)

**b. Professor Hoyer's Opinion**

416. Professor Hoyer disagreed with Dr. Joachimsthaler's opinion that consumers are likely to believe that W.B. Mason's Blizzard spring water is an extension of Dairy Queen's BLIZZARD® brand, in light of examples of restaurants selling private label water bottles such as Shake Shack's $Shack_2O$ water. (Tr. at 1526:11-19.) First, Professor Hoyer

noted that there is not much history of Dairy Queen extending its BLIZZARD® brand to other products. (Tr. at 1526:23-1527:4.) Second, he pointed to the companies' respective uses of their house marks. (Tr. at 1527:5-17.) When consumers see W.B. Mason's Blizzard spring water, they do not see Dairy Queen anywhere on that label. (Tr. at 1526:13-15.) Rather, they see WHO BUT W.B. MASON'S Blizzard spring water. (Tr. at 1526:15-16.) Accordingly, Professor Hoyer saw no reason why consumers would assume that spring water is a brand extension for Dairy Queen. (Tr. at 1527:16-17.)

417. Professor Hoyer testified that Dr. Joachimsthaler could have empirically tested his opinion on brand extensions, but did not do so. (Tr. at 1527:18-22.)

### 3. Ms. Butler's "Word Test" Association Survey

418. Ms. Butler conducted an association survey, referred to as a "word test survey" to measure consumer associations with "blizzard." (Tr. at 1723:14-21, 1748:17-24.)

419. Ms. Butler's association survey used a representative sample of individuals aged 14 years and older located throughout the United States. (Tr. at 1724:6-10.)

420. Ms. Butler did not use the Dairy Queen BLIZZARD® logo in her association survey because that logo references "DQ" in it and she was looking to measure consumer associations with "blizzard" alone. (Tr. at 1724:14-20; Exs. D-305, D-306.)

421. Ms. Butler asked respondents in her association survey about products other than ice cream and frozen treats because there are other companies using "blizzard" in connection with different products. (Tr. at 1729:16-21; Exs. D-305, D-306, D-307.)

422. Ms. Butler first asked respondents in her association survey an open-ended question, a question structured to allow respondents to generate answers without directing them to limit their answers in any particular way. (Tr. at 1724:11-13, 1724:21-1725:9.) Specifically, Ms. Butler asked respondents to state what if anything "blizzard" calls to mind or makes them think of. (Tr. at 1724:11-13; Exs. D-305, D-306.)

423. The second question in Ms. Butler's association survey aided the respondents in their answer by asking whether "blizzard" calls to mind any specific companies, brands, or products. (Tr. at 1725:20-24; Exs. D-305, D-306.) This question is important because otherwise, there is no clarity as to the context for the respondent's association with "blizzard." (Tr. at 1727:3-7.) Ms. Butler notes that there are other company associations that can be made with "blizzard." (Tr. at 1727:3-7.) For example, she found that when some people say "blizzard," they are referring to Blizzard Entertainment. (Tr. at 1727:7-11.)

424. In the final question of her association survey, Ms. Butler provided a list of products and asked respondents which, if any, they associate with the word "blizzard." (Tr. at 1726:9-13; Exs. D-305, D-306.) The list of products provided to respondents actually use the name "blizzard" as their name or as part of their name. (Tr. at 1726:13-17.)

425. Ms. Butler's association survey showed that less than half of the respondents identified Dairy Queen as being associated with "blizzard." (Tr. at 1726:24-1727:3; Ex. D-307.)

426. Ms. Butler's association survey also showed that with respect to companies, brands, or products, 41% of people said that they have *no association* with the word "blizzard." (Tr. at 1727:19-24; Ex. D-307.)

427. Ms. Butler's association survey further demonstrated that even when provided with a list of products, less than half of respondents said that they associate "blizzard" with frozen treats or desserts, whereas 14% of respondents associated "blizzard" with skis and 10% of respondents associated "blizzard" with video games. (Tr. at 1727:19-1728:3; Exs. D-305, D-306, D-307.)

428. Ms. Butler's association survey also demonstrated that, of the respondents who associated "blizzard" with Dairy Queen, almost half of those respondents then expressed other product associations with "blizzard" as well. (Tr. at 1728:4-10; Ex. D-307.)

429. As compared to Dr. Jay's recognition survey, which limited respondents' responses to whether they recognized "blizzard" as a brand of ice cream or frozen treats, Ms. Butler's association survey asked respondents in a non-contextual way their association with "blizzard," which revealed that respondents have lots of associations with the word "blizzard." (Tr. at 1728:11-1729:8; Exs. D-305, D-306.) While Dairy Queen is well known, Ms. Butler's association survey showed that there are other associations with "blizzard" as a common word and with companies and products other than Dairy Queen. (Tr. at 1728:11-23; Exs. D-305, D-306, D-307.)

**a. Analysis**

430. The Court credits and finds that Ms. Butler's association survey is persuasive because it tests whether associations exist with BLIZZARD without prompting respondents to indicate only whether they recognize BLIZZARD as a brand of ice cream or frozen treat. Ms. Butler's survey is relevant to evaluating whether consumers uniquely associate BLIZZARD with Dairy Queen and whether Dairy Queen's use of BLIZZARD has eclipsed the ordinary meaning of the word "blizzard."

**E. Consumer Confusion**

431. One of the elements of a claim for trademark infringement or false designation of origin is the likelihood of confusion between the two marks at issue. *Davis*, 430 F.3d at 903. Evidence of actual confusion among consumers is one of several relevant factors relevant to the determination of the likelihood of confusion. *Id*.

**1. Expert Opinions from Dr. Joachimsthaler and Professor Hoyer**

**a. Dr. Joachimsthaler's Opinion**

432. Dr. Joachimsthaler testified that the fact that ice cream shops were found to be reselling W.B. Mason BLIZZARD spring water makes consumer confusion more likely. (Tr. at 1109:18-1110:19.) Specifically, he stated, "I don't know how many times it happens, but in the—illustratively, this one shows that confusion and harm is very likely to happen in—in this context, a lot more than otherwise." (Tr. at 1110:15-19.)

433. Dr. Joachimsthaler also testified about two hypothetical scenarios that he characterized as being "most likely" to lead to confusion. (Tr. at 1110:20-21, 1111:15-1112:16, 1286:2-10.)

434. In the first scenario, Dr. Joachimsthaler described opening a refrigerator full of bottles of W.B. Mason Blizzard spring water. (Tr. at 1111:17-1112:6.) Picking up one of the bottles would cause him to remember that he had promised to take his children out for a treat. (Tr. at 1111:21-1112:6.)

435. In the second scenario, Dr. Joachimsthaler described seeing another person carrying a bottle of W.B. Mason Blizzard spring water. (Tr. at 1112:7-16.) Merely seeing even a portion of the bottle's label from a distance would likely trigger activation spreading. (*Id.*)

436. Dr. Joachimsthaler also testified that activation spreading could harm Dairy Queen's brand if "something potentially happened," such as contamination, to the quality of W.B. Mason's water. (Tr. at 1117:16-1118:4.)

**b. Professor Hoyer's Opinion**

437. Professor Hoyer disagreed with Dr. Joachimsthaler's opinion that the *de minimis* evidence in this case of resale of W.B. Mason Blizzard spring water by a very small number of establishments creates a high likelihood of confusion. (Tr. at 1527:23-1528:10.) He explained that Dairy Queen only identified a few shops reselling water, and that W.B. Mason's spring water is primarily sold to offices in the business-to-business sales context. (Tr. at 1528:2-3.) Professor Hoyer did not believe that a few isolated sales of Defendant's spring water at a small number of ice cream shops created high levels of confusion. (Tr. at 1528:4-6.) Further, Professor Hoyer saw no reason why a customer in a non-Dairy Queen-branded ice cream shop would naturally assume that Blizzard spring water was offered by Dairy Queen. (Tr. at 1528:6-10.)

438. In addition, Professor Hoyer noted that Dr. Joachimsthaler could have empirically tested this likelihood of confusion or likelihood of association opinion based on the limited resale of Defendant's spring water at restaurants and ice cream shops, but he did not do so. (Tr. at 1528:11-17.)

439. Professor Hoyer also disagreed with Dr. Joachimsthaler's opinion that simply viewing a partial label of W.B. Mason's Blizzard spring water at a distance would cause the viewer to experience activation spreading in their memory nodes. (Tr. at 1528:18-1529:3.) First, he questioned how often such a situation would occur or even if it has occurred, and second, he noted the lack of empirical testing of the hypothesis. (Tr. at 1528:18-1529:6.)

440. Professor Hoyer also stated that he is not surprised by the lack of evidence of actual consumer confusion based on his opinion that BLIZZARD exists in a crowded field from a consumer behavior perspective. (Tr. at 1508:8-19.) He noted that there are many different uses of BLIZZARD and consumers have learned to understand the differences and that there are different brands called BLIZZARD. (Tr. at 1508:16-19.)

**c. Ms. Butler's Likelihood of Confusion Survey**

441. Ms. Butler conducted a study to evaluate the likelihood of consumer confusion. (Tr. at 1732:13-16.)

442. Ms. Butler testified that her likelihood of confusion survey replicated the manner in which consumers might encounter the products in the real world. (Tr. at 1741:4-10; Exs. D-311–D-313.)

443. Because Ms. Butler's objective was to test the real-world probability that consumers would be confused by the products at issue, she limited the population of survey respondents to those located in the "Masonville" states in which W.B. Mason does business. (Tr. at 1741:11-20; Ex. D-313.) As noted earlier, Masonville includes all of New England, New York, Pennsylvania, New Jersey, Delaware, Maryland, Washington, Richmond, Virginia, Florida, and eastern Ohio. (Tr. at 823:1-8, 824:20-825:5, 1916:5-7.)

444. In addition, based on Ms. Butler's understanding that the majority of W.B. Mason's water is sold through its catalog or through its website, the survey respondents included individuals responsible for ordering office supplies, including water, for large and small companies. (Tr. at 1741:21-1742:6; Ex. D-313.)

445. In Ms. Butler's survey, respondents were shown the W.B. Mason website homepage, and then, as if they were searching for water, they were shown a series of water bottles available for sale on the company's website. (Tr. at 1742:8-13; Exs. D-311–D-312.) They were then shown the actual W.B. Mason Blizzard spring water bottle advertised on the company's website. (Tr. at 1742:8-13.) The images shown to respondents were taken directly from W.B. Mason's website. (Tr. at 1742:14-16, 1933:17-23; Exs. D-311–D-312.)

446. Ms. Butler testified that she designed the survey in this fashion in order to "represent the scenarios that are likely or that reflect the way real-world respondents would come into contact with the product and their ability to purchase that product." (Tr. at 1742:22-1743:1.)

447. Ms. Butler stated that after being shown the images, respondents were asked "a standard set of likelihood of confusion questions" involving "source, association, and permission": (1) who do they believe makes or puts out the product; (2) whether they believe the product is associated with any other company or brand; and (3) whether the company that makes the water received permission or approval from another company or source. (Tr. at 1743:3-12; Exs. D-311–D-312.)

448. She stated that these three questions are well-established likelihood of confusion survey questions. (Tr. at 1743:13-15.)

449. Ms. Butler found that none of the respondents cited Dairy Queen in response to the three questions. (Tr. at 1743:16-19, D-313.) She testified that these results demonstrated no consumer association between W.B. Mason's Blizzard spring water and Dairy Queen, stating, "there's no connection there." (Tr. at 1743:18-21.)

450. Ms. Butler further testified that of the hundreds of likelihood of confusion surveys that she has conducted in her career, it is "certainly unusual" to yield results of "zero confusion." (Tr. at 1743:11-1744:3.)

451. Based on Ms. Butler's experience and education in the fields of consumer survey research and consumer perception, and the data from her likelihood of consumer confusion survey, along with her association survey and dilution survey, discussed later in these Findings of Fact, Ms. Butler opined that: (1) consumers have associations with "blizzard" other than Dairy Queen, namely, with weather and the goods/services of other companies; (2) exposure to W.B. Mason's use of Blizzard does not have a weakening effect on Dairy Queen's use of BLIZZARD or its mark; and (3) there is no evidence of likelihood

of confusion when consumers interact with purchasing the products at issue here. (Tr. at 1746:4-1747:4; Exs. D-305–313.) Further, Ms. Butler testified that the results of the likelihood of confusion survey reinforce the results of her other two surveys, in that they show no association between W.B. Mason's Blizzard spring water and Dairy Queen, even when respondents were asked whether they associate W.B. Mason's Blizzard spring water with any other companies or brands. (Tr. at 1746:22-1747:4.)

**d. Dr. Stewart's Rebuttal Opinion**

452. Plaintiff's expert, Dr. Stewart, criticized Ms. Butler's likelihood of confusion survey, finding it overly contextual, stating, "The context is a website that is clearly a W.B. Mason website, that reinforces that it's the website, three times, that associates water with W.B. Mason on those sites twice. And then there's a series of questions about, you know, do you associate this product with any particular source." (Tr. at 2211:23-2212:5.) Dr. Stewart described this as "a classic example of priming" for a particular response. (Tr. at 2212:6.)

453. In addition, Dr. Stewart was critical of the likelihood of confusion survey because it was entirely website-based, and did not account for consumers who might be exposed to the products in other contexts than the website. (Tr. at 2212:8-20.) Nor did it survey initial interest or post-sale confusion. (Tr. at 1775:7-1776:15.)

**e. Analysis**

454. While the Court credits Dr. Joachimsthaler's expertise, he possessed little knowledge about the limited sale of W.B. Mason's spring water in ice cream shops. Also, the Court assigns no weight to his two hypothetical examples of the likelihood of consumer

confusion. The hypotheticals were speculative, as Dr. Joachimsthaler was unable to state how often such scenarios occur in the real world. Absent such information, or a reasonable basis for inferring it, these hypothetical scenarios fail to support a finding that an appreciable number of ordinary purchasers are likely to be confused by the W.B. Mason Blizzard mark. Nor did Dr. Joachimsthaler support his opinion about brand extension and the likelihood of consumers associating or confusing Blizzard spring water with the Dairy Queen BLIZZARD®.

455. In addition, as reflected in the credible testimony of Defendant's experts Professor Hoyer and Ms. Butler, it is both common and possible to gather empirical data on the likelihood of consumer confusion. In fact, Ms. Butler's survey, which attempted to replicate a real-word consumer purchasing scenario, found no confusion for consumers as to the source of Defendant's Blizzard spring water, whether it was associated with any other company, or whether W.B. Mason received permission from another company to offer the water.

**F. Dilution**

**1. Ms. Butler's Dilution Survey**

456. As noted earlier, W.B. Mason's expert, Ms. Butler, also conducted a study to evaluate trademark dilution of Dairy Queen's BLIZZARD® mark. (Tr. at 1732:13-16.)

457. Ms. Butler acknowledges that testing for dilution is difficult because it oftentimes involves a process that happens over time. (Tr. at 1732:25-1733:7.) However, she opined that it is nevertheless possible to survey consumers to determine whether a mark

has been weakened through some type of "break" in an association between a mark and the mark's owner. (*Id.*)

458. While there is not much literature to provide guidance regarding the mechanics of conducting a dilution survey, Ms. Butler opined that the "test, retest" or a "before-and-after-type" test can be used to evaluate the impact of exposure to other products or marks. (Tr. at 1733:8-14.)

459. The dilution research studies described in the Choy paper, which Dr. Joachimsthaler cited and relied on in his supplemental report, employ the before-after survey method. (Tr. at 1205:20-1206:1, 1206:20-22.)

460. Butler designed her dilution survey to take into account the existence of third-party use of BLIZZARD. (Tr. at 1733:15-19.)

461. Ms. Butler's dilution survey used a representative sample of individuals aged 14 years or older located throughout the United States. (Tr. at 1734:15-19.)

462. Ms. Butler's dilution survey included a few control groups, which consisted of other third-party uses of the word "blizzard." (Tr. at 1733:10-1734:2, Exs. D-308, D-309.) She explained that these control groups function much like a placebo in a drug trial, which serves to control extraneous factors that can be used to evaluate whether those factors also have an impact on the actual test. (Tr. at 1734:3-14.)

463. Ms. Butler's dilution survey also included a test group, which tests whether or not exposure to W.B. Mason's use of BLIZZARD has any impact or weakening on consumers' associations between Dairy Queen and its use of BLIZZARD. (Tr. at 1734:20-25; Exs. D-308, D-309.)

464. Ms. Butler structured her dilution survey by first showing respondents Dairy Queen's new blue BLIZZARD logo stating, "THE ORIGINAL ONLY AT DQ," and then asking them who they associate BLIZZARD with: "one company or brand, more than one company or brand, no company or brand, or don't know/no opinion," and then asking them "what company or companies [they] associate BLIZZARD with and what makes [them] say that." (Exs. D-308–D-309; Tr. at 1735:2-10.) She explained that this format provided a baseline, and served to identify respondents who associated Dairy Queen as the source of the logo. (Tr. at 1736:2-1737:20, 1759:14-16; Exs. D-308–D-309.)

465. Ms. Butler did not use the BLIZZARD word mark, alone, in the dilution survey because it is not how people would view Dairy Queen's BLIZZARD mark in the real world. (Tr. at 1759:9-13.)

466. In the test group, respondents in Ms. Butler's dilution survey were next shown the W.B. Mason Blizzard logo as well as five other logos, Sun, Dasani, Vortex, Dryer's, and Frigidaire twice, in random order. (Tr. at 1735:12-21.) These other (non-BLIZZARD) logos were designed to act as "noise" (*i.e.,* a control). (Tr. at 1736:9-12; Exs. D-308, D-309.)

467. In the control group, respondents in Ms. Butler's dilution survey were next asked the same questions, but rather than seeing the W.B. Mason Blizzard logo, they were shown different logos, namely, Blizzard Entertainment, Blizzard Skis, Blizzard Bounty snack mix from Whole Foods, and McDonald's McFlurry logo (which does not use BLIZZARD at all). (Tr. at 1735:22-1736:1, 1736:9-12, 1736:25-1737:10; Exs. D-308, D-309.)

468. Finally, as the retest, respondents in both the test group and control group were shown the Dairy Queen logo again and asked with whom they associated this logo. (Tr. at 1736:13-14; Exs. D-308, D-309.)

469. The hypothesis of Ms. Butler's dilution survey is that if showing W.B. Mason's Blizzard logo has some kind of weakening effect or impact, there would be a statistically meaningful difference or shift in the association results in that retest—the second time that respondents are shown Dairy Queen's new blue BLIZZARD® logo. (Tr. at 1736:13-19.)

470. Ms. Butler's dilution survey showed that across each of these different test and control groups, for those respondents who associated Dairy Queen's new blue BLIZZARD® logo with Dairy Queen, there was no difference in the level of that association after they were shown W.B. Mason's Blizzard logo. (Tr. at 1737:12-20.) In other words, for these respondents, their association between Dairy Queen's new blue BLIZZARD® logo and Dairy Queen was not impacted by being shown W.B. Mason's Blizzard logo. (*Id.*)

471. Ms. Butler found similar results for the other BLIZZARD marks the respondents in her survey were shown. (Tr. at 1737:12-20.) In other words, respondents' association between Dairy Queen's new blue BLIZZARD® logo and Dairy Queen was not impacted by being shown any of the other BLIZZARD logos. (Tr. at 1737:12-20.)

472. Ms. Butler opined that the results of her dilution survey are conservative in that the logos in the survey are being shown proximately in a close context without any outside world distractions. (Tr. at 1738:21-1739:3; Exs. D-308, D-309.)

### 2. Dr. Stewart's Response

473. Dr. Stewart faulted Ms. Butler's dilution survey on two bases. (Tr. at 2209:6.) First, he testified that because dilution is a process that occurs over time, a single-exposure survey fails to capture the process. (Tr. at 2209:6-10.) Second, he stated that the design of the dilution study calls attention to the Dairy Queen logo "rather than create a situation where dilution may occur." (Tr. at 2209:11-15.)

474. He acknowledged that the test/retest format is a common survey format, but raised concerns about sensitivity, stating "when you expose people to something one time, and then ask questions about it a second time, you have basically primed the individual with that prior exposure." (Tr. at 2209:22-2210:5.)

475. Dr. Stewart opined that he was unaware of any literature in his field that would support Ms. Butler's survey design, but was aware of literature that is critical of similar designs. (Tr. at 2210:6-11.)

476. Dr. Stewart testified that although Ms. Butler's surveys have a number of flaws, limiting the conclusions that can be drawn from them, "[t]hat's not to say there isn't some useful information." (Tr. at 2217:2-10.)

477. For example, and as noted earlier, Dr. Stewart testified that the dilution survey actually supports Dairy Queen, because the high level of respondents who associate the BLIZZARD® logo with Dairy Queen is "a very powerful result." (Tr. at 2216:10-13.)

478. The Court finds that although there was not much literature to guide Ms. Butler's creation of her dilution survey and her "test-retest" may not replicate a weakening of association over many years, the Court considers the survey to be relevant and helpful.

The Court credits the results of Ms. Butler's dilution survey and finds that they support a finding of no likelihood of dilution.

## CONCLUSIONS OF LAW

### I. JURISDICTION

479. This Court has subject matter jurisdiction over Dairy Queen's Lanham Act claims for trademark infringement, unfair competition by false designation of origin, and dilution under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338(a). The Court has pendant and supplemental jurisdiction, pursuant to 28 U.S.C § 1338(b) and 28 U.S.C. § 1367, over Dairy Queen's state law claims for common law unfair competition and deceptive trade practices under Minnesota law.

480. On January 8, 2019, the Court ruled, over W.B. Mason's objection, that it has personal jurisdiction over W.B. Mason under Minn. Stat. §§ 543.19 and 303, and that venue is appropriate in this judicial district under 28 U.S.C. § 1391. (Jan. 8, 2019 Order [Doc. No. 29].)

### II. TRADEMARK INFRINGEMENT/FALSE DESIGNATION OF ORIGIN

481. Under the infringement section of the Lanham Act, civil liability arises against anyone who, without the consent of the trademark registrant, "use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a).

482. The likelihood-of-confusion test also applies to a federal cause of action for false designation of origin claim under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), which provides:

> "Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin . . ., which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . ."

483. Thus, both a trademark infringement claim and a false designation of origin claim "require a trademark owner to prove that it has ownership or rights in the trademark and that the defendant has used the mark in connection with goods or services in a manner likely to cause consumer confusion as to the source or sponsorship of the goods or services." *Cmty. of Christ*, 634 F.3d at 1009.

484. Dairy Queen has registered both word marks (consisting of the word BLIZZARD on milk shakes and ice cream confections with carbonated beverages (Ex. P-119A), blender equipment (Ex. P-120-A), and restaurant services, (Ex. P-121A)) and design marks featuring the word BLIZZARD (e.g., Ex. P-389A). It has established that it holds valid, protectible BLIZZARD® marks.

485. As to the likelihood of confusion between Dairy Queen's mark and W.B. Mason's mark, the core inquiry is "whether the relevant average consumers for a product or service are likely to be confused as to the source of a product or service or as to an

affiliation between sources based on a defendant's use." *Select Comfort Corp. v. Baxter*, 996 F.3d 925, 933 (8th Cir. 2021) (citing *Anheuser-Busch, Inc. v. Balducci Publ'ns*, 28 F.3d 769, 774 (8th Cir. 1994)). Actual confusion is not essential to a finding of infringement. However, a mere possibility is not enough; there must be a substantial likelihood that the public will be confused." *Vitek Sys., Inc. v. Abbott Labs.*, 675 F.2d 190, 192 (8th Cir. 1982) (citations and quotation removed).

486. The Eighth Circuit has adopted a multi-factor balancing test for evaluating likelihood of confusion. These factors are known as the *SquirtCo* factors because the controlling case is *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980), as interpreted by *Davis v. Walt Disney Co.*, 430 F.3d 901, 903-05 (8th Cir. 2005), and others. The factors include: "1) the strength of the plaintiff's mark; 2) the similarity between the plaintiff's and defendant's marks; 3) the degree to which the allegedly infringing product competes with the plaintiff's goods; 4) the alleged infringer's intent to confuse the public; 5) the degree of care reasonably expected of potential customers, and 6) evidence of actual confusion." *Davis*, 430 F.3d at 903.

487. Application of the factors is "a highly fact-intensive inquiry both as to the assessment of the evidence concerning each factor and as to the overall synthesis of factors and the evidence." *Select Comfort*, 996 F.3d at 934. The relative weight of the factors varies from case to case and is "influenced greatly by how the other factors might apply." *Id*. "However, while no particular factors are determinative, neither should excessive importance be placed on any one factor to the exclusion of others." *Calvin Klein Cosms. Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 504 (8th Cir. 1987). Likelihood of confusion is

reviewed as a finding of fact. *Id.* The Eighth Circuit takes a flexible approach to the timing of when confusion might occur, extending to presale initial-interest confusion, *id.* at 935, and post-sale confusion among nonpurchasers, *Insty*Bit, Inc. v. Poly-Tech Indus.*, 95 F.3d 663, 671-72 (8th Cir. 1996).

**A. Strength of the Mark**

488. "Two relevant measurements of a mark's strength are its conceptual strength and its commercial strength." *Lovely Skin, Inc. v. Ishtar Skin Care Prod., LLC*, 745 F.3d 877, 888 (8th Cir. 2014).

**1. Conceptual Strength**

489. Conceptual strength exists on a continuum in which marks are evaluated in the following categories: (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful. *Cellular Sales, Inc. v. Mackay*, 942 F.2d 483, 485 (8th Cir. 1991) (citation omitted). "An arbitrary or fanciful trademark is the strongest type of mark and is afforded the highest level of protection," a generic mark "merits no trademark protection," and "[s]uggestive and descriptive marks fall somewhere in between." *Duluth News-Trib., a Div. of Nw. Publ'ns, Inc. v. Mesabi Pub. Co.*, 84 F.3d 1093, 1096 (8th Cir. 1996) (citations omitted).

490. As to conceptual strength, this Court ruled on summary judgment that Dairy Queen's BLIZZARD® mark is "suggestive." (June 1, 2021 Order [Doc. No. 290] at 20–22) (stating that the mark reflects the cold, diffuse characteristics of the product and requires imagination and reasoning by the consumer to make the connection between the cold connotations of the word "blizzard" and Dairy Queen's product).

491. However, this designation, and the incontestability of the BLIZZARD® marks, does not resolve the question of conceptual strength. *See Roederer v. Garcia Carrion, S.A.*, 732 F. Supp. 2d 836, 865 (D. Minn. 2010) ("The incontestability of the '998 mark does not prevent an inquiry into its strength."). For instance, "the frequency of prior use of [a mark's text] in other marks, particularly in the same field of merchandise or service, illustrates the mark's lack of conceptual strength." *CareFirst of Md., Inc. v. FirstCare, P.C.*, 434 F.3d 263, 270 (4th Cir. 2006) (internal quotations omitted); *see also Fl. Int'l Univ. v. Fl. Nat'l Univ.*, 830 F.3d 1242, 1257 (11th Cir. 2016) [hereinafter *FIU*] (recognizing the extent of third-party use as "an essential factor in determining a mark's strength" because "a weak trademark is one that is often used by other parties."); 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:48 (5th ed. 2022) [hereinafter "McCarthy"] ("If the common element of conflicting marks is a word that is 'weak' then this reduces the likelihood of confusion. A portion of a mark may be 'weak' in the sense that such portion is descriptive, highly suggestive, or is in common use by many other sellers in the market.") (citations omitted).

492. Indeed, W.B. Mason argues that evidence of widespread third-party use of the "blizzard" mark demonstrates that the Dairy Queen BLIZZARD® mark is weaker and entitled to a narrower scope of protection. (Def.'s Proposed FoF [Doc. No. 449] ¶¶ 518-526; Tr. at 1487-1505:25; *see also* Exs. D-56; D-106, D-148, D-209, D-220, D-223–224, D-230, D-232, D-258, D-440–441, D-450.)

493. As to the effect of a weak trademark on the likelihood of confusion, the Eighth Circuit has stated that "[d]etermining that a mark is weak means that consumer confusion has been found unlikely because the mark's components are so widely used that the public can easily distinguish slight differences in the marks, even if the goods are related." *Gen. Mills*, 824 F.2d at 626.

494. While "there is no hard-and-fast rule" about the number of third-party uses that weaken a mark, courts should consider "the entire name a third party uses, as well as the kind of business in which the user is engaged." *FIU*, 830 F.3d at 1257 (internal quotation omitted). In the Eighth Circuit, "evidence of third party usage of similar marks on similar goods is admissible and relevant to show that the mark is relatively weak and entitled to a narrower scope of protection." *Gen. Mills*, 824 F.2d at 626-27. However, the Eighth Circuit has not directly addressed how similar the goods must be for third-party use to be probative of strength.

495. In *J & B Wholesale Distrib., Inc. v. Redux Beverages, LLC*, 621 F. Supp. 2d 678, 687 (D. Minn. 2007), the court suggested that third-party uses unrelated to the product category at issue have limited weight because they do not affect the likelihood of confusion. In *J & B Wholesale*, a meat and fish distributor using the "No Name" mark asserted it against a "No Name" branded energy drink. *Id*. at 682. The defendant offered third-party uses mostly "unrelated to a specific food or drink product," with no evidence that the third-party uses were "well promoted or recognized by consumers who would purchase either [plaintiff or defendant's] products." *Id*. at 685 (referencing third-party uses like "'No Name Lounge', 'No Name Interactive', 'Pub with No Name', [and] 'No Name

Recordings'"). The court acknowledged that "[t]he law is clear that the extent of third party use of a mark must be taken into consideration," but ultimately concluded that the asserted third-party uses "should not be given much weight." *Id*. Thus, in *J & B Wholesale*, the court found meat and energy drinks were similar enough to support a likelihood of confusion, but meat and pubs were not similar enough for third party use to be relevant. *Id*.

496. Some courts have drawn narrower categories of similarity when assigning weight to third party use. For example, Dairy Queen cites *M2 Software, Inc. v. Madacy Ent*., 421 F.3d 1073, 1088 (9th Cir. 2005), a case involving a dispute between the owner of the M2 mark for business management and interactive media services for the film and music industry and the user of an M2 ENTERTAINMENT mark on a record label. The district court excluded evidence of third party marks "in unrelated fields," and the Ninth Circuit affirmed, with little discussion of relatedness. *M2 Software*, 421 F.3d at 1088. Similarly, in *Eclipse Assocs. Ltd. v. Data Gen. Corp*., 894 F.2d 1114, 1119 (9th Cir. 1990), the Ninth Circuit affirmed a district court's decision to exclude as irrelevant evidence of the ECLIPSE mark on goods "unrelated to the computer field" in a dispute between a computer software company and a company that distributed both computer hardware and software. *Id*. at 1115-16, 1119. Dairy Queen also cites *Advantus Cap. Mgmt., Inc. v. Aetna, Inc*., No. 06-CV-2855(JMR/FLN), 2006 WL 2916840 (D. Minn. Oct. 11, 2006) at *2, in which the court held that third-party use beyond the financial services industry was of minimal relevance to a dispute between two financial services businesses.

497. The Fifth Circuit has suggested that marginally-related third-party use receives more weight in the strength inquiry as the gap between the mark holder's product category and the accused product grows. *See Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 294 n.19 (5th Cir. 2020) ("[W]here we analyzed the likelihood of confusion between the marks of pizza and sugar companies, we examined third-party usage for products like canned fruits, citrus, cigarettes, cheese, wheat flours, chrome-tanned leather, canned sardines, animal feed, envelopes, pencils, fishing line, candy mints, whiskey, ladies' hosiery and hair cream. Where we examined the likelihood of confusion between two financial institutions, only 75 of 4,400 examples of third-party usage came from financial institutions.") (internal quotations and citations omitted). The Fourth Circuit has also considered third-party uses on unrelated goods relevant evidence of a mark's lack of conceptual strength, albeit not as persuasive as third-party use within the same product class. *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 227 Fed. App'x 239, 243 (4th Cir. 2007) ("[E]vidence of third-party use of a mark in unrelated markets—although not as persuasive as use within the same product class–indicates a mark's lack of conceptual strength.").

498. W.B. Mason points to Professor Hoyer's testimony regarding third-party uses of BLIZZARD in connection with a variety of goods and services, which included some consumables. These third-party uses were among the 70 third-party uses identified in the Orange Report, on which Professor Hoyer relied in forming his opinion. (See Tr. at 1482:6-1484:25.)

499. But Dairy Queen argues that procedurally, and substantively, such evidence is unavailing to W.B. Mason. As to the purported procedural failings, Dairy Queen contends that this evidence constitutes improper hearsay, as it comes from the Orange Report, and, substantively, neither Professor Hoyer nor the Orange Research Group investigated the extent or quality of the third-party uses, rendering Professor Hoyer's opinion irrelevant. (Pl.'s Proposed CoL [Doc. No. 450] ¶¶ 102–112.) Moreover, Dairy Queen contends that while Professor Hoyer criticized Dr. Joachimsthaler's lack of empirical data for many of his opinions, Professor Hoyer did not empirically test his own opinions regarding the "crowded field" of third-party uses of BLIZZARD. (*Id.* ¶ 146.)

500. As the Court observed at trial, it is well settled that experts are permitted to rely on hearsay, and questions concerning Professor Hoyer's verification of the data go to the weight of his testimony. (Tr. at 1468:22-1469:13); *see also* Fed. R. Evid. 703 (facts relied on by an expert do not need to be admissible for expert's opinion to be admissible); *Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1182 (8th Cir. 1997) ("expert may rely on otherwise inadmissible hearsay evidence in forming his opinion.").

501. As to Professor Hoyer's alleged failure to empirically test his opinions regarding the effect of third-party use, he was not required to do so, as Dairy Queen bears the burden of proof. *See Easy Spirit, LLC v. Skechers U.S.A., Inc.*, 515 F. Supp. 3d 47, 63 (S.D.N.Y. 2021) (where plaintiff offered no consumer survey evidence concerning whether the trademark had acquired secondary meaning, and instead chose to criticize defendant's survey, the court noted that plaintiff bore the burden of proof and failed to meet it as to establishing secondary meaning).

502. Dairy Queen also argues that Professor Hoyer offered no opinion on the extent of the 70 identified third-party uses of BLIZZARD, and that courts have discounted or disregarded the probative value of such limited evidence. (Pl.'s Proposed CoL ¶ 115) (citing *Palm Bay Imports v. Veuve Clicquot Ponsardin Mainson Fondee En 1772*, 396 F.3d 1369, 1373 (Fed. Cir. 2005) (noting that where there is no evidence of the extent of each third party's usage, "[t]he probative value of this evidence is minimal."); *Buzzballz, LLC v. Buzzbox Beverages, Inc.*, No. ED14-cv-01725-VAP-DTBX, 2016 WL 7496769, at *3 (C.D. Cal. Apr. 12, 2016) (granting motion in limine to exclude third-party use evidence and stating, "Defendants must submit more than the homepage of a company's website and lay a foundation for it to show each Mark is actually used in commerce."); *J & B Wholesale*, 621 F. Supp. 2d at 685 (giving little weight to third-party use evidence where defendant "ha[d] not put forth any evidence that the third-party uses were well promoted and recognized by consumers who would purchase either [parties'] products."); *Velocity Sports Performance Franchise Sys., LLC v. Extreme Fitness, Ltd.*, 2006 WL 8432579, at *7 (N.D. Ga. Jan. 10, 2006) (holding that website pages do not constitute persuasive evidence of the scope and strength of third-party uses)).

503. As noted earlier, Professor Hoyer was not asked to opine on how extensive the 70 third-party uses are, but to address the widespread use of the BLIZZARD name. He testified:

> [B]ased on my analysis, what I concluded is there are many uses of the brand name BLIZZARD in the marketplace, and so from a consumer behavior perspective, we have a crowded field. It's a popular name. It has a lot of positive features and a lot of positive associations. And so it's a crowded -- a very popular brand name used by many different companies . . . Some are

> larger, like I mentioned BLIZZARD ENTERTAINMENT and the BLIZZARD Beach at Disney and W.B. Mason's copy paper; some are small; but the point of my testimony is that there's a widespread use of the BLIZZARD name in the marketplace.

(Tr. at 1506:3-17.) In *Duluth News-Tribune*, 84 F.3d at 1097, the Eighth Circuit stated, when analyzing the strength of the plaintiff's mark in an infringement case, "the widespread use of the words 'news' and 'tribune' throughout the newspaper industry precludes plaintiff from claiming exclusive privilege to use these words.").

504. It is true that some courts have found minimal probative value in third-party registration evidence alone, absent evidence about the extent or recognition of use. *See, e.g., Han Beauty, Inc. v. Alberto-Culver Co*., 236 F.3d 1333, 1338 (Fed. Cir. 2001). But other courts have found that general evidence of third-party use should not be discounted. In *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 1339 (Fed. Cir. 2015), the Federal Circuit ruled that the Trademark Trial and Appeal Board (TTAB) gave inadequate consideration to the strength or weakness of the marks by discounting "evidence of a fair number of third-party uses of marks containing 'peace' and 'love'" based on the ground that there were no "specifics regarding the extent of sales or promotional efforts surrounding the third-party marks and, thus, what impact, if any, these uses have made in the minds of the purchasing public." There, the Federal Circuit explained:

> The "specifics" as to the extent and impact of use of the third parties' marks may not have been proven, but in the circumstances here, Juice Generation's evidence is nonetheless powerful on its face. The fact that a considerable number of third parties use similar marks was shown in uncontradicted testimony. In addition, "[a] real evidentiary value of third party registrations per se is to show the sense in which . . . a mark is used in ordinary parlance."

> 2 McCarthy on Trademarks and Unfair Competition § 11:90 (4th ed. 2015) (emphasis added). "Third party registrations are relevant to prove that some segment of the composite marks which both contesting parties use has a normally understood and well-recognized descriptive or suggestive meaning, leading to the conclusion that that segment is relatively weak." *Id.*; *see Tektronix, Inc. v. Daktronics, Inc.*, 534 F.2d 915, 917 (CCPA 1976) (even if "there is no evidence of actual use" of "third-party registrations," such registrations "may be given some weight to show the meaning of a mark in the same way that dictionaries are used"). Marks that are descriptive or highly suggestive are entitled to a narrower scope of protection, i.e., are less likely to generate confusion over source identification, than their more fanciful counterparts.

*Id.*

505. As noted, in addition to Professor Hoyer's testimony, W.B. Mason identified and offered the testimony of nine third parties using BLIZZARD, including two companies offering consumables: Blizzard Wine's use of BLIZZARD for wine and related products and Saratoga Peanut Butter's use of BLIZZARD BUTTER for peanut butter. (Tr. at 1781:14-23, 1817:10-1818:22, 1838:14-24, 1951:17-1952:7, 1969:14-1970:1, 2025:12-24, 2053:11-22, 2095:25-2096:11, 2122:25-2123:11.)

506. Dairy Queen contends that the Court should reject or discount this testimony because it involves third-party uses unrelated to the BLIZZARD® treat, or uses that are inconsequential or so niche as to have no diluting effect on Dairy Queen's mark. (Pl.'s Proposed CoL ¶ 127.) But even Dairy Queen's expert, Dr. Joachimsthaler, testified on cross-examination that activation spreading occurs in far-removed product categories, and acknowledged a 2017 research study that supported such a finding. (Tr. at 1279:7-1283:16.)

507. The Eighth Circuit has held that "evidence of third party usage of similar marks on similar goods is admissible and relevant to show that the mark is relatively weak and entitled to a narrower scope of protection." *Gen. Mills*, 824 F.2d at 626–27. However, the Eighth Circuit has not directly addressed how similar the goods must be for third-party use to be probative of either strength or substantially exclusive use.

508. Here, W.B. Mason has submitted evidence of third-party use on at least some consumables, such as wine and Blizzard-branded food and drinks sold at Disney's Blizzard Beach, including the Blizzard Burger and Blue Blizzard Margarita, as well as evidence of sales or the number of potential consumers. For example, in 2019, Blizzard Wines' annual sales were approximately $700,000 and have been increasing over time as the company grows. (Tr. at 2031:23-2032:8.) Professor Hoyer testified that Disney World, where Blizzard Beach is located, receives over two million visitors per year. (Tr. at 1485:17-20.) If Dairy Queen considers bottled water a related use, then wine, burgers, and margaritas are presumably related uses as well. The Court does not find these third-party uses of BLIZZARD to be unrelated or inconsequential.

509. Moreover, in terms of evidence of a well-promoted, third-party user of the BLIZZARD mark, Blizzard Entertainment is a multibillion-dollar company that develops and sells video games, books, E-Sport games, and related merchandise. (Tr. at 2124:15-18, 2124:24-2125:5, 2128:9-25, 2130:12-19.) In 2018, it generated $7.5 billion in revenue, and in 2019, it generated $6.6 billion. (Tr. at 2128:20-25.) It has over 30 million monthly active users and owns the URL blizzard.com. (Tr. at 2124:9-14, 2129:5-19.) It first began using BLIZZARD in connection with video games in 1994. (Tr. at 2125:11-23.) It has

even collaborated with Dairy Queen to oppose a company's trademark filing in connection with wine and spirits. (Tr. at 2160:1-2161:11.)

510. Blizzard Entertainment's use of BLIZZARD is not an inconsequential use. The Court disagrees with Dairy Queen's characterization of Blizzard Entertainment as a niche company, selling only goods and services relating to games and e-sports. (Pl.'s Proposed CoL ¶ 128.) While its goods may relate to video games, it sells branded merchandise including a variety of printed matter, clothing, action figures, cups, glasses, computer gaming accessories. (Tr. at 2141:25-2143:25.) It further worked with Uniqlo to sell clothing associated with Blizzard Entertainment video games or characters. (Tr. at 2148:3-2150:18.)

511. Furthermore, W.B. Mason's own use of Blizzard in connection with its copy paper has generated over $400 million in sales since 2003. (Tr. at 856:10-20, 1908:19-24.)

512. The Court finds that third-party use of BLIZZARD weakens the conceptual strength of Dairy Queen's BLIZZARD® mark to some degree.

**2. Commercial Strength**

513. Commercial strength depends on, among other things, consumer surveys and testimony, advertising expenditures, sales, and media attention. *Lovely Skin*, 745 F.3d at 888.

514. Dairy Queen has submitted evidence showing widespread public recognition of its BLIZZARD® mark, as demonstrated by Dr. Jay's survey and her testimony, (Ex. P-77), along with Dairy Queen's significant advertising expenditures totaling $362 million in the last ten years, (Tr. at 157:10-16, Exs. P-10–P-17, P-28, P-229), sales of $1.1 billion

in 2020, (Ex. P-226), and widespread publicity in print and television media. (*See, e.g.*, Ex. P-31 at 1–4; Tr. at 128:23-129:3.) In addition, Dr. Joachimsthaler opined that BLIZZARD® is a "very, very strong brand," (Tr. at 1084:9-11), and Professor Hoyer testified that it has "strong brand equity." (Tr. at 1509:3-13.) This evidence supports a finding that the BLIZZARD® mark is commercially strong. *Lovely Skin*, 745 F.3d at 888.

515. In sum, the Court finds while Dairy Queen's BLIZZARD® mark meets several indicia of strength, its overall strength is weakened to a degree by third-party use. The Court therefore finds that the mark enjoys moderate overall strength.

**B. Similarity**

516. The Court turns to the next *SquirtCo* factor: the similarity between the plaintiff's and defendant's marks. *Davis*, 430 F.3d at 903.

**1. Identifying the Marks for Purposes of Comparison**

517. As noted, Dairy Queen has registered both word marks and design marks featuring the word BLIZZARD. (Exs. P-119A–P-121A, P-389A.) It argues that the Court should compare the word marks first, separate from the design marks. (Pl.'s Proposed CoL ¶ 179; Pl.'s Response [Doc. No. 451] at 10.)

518. The Court disagrees. "Similarity of the marks . . . must be considered as they are encountered in the marketplace," with similarity measured "by the marks as entities," and with "similarities weigh[ing] more heavily than differences." *Vitek*, 675 F.2d at 192 (quoting *Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 444 (9th Cir. 1980) (internal quotations omitted). Similarity should be judged under "the conditions in which buying decisions are made" and the court should evaluate "what a reasonable

purchaser in market conditions would do." *Calvin Klein*, 815 F.2d at 504. "The use of identical, even dominant, words in common does not automatically mean that two marks are similar. Rather, in analyzing the similarities of sight, sound, and meaning between two marks, a court must look to the overall impression created by the marks and not merely compare individual features." *Gen. Mills*, 824 F.2d at 622. Accordingly, the Court will compare the marks based on their overall impressions.

519. As to which BLIZZARD® treat mark to compare to W.B. Mason's Blizzard spring water mark, the Court will compare Dairy Queen's word mark, BLIZZARD, as it appears in the mark/logo in use at the time of the filing of this lawsuit:




(Reg. No. 2,693,918, Ex. P-389A.) This combination best illustrates the mark as an entity.

520. Not only was this mark in use at the commencement of this litigation, the record reflects that Dairy Queen refreshed this mark/logo after accusing W.B. Mason of trademark infringement and trademark dilution and chose a design that is more similar to W.B. Mason's mark than the original mark/logo in place when the suit was commenced. (*See* Tr. at 1901:15-22) (summarizing record and ruling that Dairy Queen is not entitled to equitable remedy of disgorgement of profits).

521. Because the trademark registration image depicted above appears in black and white, the Court will refer to the full-color Dairy Queen BLIZZARD® mark as consumers would have typically encountered it in the marketplace, such as on the paper cup that Dairy Queen used from 2001-2017.







(Exs. P-56, D-238.)

522. The Court will not compare W.B. Mason's mark to the "refreshed" mark that Dairy Queen has used on BLIZZARD® cups since 2018, depicted blow, as it post-dates the Complaint.




(Ex. P-57.)

523. The applicable W.B. Mason mark is found on the label of its 16-ounce bottled water:




(Exs. D-277, D-448.)

**2. Comparison of the Marks**

524. In *General Mills*, the Eighth Circuit affirmed a district court's determination that there was no confusing similarity between OATMEAL RAISIN CRISP and APPLE RAISIN CRISP because of color scheme, lettering style, and box design differences. 824 F.2d at 622. However, in *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1055 (8th Cir. 2005), the Eighth Circuit affirmed a finding that LOUIS KEMP SEAFOOD CO on mock crab was confusingly similar to LOUIS KEMP on wild rice sides. *Id.* at 1050-51. Despite the significant differences in color, design, and font, the Eighth Circuit reversed the district court's conclusion that the marks were not confusingly similar because the "mark[s] share a dominant feature – the phrase Louis Kemp."[8] *Id.* at 1055.

[8] Other factors were also at play in *Kemp*, including a Patent and Trademark Office rejection of the accused mark as confusingly similar to the senior mark, evidence of actual confusion among buyers, and admission by the defendant that he intended to take advantage of the senior mark's good name (which was his personal name used in a prior business that he sold). Still, the Eighth Circuit was explicit that the district court clearly erred when it "discounted similarities in the marks due to differences in the trade dress." *Id.* at 1053.

525. The *SquirtoCo* similarity factor is related to the strength factor. Stronger marks require a lower degree of similarity to support a finding of infringement, whereas weaker marks require a higher degree of similarity. *Id*. at 1055. The Eighth Circuit relied on mark strength to explain how the marks in *Kemp* were clearly confusingly similar, while the RAISIN CRISP marks in *General Mills* and the LEAN CUISINE/LEAN 'N TASTY marks in *Luigino's* were not. *Id*. at n.4. The common elements in the non-similar marks were commonly used descriptive terms (i.e., RAISIN CRISP in *General Mills* and LEAN in *Luigino's*), and thus were relatively weak. *Id*. By contrast, the defendant in *Kemp* conceded that the distinctive, non-descriptive LOUIS KEMP mark was strong, and the strong part (i.e., LOUIS KEMP) was common between the senior and accused marks. *Id*. at 1055.

526. Here, the common word between the conflicting marks is BLIZZARD. It is not as unique as a given name like LOUIS KEMP, but not quite as generically descriptive as RAISIN CRISP and LEAN either. Still, it is descriptive of the frozen and cold properties of the products in question, such that BLIZZARD is not as strong of a mark as LOUIS KEMP.

527. Moreover, the word in common, BLIZZARD, is relatively weak. In Professor J. Thomas McCarthy's treatise on trademark law, he notes that if the common element in the conflicting marks is a word that is "weak," e.g., "in common use by many other sellers in the market," or "descriptive or highly suggestive," the likelihood of confusion is reduced. McCarthy § 23:48. He points to *Duluth News-Tribune*, in which the

Eighth Circuit found no likelihood of confusion between the relatively weak shared words "news" and "tribune." *Id*. (citing 84 F.3d 1093).

528. Although both parties use the common word BLIZZARD, the Court finds that their respective BLIZZARD marks convey fundamentally different overall impressions and are not similar.

529. One distinguishing feature is that both parties feature their house marks on their respective BLIZZARD marks. (Tr. at 932:20-933:4, 1509:19-1510:6.) Moreover, W.B. Mason highlights its verbal house mark by including the visual depiction of the W.B. Mason character.

530. A defendant's house mark, especially a prominent one, can significantly decrease the degree of similarity. *See Nabisco, Inc. v. Warner-Lambert Co*., 220 F.3d 43, 47 (2d Cir. 2000) (". . . [Defendant's] prominent use of its DENTYNE house mark significantly reduces, if not altogether eliminates, any likelihood of consumer confusion."). The Eighth Circuit considers the display of a house mark on the product as a factor, but "not determinative." *Vitek*, 675 F.2d at 193; *see also Gen. Mills*, 824 F.2d at 627 (finding ordinary consumer would distinguish breakfast cereal sources in part due to "sufficiently prominent" and widely recognized house marks); *Luigino's*, 170 F.3d at 831 (same for frozen food); *ZW USA, Inc. v. PWD Sys., LLC*, 889 F.3d 441, 447 (8th Cir. 2018) (prominent display of manufacturer on website reduced likelihood of confusion for dog waste bags). Still, "[d]efendants cannot avoid . . . [plaintiff's] trademark by taking it and adding their name to it." *Elec. Commc'ns, Inc. v. Elec. Components for Indus. Co*., 443 F.2d 487, 492 (8th Cir. 1971).

531. Every BLIZZARD® frozen treat sold by Dairy Queen is accompanied by the Dairy Queen house mark (on the back of every cup) and the phrase "THE ORIGINAL BLIZZARD ONLY AT DQ," confirming that Dairy Queen is the source of its product. (Tr. at 336:13-339:15, Ex. P-56; *see also* Ex. P-57.)

532. Every W.B. Mason Blizzard spring water label is branded with the W.B. Mason house mark and tagline "WHO BUT W.B. MASON" and features a portrait of the W.B. Mason character framed by two American flags, confirming that W.B. Mason is the source of its product. (Tr. at 932:20-933:4.) Indeed, the Court has previously found that "in most circumstances, W.B. Mason included its prominent house mark with its logo." (Tr. at 1900:12-13.)

533. W.B. Mason first began using its BLIZZARD mark and logo in 2003 with its copy paper. (Tr. at 852:16-18.) It later expanded its use of its BLIZZARD mark and logo to five-gallon water jugs in 2010. (Tr. at 870:1-13.) As such, consumers had already been associating W.B. Mason's BLIZZARD mark and logo with W.B. Mason (and not Dairy Queen) for seven years prior to its introduction of spring water.

534. Dairy Queen argues, however, that a comparison of the visual identity of the parties' marks demonstrates that the house marks are only a fraction of the size of the dominant, common word, BLIZZARD, and are therefore less significant. (Pl.'s Response at 11.)

535. As noted, the Court compares the visual identity of the parties' marks in use at the time of the filing of the Complaint:




(Tr. at 301:16-302:1, 302:18-23, 593:1-12; Exs. D-238, D-437 at ¶¶ 7, 34; Ex. D-448.)

536. In general, with a composite mark containing both words and a design, "the verbal portion of the mark is the one most likely to indicate the origin of the goods to which it is affixed." *In re Viterra Inc.*, 671 F.3d 1358, 1362 (Fed. Cir. 2012) (citations omitted). Nevertheless, the Federal Circuit has cautioned against applying a hard and fast rule as to whether letters or design dominate in composite marks. *In re Electrolyte Labs., Inc.*, 929 F.2d 645 (Fed. Cir. 1990). Accordingly, marks "must be considered on a case-by-case basis." *In re Viterra*, 671 F.3d at 1362–63.

537. Dairy Queen's BLIZZARD logo appears in staggered blue letters against a gold background with the phrase "THE ORIGINAL BLIZZARD ONLY AT DQ." (Tr. at 301:16-21; D-238.)

538. In contrast, W.B. Mason's Blizzard logo appears with straight white lettering in font type different from that used by Dairy Queen against a blue sky background with a tree filled with snow, the house mark of WHO BUT W.B. MASON'S, and the W.B. Mason

character with sunglasses—the same design that is used on W.B. Mason's copy paper. (Tr. at 307:3-16, 869:8-25, 1507:21-1508:7, 1509:3-1510:6; Exs. D-332, D-448.)

539. While BLIZZARD is the largest verbal portion of both marks, the verbal portion also includes the parties' respective house marks, surrounding or preceding BLIZZARD, and clearly indicating, for each mark, "the origin of the goods to which it is affixed." *In re Viterra Inc.*, 671 F.3d at 1362. In addition, although Dairy Queen argues that W.B. Mason's house mark appears in small print, rendering its presence less significant, W.B. Mason underscores its verbal house mark with its visual house mark—its iconic W.B. Mason character—which magnifies the identification of W.B. Mason as the source of the product.

540. As noted earlier, the parties' experts also testified at trial regarding the similarity of the marks. Although Dr. Joachimsthaler testified that the parties' marks were visually similar, (Tr. at 1104:23-24), he could not recall if his opening expert report analyzed similarity at all, and he was uncertain about whether, prior to testifying at trial, he had compared W.B. Mason's mark to the former Dairy Queen BLIZZARD® or to the refreshed 2018 logo. (Tr. at 1228:17-23 ("I don't know what I compared."), 1230:11-17.)

541. On the other hand, Professor Hoyer testified that he had compared the overall impressions of the former gold Dairy Queen BLIZZARD® mark with the W.B. Mason Blizzard spring water mark, and found them "very different." (Tr. at 1514:24-1515:15.) He noted the different color schemes, with Dairy Queen's use of orange or gold, the different fonts, and that both marks clearly indicated their respective sources. (*Id.*) Professor Hoyer also opined that consumer perception of similarity between two marks or

logos is often the subject of empirical testing, but Dr. Joachimsthaler chose not to do such testing. (Tr. at 1515:16-24.)

542. The Court assigns little to no weight to Dr. Joachimsthaler's opinion regarding visual similarity. He could not credibly state whether his opinion on similarity was based on comparing W.B. Mason's logo with the former gold Dairy Queen BLIZZARD® logo or the refreshed logo. While empirical testing may not have been strictly necessary, the lack of such testing, combined with the poor foundation for his testimony on visual similarity, undermines his opinion.

543. Because similarity of the marks must also take into account the conditions in which buying decisions are made, *Vitek*, 675 F.2d at 192; *Calvin Klein*, 815 F.2d at 504, the Court finds the marks are even more dissimilar when the purchasing processes for these products are considered. Dairy Queen's BLIZZARD® treat is sold to individual consumers only at Dairy Queen restaurants. (Tr. at 339:5-18.) W.B. Mason's Blizzard spring water is sold and distributed by W.B. Mason to corporate customers based on orders placed through W.B. Mason's website or a W.B. Mason sales representatives (perhaps based on a product seen in a W.B. Mason catalog). (Tr. at 823:1-18, 825:20-826:14.)

544. In sum, the Court finds that although the parties' marks use the identical word, BLIZZARD, and the applicable logos share the use of blue and white colors, the overall impression created by the parties' marks (and not merely a comparison of their individual features), demonstrates that the marks are not similar. Importantly, both logos contain sufficiently prominent verbal house marks, and W.B. Mason's logo further features the visual image of its iconic character, identifying the source of the respective goods.

(*Compare* Ex. D-238, *with* Ex. D-448.) The parties' use of their respective house marks, along with W.B. Mason's visual depiction of its founder, significantly decreases the similarity between the two BLIZZARD marks, and allows consumers to distinguish between the two products.[9] *Gen. Mills*, 824 F.2d at 627. The marks are also shaped differently (Dairy Queen's oval shape versus W.B. Mason's rectangular shape), contain distinguishing features (W.B. Mason's snowy tree combined with its W.B. Mason character), distinguishing colors (Dairy Queen's use of gold), and distinguishing fonts (including Dairy Queen's use of staggered spacing of the word BLIZZARD). (*Compare* Ex. D-238, *with* Ex. D-448.) Furthermore, when considering the products as consumers encounter them in the marketplace, they are encountered in very different commercial settings. For all of these reasons, despite the common BLIZZARD name, the Court finds that the *SquirtCo* factor of similarity between the marks weighs against a finding of the likelihood of confusion.

**C. Degree of Competitive Proximity**

545. Although Dairy Queen and W.B. Mason agree that they are not "competitors," (Tr. at 343:7-8, 913:13-15), the extent to which the allegedly infringing product competes with the plaintiff's product is a matter of degree and is focused on the likelihood of confusion. *See Kemp*, 398 F.3d at 1056. "Where products are wholly unrelated, this factor weighs against a finding that confusion is likely. Where products are

[9] The Court further addresses the use of the parties' house marks in its discussion of the degree of competitive proximity between the products, *infra* at Conclusions of Law, II.C.2, and incorporates by reference that analysis here.

related, however, it is reasonable for consumers to think that the products come from the same source, and confusion, therefore, is more likely." *Id*.

546. In *Kemp*, the Eighth Circuit characterized the inquiry as "the likelihood that consumers would draw a connection between the two products and be confused as to the identities of their respective sources." *Id.* In assessing this factor, courts may consider the extent to which the products differ in content, geographic distribution, market position, and audience appeal. *Roederer*, 732 F. Supp. 2d at 868-69 (citing cases); *J & B Wholesale*, 621 F. Supp. 2d at 686 (internal quotation omitted).

547. *Kemp* found proximity between products that complement each other—mock crab and wild rice sides—sold to professional buyers. 398 F.3d at 1056. Similarly, *J & B Wholesale* found competitive proximity between No Name meat products and an accused energy drink because "companies frequently cross product lines." 621 F. Supp. 2d at 686. Although the accused energy drink had never been sold in grocery stores, the fact that other energy drinks were sold in grocery stores was probative. *Id*. The court also observed that consumers who shop in grocery stores are also likely to shop in convenience stores. *Id*.

**1. Relatedness of Products**

548. Dr. Joachimsthaler opined that frozen treats and bottled spring water are in the same product category of "consumables," and in adjacent or related product categories, from a consumer perspective. (Tr. at 1219:1-8.) However, because Dr. Joachimsthaler had failed to disclose the methodology underlying this opinion, his testimony about his methodology was stricken from the record. (Tr. at 2191:1-2192:3.) In addition, although he testified that W.B. Mason's spring water and Dairy Queen's frozen dessert are "closely

related" within the classification of consumables, (Tr. at 1136:14-20), he also testified that "[w]e are here because Dairy Queen BLIZZARD is very different from W.B. Mason water. Water is different from the frozen treats." (Tr. at 1215:16-18.)

549. Rebutting Dr. Joachimsthaler's opinion, Professor Hoyer testified that based on categorization theory, frozen treats and spring water are in removed, non-adjacent categories. (Tr. at 1516:22-25, 1517:1-1518:21.) He explained that the category of "consumables" is an abstract level of categorization theory, because it encompasses anything that a consumer could put in their mouth. (Tr. at 1517:1-5.) Because it is such a high-level category, it fails to adequately replicate the "basic level" or "subordinate level" of categorization applied by consumers. (Tr. at 1517:8-10.) Professor Hoyer stated that basic categories such as "beverages" or "frozen desserts" are the distinct categories at issue here, with frozen dairy desserts occupying a more removed, non-adjacent category from beverages. (Tr. at 1517:8-1518:21.) He further testified that Dr. Joachimsthaler could have empirically tested whether consumers categorize frozen desserts and bottled spring water in the same or adjacent categories, but did not do so. (Tr. at 1517:19-24.)

550. Dr. Joachimsthaler argued that Professor Hoyer's opinion incorrectly relied only on product categories, without consideration of the consumer's perspective, but he found it unnecessary to conduct a consumer survey to determine the consumer's perspective. (Tr. at 1218:25-1219:21.) He acknowledged, however, that a survey is a typical, qualitative means by which to objectively test a consumer's perspective. (Tr. at 1223:20-1224:17.)

551. The Court assigns no weight to Dr. Joachimsthaler's opinion on competitive proximity because he was unable to articulate any admissible basis for it, nor did he support his opinion by empirically demonstrating how consumers categorize the products at issue or whether confusion exists.

552. However, under the case law, *Kemp* and *J & B Wholesale* do not demand a granular level of relatedness among food products in order to find competitive proximity, as Dairy Queen correctly notes. (Pl.'s Response at 12–13.) *Kemp* found competitive proximity between mock crab and wild rice sides, 398 F.3d at 1056, and *J & B Wholesale* found competitive proximity between meat products and an energy drink. 621 F. Supp. 2d at 686. Mindful of the fact that competitive proximity is a matter of degree, the Court finds that under the case law, the goods here have an attenuated relationship, but proceeds to analyze other factors relevant to competitive proximity.

**2. Brand Extension**

553. Dairy Queen admits that W.B. Mason is not a competitor, (Tr. at 343:7-8), but argues that because Dairy Queen sells bottled water at all of its restaurants nationwide, customers could think that W.B. Mason's Blizzard water is an extension of Dairy Queen's BLIZZARD® brand. In other words, Dairy Queen contends that it would be reasonable for consumers to expect that Dairy Queen launched its own BLIZZARD®-branded water. (Pl.'s Response at 13.)

554. Dairy Queen also presented testimony that it has considered expanding the BLIZZARD® brand into liquid-based treats by using coffee, slush, and soda, (Tr. at 272:8-15), but it presented no evidence that it has actually done so.

555. Dr. Joachimsthaler testified to the likelihood of consumers believing that W.B. Mason's water is an extension of Dairy Queen's BLIZZARD® brand, noting his awareness of other brand extensions into the bottled water category, citing the example of Shake Shack's bottled water. (Tr. at 1126:3-16.) He did not empirically test his opinion, however.

556. However, Professor Hoyer opined that there is no reason to assume that consumers would think the products come from the same source, given that the parties' respective house marks are displayed on the products, and there is not much history of Dairy Queen greatly extending its BLIZZARD® brand. (Tr. at 1526:23-1527:22.) Professor Hoyer explained that in the case of a strong parent brand, it is vitally important to permanently brand the extended product with the parent brand's name, stating, "And so when consumers would see W.B. Mason's Blizzard spring water, they [would] not see Dairy Queen anywhere on that label. They will see Who But W.B. Mason Blizzard spring water." (Tr. at 1527:8-17.)

557. But Dairy Queen counters that W.B. Mason's house mark on its bottled water appears too small, in terms of the graphics, to reduce the likelihood of consumer confusion. (Pl.'s Response at 11; Pl.'s Proposed CoL ¶ 163.)

558. The relative size of the house mark is considered in the context of the "overall impression" that the mark leaves on a consumer. *Gen. Mills*, 824 F.2d at 627. Dairy Queen argues that a small house mark does not help distinguish the marks, citing *Gateway, Inc. v. Companion Prods., Inc.*, No. Civ. 01-4096-KES, 2003 WL 22508907, at *16 (D. S.D. Aug. 19, 2003); and *Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 222 (1st Cir. 1989).

In *Gateway*, Gateway computers, which used cow spots in their marketing, sued a company that sold a cow-like "stretch pet," which wrapped around computer monitors. *Gateway*, 2003 WL 22508907 at *2. The court was especially focused on post-sale confusion because the distinguishing marks would usually be removed before the stuffed animal was displayed on a computer. *Id.* at *16. All that was left was a small tag attached to the animal that could not be seen from a distance. *Id.*

559. *Gateway* is distinguishable because there is no evidence here that customers remove the house mark from the bottled water, and although W.B. Mason's house mark is less prominent than its Blizzard mark, it is still visible as encountered by consumers. *See Gen. Mills*, 824 F.2d at 627 ("In finding that both parties are widely recognized in the food industry and that both have appended their house marks in a sufficiently prominent manner so that consumers would likely distinguish between the two products' sources, the district court properly stood in the shoes of the ordinary purchaser . . . .") (internal quotation omitted). Moreover, as the Court has noted, W.B. Mason's house mark is accompanied by the visual image of the W.B. Mason character, further reinforcing the source of the product.

560. *Keds* is similarly distinguishable. In *Keds*, the dispute concerned canvas shoes that used a blue label on the heel or instep. 888 F.2d at 222. The accused infringer used a virtually identical blue label (made by the same factory) on its canvas shoes, but imprinted a different word on it. *Id*. The court found that consumers could still be confused by the distinct label because "[w]ith sneaker labels . . . the impressed words can only be read a few feet away from the eyes," but typical prospective consumers "view[ed] the clothes on other people." *Id*. The products here—a BLIZZARD® treat and bottled

water—are not identical products like the canvas shoes in *Keds*. Moreover, as the Court discusses in greater detail below, unlike the shoes in *Keds*, consumers encounter Dairy Queen's BLIZZARD® and W.B. Mason's Blizzard water in the marketplace differently.

561. Dairy Queen cites *McCarthy on Trademarks* § 23:43, which states that multiple Supreme Court cases consider a house mark an aggravating factor where the rest of the circumstances create a risk that consumers will see the house mark as an indication that the senior user licensed or sponsored the infringing use. Professor McCarthy notes that the Trademark Board's general rule is to consider whether the basic marks are recognizably different, or whether the basic mark is merely descriptive or highly suggestive, such that it would not be regarded by consumers as an indicia of source. McCarthy § 23.43.

562. In addition, Dairy Queen contends that W.B. Mason's house mark actually aggravates the likelihood of confusion because consumers are used to seeing the mark in co-branding situations. (Pl.'s Response at 8; Pl.'s Proposed CoL ¶ 164.) For example, it notes that both Dairy Queen and W.B. Mason routinely advertise their products in conjunction with third-party brands (e.g., Dairy Queen with products like Snickers® or Dasani® and W.B. Mason with brands HP® and Dunkin Donuts®). (Pl.'s Proposed CoL ¶¶ 157–58.) Dairy Queen asserts that such co-branding practices make it more likely for consumers to mistakenly believe that Dairy Queen sponsors or is affiliated with W.B. Mason's Blizzard spring water. (*Id.* ¶ 158.)

563. Although it is a close question, the Court finds that this is a situation in which the use of the house mark lessens, rather than increases, the chance of consumer confusion.

W.B. Mason's house mark is sufficiently prominent and is visually amplified by the addition of the W.B. Mason character, and the basic mark, "Blizzard," is suggestive, such that W.B. Mason's use of its house mark is a mitigating factor, rather than an aggravating factor for finding a likelihood of confusion. *See* McCarthy § 23.43. Moreover, the Court has also found persuasive Professor Hoyer's testimony that because of extensive third-party use of "Blizzard," consumers are able to distinguish among different brands and uses. (Tr. at 1507:6-20.)

564. It is true that in one of the ice cream flyers identified by Dairy Queen, (Ex. P-59), Defendant's WHO BUT W.B. MASON house mark appears only on the first page, while Blizzard water appears on the third page of the flyer (depicted with its house mark on the bottle), with other third-party co-branded goods, like Solo® drinking cups and Dixie® napkins. (Ex. P-59.) But the third-party brands that W.B. Mason advertises in its ice cream flyer are specifically identified. (*Id.*) Thus, the lack of a brand name for Blizzard water suggests that W.B. Mason is the source of the spring water. *See Citigroup Inc. v. AT & T Servs., Inc.*, No. 16-CV-4333 KBF, 2016 WL 4362206, at *9 (S.D.N.Y. Aug. 11, 2016) (finding use of house mark lessened likelihood of consumer confusion where, among other things, defendant AT & T's website specifically identified other companies that partnered with it for the at-issue loyalty program, such as AMC Theatres and Live Nation, were specifically identified, thereby "decreasing the chances that a consumer would believe that [the plaintiff] Citigroup was associated with the program despite not being identified."). In addition, although the images of the water bottles depicted in the ice cream flyer are quite small, the W.B. Mason house mark is present on the labels.

### 3. Channels of Distribution

565. As the Court has discussed, the parties' products are sold and distributed through fundamentally different trade channels, sales outlets, and to different customers. (Tr. at 84:13-85:2, 249:3-18, 339:5-18, 823:1-18, 825:20-826:14.) Dairy Queen sells its BLIZZARD® treat directly to consumers, in its restaurants, while W.B. Mason sells its bottled water to business customers through its website or through contacts with sales personnel, and delivers its water in bright yellow W.B. Mason delivery trucks.

566. At trial, Dairy Queen presented evidence that ice cream shops and restaurants are among W.B. Mason's bottled water customers, as well as evidence that some of these businesses have resold Defendant's bottled water to individual customers. (*See* Exs. P-355, P-356, P-357, P-396, P-398, P-400.) Specifically, Dairy Queen's investigators found seven W.B. Mason customers who had purchased a total of approximately $5,818 in Blizzard spring water from W.B. Mason and who were reselling the water in their shops or restaurants. (Tr. at 1929:18-1930:11; Stip. of Rebuttal Facts [Doc. No. 430] at 2.) But when W.B. Mason learned of these resales, in violation of its no-resale policy, it sent letters to these customers, reminding them of the no-resale policy, and it followed up with on-site visits to ensure compliance. (Tr. at 1927:9-1929:13.)

567. The only other evidence of resale of Blizzard spring water involves W.B. Mason's sponsorship of a new minor league baseball team, the Pawtucket Red Sox. (Tr. at 984:20-986:6.) As part of the sponsorship arrangement, W.B. Mason permitted the sale of its spring water to customers at the stadium for a one-year period. (*Id.*)

568. As a general matter, Mr. Meehan credibly testified that W.B. Mason does not permit the resale of its bottled water, nor does it plan to do so, because doing so could jeopardize the company's relationship with important vendors, e.g., Poland Spring and Coca-Cola, that sell their products to W.B. Mason. (Tr. at 907:17-908:9.) Moreover, he stated that W.B. Mason's business customers have no incentive to resell Blizzard water because it is not competitively priced for a retail sales channel. (Tr. at 910:3-9.)

569. As the Court noted at trial when granting W.B. Mason's motion for partial judgment that Plaintiff was not entitled to disgorgement of profits, there is only *de minimis* evidence of customers reselling spring water, followed by W.B. Mason taking action to stop the practice. (Tr. at 1900: 3-10) ("Even in the restaurant and ice cream shop space, there is only *de minimis* anecdotal evidence of W.B. Mason's Blizzard bottled water being resold to the public, and there's evidence that W.B. Mason did not permit its customers to resell its products to the public. It appears that, generally speaking, W.B. Mason sold its Blizzard bottled water to restaurants and ice cream shops for use by [their] employees, not for sale to the public."). W.B. Mason's total Blizzard water sales of $5,818 to seven customers is miniscule in light of its more than $130 million in sales of Blizzard water from 2010 to the present. (Tr. at 898:2-5, 902:14-25, 1929:18-1930:12; Ex. D-488.) The Court views the resale of water at the baseball stadium as a similarly limited situation. This *de minimis* evidence of resale does not support a finding that the products are sold through similar channels or sales outlets, or to similar customers.

### 4. Other Factors

570. As to additional factors related to the degree of competition between the products, while there is some overlap in geographic distribution, unlike Dairy Queen, W.B. Mason does not sell its products nationwide. Rather, it primarily sells its products to businesses located in "Masonville," i.e., all of New England, New York, Pennsylvania, New Jersey, Delaware, Maryland, Washington, Virginia, Florida, and eastern Ohio. (Tr. at 823:1-8, 824:20-825:5, 1916:5-7.) Accordingly, the overlap in geographic distribution is limited to those states.

571. In terms of "audience appeal," the products are quite different, with the audience for Dairy Queen's BLIZZARD® referring to it as an indulgent, high calorie treat, (Ex. P-44 at 25, 27, 29, 32; Tr. at 344:11-17), whereas W.B. Mason's spring water is a "functional" and "thirst-quenching" product. (Tr. at 1519:17-18.)

### 5. Conclusions Regarding Competitive Proximity

572. In sum, the Court finds the degree of competitive proximity here to be negligible. Granted, under precedent that the Court must apply, food and beverage products have been found to be related for purposes of competitive proximity. As to brand extension and sponsorship, even if consumers could reasonably expect Dairy Queen to launch its own branded bottled water, the evidence here shows that the parties' respective use of their house marks lessens the likelihood of confusion concerning brand extension and sponsorship. Importantly, the sales and distribution channels of Dairy Queen's BLIZZARD® treat and W.B. Mason's Blizzard spring water are fundamentally different, with Dairy Queen selling its treat directly to consumers in restaurants, and W.B. Mason

selling its spring water to business customers through its online website or sales personnel, and delivering it in W.B. Mason-branded yellow delivery trucks. These substantially different sales and distribution channels further reduce the competitive proximity between the products. There is limited overlap in geographic distribution, and the products have very different audience appeal. On balance, because the Court finds the degree of competitive proximity to be negligible, this factor weighs in Defendant's favor as to the likelihood of consumer confusion.

**D. Intent**

573. The next *SquirtCo* factor is the intent of the alleged infringer to confuse the public. *Davis*, 430 F.3d at 903.

574. This factor is "relevant because it demonstrates the junior user's true opinion as to the dispositive issue, namely, whether confusion is likely." *Kemp*, 398 F.3d at 1057.

575. As the Court has observed, W.B. Mason uses its house mark on its spring water, and a defendant's use of its house mark may demonstrate the absence of intent to trade on a plaintiff's trademark. *See, e.g., Frosty Treats, Inc. v. Sony Computer Ent. Am. Inc.*, 426 F.3d 1001, 1009 (8th Cir. 2005) (finding no intent to pass off plaintiff's marks; defendant's product clearly indicated it was produced by defendant).

576. However, Dairy Queen contends that W.B. Mason's failure to perform due diligence by performing a trademark search prior to using its Blizzard mark constitutes a level of carelessness akin to willful ignorance. (Pl.'s Proposed CoL ¶ 194) (citing *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749, 754 (2d Cir. 1996)).

577. It is true that W.B. Mason did not conduct a trademark search prior to applying the Blizzard name to its spring water, including before it began selling individual-sized bottles of Blizzard spring water. (Tr. at 955:11-958:18.) But W.B. Mason's "failure to conduct a trademark search does not demonstrate an intent to infringe or willful indifference to [plaintiff's] trademark rights." *Roederer*, 732 F. Supp. 2d at 872; *see, e.g., George & Co. LLC v. Imagination Ent. Ltd.*, 575 F.3d 383, 398 (4th Cir. 2009) ("failure to conduct a trademark search or contact counsel shows carelessness at most, but is in any event irrelevant because knowledge of another's goods is not the same as an intent 'to mislead and to cause consumer confusion'") (quoting *Luigino's*, 170 F.3d at 831 (citation and internal quotation marks omitted)); *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1091 (10th Cir. 1999) (rejecting plaintiff's contention that "although it has no direct evidence of bad intent, a jury could infer defendants' intent to derive the benefit and goodwill of [plaintiff's] mark because they failed to conduct a full trademark search before using the phrase "king of the mountain" when plaintiff presented no evidence that defendants were even aware of plaintiff's existence).

578. In general, courts have found that the failure to conduct a trademark search warrants a finding of bad faith only when combined with other actions demonstrating a disregard of plaintiff's trademark rights, as was the case in *International Star Class Yacht Racing Association*, on which Dairy Queen relies. 80 F.3d at 754 (in the appeal of the denial of an accounting of profits, for which a showing of bad faith is required, the court found bad faith where defendant did not conduct a trademark search against advice of counsel and intentionally copied STAR CLASS mark); *see also Frehling Enters., Inc. v.*

*Int'l Select Grp., Inc.*, 192 F.3d 1330, 1340 (11th Cir. 1999) (finding defendant's failure to conduct a trademark search, combined with USPTO's refusal of defendant's trademark application based on potential confusion with plaintiff's trademark and defendant's later adoption of an 800 number incorporating plaintiff's mark, contrary to advice of defendant's own counsel demonstrated intentional blindness and improper intent).

579. Similarly, "'[r]efusal to abandon [plaintiff's] mark in the face of a cease and desist letter cannot demonstrate bad faith standing alone." *Roederer*, 732 F. Supp. 2d at 872 (quoting *O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 590 F. Supp. 2d 500, 525 (S.D.N.Y. 2008) and citing *Straus v. Notaseme Hosiery Co.*, 240 U.S. 179, 181 (1916) ("defendants' persistence in their use of the design after notice proves little or nothing against them")); *see also Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 456 (5th Cir. 2017) ("majority rule amongst jurisdictions is that a defendant's continued use of a mark even after it receives a cease and desist letter cannot be construed as evidence of intent to confuse").

580. The Court finds no evidence of W.B. Mason's bad faith, nor any additional evidence that it deliberately disregarded Dairy Queen's trademark rights. Mr. Meehan testified credibly that W.B. Mason applied the Blizzard name and mark to its spring water as an extension of its successful Blizzard copy paper line. (Tr. at 845:23-846:15, 851:15-852:2, 857:15-22, 866:8-867:14.) W.B. Mason hoped to capitalize on its customers' recognition of the brand in its business-to-business sales model for office and break room supplies.

581. Indeed, the marks for W.B. Mason's copy paper and for its spring water are quite similar. Like the copy paper label, the spring water label incorporates a snow-covered tree, blue sky, the Blizzard mark, the WHO BUT W.B. MASON house mark in red lettering, and the W.B. Mason namesake character wearing sunglasses, framed by crossed flags. W.B. Mason replaced "blinding white" on its copy paper with "spring water" on the bottled water.




(*Compare* Ex. D-279, *with* Ex. D-448.)

582. Prior to this litigation, Mr. Meehan had never heard of Dairy Queen's BLIZZARD® treat, had never been to a Dairy Queen restaurant, nor could he recall ever seeing any Dairy Queen BLIZZARD® television commercials. (Tr. at 857:23-858:17, 952:25-953:9.) He explained that Dairy Queen's BLIZZARD® mark was never considered when W.B. Mason created its Blizzard® mark for copy paper, nor when the company expanded into spring water. (Tr. at 858:18-22.)

583. He also testified credibly that in using the Blizzard mark, W.B. Mason was not attempting to create an association between W.B. Mason and Dairy Queen, in general, or with its frozen dessert, in particular, and could think of no possible reason why such an

association would benefit W.B. Mason. (Tr. at 857:15-22, 884:14-17.) Mr. Meehan explained, "[W]ater is a healthy, low-calorie or no-calorie drink for refreshment, and a BLIZZARD® frozen treat is just the opposite. It's a wonderful-tasting dessert that is very high in calories. Let's say it's not a real healthy drink. You wouldn't drink it for health. So they are really opposite spectrums, so I don't see how that [an association between the products] would help us in any way, shape or form, in selling more Blizzard water." (Tr. at 920:20-921:2.)

584. None of the evidence here demonstrates carelessness akin to willful indifference or willful disregard. Notably, W.B. Mason was granted its trademark for use on copy paper, and with respect to spring water, the USPTO approved its applications for publication without citing any of Dairy Queen's BLIZZARD® registrations as a basis for refusal, although Dairy Queen opposes the spring water registrations, and trademarks have not been granted at this time. (Tr. at 923:14-16, 944:21-945:5, 1669:14-16.) Mr. Meehan testified that when W.B. Mason launched its Blizzard spring water in 2010, he turned the trademark application process over to his attorney, and was surprised to learn in 2016 that no trademark application had been filed for the spring water. Even if W.B. Mason had conducted a trademark search prior to launching its Blizzard products, there is no indication that it would have adopted a different mark in the face of Dairy Queen's BLIZZARD® mark.

585. Nor does the evidence here support a finding of bad faith. At trial, the Court ruled for W.B. Mason on its motion for partial findings that Dairy Queen was not entitled to the disgorgement of profits. (Tr. at 1898:9-12, 1902:5-7.) The Court observed that while

a showing of willfulness is not required for disgorgement, the Court was nonetheless "unaware of any court that has awarded the disgorgement of profits against an innocent infringer in the absence of some sort of evidence of bad faith or intentional misconduct or wrongful behavior." (Tr. at 1898:5-12.) The Court found that "the evidence of record does not support an award of the equitable remedy of disgorgement of profits in this case." (Tr. at 1902:5-7.)

586. For all of these reasons, the Court finds that the evidence here fails to establish W.B. Mason's intent to confuse the public. Thus, this likelihood-of-confusion factor weighs in W.B. Mason's favor.

**E. Degree of Care of Potential Customers**

587. The next factor in the analysis of the likelihood of confusion is the degree of care reasonably expected of potential customers. *Davis*, 430 F.3d at 903. The Eighth Circuit has noted that "the type of product, its cost, and conditions of purchase" inform the customers' degree of care. *Luigino's, Inc*., 170 F.3d at 830.

588. This factor is analyzed from the perspective of "the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Gen. Mills*, 824 F.2d at 627.

589. As a general matter, "the greater the cost of the product or service, the more time and effort consumers are expected to expend when making decisions, and therefore the likelihood of confusion decreases." *Mars Musical Adventures, Inc. v. Mars, Inc*., 159 F. Supp. 2d 1146, 1153 (D. Minn. 2001).

590. However, other factors, such as defendant's distribution methods, may affect the consumers' degree of care, even when the individual product is not expensive. *See*, *e.g.*, *ZW USA*, 889 F.3d at 447-48 (finding fact that parties sold their respective low-cost products on different websites under different trade names strongly cut against a likelihood of confusion); *Duluth News-Tribune*, 84 F.3d at 1099 (rejecting argument that consumers exercised minimal care when purchasing newspapers, because it "ignore[d] the reality of defendant's distribution methods," in which 92% of the allegedly infringing products were sold via subscriptions, which implicated a greater degree of consumer knowledge).

591. The low cost of Blizzard water suggests that consumers might be likely to exercise minimal care when purchasing it. *See* McCarthy § 23:95 ("Purchasers of relativity inexpensive goods such as ordinary grocery store foods are held to a lesser standard of purchasing care. . . . The ordinary prudent purchaser does not give much care or thought to the everyday purchase of relativity inexpensive items."); *see also Fiji Water Co. v. Fiji Mineral Water USA, LLC*, 741 F. Supp. 2d 1165, 1180-81 (C.D. Cal. 2010) (finding degree of care weighed in favor of plaintiff where premium water product was considered low-cost consumer good); *Starbucks U.S. Brands, LLC v. Ruben*, 78 U.S.P.Q.2d 1741, 2006 WL 402564, at *9 (T.T.A.B. Feb. 9, 2006) ("[B]ecause retail coffee and tea beverages and coffee and tea itself are inexpensive products and may be purchased on impulse and without care, consumers devote limited attention to the purchase of such goods and services, and thus are more susceptible to confusion.").

592. The parties' branding experts agree that the products in question are "low involvement" purchases, meaning that consumers exercise less care in purchasing them.

593. However, the purchasers of Blizzard water are typically businesses with sophisticated and knowledgeable personnel responsible for purchasing office supplies, who buy such products in bulk quantities. (Tr. at 823:1-8, 825:20-826:14, 1916:5-7.) This suggests a higher degree of care in the purchase of W.B. Mason's spring water.

594. Dairy Queen argues that this factor should be considered not only for the business/bulk purchasers of W.B. Mason's water, but also for the handful of retail purchasers, and the water's eventual consumers—not just purchasers. (*See* Pl.'s Proposed CoL ¶ 198.) It contends that when the purchasing class is mixed, courts place greater emphasis on the least sophisticated consumers in a purchasing group, and that the Court must consider initial interest confusion and post-sale confusion among these consumers. (*Id.* ¶¶ 198, 201) (citing *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 285 (3d Cir. 2001) ("If there is evidence that both average consumers and specialized commercial purchasers buy goods, there is a lower standard of care because of the lack of sophistication of some of the relevant purchasers.")).

595. Dairy Queen also argues that the Court should consider consumers' initial interest confusion and post-sale confusion. (*Id.* ¶ 201.)

596. In *Select Comfort*, 996 F.3d at 936, the Eighth Circuit held that a theory of initial interest confusion may apply in this Circuit, although it is inapplicable where the relevant average consumers are sophisticated at the level of careful professional purchasers. The theory "recognizes that a senior user's goodwill holds value at all times, not merely at the moment of purchase," and "protects against the threat of a competitor

receiving a free ride on the goodwill of an established mark." *Id*. at 932 (citing *Checkpoint Sys.*, 269 F.3d at 295) (cleaned up).

597. In *Insty*Bit*, 95 F.3d at 671–72, the Eighth Circuit held that post-sale confusion—confusion among non-purchasers, including observers—could also support an action for trademark infringement. Other circuits have considered the confusion of those who are not potential purchasers if their confusion "threatens the trademark owner's commercial interest in its mark." *Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.*, 376 F.3d 8, 16 (1st Cir. 2004) (collecting cases). Some courts have held that for confusion extending beyond the typical purchaser, the plaintiff must show how public confusion will adversely affect the plaintiff's reputation among stakeholders. *See Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 128 (4th Cir. 1990) (citing *Commc'ns Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1250 (4th Cir. 1970)).

598. The Court finds that consideration of this factor—the degree of care exercised by potential consumers—does not clearly favor either Dairy Queen or W.B. Mason, even applying it to initial interest confusion and post-sale confusion, as Dairy Queen requests. While the individual product, bottled water, is inexpensive, W.B. Mason sells it in bulk, primarily to relatively sophisticated business customers. When products are sold to "sophisticated customers after a collaborative process," potential confusion tends to be mitigated. *Sensient Techs. Corp v. SensoryEffects Flavor Co.*, 613 F.3d 754, 769 (8th Cir. 2010).

599. As the Court has discussed, the limited instances of resale to downstream consumers in restaurants, ice cream shops, and baseball games is *de minimis*. In *Duluth*

*News-Tribune*, 84 F.3d at 1099, the Eighth Circuit examined the degree of care reasonably expected of newspaper consumers, finding that where only 6% of the newspapers at issue were sold through newspaper racks lacking identification of the publication source, the number of such limited sales was "too small to create a genuine issue of fact regarding the likelihood that an appreciable number of customers will be confused." The Court similarly finds that the limited instances of resale in this case fail to support a finding of the likelihood of confusion.

600. Moreover, Dairy Queen's investigators did not gather information from any customers of these retail establishments as to their possible confusion over the source of the bottled water, nor has W.B. Mason ever received questions from customers who received its ice-cream flyers regarding any affiliation with Dairy Queen. (Tr. at 780:21-781:22, 797:7-16, 809:10-810:1; Stip. of Rebuttal Facts at 2; Tr. at 1930:13-1931:5, 1937:17-1938:10.) Accordingly, these sales do not factor into the analysis here.

601. The Court recognizes, however, that relatively unsophisticated, individual consumers of the bottled water, employed by W.B. Mason's customers, could theoretically combine with their purchasing-savvy employers to create a mixed class of consumers. Placing greater emphasis on the less sophisticated consumer group, s*ee Checkpoint Sys.,* 269 F.3d at 285 (3d Cir. 2001), would support the notion that consumers are likely to exercise a lower degree of care, thereby increasing the likelihood of confusion. But the record contains little evidence regarding such consumers, including the number of such consumers, their attitude about W.B. Mason's water, and any confusion they might have concerning the product. Dr. Joachimsthaler testified about such end-users when addressing

activation spreading, but only in a hypothetical fashion. (Tr. at 1105:10-16) (discussing employees in an office setting who might see W.B. Mason's Blizzard mark at the water cooler, such that "whatever they experience at the moment, either objectively or incidentally spreads into the network of Dairy Queen.").

602. The Court also notes that the parties' distribution methods are quite different. W.B. Mason's spring water is sold online or through sales people, and delivered in its distinctive yellow trucks, which could support a finding that purchasers exercise a higher degree of care, diminishing the likelihood of confusion.

603. Ultimately, the Court finds that consideration of this factor—the degree of care of potential consumers—results in a "wash." The evidence here neither supports nor refutes the likelihood of confusion.

**F. Evidence of Actual Confusion**

604. Evidence of actual confusion is the final *SquirtCo* factor. *Davis*, 430 F.3d at 903.

605. If present, evidence of actual confusion is strong evidence of the likelihood of confusion. *See Eclipse*, 894 F.2d at 1118. The absence of such evidence is not determinative. *See id.* However, courts have found "[p]roof that for a long period of concurrent use of the marks, there was no actual confusion between them" to be relevant evidence concerning the likelihood of confusion. McCarthy § 23:18 (collecting cases) (citations omitted). The Fourth Circuit has stated that "Although proof of actual confusion is not necessary to show a likelihood of confusion, the absence of any evidence of actual confusion over a substantial period of time—here, approximately nine years—creates a

strong inference that there is no likelihood of confusion. *CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 269 (4th Cir. 2006) (citing *Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.*, 958 F.2d 594, 598 (4th Cir.1992)).

606. Some courts weigh this factor heavily only if there is evidence of actual confusion or if the circumstances indicate that there should have been such evidence. *See, e.g.*, *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1119 (6th Cir. 1996) ("[T]he factor should be weighted heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available. Thus, absence of such evidence, in the usual case, is not weighted heavily against a plaintiff.") (internal quotation and citation omitted); *SquirtCo*, 628 F.2d at 1091 ("[A]ctual confusion is not essential to a finding of trademark infringement, although it is positive proof of likelihood of confusion.").

607. In assigning weight to this factor, courts take into consideration the length of time that the products are used in the same territory. *See David Sherman Corp. v. Heublin, Inc.*, 340 F.2d 377, 380 (8th Cir. 1965) (noting that courts have regarded the absence of actual confusion an important factor, but ultimately affirming likelihood of confusion between SMIRNOFF and SARNOFF for vodkas despite no evidence of actual confusion after six years of market co-existence). Still, even instances of actual confusion can be given little weight if they are infrequent or not serious. *See, e.g., Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88 (4th Cir. 1997) ("In light of its huge volume of commerce, [plaintiff's] meager evidence of actual confusion is at best de minimis."); *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111

(6th Cir. 1996) ("[F]our incidents is not a considerable quantum of evidence of actual confusion and minimal or isolated instances of actual confusion are, obviously, less probative than a showing of substantial actual confusion.").

608. Survey evidence is useful to a finding of actual confusion, but is not required. *Insty*Bit*, 95 F.3d at 671. The weight a district court places on survey evidence is "well within its broad fact finding authority" and can take into account the survey participant population and methods. *Kemp*, 398 F.3d at 1053, 1057. Technical deficiencies in such evidence go to the weight of the evidence, rather than to its admissibility. *SquirtCo*, 628 F.2d at 1091. For example, the Eighth Circuit noted in *SquirtCo* that in an opinion survey, a 25% response from the sample finding that two products were made by the same company was sufficient to support an inference of the likelihood of confusion. *Id*. (citations omitted).

609. Here, Dairy Queen has not identified any instances of actual confusion as to the source or sponsorship of W.B. Mason's Blizzard spring water, after 11 years of coexistence, over $130 million in Blizzard water sales, and over 190 million individual water bottles sold. (Tr. at 1917:4-6, 1919:24-1920:9; Ex. D-488.)

610. None of the 4.4 million members of Dairy Queen's BLIZZARD® fan club have contacted Dairy Queen to express confusion about W.B. Mason's Blizzard spring water. (Tr. at 299:17-300:20.)

611. Dairy Queen did not identify anyone who has mistakenly believed that W.B. Mason's Blizzard spring water is actually a Dairy Queen product. (Tr. at 342:18-343:1.) Nor did Dairy Queen identify anyone who has mistakenly believed that W.B. Mason's

Blizzard spring water is connected to Dairy Queen's BLIZZARD® product. (Tr. at 343:2-6.)

612. While a likelihood of confusion survey may serve as a proxy for evidence of actual confusion, but is not required, Dairy Queen did not offer a likelihood of confusion survey in this case.

613. In contrast, W.B. Mason, through its expert Sarah Butler, did conduct a likelihood of confusion survey. (Tr. at 1723:2-12.) Her survey, which the Court finds sufficiently reliable and helpful, found no confusion when respondents were presented with a simulated purchase scenario that replicated the conditions in which a customer would actually confront the junior user's mark (W.B. Mason's website) in the real world. (Tr. at 1733:8-14, 1735:2-1737:10, 1738:12-1739:3.)

614. Accordingly, given the lack of evidence of actual confusion after 11 years of co-existence, 190 million bottles of Blizzard spring water sold, and more than $130 million dollars of W.B. Mason Blizzard water sales, combined with the results of Ms. Butler's likelihood of confusion survey (yielding no confusion), this factor weighs in favor of W.B. Mason. It is not determinative, however, and because Plaintiff is not required to demonstrate actual confusion, the Court assigns moderate weight to it.

### G. Balancing the *SquirtoCo* Factors

615. In conclusion, the Court finds that even if the Dairy Queen BLIZZARD® mark is commercially strong, the widespread use of BLIZZARD as a brand on related and even unrelated products weakens the mark's conceptual strength, and therefore weakens the mark overall, to a moderate degree. While the weakening effect caused by activation

spreading is strongest when the word is used on related goods, even Dairy Queen's expert, Dr. Joachimsthaler testified that activation spreading occurs in far-removed product categories and acknowledged a research study that supported such a finding. (Tr. at 1279:7-1283:16.)

616. Moreover, for purposes of Dr. Joachimsthaler's opinion on activation-spreading and his associative memory diagram, the Court assigns no weight to his opinion that Dairy Queen's BLIZZARD® and W.B. Mason's Blizzard spring water share the identical product attributes of "cold," "refreshing," and "portable." (Tr. at 1117:4-10, 1135:5-12, 1136:1-13.) Dr. Joachimsthaler settled upon those attributes himself, based on no empirical testing. Instead, Dr. Joachimsthaler eschewed putting his opinions to the test through empirical testing, and choose to instead rely on "unwavering," "law-like" principles of branding and consumer psychology. (Tr. at 1138:12-1140:10, 1297:9-19.)

617. The Court also gives little credence to his opinion that consumers "cannot really tell what they know and oftentimes cannot express their feelings accurate," (Tr. at 1170:17-1171:3), which may support his lack of empirical testing, but suggests that the entire practice of consumer surveys is irrelevant. As Professor Hoyer opined, in rebuttal to Dr. Joachimsthaler's opinion, "[I]t's all about consumers and what's in their minds. And consumers can remember things. If they couldn't, then brands wouldn't have any meaning whatsoever." (Tr. at 1523:25-1524:7.)

618. Dr. Joachimsthaler's opinion was not even informed by Dairy Queen's own internal consumer data, best embodied in the 2012 DQ Treats Presentation. (Tr. at 373:1-375:7, 1172:19-24; Ex. P-44.) The presentation included a correspondence map that

displayed the characteristics consumers most associate with the frozen BLIZZARD® treat: "something I crave," "totally indulgent," "something I will go out of my way for," "something I like to share with friends or family," and "brings a smile to my face." (Ex. P-44 at 25.) It contained no mention of "portable." The Court finds Professor Hoyer's opinion persuasive that "portable" is a broad, generic term, relevant to all food, in some sense, and is not a key defining product attribute. (Tr. at 1519:20-23.)

619. Comparing the mark and logo of Dairy Queen's BLIZZARD® mark and W.B. Mason's bottled water, the Court finds that the overall impression of the marks, when considered as consumers encounter them in the marketplace, shows that they are not significantly similar, despite the common name. In addition, the Court finds that Dairy Queen's BLIZZARD® treat and W.B. Mason's Blizzard spring water have negligible competitive proximity and there is no evidence that W.B. Mason intended to pass off its goods as being associated with Dairy Queen. The degree of care that potential customers use when purchasing or consuming the two products favors neither Dairy Queen nor W.B. Mason. Finally, there is no evidence of actual confusion.

620. While Dairy Queen was not required to submit direct evidence in the form of surveys to support many of the factors relevant to the likelihood of confusion, such evidence is preferable to indirect evidence. Other than Dr. Jay's recognition survey, Dr. Joachimsthaler conducted no surveys, and at times, questioned the necessity for surveys. While he certainly possesses expertise in general principles of consumer marketing and branding, his opinion was often lacking in foundation, and, lacking empirical support, was subject to potential bias or subjectivity. As Professor Hoyer testified, consumer surveys

are necessary to "average out" individual consumers' biases to obtain a sample of consumer opinions. (Tr. at 1524:13-16.)

621. By contrast, W.B. Mason offered Ms. Butler's likelihood-of-confusion survey and opinion, demonstrating no consumer association between W.B. Mason's Blizzard spring water and Dairy Queen. (Tr. at 1743:18-21.) Since her survey assessed present-day consumers, rather than consumers in 2010, the weight of the evidence is slightly lessened. However, the Court still finds that it also supports the finding of a lack of the likelihood of confusion.

622. Moreover, Professor Hoyer persuasively testified that consumers can readily distinguish between two products that share a brand name, particularly when the name is a common word, exists in a crowded field of similarly-named goods, and both companies use house marks on the two respective products.

623. As noted earlier, under the Lanham Act, a plaintiff asserting a claim for trademark infringement or false designation of origin, must establish that the defendant is using a mark or symbol that is likely to cause confusion among consumers as to association or origin. 15 U.S.C. §§ 1114(1)(a); 1125(a)(1)(A). Having considered the *SquirtCo* factors, the Court finds that, on balance, the factors favor W.B. Mason. Therefore, Dairy Queen has failed to establish by a preponderance of the evidence the likelihood of confusion—a required element for its claims under Counts 1 and 2.

624. In addition, the Eighth Circuit has observed that "all Lanham Act remedies are equitable in nature." *Masters v. UHS of Del., Inc.*, 631 F.3d 464, 471 (8th Cir. 2011). The Court notes that in 2018, Dairy Queen decided to change its BLIZZARD® logo to a

new logo that contains features more similar to W.B. Mason's logo—months after sending W.B. Mason a cease and desist letter, and during a period when the parties were trying to resolve their dispute. It finalized the decision after this lawsuit was filed. It is true that the USPTO allowed Dairy Queen to amend its prior logo registration, acknowledging that the new design represented an immaterial change from the prior logo design. However, Dairy Queen's in-house counsel agreed that Dairy Queen's logo registration did not pertain to differences in color, which is one of the key distinguishing features between the old logo and new logo. In short, Dairy Queen's own conduct suggests that it was not concerned about the likelihood of consumer confusion when it consciously changed its BLIZZARD® logo to make it more similar to W.B. Mason's logo. Awarding relief to Dairy Queen under such circumstances would be inconsistent with the equitable principles of the Lanham Act.

625. For all of these reasons, the Court enters judgment in favor of W.B. Mason on Counts 1 and 2 of the Complaint [Doc. No. 1].

## III. DILUTION

626. Under the Trademark Dilution Revision Act (TDRA), and subject to the principles of equity, the owner of a famous and distinctive trademark may obtain injunctive relief against an entity that uses the owner's mark or trade name in commerce, after the mark has become famous, in a way "that is likely to cause dilution by blurring . . . of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1).

627. Dilution by blurring occurs when "consumers associate a famous mark that has traditionally identified the mark holder's goods with a new and different source."

*Luigino's*, 170 F.3d at 832. Thus, by "causing consumers to connect the famous mark with different products, the subsequent mark weakens, or dilutes, the famous mark's unique and distinctive link to a particular product." *Id*.

628. A claim for dilution is "[s]ubject to the principles of equity," 15 U.S.C. § 1125(c), and equitable considerations have been found to be "part of the claim itself, rather than merely as a consideration affecting the remedy." *Hasbro, Inc. v. Clue Computing, Inc*., 66 F. Supp. 2d 117, 136 (D. Mass. 1999), *aff'd*, 232 F.3d 1 (1st Cir. 2000) (applying prior statute, with same language "subject to the principles of equity.").

629. Dilution claims are "reserved for a select class of marks—those marks with such powerful consumer associations that even non-competing uses can impinge their value." *Everest Cap. Ltd. v. Everest Funds Mgmt*., LLC, 393 F.3d 755, 763 (8th Cir. 2005) (citation omitted).

630. A plaintiff may establish dilution through direct evidence, such as consumer surveys. *See Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 434 (2003) ("It may well be . . . that direct evidence of dilution such as consumer surveys will not be necessary if actual dilution can reliably be proved through circumstantial evidence—the obvious case is where the junior and senior marks are identical.").

631. Courts may also weigh relevant circumstantial evidence including, but not limited to: (1) the degree of similarity between the two marks; (2) the distinctiveness of the famous mark; (3) the exclusivity of the famous mark; (4) how recognizable the famous mark is; (5) the intent of the user of the allegedly diluting mark; and (6) the existence of

any actual association between the famous mark and the allegedly diluting mark. 15 U.S.C. § 1125(c)(2)(B).

632. These factors provide a "starting point" for the Court's analysis, but the Court also considers whether the defendant's mark is likely to impair the distinctiveness of the famous mark. *Prairie Island*, 2020 WL 7490034, at *4 (citing *Luigino's*, 170 F.3d at 832).

**A. Fame**

633. The threshold inquiry in a federal dilution claim is whether the mark in question is "famous." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1372 (Fec. Cir. 2012). A mark is "famous," for purposes of dilution, if it "is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A).

634. The TDRA provides that courts may consider all relevant factors in evaluating fame, including, but not limited to: "(1) the duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; (2) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (3) the extent of actual recognition of the mark; and (4) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register." *Id.*

635. The Eighth Circuit has stated that proving that a mark is "famous" is a "rigorous standard" for FTDA purposes. *Everest*, 393 F.3d at 763. The Federal Circuit agrees. *Coach*, 668 F.3d at 1373 ("It is well-established that dilution fame is difficult to prove.").

636. Fame for purposes of dilution is a separate and more stringent inquiry than fame for likelihood of confusion. *Id*. Unlike fame for likelihood of confusion, which exists "along a continuum," fame for dilution "either exists or does not." *Id*. (citing *Palm Bay Imports*, 396 F.3d at 1374-75). "[A] mark can acquire sufficient public recognition and renown to be famous for purposes of likelihood of confusion without meeting the more stringent requirement for dilution fame." *Id*. (internal quotation and citation omitted). Fame can be particularly difficult to prove where "the mark is a common English word that has different meanings in different contexts." *Id*.

637. Under the TDRA, the famous mark must have been famous by the time the alleged dilutive first use occurred. 15 U.S.C. § 1125(c)(1) (stating that dilution claim arises when diluting use occurs after the mark has become famous).

638. The relevant date from which to measure fame is the first use of a mark that blurs or tarnishes the famous mark. *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 171 (4th Cir. 2012) ("[F]or § 1125(c)(1) to apply, the defendant must have 'commence[d]' a diluting use of the plaintiff's mark after the point at which the mark became famous.").

639. W.B. Mason contends that the relevant date of the alleged diluting use is 2003, because that is when W.B. Mason launched its BLIZZARD BLINDING WHITE COPY PAPER. (Def.'s Proposed FoF ¶¶ 610–11.) However, Dairy Queen does not assert that W.B. Mason's use of "Blizzard" on copy paper is diluting. Rather, it contends that W.B. Mason's use of "Blizzard" on spring water, beginning in 2010, is the diluting use, and that 2003 is not relevant. (Pl.'s Proposed FoF ¶¶ 12–16.)

640. In *Rosetta Stone*, 676 F.3d at 172, the court stated that "[t]he statute does not permit the owner of a famous mark to pick and choose which diluting use counts for purposes of § 1125(c)(1)." *Accord Nissan Moto Co. v. Nissan Comput. Corp.*, 378 F.3d 1002, 1013 (9th Cir. 2004) ("If . . . first use for purposes of § 1125(c) turned on whatever use the mark's owner finds particularly objectionable, owners of famous marks would have the authority to decide when an allegedly diluting use was objectionable, regardless of when the party accused of diluting first began to use the mark."); *cf. Enterprise Rent-A-Car Co. v. Advantage Rent-A-Car, Inc.*, 330 F.3d 1333, 1341 (Fed. Cir. 2003) (holding that, although the statutory text of pre-amendment FTDA could refer to either "any use . . . in commerce" or the "particular use challenged in litigation," the "purpose of the statute was to provide for nationwide relief against diluting uses" so the text must refer to "any use in commerce" rather than use in a specific geographic area).

641. That said, the authority noted above did not concern a company using a mark in one product category and then later applying it to a product category that is closer to the product covered by the senior mark, as is the case here. This case is not about W.B. Mason's copy paper, and none of the evidence pertains to whether W.B. Mason's use of BLIZZARD on copy paper dilutes Dairy Queen's BLIZZARD® mark. Accordingly, the Court will measure Dairy Queen's fame from the date of the alleged diluting use of W.B. Mason's Blizzard spring water, in 2010.

642. As with Dairy Queen's trademark infringement claim, the relevant mark that the Court considers for purposes of Dairy Queen's dilution claim is its older BLIZZARD® mark with the gold background. Again, the older BLIZZARD® logo and mark were in

use at the time Dairy Queen commenced this action against W.B. Mason, and in light of these facts, it is the senior user's mark that is relevant to this dilution claim. As the Court has also noted, after filing this lawsuit, and with full knowledge of W.B. Mason's Blizzard logo and mark, Dairy Queen began using its current BLIZZARD® logo and mark, which is more similar to W.B. Mason's mark than Dairy Queen's older BLIZZARD® logo and mark.

643. The evidence here demonstrates that Dairy Queen has met several of the enumerated factors relevant to a finding of fame. As to the duration, extent, and geographic reach of advertising and publicity, 15 U.S.C. § 1125(c)(2)(A)(i), Dairy Queen has, on a nationwide basis, continuously advertised and promoted its BLIZZARD® treat from 2010 to the present, and has devoted considerable resources to its BLIZZARD® advertising. (Tr. at 157:10-16, Exs. P-10–P-17, P-28, P-229.) It has engaged in in-person and web-based anniversary promotions of the BLIZZARD® treat, (Tr. at 128:23-131:23; Ex. P-25), and, in a one-month period in 2010, was featured in the media over 650 times. (Ex. P-31 at 1–4.) Accordingly, it satisfies this factor. *See, e.g.*, *Edina Realty v. TheMLSonline.com, Inc*., No. 04-cv-4371 (JRT/FLN), 2006 WL 737064 (D. Minn. Mar. 20, 2006) (finding the mark EDINA REALTY famous where plaintiff spent "tens of millions" of dollars advertising its mark over a 50-year period); *Armstrong Cork. Co. v. Armstrong Plastic Covers Co*., 434 F. Supp. 860, 864 (E.D. Mo. 1977) (spending $168 million over a 20-year period); *Craters & Freighters v. Daisychain Enters*, No. C-09-04531 CW (JCS), 2010 WL 11484728, at *6 (N.D. Cal. 2010) (using mark for only twenty years).

644. With respect to the amount, volume, and geographic extent of sales of goods offered under the mark, 15 U.S. C. § 1125(c)(2)(A)(ii), Dairy Queen presented evidence demonstrating significant nationwide sales of its BLIZZARD® treat. From 2001 to 2020, Dairy Queen sold over $13.3 billion in BLIZZARD® treats in the United States, hitting $1.1 billion in sales in 2020 alone. (Ex. P-226.) As to the volume of its sales, in 2010, it sold 210 million units of BLIZZARD® in the United States, rising to 273 million units in 2020. (*Id.*) Accordingly, Dairy Queen satisfies this factor relevant to a finding of fame. *See, e.g.*, *Edina Realty*, 2006 WL 737064 (finding EDINA REALTY mark famous where plaintiff sold 40,984 units in one year); *New Balance Athletics, Inc. v. USA New Bunren Int'l Co. Ltd. LLC*, 424 F. Supp. 3d 334, 350–51 (D. Del. 2019) (finding "N" mark famous where plaintiff used it for 45 years, sold hundreds of millions of units of product in a five-year period, and generated $6 billion in revenue over a five-year period).

645. Regarding the factor relevant to a finding of fame based on trademark registrations, 15 U.S.C. § 1125(c)(2)(A)(iv), Dairy Queen owns valid BLIZZARD® registrations. (Registration No. 559,844, Ex. P-118A; Registration No. 1,458,987, Ex. P-120A; Registration No. 1,503,396, Ex. P-121A; Registration No. 2,693,918, Ex. P-389A.) Dairy Queen therefore meets this factor. *See New Balance*, 424 F. Supp. 3d at 351.

646. The final enumerated factor relevant to fame—the extent of actual recognition of the mark, 15 U.S.C. § 1125(c)(2)(A)(iii)—is hotly contested by Dairy Queen and W.B. Mason. The evidence relevant to actual recognition also pertains to one of the enumerated factors relevant to blurring—"the degree of recognition of the famous mark." 15 U.S.C. § 1125(c)(2)(B)(iv). Moreover, in assessing the fame of the Dairy Queen

BLIZZARD® mark, W.B. Mason urges the Court to consider numerous third-party uses of BLIZZARD to find that the mark is not famous for purposes of dilution.

647. Because the Court will address consumer recognition and exclusivity (including third-party use) below, and in light of the conclusions of law that follow, the Court will simply assume without deciding that Dairy Queen's BLIZZARD® mark is famous. This assumption holds true even if the relevant date of the diluting use is 2003, and not 2010. As the Court has noted, responses to Ms. Butler's dilution survey included comments from respondents attesting to their length of their familiarity with the BLIZZARD® treat since childhood, "for over 30 years," "for the last decade," and "for many years." (Ex. D-310 at 29, 33, 43, 53, 63, 64, 69, 73, 74, 84, 143, 218.)

**B. Degree of Similarity**

648. As noted earlier, one of the enumerated factors relevant to a finding of dilatation by blurring is the degree of similarity between the mark and the famous mark. 15 U.S.C. § 1125(B).

649. Although the TDRA does not require that the marks be "identical or nearly identical," *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 633 F.3d 1158, 1173 (9th Cir. 2011), a lack of similarity is an important factor in many cases. *See, e.g.*, *Luigino's*, 170 F.3d at 832 (applying pre-TDRA law to hold that "Lean Cuisine" and "Lean N' Tasty" were not similar enough to create a triable issue of fact); *Sensient Techs.*, 613 F.3d at 770 (quoting with approval *Luigino's* "essentially the same" standard while applying Missouri dilution law); *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 736 F.3d 198, 213 (2d Cir. 2012) ("Because Starbucks' principal evidence of association . . . was

fundamentally flawed, and because there was minimal similarity between the marks at issue, we agree with the District Court that Starbucks failed to show that [accused use] is likely to dilute the Starbucks Marks."); *FIU*, 830 F.3d at 1267 (affirming that "the marks were not similar enough to create a likelihood of dilution" under Florida law). *But see Levi Strauss & Co.*, 633 F.3d at 1171-72 (questioning whether the very or substantially similar requirement from previous case law survived TDRA).

650. Courts have noted that there is "substantial overlap" between the factor of similarity relevant to trademark dilution and to trademark infringement. *New Balance*, 424 F. Supp. 3d at 351 (citing *Adidas Am., Inc. v. Sketchers USA, Inc.*, 890 F. 3d 747, 759 (9th Cir. 2018)); *see also Starbucks*, 736 F.3d at 208 (rejecting argument that prior decision was limited to similarity for purposes of trademark infringement and did not apply to similarity for purposes of dilution).

651. The Court has found, in its analysis of the similarity factor for trademark infringement and false designation of origin, that although the parties use an identical word, their respective BLIZZARD marks convey different overall impressions. The Court declines to repeat its analysis here. Because similarity for purposes of dilution is determined by degree, the Court finds that the evidence here demonstrates only a minimal degree of similarity, due to the use of the same word. This factor weighs in W.B. Mason's favor. *Starbucks*, 736 F.3d at 212 (finding of minimal similarity between marks weighed in defendant's favor).

**C. Distinctiveness of the Famous Mark and Substantially Exclusive Use**

652. The Court next examines the distinctiveness and substantial exclusivity of the famous mark, which are two additional enumerated factors under the TDRA relevant to blurring. 15 U.S.C. § 1125(B). Because these factors bear a close relationship, the Court analyzes them together. *See Starbucks*, 736 F.3d at 212 (finding the Starbucks mark to be an arbitrary mark that was highly distinctive, and because it was in substantially exclusive use, its distinctiveness was more likely to be impaired by a junior user).

653. Dairy Queen maintains that because the Court found on summary judgment that its BLIZZARD® treat mark was suggestive, "[i]t is therefore inherently distinctive, and no showing of acquired distinctiveness is required." (Pl.'s Proposed CoL ¶ 88.)

654. "Word marks that are arbitrary, fanciful, or suggestive are inherently distinctive." *In re Chippendales USA, Inc.*, 622 F.3d 1346, 1351 (Fed. Cir. 2010) (citing *Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210–11 (2000).

655. While a trademark cannot be "famous" unless it is "distinctive," it can be "distinctive" without being "famous," because "a designation cannot legally qualify as a 'trademark' at all unless it is 'distinctive.'" McCarthy § 24:118.

656. The Court finds that Dairy Queen's suggestive mark, which it has registered for many years, enjoys a presumption of distinctiveness. *Easy Spirit*, 515 F. Supp. 3d at 72 (finding that suggestive Traveltime mark was inherently distinctive, and because it had been used for five consecutive years since registration, it "enjoy[ed] a conclusive presumption of distinctiveness.") (citing *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 457 (2d Cir. 2004)).

**1. Enforcement Activity**

657. The Court therefore turns to "the extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark." 15 U.S.C. § 1125(c)(2)(B)(iii). The Court agrees with Dairy Queen that under the TDRA, it need not establish exclusive use of the mark, but rather "*substantially* exclusive use." *Id.* (emphasis added).

658. Dairy Queen asserts that its enforcement of the BLIZZARD® mark over the course of many years weighs in favor of a finding of substantial exclusivity. (Pl.'s Proposed CoL ¶ 98) (citing *New Balance*, 424 F. Supp. 3d at 351) ("Substantial exclusivity can be evidenced by federal registration of the trademark and significant enforcement efforts against unauthorized use."); *Re/Max, LLC v. Shenzhen Remax Co., Ltd.*, No. 1:15-cv-02496-REB-SKC, 2019 WL 1081039, at *7 (D. Colo. Jan. 18, 2019) (finding that active policing of unauthorized use of the plaintiff's marks supported the court's conclusion that the plaintiff was engaged in substantially exclusive use of its marks); *General Motors Co. v. Urban Gorilla, LLC*, No. 2:06-CV-00133 BSJ, 2010 WL 5395065, at *11 (D. Utah Dec. 27, 2010) ("Active and aggressive policing of unauthorized uses of a mark supports a finding that the owner is engaging in substantially exclusive use of the mark."); *Chanel Inc. v. Camacho & Camacho, LLP*, No. 91229126, 2018 WL 447496, at *15–16 (T.T.A.B. Jan. 12, 2008) (finding substantial exclusivity where plaintiff showed that it had "aggressively and successfully enforced its rights in the mark")).

659. Indeed, Dairy Queen's in-house legal counsel, Ms. Edlund, testified about Dairy Queen's longstanding practice of enforcing its trademark rights in the field of

consumables. (Tr. at 1600:19-1602:2.) Specifically, she testified that Dairy Queen's general BLIZZARD® trademark enforcement strategy is to stop others from using "blizzard" in connection with food or beverages because Dairy Queen® stores carry a broad variety of consumable food and beverage products. (Tr. at 1049:12-1050:1.)

660. In particular, Ms. Edlund stated that Dairy Queen takes a variety of actions to protect its BLIZZARD® mark, primarily through cease and desist letters, as well as trademark oppositions, take-down requests, and litigation. (Tr. at 1051:15-1052:12.)

661. Dairy Queen has enforced its BLIZZARD® marks at least 109 times against infringers using marks confusingly similar to BLIZZARD. (Ex. P-199c.) Of those 109 matters, 105 were resolved to Dairy Queen's satisfaction. (Tr. at 1578:8-22.) The Court notes some exceptions to Dairy Queen's enforcement actions in the realm of consumables. It has not pursued enforcement activity against Disney's Blizzard Beach food items, and although Dairy Queen has sent Blizzard Wines a reservation of rights letter, it has not pursued infringement enforcement against the company. (Tr. at 1618:19-1619:8; 1625:13-19.) Overall, however, Dairy Queen's conduct in enforcing its trademark as to consumables supports its argument regarding substantially exclusive use.

**2. Common Word**

662. W.B. Mason contends that because "blizzard" is a common word, it is neither distinctive nor exclusive.

663. Dairy Queen urges the Court to reject this argument because it adds a requirement that "a mark must not be used at all by a third party regardless of whether it is on totally unrelated goods and services," which would "necessarily mean that most

famous trademarks (e.g., Apple and Amazon, and [others]) are as a matter of law not capable of being protected . . . ." (Pl.'s Proposed CoL ¶¶ 68-69; 624-41.)

664. Again, as Dairy Queen notes, the TDRA requires that a plaintiff demonstrate substantially exclusive use of its mark, not singular use of its mark. U.S.C. § 1125(c)(2)(B)(iii). The Eighth Circuit has advised caution when applying anti-dilution law to common words. *See Viacom Inc. v. Ingram Enter.*,141 F.3d 886, 892 (8th Cir. 1998) (that "Viacom is seeking a complete monopoly on the use of a rather common word [BLOCKBUSTER] with multiple meanings [where the parties' marks are both suggestive of their respective products] would make us hesitate to uphold summary judgment on its dilution-by-blurring claim"); *see also Duluth News-Tribune*, 84 F.3d at 1099-1100 ("Plaintiff cannot expect to acquire exclusive use . . . of the common words 'news' and 'tribune'").

665. Other commentators and courts have rejected any wholesale notion that a common word is unworthy of protection. McCarthy § 11:87 ("That a word is in "common usage" is quite irrelevant," as "[s]ome of the strongest marks are 'common words' found in the dictionary," such as "SHELL, CAMEL, APPLE."); *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1190 n.4 (6th Cir. 1988) (rejecting the fallacy that a "common term" found in the dictionary is either weak or unworthy of protection).

666. The Court does not find that simply because "blizzard" is a common word in the English language that refers to a severe winter storm, (Tr. at 621:18-21, 685:13-19, 717:8-13, 1133:7-16, 1749:16-19), Dairy Queen's BLIZZARD® treat is unworthy of protection against trademark dilution. More relevant than the ubiquity of "blizzard" in the

English language, however, is the extent to which the word is used on other branded products or services in the marketplace. McCarthy § 11:87 ("The issue is whether [the] word is in common usage as a mark for similar goods or services such that its distinctiveness in the customer's mind is blurred."); *Visa Intern.*, 610 F.3d at 1091 ("The significant factor is not whether the word itself is common, but whether the way the word is used in a particular context is unique enough to warrant trademark protection.") (citation omitted).

**3. Third-Party Use**

667. W.B. Mason contends that because of widespread third-party use of BLIZZARD in commerce, the mark is not uniquely or singularly associated with Dairy Queen, such that Dairy Queen does not maintain substantially exclusive use of the mark. (Def.'s Proposed CoL ¶¶ 140–44.) It points to the testimony of Professor Hoyer, in which he identified more than 70 trademark registrations or applications for BLIZZARD marks that Dairy Queen did not oppose or does not intend to oppose, as well as the testimony of nine third parties using the BLIZZARD mark. (*Id.* ¶¶ 647–51.)

668. While Congress deleted "the nature and extent of use of the same or similar marks by third parties" as an enumerated statutory factor for fame and distinctiveness in the 2006 TDRA, *see* 15 U.S.C. § 1125(c)(1)(G) (effective 1999-2006), the TDRA directs the Court to consider "all relevant factors." 15 U.S.C. § 1125(c)(2)(B). Certainly, courts have taken into consideration other notable uses of a mark when evaluating fame and distinctiveness, as the Court discusses below.

669. A "crowded field" of identical or similar third-party uses of the plaintiff's mark can militate against finding that the senior user is not engaging in substantially exclusive use of that mark. *See, e.g., Bath & Body Works Brand Mgmt., Inc. v. Summit Entm't, LLC*, 7 F. Supp. 3d 385, 400–01 (S.D.N.Y. 2014) (finding 63 active federal trademark registrations including the word "twilight" was persuasive evidence against exclusive use); *Va. Polytechnic Inst. & State Univ. v. Hokie Real Estate, Inc.*, No. 7:10-CV-00466, 2011 WL 926862, at *15 (W.D. Va. Mar. 15, 2011) (evidence that "a multitude of restaurants and other businesses are currently utilizing the [] mark without permission from [the senior user]" militates against finding substantially exclusive use).

670. This is because, as the court observed in *Prairie Island*, "a mark that is merely one of several identical or very similar marks is already diluted." *Prairie Island*, 2020 WL 7490034, at *4 (citing McCarthy § 24:120); *Hershey Co. & Hershey Chocolate & Confectionery Corp. v. Promotion in Motion, Inc.*, No. 07-CV-1601 (SDW), 2013 WL 12157828, at *25 (D. N.J. Jan. 18, 2013) ([w]here there are several identical or very similar marks, a new junior user that may have some similarities to the senior mark is unlikely to cause any significant further dilution" and finding that substantially-exclusive use factor weighed in defendant's favor because although "Hershey has developed and acquired distinctiveness for its KISSES mark, [it] has not had substantially exclusive use of the term for most of its existence"); *see also* Shari Seidman Diamond & Jerre B. Swann, *Trademark and Deceptive Advertising Surveys: Law, Science, and Design* ¶ 58 at 152 (where famous marks are "commonly used by numerous companies" then "it is unlikely that the famous mark will be blurred by another use" (citation omitted)).

671. For all of the reasons set forth in the Court's prior discussion of third-party use with respect to the strength of Dairy Queen's BLIZZARD® mark, the Court finds that Dairy Queen's use of its BLIZZARD® mark is not substantially exclusive. Some companies, including Blizzard Wines and Disney's Blizzard Beach, are selling BLIZZARD-branded consumables with commercial success. Moreover, other companies such as Blizzard Entertainment, are selling goods and services with phenomenal success, and Blizzard Entertainment even has the ownership right to blizzard.com. In fact, Ms. Kenny testified that Dairy Queen and Blizzard Entertainment have a "shared interest" in defending the BLIZZARD mark, (Tr. at 334:9-336:9), which undercuts Dairy Queen's position on substantially exclusive use. While many of the Blizzard-branded goods and services are unrelated to food and beverages, the Court finds it appropriate to give some weight to the impact of such products and services in lessening the exclusivity of Dairy Queen's BLIZZARD® mark. Even Dr. Joachimsthaler acknowledged that third-party uses of BLIZZARD in far-removed goods can prompt activation spreading among consumers. (Tr. at 1279:7-1283:16.) The Court assigns less weight to the portions of Professor Hoyer's testimony regarding the overall 70 trademark registrations or applications of BLIZZARD, unopposed by Dairy Queen before the USPTO, as it does not address the extent of such uses. But the third-party deposition evidence provides that necessary context. Professor Hoyer also relied upon the third-party deposition testimony in forming his opinion. The Court finds that while Dairy Queen's suggestive mark is presumptively distinctive, Dairy Queen has not demonstrated substantially exclusive use of BLIZZARD.

**D. Degree of Recognition**

672. As to the degree of recognition of Dairy Queen's BLIZZARD® mark, 15 U.S.C. § 1125(C)(2)(b), Dairy Queen has submitted evidence showing widespread public recognition of its BLIZZARD® mark, as demonstrated by Dr. Jay's survey and in her testimony. (Ex. P-77.)

673. Dr. Jay's aided survey found that 84% of the general U.S. population of respondents recognized the BLIZZARD® brand in connection ice cream or frozen treats. In addition, Ms. Butler's unaided association survey, with no contextual cues, found that consumers associate the word "Blizzard" first with snowstorms, at 82%, and second with Dairy Queen or ice cream/frozen treats, at 39%. No other association came close. In response to Ms. Butler's association survey question that asked about what companies, products, or brands the word "Blizzard" calls to mind, 54% of respondents said Dairy Queen or ice cream/frozen treats.

674. W.B. Mason argues that Dr. Jay's recognition survey should be disregarded because it was conducted after W.B. Mason's first use of the Blizzard water mark in 2010. However, courts accept surveys and other evidence of present-day fame as probative of fame at the time of the relative reference date. *See Apple, Inc. v. Samsung Elecs. Co*., 920 F. Supp. 2d 1079, 1097-98 (N.D. Cal. 2013) ("Apple's substantial advertising and press coverage prior to release of Samsung's phones, taken together with Apple's later-collected survey evidence, provides substantial evidentiary support for the jury's finding that Apple's trade dresses were famous before Samsung's first sale of an accused diluting phone . . . .") (internal citations omitted) (internal citations omitted), *rev'd in part on other*

*grounds*, 137 S. Ct. 429 (2016); *see also Deere & Co. v. FIMCO, Inc.*, 302 F. Supp. 3d 837, 899 (W.D. Ky. 2017), *superseded in part*, 301 F. Supp. 3d 704 (W.D. Ky. 2018) (relying on a fame survey in 2016 when the reference date was 1998); *Ford Motor Co. v. Ford Fin. Sols., Inc.*, No. C00-2009-EJM, 2000 WL 963999, at *2 (N.D. Iowa May 9, 2000) (citing a "recent survey" proving fame when the junior user began using the diluting marks over two years before the decision); *Combe, Inc. v. Dr. August Wolff GMBH & Co KG Arzneimittel*, 382 F. Supp. 3d 429, 451 (E.D. Va. 2019) (finding a fame survey taken after commencement of the action was "substantial and certainly support[s] a finding" of fame).

675. Moreover, Ms. Butler's association survey shows broad recognition of the Dairy Queen BLIZZARD® mark. Her survey demonstrated that the primary brand association of the word "Blizzard" was Dairy Queen or frozen treats. She found that 39% of respondents initially associated the word "Blizzard" with Dairy Queen or frozen treats, second only to associations with snowstorms, the generic meaning of the word. When asked what company, brand or product respondents associate with the word "blizzard," 54% of respondents named Dairy Queen or frozen treats. Dr. Stewart also found the results of Ms. Butler's association survey supported high recognition of the Dairy Queen BLIZZARD® mark in the marketplace. (Tr. 2212:21-2213:20) ("There are many, many marketers who would love to obtain that result when they put their brand name in the market without context get over half the market to recognize it as their product.").

676. Ms. Butler's dilution survey also strongly supports the conclusion that Dairy Queen's BLIZZARD® logo is well-recognized. In the baseline for the survey, 78.2% of respondents associated the BLIZZARD® logo with Dairy Queen. (Tr. 1759:23-1760:3.)

677. Dairy Queen's publicity evidence also shows substantial actual recognition of Dairy Queen's BLIZZARD® mark, including evidence that the public often refers to the BLIZZARD® mark as "famous" and "iconic."

678. The Court therefore finds that Dairy Queen's BLIZZARD® mark enjoys a high degree of recognition among the consuming public.

**E. Intent to Create an Association with Senior Mark**

679. This factor assesses "[w]here the user of the mark or trade name intended to create an association with the famous mark." 15 U.S.C. § 1125(c)(2)(B).

680. The Court will not repeat its analysis of intent set forth in its discussion of Dairy Queen's trademark infringement claim, *supra* at CoL, II.D. Again, the Court finds no evidence of an intent on the part of W.B. Mason to create an association with between its Blizzard spring water mark and Dairy Queen's BLIZZARD® treat mark.

**F. Evidence of Actual Association Between the Marks**

681. The Court turns to the next enumerated factor for a showing of dilution by blurring under the TDRA: evidence of actual association between the marks. 15 U.S.C. § 1125(c)(2)(B). In particular, this factor contemplates the introduction of evidence that ordinary consumers make a mental association between the accused mark and the famous mark. McCarthy § 24:119.

682. "A showing of actual association is not necessary to prevail on a dilution claim." *New Balance*, 424 F. Supp. 3d at 352 (citing *Starbucks*, 736 F.3d at 212–13); *see also Pendleton Woolen Mills, Inc. v. Round Up Ass'n*, No. 3:11-CV-592-AC, 2012 WL 2721856, at *7 (D. Or. July 9, 2012).

683. However, the actual association factor of the TDRA has been called a "gateway" requirement for dilution by blurring. McCarthy § 24:117. If the ordinary consumer does not call to mind the allegedly famous mark when encountering the junior user's mark, "there is neither dilution or the likelihood of it." *Id.*

684. As Professor McCarthy explains,

> [t]his factor points to introduction of any evidence, such as survey evidence, that a significant number of ordinary consumers make a mental association between the accused mark and the famous mark. Thus, if the ordinary prospective purchaser, upon encountering the junior user's mark which is the same as the famous mark, is, because of the context, not likely to even think of the famous mark, then there is no 'association' between the marks and dilution by blurring cannot occur.

*Id.* § 24:120.

685. The necessary "association" must arise from the similarity of the conflicting marks, and "cannot be created just because the two products possess some similar characteristics." *Id.* § 24:117.

686. Here, no evidence in the record demonstrated an actual association between Dairy Queen's BLIZZARD® treat and W.B. Mason's Blizzard spring water. Dairy Queen appears to concede as much, noting that Dr. Joachimsthaler's testimony regarding his branding methodology demonstrated that association is "*likely*." (Pl.'s Proposed CoL ¶ 138) (emphasis added).

687. Absent first-hand testimony, evidence of actual confusion can be demonstrated through empirical survey evidence, and some courts have found the absence of such survey evidence to militate against finding a likelihood of dilution. *See, e.g., Nissan Motor Co. v. Nissan Comput. Corp.*, No. CV99-12980 DDP, 2007 WL 9374946, at *15 (C.D. Cal. 2007) (finding plaintiff's failure to conduct a "simple and obvious" dilution survey is a "significant omission" that caused actual association—the "most important" factor—to "weigh[] heavily" in defendant's favor); *Miss Universe, L.P., LLLP v. Villegas*, 672 F. Supp. 2d 575, 595 (S.D.N.Y. 2009) (granting defendants summary judgment on dilution claim in part because "evidence, in the form of surveys or polls, is commonly collected in cases like this one" but was "conspicuous[ly] absen[t]" here).

688. Dairy Queen offered no first-hand testimony, nor did its expert, Dr. Joachimsthaler, conduct an association survey. Dairy Queen appears to concede that it has no evidence of an actual association, as it points to Dr. Joachimsthaler's testimony to assert that his branding methodology "demonstrated that association and harm is *likely*." (Pl.'s Proposed CoL ¶ 138) (emphasis added).

689. Dr. Joachimsthaler testified that consumer association was most likely to occur in several situations where consumers other than office supply purchasers view the individual water bottles. (Tr. at 1111:15-1112:16.) He opined that there are "so many variations" of situations in which consumers could see the Blizzard water bottle label and associate it with Dairy Queen's BLIZZARD®. (Tr. at 1112:7-16.) Dr. Joachimsthaler also opined that because the BLIZZARD word dominates W.B. Mason's spring water label,

consumers are likely to falsely associate the product with Dairy Queen's BLIZZARD® treat, despite the presence of house marks. (Tr. at 1289:2-20.)

690. Actual association cannot be established by speculative predictions about theoretical or possible associations, however. *See Nissan Motor Co.*, 2007 WL 9374946, at *16 (citing McCarthy § 24:67 (4th ed. 2006) ("Even the probability of dilution should be proven by evidence, not just by theoretical assumptions about what possibly could occur or what might happen")). The Court finds that Dr. Joachimsthaler's testimony regarding association between the two products was speculative and accords no weight to it for purposes of this factor.

691. In addition, some courts have found that the inability to present any evidence of actual association after many years of co-existence of the marks constitutes strong evidence of no actual association between the marks. *See Century 21 Real Estate LLC v. Century Sur. Co.*, No. CIV-030053-PHX-SMM, 2007 WL 433579, at *5 (D. Ariz. Feb. 6, 2007), *aff'd*, 300 F. App'x 527 (9th Cir. 2008) (affirming summary judgment and finding plaintiff's inability to produce evidence of association during 15 years of coexistence favored defendant "overwhelmingly"); *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1539 (9th Cir. 1989) (upholding district court decision that parties' concurrent use of marks at issue for 25 years "effectively precluded a finding that the value of [plaintiff's] trade name could be diluted).

692. In sum, there is no evidence of actual association here, either through first-hand testimony or surveys, despite the 11-year coexistence of Dairy Queen's

BLIZZARD® and W.B. Mason's Blizzard spring water. This factor weighs in W.B. Mason's favor.

**G. Likelihood of Impairment of Famous Mark's Distinctiveness**

693. As noted, a TDRA claim for dilution by blurring requires proof of the likelihood that the defendant's use "impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B) (stating that "'dilution by blurring' is an association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark.") (emphasis added); *see also Prairie Island*, 2020 WL 7490034, at *4 (stating that the likelihood of impairment of distinctiveness is another factor relevant to a dilution claim).

694. Expert testimony and/or survey evidence can be used to demonstrate the likelihood of impairment. McCarthy § 24:131.

695. Dairy Queen offered Dr. Joachimsthaler's expert opinion that W.B. Mason's use of BLIZZARD is likely to cause harm to Dairy Queen's BLIZZARD® brand. (Tr. at 1107:13-1109:13.) He opined that when a brand uses a similar or identical mark, such as BLIZZARD, but with a different brand personality, it causes activation spreading that weakens the senior mark. (*Id.*)

696. Dr. Joachimsthaler also examined pictures of ice cream shops that sold Blizzard spring water and testified that activation spreading in the form of false recognition and harm was very likely to take place in this context. (Tr. at 1109:18-1110:19.)

697. He further testified that consumers are familiar with businesses extending their brands to bottled water, and Dairy Queen consumers would be more likely to expect that a BLIZZARD branded water bottle comes from Dairy Queen. (Tr. at 2191:11-16.)

698. In addition, Dr. Joachimsthaler testified that issues related to water quality, such as possible contamination, could potentially occur with respect to W.B. Mason's spring water, which could harm Dairy Queen's BLIZZARD® brand through activation spreading. (Tr. at 1117:16-1118:4.)

699. Dr. Joachimsthaler did not support his opinions with empirical testing.

700. In response to Dr. Joachimsthaler's opinion that activation spreading between the two products is likely to impair Dairy Queen's BLIZZARD® mark, Professor Hoyer testified credibly that "blizzard" is a common word and due to the prevalence of BLIZZARD among numerous third-party brands, consumers have learned to distinguish among them. (Tr. at 1508:20-1509:2.) He further opined that Dairy Queen's BLIZZARD® mark has "strong brand equity" and because Dairy Queen has "engaged in a lot of solid marketing activities over the years through good product differentiation, through advertising, [and] through strong promotion," it has "been very successful in differentiating" the BLIZZARD® brand. (Tr. at 1509:3-13.)

701. He noted that the parties' uses of their respective house marks on their products further distinguishes them, with Dairy Queen's BLIZZARD® logo announcing its singular availability at Dairy Queen by stating, "THE ORIGINAL ONLY AT DQ." (Tr. at 1509:3-1510:6.) Furthermore, Professor Hoyer testified that the two products were

further distinguishable based on their different purchase contexts and consumption experiences. (Tr. at 1520:11-1526:7.)

702. Dr. Joachimsthaler acknowledged that many third parties use the BLIZZARD name, but he opined that W.B. Mason's use of the word on its spring water is nonetheless likely to cause Dairy Queen harm because, from a consumer perspective, they are in related product categories. (Tr. at 1122:5-1125:21.) While Dr. Joachimsthaler was able to offer this opinion on relatedness, he was unable to explain his methodology for that opinion because he had failed to previously disclose it. (Tr. at 2191:1-2192:3.) Moreover, Professor Hoyer testified that the BLIZZARD® treat occupies the frozen dairy dessert product category, whereas Blizzard spring water occupies the beverage category, and he found these categories to be removed and non-adjacent. (Tr. at 1517:1-1518:21.)

703. The Court finds Professor Hoyer's testimony credible that consumers are able to distinguish among the many third-party uses of BLIZZARD, whereas Dr. Joachimsthaler's contrary opinion was unsupported by any methodology. While Dr. Joachimsthaler's testimony might have been buttressed by a dilution survey, he did not conduct a survey.

704. By contrast, Ms. Butler conducted a dilution survey that utilized a "test, retest" or "before-and-after" format that took into account third-party use of BLIZZARD. (Tr. at 1733:8-14.) While the Court appreciates that it is difficult to survey for dilution, since dilution is a process that generally occurs over time, the Court accounts for that by giving slightly less weight to Butler's dilution survey. However, her survey found that consumers continued to associate the new Dairy Queen BLIZZARD® logo with Dairy

Queen, after being shown W.B. Mason's Blizzard logo and several third-party BLIZZARD logos and McDonald's McFlurry logo. (Tr. at 1737:12-20; Exs. D-308, D-309.) Granted, Ms. Butler's dilution survey utilized the new Dairy Queen logo, whereas the relevant comparison is between W.B. Mason's Blizzard spring water logo. However, considering that the new Dairy Queen BLIZZARD® logo looks more like W.B. Mason's Blizzard logo, her findings using the new Dairy Queen BLIZZARD® logo would appear to lend support to her findings. In any event, the Court has appropriately discounted aspects of her dilution survey, but still finds it supports a finding of no likelihood of dilution.

705. The Court is also unpersuaded by Dr. Joachimsthaler's opinion that false recognition and harm are likely to occur in the context of ice cream shops selling Blizzard spring water because evidence of such sales is *de minimis*.

706. The Court finds Dr. Joachimsthaler's opinion that Dairy Queen's BLIZZARD® mark might be impaired by the sale of possibly contaminated Blizzard spring water to be entirely speculative.

707. Notably, Dairy Queen's Vice President of Brand & Product Marketing, Ms. Kenny, testified that she was unaware of any evidence suggesting that brand awareness of Dairy Queen's BLIZZARD® had suffered as a result of W.B. Mason's use of BLIZZARD, or that consumer perceptions of the quality and consistency of Dairy Queen's BLIZZARD® had diminished as a result of W.B. Mason's Blizzard spring water. (Tr. at 381:24-382:9.) Ms. Kenny was likewise unaware of any evidence that the strength and cohesiveness of Dairy Queen's image had been harmed as a result of W.B. Mason using BLIZZARD on spring water, or that Dairy Queen had lost brand credibility and resonance

in the marketplace as a result of W.B. Mason's Blizzard spring water. (Tr. at 383:16-25.) In addition, Ms. Kenny could point to no evidence suggesting that Dairy Queen's ability to leverage its brand to drive awareness and do business had been damaged as a result of W.B. Mason's spring water, or that Dairy Queen had to increase its marketing expenditures to counter any damage that Dairy Queen had suffered as a result of W.B. Mason's Blizzard spring water. (Tr. at 384:1-10.)

708. Dr. Joachimsthaler also opined that Dairy Queen's BLIZZARD® is a "very, very strong brand," (Tr. at 1084:9-10), and he acknowledged that 2020 was a banner year for sales of the Dairy Queen BLIZZARD® treat. (Tr. at 1297:6-8.)

709. After 11 years of coexistence between Dairy Queen's BLIZZARD® and W.B. Mason's Blizzard spring water one would expect any "likely" harm or impairment to have manifested after such a long period of co-existence.

710. Accordingly, for all of the foregoing reasons, the Court finds that Dairy Queen has not demonstrated the likelihood of impairment of its mark's distinctiveness.

**H. Balancing the Factors**

711. In sum, even if the Court assumes without deciding that Dairy Queen's BLIZZARD® mark is famous, Dairy Queen has failed to demonstrate by a preponderance of the evidence that W.B. Mason's use of Blizzard spring water is likely to impair the distinctiveness of Dairy Queen's BLIZZARD® mark, such that it is likely to cause dilution by blurring.

712. Applying the enumerated TDRA factors relevant to dilution by blurring, 15 U.S.C. § 1125(c)(2)(B), the Court finds that although the products share the name

BLIZZARD, their overall impressions are not very similar due to the presence of house marks as well as differences in color (with Dairy Queen using a gold color), font, and straight or staggered text. This factor weighs in W.B. Mason's favor.

713. Although Dairy Queen's BLIZZARD® mark is suggestive, for which it enjoys a presumption of distinctiveness, and it generally engages in frequent trademark enforcement against BLIZZARD-branded consumable goods, the Court finds that its exclusivity is significantly lessened by the fact that it is a common word, and exists in a crowded field of substantial third-party use. If the third-party product or service is not a consumable, Dairy Queen selectively chooses not to contest or enforce the BLIZZARD mark. And although it is rare, even when the product is a consumable, Dairy Queen has sometimes chosen not to contest or enforce the BLIZZARD mark, as with Disney's BLIZZARD-branded items at Blizzard Beach, and with Blizzard Wines. (Tr. at 1618:19-1619:8; 1625:13-19.)

714. In response to Ms. Butler's word-association survey, asking "What, if anything, does 'BLIZZARD' call to mind or make you think of?", 82% of respondents answered "snow, a storm, windy or cold weather"—the common meaning of the word—and 39% said "Dairy Queen" or "ice cream/frozen treats" (25% specified "Dairy Queen," while 14% said "ice cream or frozen treats"). (Ex. P-78, Table 3; Tr. at 684:2-9, 687:2-6, 1749:20-1750:1.) As noted, the Eighth Circuit has advised caution when applying anti-dilution law to common words. *See Viacom Inc.*,141 F.3d at 892 (that "Viacom is seeking a complete monopoly on the use of a rather common word [BLOCKBUSTER] with multiple meanings [where the parties' marks are both suggestive of their respective

products] would make us hesitate to uphold summary judgment on its dilution-by-blurring claim"); *see also Duluth News-Tribune*, 84 F.3d at 1099-1100 ("Plaintiff cannot expect to acquire exclusive use . . . of the common words 'news' and 'tribune'").

715. It is true that many of the third-party uses of BLIZZARD involve unrelated products, but some are used in the consumable context with commercial success, such as Blizzard Wines and the Blizzard Burger and Blue Blizzard Margarita sold at Disney's Blizzard Beach. And some third-party users, such as the Alexandria Blizzard Hockey Team, have actively created an association with Dairy Queen, by throwing BLIZZARD® treats into the stands after hockey games and using a co-branded player tunnel. (Tr. at 2016:13-2017:1; D-224.) Further, the Court cannot overlook the magnitude of Blizzard Entertainment's presence in the marketplace, with its $1.1 billion in revenue in 2020, its exclusive use of blizzard.com, and the fact that when the term "blizzard" is searched on the Google search engine, Blizzard Entertainment is the first result. (Tr. at 607:12-14, 608:1-7, 610:11-17.) Moreover, Ms. Kenny testified that Dairy Queen and Blizzard Entertainment have a "shared interest" in defending the BLIZZARD mark, (Tr. at 334:9-336:9), which undercuts Dairy Queen's position on substantially exclusive use.

716. As to Dr. Joachimsthaler's opinion regarding Dairy Queen's substantially exclusive use of BLIZZARD, he conducted no surveys nor attempted to measure dilution among consumers, and to the extent he attempted to rebut Professor Hoyer's opinion by utilizing Brand Keys' services, he had no knowledge of the questions that Brand Keys asked of consumers, and apparently only sought to purchase their information if it supported his opinion.

717. For all of these reasons, the Court finds that Dairy Queen has not established substantially exclusive use of the BLIZZARD mark.

718. As to the degree of recognition of the Dairy Queen BLIZZARD® mark, which contains Dairy Queen's house mark, again, the Court finds that Dairy Queen has obtained a high degree of recognition, which weighs in Dairy Queen's favor.

719. With respect to the factor of intent, the evidence shows that W.B. Mason did not intend to create an association with Dairy Queen's BLIZZARD® mark. Rather, W.B. Mason applied its existing Blizzard® copy paper brand to its spring water, both of which it sells in bulk to businesses. W.B. Mason's CEO, Mr. Meehan, credibly testified that he believed the products shared bright and crisp qualities, and he hoped to build upon consumer recognition of W.B. Mason's Blizzard® copy paper brand when it introduced its spring water as part of its office break room products. Prior to this lawsuit, Mr. Meehan was unfamiliar with the Dairy Queen BLIZZARD® treat. Moreover, he testified that W.B. Mason would not enjoy any commercial gain by associating its spring water with Dairy Queen's BLIZZARD®, or confusing consumers as to the product's origin, given the different attributes between healthy spring water and an indulgent, high-caloric treat. Accordingly, the factor of intent weighs in W.B. Mason's favor.

720. Dairy Queen introduced no evidence of an actual association between the two products. The Court finds this particularly compelling, given 11 years of the products' coexistence in the marketplace. If association were to occur, in all likelihood, it would have occurred by now. Dr. Joachimsthaler conducted no empirical testing of association,

and instead offered a speculative opinion on consumer association, based on hypothetical scenarios, which the Court rejects. This factor weighs in W.B. Mason's favor.

721. Finally, the Court considers whether W.B. Mason's Blizzard spring water mark is likely to impair the distinctiveness of Dairy Queen's BLIZZARD® mark. Again, while Daily Queen offered Dr. Joachimsthaler's opinion on harm, he did not support his opinion with any empirical testing. Moreover, there is no evidence in the record of any financial harm to Dairy Queen, after 11 years of marketplace coexistence with W.B. Mason's Blizzard water—a type of impairment that might be expected after over a decade.

722. A reasonable explanation for the lack of impairment to Dairy Queen, and the lack of any actual association between the two products, is found in Professor Hoyer's testimony, in which he lauded Dairy Queen's success at distinguishing its BLIZZARD® brand among a crowded field of BLIZZARD brands through "a lot of solid marketing activities," and "through good product differentiation, through advertising, [and] through strong promotion." (Tr. at 1509:3-13.) Indeed, Dairy Queen's BLIZZARD® mark contains the phrase "THE ORIGINAL BLIZZARD ONLY AT DQ," explicitly informing consumers of the only place to obtain a BLIZZARD® treat. (Ex. D-238.)

723. On balance, the Court finds that the factors relevant to dilution by blurring weigh against Dairy Queen, which has failed to prove its claim by a preponderance of the evidence. Even assuming the fame of Dairy Queen's BLIZZARD®, its recognition, and a presumption of distinctiveness, the Court finds that the two marks in question have little similarity, Dairy Queen does not enjoy substantially exclusive use of the mark, there is no evidence of W.B. Mason's intent to dilute Dairy Queen's mark, there is no evidence of

actual consumer association between Dairy Queen's BLIZZARD® treat and W.B. Mason's Blizzard spring water after 11 years of coexistence in the marketplace, and Dairy Queen has not demonstrated the likelihood of impairment of its BLIZZARD® mark.

724. In addition, the Court again notes that Lanham Act claims are "equitable in nature." *Masters*, 631 F.3d at 471. Specifically, the TDRA expressly conditions injunctive relief for dilution by blurring on the "principles of equity." 15 U.S.C. § 1125(c)(1). As the Court has noted in its balancing of the factors relevant to Dairy Queen's trademark infringement claim, the fact that Dairy Queen changed its BLIZZARD® logo to look more like W.B. Mason's Blizzard logo, with full knowledge of the parties' dispute, weighs against awarding it relief under the TDRA. While the Court has declined to compare the new BLIZZARD® logo to W.B. Mason's Blizzard logo with respect to Dairy Queen's claims, Dairy Queen's change in logo, and the timing of that change, suggests that it was not concerned about the dilution of its mark.

725. For all of these reasons, the Court enters judgment in favor of W.B. Mason on Count 3 of the Complaint.

## IV. STATE LAW CLAIMS

726. Because Dairy Queen's common law unfair competition and deceptive trade practices claims under Minnesota law (Compl., Counts 4 & 5), require the same likelihood of confusion analysis as Dairy Queen's Lanham Act claims, the Court's finding of no likelihood of confusion, and thus, no trademark infringement or unfair competition by false designation of origin under the Lanham Act, applies equally to Dairy Queen's state law claims. *DaimlerChrysler*, 315 F.3d at 935 (finding state and federal trademark

infringement claims were 'coextensive' and subject to the same analysis, negating need to discuss state law claims independently); *Wing Enter., Inc. v. Tricam Indus., Inc.*, 511 F. Supp. 3d 957, 964 (D. Minn. 2021) (noting that the Minnesota Deceptive Trade Practices Act "mirrors" the Lanham Act, and courts therefore use the same analysis to evaluate parallel claims that are simultaneously asserted under federal and state statutes); *Med Graphics Corp. v SensorMedics Corp.*, 872 F. Supp. 643, 649 (D. Minn. 1994) (noting that same analysis of false advertising claim under the Lanham Act applied to false advertising claim under the Minnesota Deceptive Trade Practices Act, as the state law claim mirrored the federal claim)).

727. Accordingly, based on the Court's findings above, the Court also finds that Dairy Queen has not proven by a preponderance of the evidence that W.B. Mason's use of BLIZZARD on spring water constitutes unfair competition and/or deceptive trade practices under Minnesota law. Therefore, the Court enters judgment in favor of W.B. Mason on Counts 4 and 5 of the Complaint.

## V. INJUNCTIVE RELIEF

728. This Court may grant an injunction "to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection . . . (c) . . . of section 1125 of this title." 15 U.S.C. § 1116(a). As noted, Dairy Queen's Lanham Act claims arise under § 1125.

729. "The Court has wide discretion in fashioning an appropriate equitable remedy to prevent violations of Plaintiffs' trademark." *Zerorez Franchising System, Inc. v. Distinctive Cleaning, Inc.*, 103 F. Supp. 3d 1032, 1048 (D. Minn. 2015).

730. The Court may issue a permanent injunction for trademark infringement or trademark dilution if the plaintiff proves:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for the injury; (3) that, considering the balance of hardships between the plaintiff and defendant, an equitable remedy is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Roederer*, 732 F. Supp. 2d at 880-81 (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)); *Nike, Inc. v. Nikepal Int'l, Inc.*, No. 2:05-CV-1468-GEB-JFM, 2007 WL 2782030, at *8 (E.D. Cal. Sept. 18, 2007) (applying same *eBay* injunction standard to remedy for dilution under TDRA).

731. Based on the Court's finding of no likelihood of confusion or likelihood of dilution, there is no basis for granting Dairy Queen's request for injunctive relief. Nor is there a showing that Dairy Queen has suffered an irreparable injury, that monetary damages would be inadequate compensation if there were an injury, or that the public interest would be served by granting a permanent injunction. Further, as this Court has previously found, based on Dairy Queen's conduct in changing its logo to look more like W.B. Mason's logo, after filing this lawsuit, equitable relief is not warranted.

## **ORDER**

Dairy Queen has failed to prove, by a preponderance of the evidence, all of the elements of its claims for trademark infringement, trademark dilution, unfair competition by false designation of origin, as well as common law unfair competition and deceptive trade practices claims under Minnesota law. Accordingly, based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that

1. Judgment on Count 1 of the Complaint, for trademark infringement under 15 U.S.C. § 1114(1)(a), be entered in favor of Defendant.

2. Judgment on Count 2 of the Complaint, for unfair competition under 15 U.S.C. § 1125(a) by false designation of origin, be entered in favor of Defendant.

3. Judgment on Count 3 of the Complaint, for trademark dilution under 15 U.S.C. § 1125(c), be entered in favor of Defendant.

4. Judgment on Count 4 of the Complaint, for common law unfair competition, be entered in favor of Defendant.

5. Judgment on Count 5 of the Complaint, for deceptive trade practices under Minn. Stat. §§ 325D.44, be entered for Defendant.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: July 14, 2022

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge